Case Nos.:  **2:24-cv-02727-JMG**
**2:24-cv-06397-JMG**
**2:24-cv-06498-JMG**
**2:24-cv-06617-JMG**

_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

## IN THE MATTER OF: STREAM TV NETWORKS, INC., et al.

## APPEALS OF REMBRANDT 3D HOLDING LTD. AND VISUAL SEMICONDUCTOR, INC. FROM ORDERS ENTERED IN BANKR. E.D. Pa. No. 23-10763-AMC

## <u>APPELLEE'S SUPPLEMENTAL APPENDIX</u>

### Volume 1 of 2

Steven M. Coren, Esquire
**COREN & RESS, P.C.**
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 735-8700

Michael D. Vagnoni, Esquire
Edmond M. George, Esquire
**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066

*Counsel to Appellee William A. Homony, Chapter 11 Trustee*

| Docket No. | Date | Description | Appx. Pg Nos. |
|---|---|---|---|
| **Docket Entries from *In re: Stream TV Networks, Inc., et al.*, Bankr. E.D. Pa. No. 23-10763** |
| 53 | 3/29/2023 | Stream Schedule D: Creditors Who Have Claims Secured by Property | TA-001-TA-005 |
| 54 | 3/29/2023 | Stream Schedule E/F: Creditors Who Have Unsecured Claims | TA-006-TA-055 |
| 58 | 3/29/2023 | Stream Statement of Financial Affairs | TA-056-TA-068 |
| 548 | 1/5/2024 | Memorandum Opinion (the "Trustee Opinion") | TA-069-TA-146 |
| 630 | 5/6/2024 | Motion Of William A. Homony in His Capacity as Chapter 11 Trustee for Entry of an Order Approving a Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd., as Collateral Agent for the Secured Noteholders of Seecubic, Inc., Pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) | TA-147-TA-192 |
| 795 | 11/11/2024 | Praecipe to Substitute Exhibit "B" to Motion of William A. Homony in His Capacity as Chapter 11 Trustee for (i) an Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner Of Notice thereof and Scheduling a Sale by Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g), and (F) Granting Related Relief, and (ii) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief | TA-193 TA-243 |
| 834 | 11/29/2024 | Objection of William A. Homony, Chapter 11 Trustee, to Visual Semiconductor, Inc.'s Motion for Expedited Consideration, Shortened Time, and Limited Notice of | TA-244 TA-251 |

| Docket No. | Date | Description | Appx. Pg Nos. |
|---|---|---|---|
| | | Motion to Reconsider and/or Clarify November 14, 2024 Order Quashing the Remaining VSI Discovery | |
| 835 | 11/29/2024 | Omnibus Response of William A. Homony, in His Capacity as Chapter 11 Trustee, to the Objections to the Trustee's Motion for, inter alia, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief | TA-252 TA-420 |
| 845 | 12/2/2024 | Notice of No Auction to be Held and Selection of Successful Bidder | TA-421 TA-422 |
| 850 | 12/3/2024 | Declaration of William A. Homony in His Capacity as Chapter 11 Trustee, in Support of the Motion for Entry of an Order (A) Approving the Sale of the Debtors' assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief | TA-423 TA-428 |
| 852 | 12/3/2024 | Declaration of J. Scott Victor in Support of Chapter 11 Trustee's Motion for Entry of an Order (i) Authorizing and Approving, but Not Directing, the Sale of the Assets, in Each Case with Such Sale Being Free and Clear of Any and All Liens, Claims, Encumbrances and Interests, (ii) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, and (iii) Granting Related Relief | TA-429 TA-435 |
| 898 | 12/23/2024 | Motion of Visual Semiconductor, Inc. to Stay the Order (A) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing the Trustee to Enter Into and Perform Debtors' Obligations Under the Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief Pending Resolution of Appeal | TA-436 TA-668 |

| Docket No. | Date | Description | Appx. Pg Nos. |
|---|---|---|---|
| 906 | 12/30/2024 | Notice of Hybrid Hearing on Motion of Visual Semiconductor, Inc. to Stay the Order (A) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing the Trustee to Enter Into and Perform Debtors' Obligations Under the Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief Pending Resolution of Appeal | TA-669 TA-673 |
| 915 | 1/6/2025 | Notice of Closing on Sale of Substantially All of the Assets of Stream Tv Networks, Inc. and Technovative Media Inc. | TA-674 TA-675 |
| 938 | 1/29/2025 | Order | TA-676 TA-679 |
| N/A | 2/13/2025 | Stream Claims Register | TA-680 TA-684 |
| **Docket Entries from *In re: Technovative Media, Inc.*, Bankr. E.D. Pa. No. 23-10764** | | | |
| 1 | 3/15/2023 | Voluntary Petition for Non-Individuals Filing for Bankruptcy Technovative Media, Inc. | TA-685- TA-696 |
| 3 | 3/15/2023 | Technovative List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders | TA-697 TA-698 |
| 48 | 3/29/2023 | Technovative Schedule D: Creditors Who Have Claims Secured by Property | TA-699 TA-703 |
| 50 | 3/29/2023 | Technovative Schedule E/F: Creditors Who Have Unsecured Claims | TA-704 TA-708 |
| N/A | 2/13/2025 | Technovative Claims Register | TA-709 TA-710 |
| **Docket Entries from Visual Semiconductor, Inc., Petitioner, E.D. Pa. 24-06548** | | | |
| 1 | 12/9/2024 | Emergency Joint Petition for (i) Writ of Mandamus; (ii) Writ of Prohibition; (iii) Motion for Stay Pending Appeal; and (iv) in the Alternative, Motion for Withdrawal of Reference to Bankruptcy Court | TA-711 TA-787 |

| Docket No. | Date | Description | Appx. Pg Nos. |
|---|---|---|---|
| 9 | 12/11/2024 | Response in Opposition to Emergency Joint Petition for (i) Writ of Mandamus; (ii) Writ of Prohibition; (iii) Motion for Stay Pending Appeal; and (iv) in the Alternative, Motion for Withdrawal of Reference to Bankruptcy Court | TA-788 TA-829 |
| 16 | 12/12/2024 | Order | TA-830 TA-831 |

Respectfully submitted,

Dated: February 18, 2025

By: */s/ Steven M. Coren*
Steven M. Coren, Esquire
COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 735-8700

and

By: */s/ Michael D. Vagnoni*
Michael D. Vagnoni, Esquire
Edmond M. George, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066

*Counsel to the Trustee*

iv

**GLOBAL NOTES TO SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS OF
DEBTORS, STREAM TV NETWORKS, INC., CASE NO. 23-10763(mdc) AND
TECHNOVATIVE MEDIA, INC., CAUSE NO. 10764 (Joint Administration Requested)**

The Debtors develop their technology and conduct the majority of their business through their direct and indirect foreign and domestic subsidiaries. The Debtors provided capital to their direct and indirect foreign and domestic subsidiaries for the purpose of acquiring and developing assets and to conduct business operations. The Debtors direct interested parties to the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [Docket No. 48] ("Rajan Declaration") in which the Debtors' organizational and operational structure is described in greater detail.

In its bankruptcy schedules, the Debtors disclose and describe the assets, including their ownership interest in direct subsidiaries and their contracts, that the Debtors owned as of March 15, 2023 (the "Petition Date"). The Debtors' direct subsidiaries, in turn, hold or may hold ownership interests in the Debtors' indirect subsidiaries as depicted on the Debtor's Organization Chart included in the Rajans Declaration. The assets of the Debtors' direct and indirect subsidiaries are not included in the Debtors' bankruptcy schedules.

The Debtors intend to complete a recovery of assets which were previously and improperly transferred in contravention of express provisions of its corporate charter through an invalidated board settlement agreement as confirmed by the Delaware Supreme Court through an *en banc* unanimous decision on June 15, 2022. *See Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction").[1] The Delaware Supreme Court also held that the "agreement authorizing the secured creditors to transfer Stream's pledged assets . . . is **invalid** because Stream's unambiguous certificate of incorporation required the approval of Stream's Class B stockholders." *Id..* at p. 34. (emphasis added).

---

[1] A debt resolution committee of the Debtor's Board of Directors purporting to act on the Debtor's behalf reached an unauthorized settlement enshrined in an agreement titled as the Omnibus Agreement, dated May 6, 2021, between the Debtor's senior secured lender, SLS Holdings VI, LLC ("SLS") and the Debtor's debt resolution committee, which was which approved by the Delaware Court of Chancery and then held to be invalid by the Delaware Supreme Court on appeal.  Prior to the Delaware Supreme Court ruling the SLS Holdings and its newly formed company,

The new company formed by the purported secured lenders,[2] SeeCubic, Inc. ("SeeCubic"),[3] asserted an ownership interest in all of the Debtor's assets and took possession of, and in some cases, destroyed the Debtors' assets. The Chancery Court, on remand and with direction from the Delaware Supreme Court to effectuate the dismissal and vacating of its prior injunctive relief, has made it clear that the assets must be returned **both in title and possession to the Debtors.**[4] Furthermore, the Chancery Court on August 10, 2022, issued an *Order Granting Partial Final Judgment* in favor of the Debtor. The order stated: "Pending transfer of the Assets from SeeCubic to Stream, SeeCubic and all those acting in concert with it shall not use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream." Rajan Declaration, Exhibit BB. Despite these clear directives, the purported secured lenders have resisted and continue to resist return of the assets.

The Debtors have also been alerted to SeeCubic's violation of intellectual property licenses which were held by the Debtors and were non-transferable, actions violating third party rights under applicable Federal and state law which cannot be remedied or cleansed by the invalidated settlement, even prior to its invalidation by the Delaware Supreme Court. Even before the Omnibus Agreement was invalidated, the transfers themselves were invalid under both a Phillips license to the Debtors and a Rembrandt 3D Holding Ltd. ("Rembrandt") license, both parties not subject to the settlement or any now invalidated injunctive relief by the Chancery Court.[5]

The Debtors have been subjected to continuous damage by the purported secured creditors, even after the Supreme Court decision. SeeCubic, the purported lenders, and Mr. Shad Stastney of SeeCubic and SLS, were held in contempt by the Delaware Court of Chancery in October 2022 for their orchestrated efforts to seize control of the Debtor's subsidiary, TechnoVative Media, Inc.,

---

[2] The Debtors contend that SLS Holdings VI, LLC ("SLS") and Hawk Investment Holdings Limited ("Hawk") hold secured debt convertible to equity or must pursue their claims in chapter 11 where they will be paid in full, if their claims are allowed.

[3] SeeCubic, Inc., a Delaware entity, took its name from a foreign Dutch subsidiary of the Debtors, SeeCubic B.V. (The Netherlands) ("SCBV") and is likely in violation of trademark laws protecting the Debtors and its foreign subsidiary).

[4] On August 9, 2022, nearly 8 weeks after the Delaware Supreme Court opinion, the Chancery Court issued a TRO against SeeCubic. Vice Chancellor Laster specifically stated his expectations: "SeeCubic will restore Stream's assets to Stream in accordance with the Rule 54(b) order. Once this has occurred, SeeCubic may seek to exercise any creditor's rights it possesses against Stream. SeeCubic must do so based on a status quo where Stream has title to and possession of its assets, not a status quo in which SeeCubic acquired possession based on a decision that the Delaware Supreme Court has held is erroneous."

[5] On February 21, 2023, Rembrandt filed suit in the U.S. District Court for the District of Delaware against parties using the Ultra-D technology without a Rembrandt license. It sued TechnoVative USA, which was under the direction of the Chancery Court-appointed Receiver, Hawk, and SeeCubic for trade secret violations and injunctive relief to prevent the sale of Stream's assets *Rembrandt 3D Holding Ltd v Technovative Media, Inc., Hawk Investment Holdings Ltd. and SeeCubic, Inc.*

in the months after the Supreme Court decision. In ¶ 3 of his October 3, 2022 Opinion, Vice Chancellor Laster wrote: "This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk." *See* Rajan Declaration, Exhibit AA.

SLS and SeeCubic possess some and claim to have obtained possession or control of other of the Debtor's assets before the Petition Date. The Debtor's investigation into the location and condition of its assets is ongoing. The Debtors have listed the assets that they believe they continue to own, unless otherwise expressly indicated in its bankruptcy schedules. The Debtors intend to pursue recovery of assets and to operate their business under the provisions of the Bankruptcy Code in this case.

Additional Notes:

1.     Because US GAAP treatment may not apply to the Debtor's assets located in foreign jurisdictions, the values provided for certain assets may differ from typical accounting standards.

2.     Funding advanced by the Debtors to their direct and indirect subsidiaries are reflected in intercompany loans.

3.     The Debtors' goodwill and similar intangible value is not reflected in the Debtors' bankruptcy schedules.

4.     SeeCubic BV (the Netherlands) is a subsidiary of the Debtors, SeeCubic BV (the Netherlands) is unrelated to and is a separate entity from SeeCubic Inc., a company newly formed in Delaware by SLS Holdings, Inc.

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor name | **Stream TV Networks, Inc.** |
| United States Bankruptcy Court for the: | **EASTERN DIST. OF PENNSYLVANIA** |
| Case number (if known) | **23-10763** |

☐ Check if this is an amended filing

Official Form 206D

## Schedule D: Creditors Who Have Claims Secured by Property                    12/15

Be as complete and accurate as possible.

1. **Do any creditors have claims secured by debtor's property?**
   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   ☑ Yes. Fill in all of the information below.

| **Part 1:** | **List Creditors Who Have Secured Claims** |
|---|---|

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | Column A **Amount of claim** Do not deduct the value of collateral. | Column B **Value of collateral that supports this claim** |
|---|---|---|---|
| **2.1** Creditor's name **Dell Financial Services, LLC** | Describe debtor's property that is subject to a lien **Dell Computer Servers** | $77,340.57 | $77,340.57 |
| Creditor's mailing address **Mail Stop-PS2DF-23** **One Dell Way** | Describe the lien **UCC / Agreement** | | |
| **Round Rock        TX    78682** | Is the creditor an insider or related party? ☑ No  ☐ Yes | | |
| Creditor's email address, if known | Is anyone else liable on this claim? ☑ No  ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) | | |
| Date debt was incurred **12/04/2018** Last 4 digits of account number **6  9  3  1** | As of the petition filing date, the claim is: Check all that apply. | | |
| Do multiple creditors have an interest in the same property? ☑ No ☐ Yes. Specify each creditor, including this creditor, and its relative priority. | ☐ Contingent ☐ Unliquidated ☐ Disputed | | |

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.** $6,885,121.57

**TA-004**

Debtor    **Stream TV Networks, Inc.** _____    Case number (if known) **23-10763**

| Part 1: | Additional Page | | | | Column A **Amount of claim** Do not deduct the value of collateral. | Column B **Value of collateral that supports this claim** |
|---|---|---|---|---|---|---|

Copy this page only if more space is needed.  Continue numbering the lines
sequentially from the previous page.

**2.2**

**Creditor's name**
**SLS Holdings VI, LLC**

**Creditor's mailing address**
**Attn: Shad Stastney**

**392 Taylor Mills Road**

_____

**Marlboro          NJ    07746**

**Creditor's email address, if known**

_____

**Date debt was incurred    2011-2012**

**Last 4 digits of account
number**         ___ ___ ___ ___

**Do multiple creditors have an interest in
the same property?**

☑ No

☐ Yes.  Have you already specified the
        relative priority?

   ☐ No.  Specify each creditor, including this
           creditor, and its relative priority.

   ☐ Yes.  The relative priority of creditors is
           specified on lines  _____

**Describe debtor's property that is
subject to a lien**
**All assets**

**Describe the lien**
**loan/investment / Agreement**

_____

**Is the creditor an insider or related party?**

☑ No
☐ Yes

**Is anyone else liable on this claim?**

☑ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply.

☐ Contingent
☐ Unliquidated
☑ Disputed

|  | $6,807,781.00 | $6,807,781.00 |
|---|---|---|

**TA-005**

**GLOBAL NOTES TO SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS OF DEBTORS, STREAM TV NETWORKS, INC., CASE NO. 23-10763(mdc) AND TECHNOVATIVE MEDIA, INC., CAUSE NO. 10764 (Joint Administration Requested)**

The Debtors develop their technology and conduct the majority of their business through their direct and indirect foreign and domestic subsidiaries. The Debtors provided capital to their direct and indirect foreign and domestic subsidiaries for the purpose of acquiring and developing assets and to conduct business operations. The Debtors direct interested parties to the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [Docket No. 48] ("Rajan Declaration") in which the Debtors' organizational and operational structure is described in greater detail.

In its bankruptcy schedules, the Debtors disclose and describe the assets, including their ownership interest in direct subsidiaries and their contracts, that the Debtors owned as of March 15, 2023 (the "Petition Date"). The Debtors' direct subsidiaries, in turn, hold or may hold ownership interests in the Debtors' indirect subsidiaries as depicted on the Debtor's Organization Chart included in the Rajans Declaration. The assets of the Debtors' direct and indirect subsidiaries are not included in the Debtors' bankruptcy schedules.

The Debtors intend to complete a recovery of assets which were previously and improperly transferred in contravention of express provisions of its corporate charter through an invalidated board settlement agreement as confirmed by the Delaware Supreme Court through an *en banc* unanimous decision on June 15, 2022. *See Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction").[1] The Delaware Supreme Court also held that the "agreement authorizing the secured creditors to transfer Stream's pledged assets . . . is **invalid** because Stream's unambiguous certificate of incorporation required the approval of Stream's Class B stockholders." *Id.*. at p. 34. (emphasis added).

---

[1] A debt resolution committee of the Debtor's Board of Directors purporting to act on the Debtor's behalf reached an unauthorized settlement enshrined in an agreement titled as the Omnibus Agreement, dated May 6, 2021, between the Debtor's senior secured lender, SLS Holdings VI, LLC ("SLS") and the Debtor's debt resolution committee, which was which approved by the Delaware Court of Chancery and then held to be invalid by the Delaware Supreme Court on appeal. Prior to the Delaware Supreme Court ruling the SLS Holdings and its newly formed company,

The new company formed by the purported secured lenders,[2] SeeCubic, Inc. ("SeeCubic"),[3] asserted an ownership interest in all of the Debtor's assets and took possession of, and in some cases, destroyed the Debtor's assets. The Chancery Court, on remand and with direction from the Delaware Supreme Court to effectuate the dismissal and vacating of its prior injunctive relief, has made it clear that the assets must be returned **both in title and possession to the Debtors.**[4] Furthermore, the Chancery Court on August 10, 2022, issued an *Order Granting Partial Final Judgment* in favor of the Debtor. The order stated: "Pending transfer of the Assets from SeeCubic to Stream, SeeCubic and all those acting in concert with it shall not use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream." Rajan Declaration, Exhibit BB.  Despite these clear directives, the purported secured lenders have resisted and continue to resist return of the assets.

The Debtors have also been alerted to SeeCubic's violation of intellectual property licenses which were held by the Debtors and were non-transferable, actions violating third party rights under applicable Federal and state law which cannot be remedied or cleansed by the invalidated settlement, even prior to its invalidation by the Delaware Supreme Court.  Even before the Omnibus Agreement was invalidated, the transfers themselves were invalid under both a Phillips license to the Debtors and a Rembrandt 3D Holding Ltd. ("Rembrandt") license, both parties not subject to the settlement or any now invalidated injunctive relief by the Chancery Court.[5]

The Debtors have been subjected to continuous damage by the purported secured creditors, even after the Supreme Court decision.  SeeCubic, the purported lenders, and Mr. Shad Stastney of SeeCubic and SLS, were held in contempt by the Delaware Court of Chancery in October 2022 for their orchestrated efforts to seize control of the Debtor's subsidiary, TechnoVative Media, Inc.,

---

[2] The Debtors contend that SLS Holdings VI, LLC ("SLS") and Hawk Investment Holdings Limited ("Hawk") hold secured debt convertible to equity or must pursue their claims in chapter 11 where they will be paid in full, if their claims are allowed.

[3] SeeCubic, Inc., a Delaware entity, took its name from a foreign Dutch subsidiary of the Debtors, SeeCubic B.V. (The Netherlands) ("SCBV")  and is likely in violation of trademark laws protecting the Debtors and its foreign subsidiary).

[4] On August 9, 2022, nearly 8 weeks after the Delaware Supreme Court opinion, the Chancery Court issued a TRO against SeeCubic. Vice Chancellor Laster specifically stated his expectations: "SeeCubic will restore Stream's assets to Stream in accordance with the Rule 54(b) order. Once this has occurred, SeeCubic may seek to exercise any creditor's rights it possesses against Stream. SeeCubic must do so based on a status quo where Stream has title to and possession of its assets, not a status quo in which SeeCubic acquired possession based on a decision that the Delaware Supreme Court has held is erroneous."

[5] On February 21, 2023, Rembrandt filed suit in the U.S. District Court for the District of Delaware against parties using the Ultra-D technology without a Rembrandt license. It sued TechnoVative USA, which was under the direction of the Chancery Court-appointed Receiver, Hawk, and SeeCubic for trade secret violations and injunctive relief to prevent the sale of Stream's assets *Rembrandt 3D Holding Ltd v Technovative Media, Inc., Hawk Investment Holdings Ltd. and SeeCubic, Inc.*

in the months after the Supreme Court decision. In ¶ 3 of his October 3, 2022 Opinion, Vice Chancellor Laster wrote: "This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk." *See* Rajan Declaration, Exhibit AA.

SLS and SeeCubic possess some and claim to have obtained possession or control of other of the Debtor's assets before the Petition Date. The Debtor's investigation into the location and condition of its assets is ongoing. The Debtors have listed the assets that they believe they continue to own, unless otherwise expressly indicated in its bankruptcy schedules. The Debtors intend to pursue recovery of assets and to operate their business under the provisions of the Bankruptcy Code in this case.

Additional Notes:

1.    Because US GAAP treatment may not apply to the Debtor's assets located in foreign jurisdictions, the values provided for certain assets may differ from typical accounting standards.

2.    Funding advanced by the Debtors to their direct and indirect subsidiaries are reflected in intercompany loans.

3.    The Debtors' goodwill and similar intangible value is not reflected in the Debtors' bankruptcy schedules.

4.    SeeCubic BV (the Netherlands) is a subsidiary of the Debtors, SeeCubic BV (the Netherlands) is unrelated to and is a separate entity from SeeCubic Inc., a company newly formed in Delaware by SLS Holdings, Inc.

| Fill in this information to identify the case: | |
|---|---|
| Debtor | **Stream TV Networks, Inc.** |
| United States Bankruptcy Court for the: | **EASTERN DIST. OF PENNSYLVANIA** |
| Case number (if known) | **23-10763** |

☐ Check if this is an amended filing

Official Form 206E/F

## Schedule E/F: Creditors Who Have Unsecured Claims                    12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

| **Part 1:** | **List All Creditors with PRIORITY Unsecured Claims** |
|---|---|

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

    ☐ No. Go to Part 2.
    ☑ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or part.**
   If more space is needed for priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  |  | Total claim | Priority amount |
|---|---|---|---|

**2.1**  Priority creditor's name and mailing address

**California Department of**
**Tax and Fee Adm**
**Account Info. Group, MIC 29**
PO Box 942879
**Sacramento**          **CA**    **94279-0029**

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account number    __ __ __ __

Specify Code subsection of PRIORITY unsecured claim:  11 U.S.C. § 507(a)(  **8**  )

As of the petition filing date, the claim is: *Check all that apply.*
☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Disability insurance**

Is the claim subject to offset?
☑ No
☐ Yes

Total claim: **$2,688.27**        Priority amount: **$2,688.27**

**2.2**  Priority creditor's name and mailing address

**Internal Revenue Service**
PO Box 7346

**Philadelphia**          **PA**    **19101-7346**

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account number    __ __ __ __

Specify Code subsection of PRIORITY unsecured claim:  11 U.S.C. § 507(a)(  **8**  )

As of the petition filing date, the claim is: *Check all that apply.*
☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Medicare**

Is the claim subject to offset?
☑ No
☐ Yes

Total claim: **$8,805.72**        Priority amount: **$8,805.72**

TA-009

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |
|---|---|---|---|

| **Part 1:** | **Additional Page** |
|---|---|

Copy this page if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional PRIORITY creditors exist, do not fill out or submit this page.

|  | **Total claim** | **Priority amount** |
|---|---|---|

**2.3**   Priority creditor's name and mailing address

**Internal Revenue Service**

**PO Box 7346**

_____

**Philadelphia**          **PA**    **19101-7346**

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account
number      ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured
claim:   11 U.S.C. § 507(a)( **8** )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Medicare employer portion**

Is the claim subject to offset?

☑ No
☐ Yes

Total claim: **$8,805.72**   Priority amount: **$8,805.72**

---

**2.4**   Priority creditor's name and mailing address

**Internal Revenue Service**

**PO Box 7346**

_____

**Philadelphia**          **PA**    **19101-7346**

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account
number      ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured
claim:   11 U.S.C. § 507(a)( **8** )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Social Security employee portion**

Is the claim subject to offset?

☑ No
☐ Yes

Total claim: **$32,006.82**   Priority amount: **$32,006.82**

---

**2.5**   Priority creditor's name and mailing address

**Internal Revenue Service**

**PO Box 7346**

_____

**Philadelphia**          **PA**    **19101-7346**

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account
number      ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured
claim:   11 U.S.C. § 507(a)( **8** )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Income taxes**

Is the claim subject to offset?

☑ No
☐ Yes

Total claim: **$69,097.66**   Priority amount: **$69,097.66**

**TA-010**

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |
|---|---|---|---|

| **Part 1:** | **Additional Page** |
|---|---|

Copy this page if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional PRIORITY creditors exist, do not fill out or submit this page.

| | | **Total claim** | **Priority amount** |
|---|---|---|---|

---

**2.6**   Priority creditor's name and mailing address

**Internal Revenue Service**

**PO Box 7346**

_____

| **Philadelphia** | **PA** | **19101-7346** |

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account
number   ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)(   **8**   )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Social Security Employer Portion**

Is the claim subject to offset?

☑ No
☐ Yes

**Total claim** $32,006.82    **Priority amount** $32,006.82

---

**2.7**   Priority creditor's name and mailing address

**Internal Revenue Service**

**PO Box 7346**

_____

| **Philadelphia** | **PA** | **19101-7346** |

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account
number   ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)(   **8**   )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**941/944**

Is the claim subject to offset?

☑ No
☐ Yes

**Total claim** $4,580.49    **Priority amount** $4,580.49

---

**2.8**   Priority creditor's name and mailing address

**Internal Revenue Service**

**PO Box 7346**

_____

| **Philadelphia** | **PA** | **19101-7346** |

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account
number   ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)(   **8**   )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**941 Taxes**

Is the claim subject to offset?

☑ No
☐ Yes

**Total claim** $711.31    **Priority amount** $711.31

---

**TA-011**

Case 23-10763-mdc     Doc 54     Filed 03/29/23     Entered 03/29/23 22:05:20     Desc Main
Document     Page 7 of 50

Debtor     **Stream TV Networks, Inc.**                                     Case number (if known)  **23-10763**

| Part 1: | Additional Page |
|---|---|

Copy this page if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional PRIORITY creditors exist, do not fill out or submit this page.        Total claim        Priority amount

---

**2.9**  Priority creditor's name and mailing address

**Nevada Dept. of Employment**

**Training & Rehabilitation**

**500 E. Third Street**

**Carson City                NV      89713**

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account
number  ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)( __8__ )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Taxes**

Is the claim subject to offset?
☑ No
☐ Yes

Total claim: **$476.88**     Priority amount: **$476.88**

---

**2.10**  Priority creditor's name and mailing address

**New Jersey Division of Taxation**

**Compliance&Enforcement-Bankruptcy**

**50 Barrack Street, 9th Floor**

**PO Box 245**

**Trenton                NJ      08695-0267**

Date or dates debt was incurred
**12/31/2020**

Last 4 digits of account
number  ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)( __8__ )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Income Taxes**

Is the claim subject to offset?
☑ No
☐ Yes

Total claim: **$399.14**     Priority amount: **$399.14**

---

**2.11**  Priority creditor's name and mailing address

**Pennsylvania Department of Revenue**

**Department 280946**

**Attn: Bankruptcy Division**

**Harrisburg                PA      17128-0946**

Date or dates debt was incurred
**12/31/2020**

Last 4 digits of account
number  ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)( __8__ )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Income Taxes**

Is the claim subject to offset?
☑ No
☐ Yes

Total claim: **$1,763.45**     Priority amount: **$1,763.45**

---

**TA-012**

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |
|---|---|---|---|

---

| **Part 1:** | **Additional Page** |
|---|---|

Copy this page if more space is needed.  Continue numbering the lines sequentially from the previous page.  If no additional PRIORITY creditors exist, do not fill out or submit this page.

| | | **Total claim** | **Priority amount** |
|---|---|---|---|

**2.12**  Priority creditor's name and mailing address

**Pennsylvania Department of Revenue**

**Department 280946**

**Attn: Bankruptcy Division**

**Harrisburg**          **PA**    **17128-0946**

Date or dates debt was incurred

_____

Last 4 digits of account
number      __ __ __ __

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)(    **8**    )

As of the petition filing date, the claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Unemployment Insurance**

Is the claim subject to offset?
☑ No
☐ Yes

**$460.47**          **$460.47**

---

**2.13**  Priority creditor's name and mailing address

**Pennsylvania Department of Revenue**

**Department 280946**

**Attn: Bankruptcy Division**

**Harrisburg**          **PA**    **17128-0946**

Date or dates debt was incurred
**12/31/2020**

Last 4 digits of account
number      __ __ __ __

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)(    **8**    )

As of the petition filing date, the claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Taxes**

Is the claim subject to offset?
☑ No
☐ Yes

**$156.00**          **$156.00**

---

**2.14**  Priority creditor's name and mailing address

**Pennsylvania Department of Revenue**

**Department 280946**

**Attn: Bankruptcy Division**

**Harrisburg**          **PA**    **17128-0946**

Date or dates debt was incurred
**12/31/2020**

Last 4 digits of account
number      __ __ __ __

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)(    **8**    )

As of the petition filing date, the claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Taxes**

Is the claim subject to offset?
☑ No
☐ Yes

**$1,165.62**          **$1,165.62**

---

**TA-013**

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |
|---|---|---|---|

| **Part 1:** | **Additional Page** |
|---|---|

Copy this page if more space is needed.  Continue numbering the lines sequentially from the previous page.  If no additional PRIORITY creditors exist, do not fill out or submit this page.

|  |  | **Total claim** | **Priority amount** |
|---|---|---|---|

**2.15**  Priority creditor's name and mailing address

**Pennsylvania Department of Revenue**

**Department 280946**

**Attn: Bankruptcy Division**

**Harrisburg**          **PA**      **17128-0946**

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account number  ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured claim:  11 U.S.C. § 507(a)(    **8**    )

As of the petition filing date, the claim is: *Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☐ Disputed

Basis for the claim:
**Taxes**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

**Total claim** $1,324.21    **Priority amount** $1,324.21

---

**2.16**  Priority creditor's name and mailing address

**Pennsylvania Department of Revenue**

**Department 280946**

**Attn: Bankruptcy Division**

**Harrisburg**          **PA**      **17128-0946**

Date or dates debt was incurred
**3/31/2020**

Last 4 digits of account number  ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured claim:  11 U.S.C. § 507(a)(    **8**    )

As of the petition filing date, the claim is: *Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☐ Disputed

Basis for the claim:
**Taxes**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

**Total claim** $3,821.13    **Priority amount** $3,821.13

---

**2.17**  Priority creditor's name and mailing address

**Philadelphia Department of Revenue**

**Municipal Services Building**

**1401 JFK Boulevard**

**Philadelphia**          **PA**      **19102**

Date or dates debt was incurred
**12/31/2020**

Last 4 digits of account number  ___ ___ ___ ___

Specify Code subsection of PRIORITY unsecured claim:  11 U.S.C. § 507(a)(    **8**    )

As of the petition filing date, the claim is: *Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☐ Disputed

Basis for the claim:
**Income Tax**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

**Total claim** $10,642.58    **Priority amount** $10,642.58

TA-014

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |

| **Part 1:** | **Additional Page** |

Copy this page if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional PRIORITY creditors exist, do not fill out or submit this page.    **Total claim**    **Priority amount**

**2.18**  Priority creditor's name and mailing address

**Secretary of State - Delaware**

**Division of Corporations**

**Franchise Tax**

**PO Box 898**

**Dover**                    **DE**    **19903**

Date or dates debt was incurred

**12/31/2020**

Last 4 digits of account
number    __ __ __ __

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)(  **8**  )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:

**Franchise Tax**

Is the claim subject to offset?

☑ No
☐ Yes

**$5,000.00**    **$5,000.00**

**2.19**  Priority creditor's name and mailing address

**State of California**

**Franchise Tax Board**

**Bankruptcy Section, MS: A-340**

**PO Box 2952**

**Sacramento**            **CA**    **95812-2952**

Date or dates debt was incurred

**12/31/2020**

Last 4 digits of account
number    __ __ __ __

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)(  **8**  )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:

**Taxes**

Is the claim subject to offset?

☑ No
☐ Yes

**$20,121.89**    **$20,121.89**

**2.20**  Priority creditor's name and mailing address

**State of California Employment**

**Development Department**

**PO Box 826880, DICO, MIC 29**

**Sacramento**            **CA**    **94280**

Date or dates debt was incurred

**3/31/2020**

Last 4 digits of account
number    __ __ __ __

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)(  **8**  )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:

**CA PIT/SDI**

Is the claim subject to offset?

☑ No
☐ Yes

**$9,808.22**    **$9,808.22**

**TA-015**

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |

| **Part 1:** | **Additional Page** |

Copy this page if more space is needed.  Continue numbering the lines sequentially from the previous page.  If no additional PRIORITY creditors exist, do not fill out or submit this page.

| | | **Total claim** | **Priority amount** |

**2.21** Priority creditor's name and mailing address

**State of California Employment**

**Development Department**

**PO Box 826880, UIPCD, MIC 40**

**Sacramento**          **CA**    **94280**

Date or dates debt was incurred

**3/31/2020**

Last 4 digits of account
number     __ __ __ __

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)( **8** )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**SUI/ETT**

Is the claim subject to offset?
☑ No
☐ Yes

**Total claim** $2,598.75   **Priority amount** $2,598.75

**2.22** Priority creditor's name and mailing address

**State of Florida, Dept. of Revenue**

**Attn: Mark Hamilton**

**P.O. Box 6668**

**Tallahassee**          **FL**    **32314-6668**

Date or dates debt was incurred

**3/31/2020**

Last 4 digits of account
number     __ __ __ __

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)( **8** )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Taxes**

Is the claim subject to offset?
☑ No
☐ Yes

**Total claim** $123.75   **Priority amount** $123.75

**2.23** Priority creditor's name and mailing address

**Texas Workforce Commission**

**P.O. Box 149037**

**Austin**          **TX**    **78714-9037**

Date or dates debt was incurred

**3/31/2020**

Last 4 digits of account
number     __ __ __ __

Specify Code subsection of PRIORITY unsecured
claim:  11 U.S.C. § 507(a)( **8** )

As of the petition filing date, the
claim is: *Check all that apply.*

☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim:
**Taxes**

Is the claim subject to offset?
☑ No
☐ Yes

**Total claim** $11.11   **Priority amount** $11.11

**TA-016**

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |
|---|---|---|---|

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
|---|---|

3.  **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If more space is needed for nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

**Amount of claim**

| **3.1** | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$7,500.00** |
|---|---|---|---|

**3Detroit Film Co. LLC**

**2385 N. Pine Center St**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

| **West Bloomfield** | **MI** | **48323** | **good, services** |
|---|---|---|---|

Date or dates debt was incurred    **2017-2018**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    __ __ __ __

---

| **3.2** | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$4,000.00** |
|---|---|---|---|

**Aaron Lamkin**

**793A East Foothill Blvd. #43**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

| **San Luis Obisbo** | **CA** | **93405** | **goods, services** |
|---|---|---|---|

Date or dates debt was incurred    **5/20/2019**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    __ __ __ __

---

| **3.3** | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$1,159.00** |
|---|---|---|---|

**Abu Dhabi Investment Council**

**P.O. Box 61999**

**Abu Dhabi, UAE**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**loan, investment**

Date or dates debt was incurred    **10/09/2017**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    __ __ __ __

---

| **3.4** | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$35,820.00** |
|---|---|---|---|

**Ac Lordi**

**75 Valley Stream Parkway Suite 201**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

| **Malvern** | **PA** | **19355** | **goods, services** |
|---|---|---|---|

Date or dates debt was incurred    **2016-2019**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    __ __ __ __

---

**TA-017**

Debtor    **Stream TV Networks, Inc.**                                     Case number (if known)  **23-10763**

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.        **Amount of claim**

| 3.5 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $324,644.60 |
|---|---|---|---|

**Adept Chip Service Private Ltd.**

**Site No.86 1st Floor**

**LRDI Layout Karthik Nagar**

**fvlarathahalli Outer Ring**

 **Bengaluru, India 560037**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2019**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☒ No
☐ Yes

---

| 3.6 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $19,682.75 |
|---|---|---|---|

**Adrian & Roth**

**Personalberatung GmbH**

**Tengstraße 45**

**Munchen, Germany 80796**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2018**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☒ No
☐ Yes

---

| 3.7 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $15,000.00 |
|---|---|---|---|

**Advanced Imaging Society**

**16027 Ventura Blulevard Suite #301**

**Encino                    CA      91436**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2017**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☒ No
☐ Yes

---

| 3.8 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $3,020.00 |
|---|---|---|---|

**Alliance International Law Offices**

**75-1, 58 Chung Shan N. Rd. Sec. 3**

**Taipei, Taiwan**

**10452**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**Attorney Fees**

Date or dates debt was incurred    **2016-2018**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☒ No
☐ Yes

**TA-018**

Debtor    **Stream TV Networks, Inc.**                                    Case number (if known)  **23-10763**

| **Part 2:** | **Additional Page** |
| --- | --- |

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                **Amount of claim**

**3.9**  Nonpriority creditor's name and mailing address          As of the petition filing date, the claim is:              **$91,700.00**
                                                                *Check all that apply.*

**Alvarte Technology LLP**                                        ☐ Contingent

**S No29, PL52, Office #201**                                     ☐ Unliquidated

**Bhama Emrald, Satara Road, Dhankawadi**                         ☐ Disputed

**Pune, Maharashtra 411043**                                      **Basis for the claim:**
                                                                **goods, services**

Date or dates debt was incurred      **2019**                    **Is the claim subject to offset?**

Last 4 digits of account number    ___  ___  ___  ___            ☑ No
                                                                ☐ Yes

**3.10**  Nonpriority creditor's name and mailing address        As of the petition filing date, the claim is:              **$1,544.12**
                                                                *Check all that apply.*

**Amanda Von Ahnen**                                              ☐ Contingent

**105 Edwards Run Road**                                          ☐ Unliquidated

                                                                ☐ Disputed

**Mount Royal**              **NJ**    **08061**                  **Basis for the claim:**
                                                                **wages**

Date or dates debt was incurred    **Feb 16-29, 2020**           **Is the claim subject to offset?**

Last 4 digits of account number    ___  ___  ___  ___            ☑ No
                                                                ☐ Yes

**3.11**  Nonpriority creditor's name and mailing address        As of the petition filing date, the claim is:              **$49,632.62**
                                                                *Check all that apply.*

**AON Risk Services Inc. of New York**                           ☐ Contingent

**111 Wall Street**                                              ☐ Unliquidated

**New York, NY**                                                 ☐ Disputed

                                                                **Basis for the claim:**
                                                                **goods, services**

Date or dates debt was incurred    **2017-2021**                 **Is the claim subject to offset?**

Last 4 digits of account number    **0**  **0**  **4**  **3**    ☑ No
                                                                ☐ Yes

**3.12**  Nonpriority creditor's name and mailing address        As of the petition filing date, the claim is:              **$132,500.00**
                                                                *Check all that apply.*

**Arasan Chip Systems, Inc.**                                    ☐ Contingent

**2150 North First Street, Suite 240**                           ☐ Unliquidated

                                                                ☐ Disputed

**San Jose**                 **CA**    **95131**                 **Basis for the claim:**
                                                                **goods, services**

Date or dates debt was incurred    **2019-2020**                 **Is the claim subject to offset?**

Last 4 digits of account number    ___  ___  ___  ___            ☑ No
                                                                ☐ Yes

**TA-019**

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |
|---|---|---|---|

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                    **Amount of claim**

| **3.13** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$34,626.25** |
|---|---|---|---|

**Aria Resort-Casino At Ctycntr**

**4882 Frank Sinatra Dr.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

| **Las Vegas** | **NV** | **89158** |
|---|---|---|

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☒ No
☐ Yes

| **3.14** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$30,024.42** |
|---|---|---|---|

**Avnet EM**

**2211 South 47th Street**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

| **Phoenix** | **AZ** | **85034** |
|---|---|---|

Date or dates debt was incurred    **2019**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☒ No
☐ Yes

| **3.15** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$12,066.00** |
|---|---|---|---|

**AY Commercial Law Offices**

**9F, No. 333, Sec. 1, Keelung Road**

**Taipei City, Taiwan ROC 11012**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**Attorney Fees**

Date or dates debt was incurred    **2018-2020**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☒ No
☐ Yes

| **3.16** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$17,880.00** |
|---|---|---|---|

**BDO USA, LLP**

**75 Valley Stream Parkway**

**Suite 201**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

| **Malvern** | **PA** | **19355** |
|---|---|---|

Date or dates debt was incurred    **2014-2019**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☒ No
☐ Yes

**TA-020**

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |
|---|---|---|---|

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

| 3.17 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $5,963.23 |
|---|---|---|---|

**Blue Ocean Partners**

**100 Queens Rd.**

**Central, Hong Kong, China**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2018-2020**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☒ No
☐ Yes

| 3.18 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $6,000.00 |
|---|---|---|---|

**Bubble Communications East**

**East Side Complex Rm 555**

**Pinewood Studios, Pinewood Rd Iver Heath**

**Buckinghamshire, UK SL0 0NH**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2018-2019**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☒ No
☐ Yes

| 3.19 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $41,816.50 |
|---|---|---|---|

**Buchanan Ingersoll & Rooney PC**

**919 North Market Street**

**Suite 1500**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Wilmington            DE      19801**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2018-2020**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☒ No
☐ Yes

| 3.20 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $524,340.00 |
|---|---|---|---|

**Cadence Design Systems, Inc.**

**2655 Seely Avenue**

☐ Contingent
☐ Unliquidated
☐ Disputed

**San Jose            CA      95134**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☒ No
☐ Yes

**TA-021**

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |
|---|---|---|---|

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                      **Amount of claim**

---

| 3.21 | **Nonpriority creditor's name and mailing address** |
|---|---|

**Capital One**

**P.O. Box 71083**

Amount of claim: **$71,450.76**

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Charlotte**          **NC      28272-1083**

**Basis for the claim:**
**Credit Card**

Date or dates debt was incurred    **2009-2020**

Last 4 digits of account number    ___  ___  ___  ___

**Is the claim subject to offset?**
☑ No
☐ Yes

---

| 3.22 | **Nonpriority creditor's name and mailing address** |
|---|---|

**Capital One-5**

**P.O.Box 71083**

Amount of claim: **$8,720.42**

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Charlotte**          **NC      28272-1083**

**Basis for the claim:**
**Credit Card**

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    ___  ___  ___  ___

**Is the claim subject to offset?**
☑ No
☐ Yes

---

| 3.23 | **Nonpriority creditor's name and mailing address** |
|---|---|

**CCH Incorporated (Wolters Kluwer)**

**P.O. Box 4307**

Amount of claim: **$3,355.02**

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Carol Stream**          **IN      60197-4307**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2019**

Last 4 digits of account number    ___  ___  ___  ___

**Is the claim subject to offset?**
☑ No
☐ Yes

---

| 3.24 | **Nonpriority creditor's name and mailing address** |
|---|---|

**Charles Robertson**

**10 Via Visione, Unit 201**

Amount of claim: **$53,549.46**

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Henderson**          **NV      89011**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    ___  ___  ___  ___

**Is the claim subject to offset?**
☑ No
☐ Yes

---

**TA-022**

Debtor    **Stream TV Networks, Inc.**                                    Case number (if known)  **23-10763**

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

| 3.25 | **Nonpriority creditor's name and mailing address** |

| As of the petition filing date, the claim is: | **$3,818.92** |

**Charles Robertson**

Check all that apply.

**10 Via Visione, Unit 201**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

Henderson                NV      89011        **wages**

Date or dates debt was incurred    **Feb 16-29, 2020**    Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___    ☑ No
☐ Yes

---

| 3.26 | **Nonpriority creditor's name and mailing address** |

As of the petition filing date, the claim is:    **$2,724.62**

**Che Wei Chang**

Check all that apply.

**327 Camphor Avenue**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

San Jose                CA      95131        **goods, services**

Date or dates debt was incurred    **2019-2020**    Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___    ☑ No
☐ Yes

---

| 3.27 | **Nonpriority creditor's name and mailing address** |

As of the petition filing date, the claim is:    **$117,600.00**

**Cipher Development Partners LLC**

Check all that apply.

**1381 McCarthy Blvd.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

Milpitas                CA      95035        **goods, services**

Date or dates debt was incurred    **2019-2020**    Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___    ☑ No
☐ Yes

---

| 3.28 | **Nonpriority creditor's name and mailing address** |

As of the petition filing date, the claim is:    **$63,793.70**

**Citi Cards**

Check all that apply.

**PO BOX 9001037**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

Louisville                KY      40290-1037        **Credit Card**

Date or dates debt was incurred    **2019-2020**    Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___    ☑ No
☐ Yes

---

**TA-023**

Debtor    **Stream TV Networks, Inc.**    Case number (if known) **23-10763**

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.    **Amount of claim**

---

**3.29**    **Nonpriority creditor's name and mailing address**

**Cittone Demers & Arneri LLP**

**11 Broadway**

**Suite 615**

**New York**                NY      **10040**

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**Attorney Fees**

Is the claim subject to offset?
☑ No
☐ Yes

**$6,065.00**

---

**3.30**    **Nonpriority creditor's name and mailing address**

**CNA INSURANCE**

**P.O. BOX 790094**

**ST LOUIS**                MO      **63179-0094**

Date or dates debt was incurred    **12/31/2019**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

**$1,984.84**

---

**3.31**    **Nonpriority creditor's name and mailing address**

**Concur Technologies, Inc.**

**62157 Collections Center Drive**

**Chicago**                IL      **60693**

Date or dates debt was incurred    **2018**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

**$2,012.96**

---

**3.32**    **Nonpriority creditor's name and mailing address**

**Conference Technologies, Inc.**

**11653 Adie Road**

**Maryland Heights**                MO      **63043**

Date or dates debt was incurred    **9/30/2017**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

**$1,200.00**

---

TA-024

Case 23-10763-mdc    Doc 54    Filed 03/29/23    Entered 03/29/23 22:05:20    Desc Main
Document    Page 20 of 50

Debtor    **Stream TV Networks, Inc.** _____    Case number (if known) __**23-10763**__

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.    **Amount of claim**

| 3.33 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $31,285.00 |
|---|---|---|---|

**Coral Vision Ltd**

**Easton House, Manor Way**

**Oxshott, UK KT22 0HU**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2017**

Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| 3.34 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $90.00 |
|---|---|---|---|

**Corporate Filings**

**30 North Gould Street**

**Suite 7001**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Sheridan**          **WY     82801**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **8/23/2019**

Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| 3.35 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $27,947.08 |
|---|---|---|---|

**Cousins Law**

**Brandywine Plaza West**

**1521 Concord Pike, Suite 301**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Wilmington**          **DE     19803**

**Basis for the claim:**
**Attorney Fees**

Date or dates debt was incurred    **2020**

Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| 3.36 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $1,125.00 |
|---|---|---|---|

**Coverall North America, Inc.**

**2955 Momentum Place**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Chicago**          **IL     60689**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2019-2020**

Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

**TA-025**

Debtor    **Stream TV Networks, Inc.** _____    Case number (if known) __**23-10763**__

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.    Amount of claim

| 3.37 | Nonpriority creditor's name and mailing address |
|------|--------|

As of the petition filing date, the claim is:    $45,600.00
*Check all that apply.*

**Cryslink Technologies Co., Ltd**
**Computer Village, ikeja, Lagos**
**Otta Nigeria 101233**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2/24/2016**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☑ No
☐ Yes

---

| 3.38 | Nonpriority creditor's name and mailing address |
|------|--------|

As of the petition filing date, the claim is:    $2,004.22
*Check all that apply.*

**Daniel J. Rink**
**1017 E. 28th Street**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Houston**        **TX**    **77009**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **February 2020**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☑ No
☐ Yes

---

| 3.39 | Nonpriority creditor's name and mailing address |
|------|--------|

As of the petition filing date, the claim is:    $2,070.57
*Check all that apply.*

**Daniel J. Rink**
**1017 E. 28th Street**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Houston**        **TX**    **77009**

**Basis for the claim:**
**wages**

Date or dates debt was incurred    **Feb 16-29, 2020**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☑ No
☐ Yes

---

| 3.40 | Nonpriority creditor's name and mailing address |
|------|--------|

As of the petition filing date, the claim is:    $6,250.00
*Check all that apply.*

**DeMartino and Associates LLC**
**875 Union Ave.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Boulder**        **CO**    **80304**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2019**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☑ No
☐ Yes

---

**TA-026**

Debtor     **Stream TV Networks, Inc.** _____     Case number (if known) **23-10763** _____

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.          Amount of claim

| **3.41** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | **$7,976.63** |
|---|---|---|---|

**Dezan Shira & Associates**

**Suite EF06, East Tower B12**

**Jian Guo Men Wai Avenue**

**Beijing, China 100022**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**Attorney Fees**

Date or dates debt was incurred     **2019**

Last 4 digits of account number     ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

| **3.42** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | **$15,000.00** |
|---|---|---|---|

**Digital Content Protection LLC**

**3855 SW 153rd Drive**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Beaverton          OR     97006**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred     **3/29/2019**

Last 4 digits of account number     ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

| **3.43** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | **$798,925.44** |
|---|---|---|---|

**DLA Piper LLP(US)**

**6225 Smith Avenue**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Baltimore          MD     21209-3600**

**Basis for the claim:**
**Attorney Fees**

Date or dates debt was incurred     **2011-2020**

Last 4 digits of account number     ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

| **3.44** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | **$420.00** |
|---|---|---|---|

**Dunner Law PLLC**

**3243 P Street, N.W.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Washington          DC     20007**

**Basis for the claim:**
**Attorney Fees**

Date or dates debt was incurred     **2019**

Last 4 digits of account number     ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

**TA-027**

Debtor    **Stream TV Networks, Inc.**                                    Case number (if known) __23-10763__

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                **Amount of claim**

| 3.45 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$216,179.17** |
|---|---|---|---|

**Elliott Greenleaf**

**1105 North Market Street**

**17th Floor**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Wilmington**                    **DE**    **19801-1216**        **goods, services**

Date or dates debt was incurred    **2020**            **Is the claim subject to offset?**

Last 4 digits of account number    __ __ __ __        ☒ No
☐ Yes

---

| 3.46 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$600.00** |
|---|---|---|---|

**EMA Design Automation**

**225 Park Tech Dr.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Rochester**                    **NY**    **14623**        **goods, services**

Date or dates debt was incurred    **2019**            **Is the claim subject to offset?**

Last 4 digits of account number    __ __ __ __        ☒ No
☐ Yes

---

| 3.47 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$68.99** |
|---|---|---|---|

**EME Enterprise Inc.**

**1256 West Winton Avenue**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Hayward**                    **CA**    **94545**        **goods, services**

Date or dates debt was incurred    **2020**            **Is the claim subject to offset?**

Last 4 digits of account number    __ __ __ __        ☒ No
☐ Yes

---

| 3.48 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$36,550.00** |
|---|---|---|---|

**Eric Singer**

**200 E. 71st Street**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**New York**                    **NY**    **10021**        **goods, services**

Date or dates debt was incurred                    **Is the claim subject to offset?**

Last 4 digits of account number    __ __ __ __        ☒ No
☐ Yes

**TA-028**

Debtor      **Stream TV Networks, Inc.**                                      Case number (if known)  **23-10763**

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                              Amount of claim

| 3.49 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: _Check all that apply._ | **$5,000.00** |
|---|---|---|---|

**ESPN Inc. Miscellaneous**
**P.O. Box 732527**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Dallas**                          TX      **75373-2527**          **goods, services**

Date or dates debt was incurred      **2015-2016**              **Is the claim subject to offset?**
                                                            ☑ No
Last 4 digits of account number      ___ ___ ___ ___       ☐ Yes

| 3.50 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: _Check all that apply._ | **$5,093.44** |
|---|---|---|---|

**Farrukh Shah Kahn**
**1564 Kooser Road**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**San Jose**                        CA      **95118**            **wages**

Date or dates debt was incurred      **Feb 16-29, 2020**         **Is the claim subject to offset?**
                                                            ☑ No
Last 4 digits of account number      ___ ___ ___ ___       ☐ Yes

| 3.51 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: _Check all that apply._ | **$23,432.00** |
|---|---|---|---|

**Feng Tsang Corporation**
**1F, No. 1, Alley 50**
**Lane 737, Sec. 1**
**Nei Hu Road, Taipei, TAIWAN**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**goods, services**

Date or dates debt was incurred      **2017-2020**              **Is the claim subject to offset?**
                                                            ☑ No
Last 4 digits of account number      ___ ___ ___ ___       ☐ Yes

| 3.52 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: _Check all that apply._ | **$5,543.43** |
|---|---|---|---|

**Feng Tsang Corporation-TWN**
**1F, No. 1, Alley 50**
**Lane 737, Sec. 1**
**Nei Hu Road, Taipei, TAIWAN**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**goods, services**

Date or dates debt was incurred      **2016-2020**              **Is the claim subject to offset?**
                                                            ☑ No
Last 4 digits of account number      ___ ___ ___ ___       ☐ Yes

**TA-029**

Debtor    **Stream TV Networks, Inc.** _____    Case number (if known) __**23-10763**__

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.53**    **Nonpriority creditor's name and mailing address**

FHP Consultants Ltd.

Goddard's Green Barn

Goddard's Green Road

Benenden Kent, UK TN17 4AR

Date or dates debt was incurred    **2018-2019**

Last 4 digits of account number    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
goods, services

**Is the claim subject to offset?**
☑ No
☐ Yes

**$17,000.00**

---

**3.54**    **Nonpriority creditor's name and mailing address**

First Sentinel Advisory Limited

Office Suite 12A

55 Park Lane

London, England UK W1K 1QG

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
goods, services

**Is the claim subject to offset?**
☑ No
☐ Yes

**$6,000.00**

---

**3.55**    **Nonpriority creditor's name and mailing address**

Fornax Associates Ltd.

70C 16 Buckhold Rd.

London, England UK Sw18 4fy

Date or dates debt was incurred    **1/1/2018**

Last 4 digits of account number    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
goods, services

**Is the claim subject to offset?**
☑ No
☐ Yes

**$22,944.55**

---

**3.56**    **Nonpriority creditor's name and mailing address**

Frewin & Close Ltd.

18 Oakley Street

London, England SW3 5NT

UK

Date or dates debt was incurred    **2018-2019**

Last 4 digits of account number    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
goods, services

**Is the claim subject to offset?**
☑ No
☐ Yes

**$2,602.37**

---

**TA-030**

Debtor   **Stream TV Networks, Inc.** _____   Case number (if known) **23-10763** _____

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.   **Amount of claim**

| | | |
|---|---|---|
| **3.57** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$46,922.47** |

**FTI Consulting (China) Limited**
**Unit 2101-04, Central Plaza**
**227 Huangpi (N) Road**
**Shanghai, China 200003**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred   **2018-2019**

Last 4 digits of account number  ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

---

| | | |
|---|---|---|
| **3.58** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$13,005.90** |

**FULL FRONTAL GROUP FZ LLE**
**Unit P12, Rimal The Walk**
**JBR PO Box 487177**
**Dubai, UAE**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred   **2016-2017**

Last 4 digits of account number  ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

---

| | | |
|---|---|---|
| **3.59** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$27,612.50** |

**Global Tax Management**
**656 E. Swedesford Rd., Suite 200**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Wayne**                    **PA**    **19087**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred   **2019**

Last 4 digits of account number  ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

---

| | | |
|---|---|---|
| **3.60** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$10,003.15** |

**HDMI Licensing Administrator, Inc.**
**550 S. Winchester Blvd Suite 515**

☐ Contingent
☐ Unliquidated
☐ Disputed

**San Cose**                 **CA**    **95128**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred   **2019-2020**

Last 4 digits of account number  ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

**TA-031**

Debtor    **Stream TV Networks, Inc.** _____    Case number (if known) __**23-10763**__

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.61**  Nonpriority creditor's name and mailing address

**Hoang Nguyen**

**359 Dale Drive**

_____

**San Jose**                **CA**    **95127**

Date or dates debt was incurred    **Feb 16-29, 2020**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**wages**

Is the claim subject to offset?
☑ No
☐ Yes

**$3,691.63**

---

**3.62**  Nonpriority creditor's name and mailing address

**Hold Jumper (Suzhou) Packing Co. Ltd.**

**No. 1, Xiang Street, High-Tech District**

**Suzhou, China**

_____

Date or dates debt was incurred    **12/28/2018**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

**$1,813,662.35**

---

**3.63**  Nonpriority creditor's name and mailing address

**Howell International Trade Fair Ltd.**

**5A-604 Houxiandaicheng**

**No. 16 Baiziwan Rd.**

**Chaoyang District Beijing, China**

Date or dates debt was incurred    **2016**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

**$21,258.00**

---

**3.64**  Nonpriority creditor's name and mailing address

**HSBC Bank USA, N.A.**

**140 Broadway**

**Suite 5020**

_____

**New York**                **NY**    **10005**

Date or dates debt was incurred    _____

Last 4 digits of account number    **7** **1** **0** **5**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**Paycheck Protection Program**

Is the claim subject to offset?
☑ No
☐ Yes

**$805,177.00**

---

TA-032

Debtor    **Stream TV Networks, Inc.**                                Case number (if known)    **23-10763**

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                            Amount of claim

---

**3.65** Nonpriority creditor's name and mailing address

**Hudson Valuation Group LLC**

**One Glenlake Parkway Suite #700**

_____

**Atlanta**              **GA**    **30328**

Date or dates debt was incurred    **2019**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

$12,770.00

---

**3.66** Nonpriority creditor's name and mailing address

**Iinuma Gauge Manufacturing Co., Ltd.**

**11400-327 Harayama, Tamagawa**

**Chino-City Nagano, Japan 391-0011**

**Nagano, Japan 391-0011**

_____

Date or dates debt was incurred    **2015-2019**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

$7,252,635.17

---

**3.67** Nonpriority creditor's name and mailing address

**IMG Media Ltd.**

**Building 6, Chiswick Park**

**566 Chiswick High Road**

**London, England UK W4 5HR**

_____

Date or dates debt was incurred    **2019**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

$426,437.00

---

**3.68** Nonpriority creditor's name and mailing address

**infoComm International**

**11242 Waples Mill Rd, Suite 200**

_____

**Fairfax**              **VA**    **22030**

Date or dates debt was incurred    **4/6/2017**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

$500.00

---

**TA-033**

Debtor      **Stream TV Networks, Inc.**                                            Case number (if known)  **23-10763**

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                     Amount of claim

| 3.69 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | $178,100.96 |
|---|---|---|---|

**Innoventures Group LLC**

**1105 William Penn Drive**

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Bensalem**                    **PA**      **19020**

Basis for the claim:
**goods, services**

Date or dates debt was incurred      **2020**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

Last 4 digits of account number      ___ ___ ___ ___

---

| 3.70 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | $2,893.63 |
|---|---|---|---|

**Itaya Misa (TWD)**

**1F, No. 1, Alley 50**

**Lane 737, Sec. 1, Nei Hu Road**

**Taipei, TAIWAN**

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim:
**goods, services**

Date or dates debt was incurred      **2019-2020**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

Last 4 digits of account number      ___ ___ ___ ___

---

| 3.71 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | $7,500.00 |
|---|---|---|---|

**IZON**

**2005 Tree Fork Lane, Suite 109**

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Longwood**                    **FL**      **32750**

Basis for the claim:
**goods, services**

Date or dates debt was incurred      **12/29/2017**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

Last 4 digits of account number      ___ ___ ___ ___

---

| 3.72 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | $122,768.45 |
|---|---|---|---|

**Jamuna Travels, Inc**

**6439 Market St.**

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Upper Darby**                    **PA**      **19082**

Basis for the claim:
**goods, services**

Date or dates debt was incurred      **2018-2019**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

Last 4 digits of account number      ___ ___ ___ ___

**TA-034**

| | |
|---|---|
| Debtor    **Stream TV Networks, Inc.** | Case number (if known)    **23-10763** |

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

---

**3.73** | Nonpriority creditor's name and mailing address

**Jih-Chun Yeh**

**4F No., Ln. 232 Zhixiang 1st St.**

**Zhongli Dist**

**Taoyuan City Taiwan 320**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

Date or dates debt was incurred

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

**$543.68**

---

**3.74** | Nonpriority creditor's name and mailing address

**Karen S. Donovan**

**393 Mystic Street**

**Arlington          MA     02474**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

Date or dates debt was incurred

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

**$4,318.00**

---

**3.75** | Nonpriority creditor's name and mailing address

**Kaushik Banerjee**

**342 Stanforth Court**

**San Ramon          CA     94582**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**wages**

Date or dates debt was incurred    **February 2020**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

**$3,617.61**

---

**3.76** | Nonpriority creditor's name and mailing address

**Kaushik Banerjee**

**342 Stanforth Court**

**San Ramonn          CA     94582**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**wages**

Date or dates debt was incurred    **Feb 16-29, 2020**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

**$9,264.97**

---

**TA-035**

Debtor    **Stream TV Networks, Inc.**                                      Case number (if known)  __23-10763__

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                 Amount of claim

---

| 3.77 | **Nonpriority creditor's name and mailing address** |
|---|---|

**Kenneth W. Carroll**

**8379 Sweet Briar Court**

**Liberty Township**          **OH**    **45044-0000**

Date or dates debt was incurred    __1/31/2017__

Last 4 digits of account number    __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

**Is the claim subject to offset?**
☑ No
☐ Yes

$6,000.00

---

| 3.78 | **Nonpriority creditor's name and mailing address** |
|---|---|

**Kevin Cabot**

**11 Rue Paul Langevin**

**Saint Ouen**

**France 93400**

Date or dates debt was incurred    __2020__

Last 4 digits of account number    __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

**Is the claim subject to offset?**
☑ No
☐ Yes

$4,376.87

---

| 3.79 | **Nonpriority creditor's name and mailing address** |
|---|---|

**Kleinwort Benson (GBP)**

**14 St. George Street**

**London, England UK W1S 1FE**

Date or dates debt was incurred    __8/30/2017__

Last 4 digits of account number    __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

**Is the claim subject to offset?**
☑ No
☐ Yes

$1,010.73

---

| 3.80 | **Nonpriority creditor's name and mailing address** |
|---|---|

**Law Offices of Young K. Park**

**2009 Chestnut Street**

**Philadelphia**          **PA**    **19103**

Date or dates debt was incurred    __2019-2020__

Last 4 digits of account number    __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**Attorney Fees**

**Is the claim subject to offset?**
☑ No
☐ Yes

$77,992.33

---

**TA-036**

Debtor    **Stream TV Networks, Inc.**                                    Case number (if known) **23-10763**

| Part 2: | Additional Page |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                **Amount of claim**

---

**3.81**  Nonpriority creditor's name and mailing address          As of the petition filing date, the claim is:              **$2,800.00**
                                                                    *Check all that apply.*

**Lee and Ko**                                                       ☐ Contingent

**Hanjin Buliding, 63 Namdaemun-ro**                                 ☐ Unliquidated

**Jung-gu**                                                          ☐ Disputed

**Seoul, Korea 04532**                                               Basis for the claim:
                                                                    **Attorney Fees**

Date or dates debt was incurred    **8/3/2016**                      Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___                  ☒ No
                                                                    ☐ Yes

---

**3.82**  Nonpriority creditor's name and mailing address          As of the petition filing date, the claim is:              **$2,347.73**
                                                                    *Check all that apply.*

**Leo J. Riley**                                                     ☐ Contingent

**225 Aqua Lane**                                                    ☐ Unliquidated

                                                                    ☐ Disputed

                                                                    Basis for the claim:

**Delran**                     **NJ      08075**                    **wages**

Date or dates debt was incurred    **Feb 16-29, 2020**              Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___                  ☒ No
                                                                    ☐ Yes

---

**3.83**  Nonpriority creditor's name and mailing address          As of the petition filing date, the claim is:              **$2,317.08**
                                                                    *Check all that apply.*

**Leo Riley**                                                        ☐ Contingent

**225 Aqua Lane**                                                    ☐ Unliquidated

                                                                    ☐ Disputed

                                                                    Basis for the claim:

**Delran**                     **NJ      08075**                    **wages**

Date or dates debt was incurred    **3/3/2020**                     Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___                  ☒ No
                                                                    ☐ Yes

---

**3.84**  Nonpriority creditor's name and mailing address          As of the petition filing date, the claim is:              **$6,602.08**
                                                                    *Check all that apply.*

**Luijks Advies B.V.**                                               ☐ Contingent

**Vinkenkade 41 R 3**                                                ☐ Unliquidated

**Vinkeveen, The Netherlands 3645 AP**                               ☐ Disputed

                                                                    Basis for the claim:
                                                                    **goods, services**

Date or dates debt was incurred    **1/5/2019**                     Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___                  ☒ No
                                                                    ☐ Yes

---

**TA-037**

| | | |
|---|---|---|
| Debtor | **Stream TV Networks, Inc.** | Case number (if known) __**23-10763**__ |

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

| 3.85 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$5,682.93** |
|---|---|---|---|

**Luong D. Nguyen**

**2801 Camino Del Rey**

☐ Contingent
☐ Unliquidated
☐ Disputed

**San Jose**          **CA**    **95132**

**Basis for the claim:**
**wages**

Date or dates debt was incurred    **Feb 16-29, 2020**

**Is the claim subject to offset?**
☒ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| 3.86 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$146,820.00** |
|---|---|---|---|

**Marcum LLP**

**One SE Third Ave, Suite 1100**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Miami**          **FL**    **33131**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2019**

**Is the claim subject to offset?**
☒ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| 3.87 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$5,325.57** |
|---|---|---|---|

**Mathu  Rajan**

**1105 William Penn Drive**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Bensalem**          **PA**    **19020**

**Basis for the claim:**
**wages**

Date or dates debt was incurred    **Feb 16-29, 2020**

**Is the claim subject to offset?**
☒ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| 3.88 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$185,354.47** |
|---|---|---|---|

**Mathu Rajan**

**1105 William Penn Drive**

**Bensalem, PA19020**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**Services**

Date or dates debt was incurred    _____

**Is the claim subject to offset?**
☒ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

**TA-038**

Debtor    **Stream TV Networks, Inc.**                                        Case number (if known)  **23-10763**

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                    Amount of claim

| 3.89 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:
*Check all that apply.* | $74,000.00 |
|---|---|---|---|

**Mathu Rajan**

**1105 William Penn Drive**

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Services**

Date or dates debt was incurred  **2019-2020**

Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number  ___ ___ ___ ___

| 3.90 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:
*Check all that apply.* | $155,000.00 |
|---|---|---|---|

**Matrex Exhibits, Inc.**

**301 S. Church St.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Addison          IL     60101**

Basis for the claim:  **goods, services**

Date or dates debt was incurred  **9/30/2019**

Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number  ___ ___ ___ ___

| 3.91 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:
*Check all that apply.* | $120.46 |
|---|---|---|---|

**Matt J. Lo.**

**7322 Carter Ave.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Newark          CA    94560**

Basis for the claim:  **goods, services**

Date or dates debt was incurred  **9/16/2019**

Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number  ___ ___ ___ ___

| 3.92 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:
*Check all that apply.* | $7,128.63 |
|---|---|---|---|

**Matthew Lo**

**7322 Carter Ave.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Newark          CA    94560**

Basis for the claim:  **wages**

Date or dates debt was incurred  **Feb 16-29, 2020**

Is the claim subject to offset?
☑ No
☐ Yes

Last 4 digits of account number  ___ ___ ___ ___

**TA-039**

Debtor    **Stream TV Networks, Inc.**                                    Case number (if known) **23-10763**

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                    Amount of claim

| 3.93 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$60,000.00** |
|---|---|---|---|

**Mediatainment, Inc**

**1105 William Penn Drive**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Bensalem**          **PA**    **19020**          **goods, services**

Date or dates debt was incurred    **2018-2020**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

| 3.94 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$890,590.68** |
|---|---|---|---|

**Mediatainment, Inc.**

**Attn: Raja Rajan**

**1105 William Penn Drive**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Bensalem**          **PA**    **19020**

**Basis for the claim:**

**Note**

Date or dates debt was incurred

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

| 3.95 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$402,564.00** |
|---|---|---|---|

**Mentor Graphics Corporation**

**8005 SW Boeckman Rd.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Wilsonville**          **OR**    **97070-7777**          **goods, services**

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

| 3.96 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$61,780.89** |
|---|---|---|---|

**Modular Mobile GmbH**

**Hansaallee 201**

**Dusseldorf, GERMANY**

**D-450549**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**goods, services**

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☑ No
☐ Yes

**TA-040**

Debtor    **Stream TV Networks, Inc.**                                      Case number (if known)  **23-10763**

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

---

**3.97**    Nonpriority creditor's name and mailing address

**MotivIT**

**2880 Zanker Rd., Suite 203**

_____

San Jose        CA    95134

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

$34,281.89

---

**3.98**    Nonpriority creditor's name and mailing address

**MTL Shipping & Investment Ltd.**

**Hillside, Crocknorth Road**

**East Horsley**

**Surrey KT24 5TF UK**

Date or dates debt was incurred    _____

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

$75,849.00

---

**3.99**    Nonpriority creditor's name and mailing address

**Muni Mohan**

**4612 Aviara Ct.**

_____

San Jose        CA    95135

Date or dates debt was incurred    **2/28/2020**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**wages**

Is the claim subject to offset?
☑ No
☐ Yes

$2,535.00

---

**3.100**    Nonpriority creditor's name and mailing address

**Muni Mohan**

**4612 Aviara Ct.**

_____

San Jose        CA    95135

Date or dates debt was incurred    **Feb 16-29, 2020**

Last 4 digits of account number    ___ ___ ___ ___

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**wages**

Is the claim subject to offset?
☑ No
☐ Yes

$6,113.47

---

**TA-041**

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |
|---|---|---|---|

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.     **Amount of claim**

---

| **3.101** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: | **$75,811.00** |
|---|---|---|---|

*Check all that apply.*

**MWL International Ltd.**

**Attn: David Walpole**

☐ Contingent
☐ Unliquidated
☐ Disputed

**1 Paper Mews, 330 High Street**

**Dorking, Surrey RH4 2TU**

**Basis for the claim:**

**goods, services**

Date or dates debt was incurred

Last 4 digits of account number    ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

---

| **3.102** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: | **$1,400.27** |
|---|---|---|---|

*Check all that apply.*

**Nicole Marie Maneen**

**2394 Barberee Drive**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Crestview**    **FL**    **32536**

**Basis for the claim:**

**wages**

Date or dates debt was incurred    **Feb 16-29, 2020**

Last 4 digits of account number    ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

---

| **3.103** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: | **$12,682.42** |
|---|---|---|---|

*Check all that apply.*

**Open Sales Solutions, LLC**

**548 Market Street, Suite 11745**

☐ Contingent
☐ Unliquidated
☐ Disputed

**San Francisco**    **CA**    **94104**

**Basis for the claim:**

**goods, services**

Date or dates debt was incurred    **2015-2017**

Last 4 digits of account number    ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

---

| **3.104** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: | **$24,539.78** |
|---|---|---|---|

*Check all that apply.*

**Pactron**

**3000 Patrick Henry Dr.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Santa Clara**    **CA**    **95054-1814**

**Basis for the claim:**

**goods, services**

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

---

**TA-042**

Debtor    **Stream TV Networks, Inc.**    Case number (if known)  **23-10763**

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

**3.105**  Nonpriority creditor's name and mailing address

**Pegatron Corporation**

**5F No. 76, Ligong St., Beitou District**

**Taipei City 112**

**Taiwan**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

**$2,125,415.54**

Date or dates debt was incurred    **2017-2020**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.106**  Nonpriority creditor's name and mailing address

**Polsinelli PC**

**222 Delaware Avenue, Suite 1101**

**Wilmington**        **DE**    **19801**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**Attorney Fees**

**$206,006.36**

Date or dates debt was incurred

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.107**  Nonpriority creditor's name and mailing address

**Porter Digital Signage**

**241 N. Caldwell Circle**

**Downingtown**        **PA**    **19335**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

**$3,000.00**

Date or dates debt was incurred    **2017**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.108**  Nonpriority creditor's name and mailing address

**PR NESWIRE ASSOCIATION, LLC**

**G.P.O. Box 5897**

**New York**        **NY**    **10087-5897**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

**$9,198.00**

Date or dates debt was incurred    **2018**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☑ No
☐ Yes

**TA-043**

Debtor   **Stream TV Networks, Inc.**                                    Case number (if known)   **23-10763**

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.          Amount of claim

| | | |
|---|---|---|
| **3.109** Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $3,807.60 |

**Raja Rajan**

**5215 Bishop View Circle**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Cherry Hill**          **NJ**    **08002**          **wages**

Date or dates debt was incurred    **Feb 16-29, 2020**        Is the claim subject to offset?

Last 4 digits of account number    __ __ __ __          ☑ No
                                                        ☐ Yes

| | | |
|---|---|---|
| **3.110** Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $935.86 |

**RL Systems**

**Old Post Office Cottage, Post Office Rd.**

**Inkpen, Berkshire, RG17 9PY**

**United Kingdon**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**goods, services**

Date or dates debt was incurred    **12/16/2019**        Is the claim subject to offset?

Last 4 digits of account number    __ __ __ __          ☑ No
                                                        ☐ Yes

| | | |
|---|---|---|
| **3.111** Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $30,321.53 |

**Robert Half Management Svs.**

**12400 Collections Center Drive**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Chicago**          **IL**    **60693**          **goods, services**

Date or dates debt was incurred    **2019-2020**        Is the claim subject to offset?

Last 4 digits of account number    __ __ __ __          ☑ No
                                                        ☐ Yes

| | | |
|---|---|---|
| **3.112** Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $14,115.00 |

**Robert S. French Revocable**

**1712 KImberly Drive**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Sunnyvale**          **CA**    **94087**          **loan**

Date or dates debt was incurred                        Is the claim subject to offset?

Last 4 digits of account number    __ __ __ __          ☑ No
                                                        ☐ Yes

**TA-044**

Debtor    **Stream TV Networks, Inc.**                    Case number (if known) __23-10763__

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.113**  Nonpriority creditor's name and mailing address          As of the petition filing date, the claim is:          $173,257.51
                                                                    *Check all that apply.*

Salazar Law                                                         ☐ Contingent

2000 Ponce De Leon Boulevard, Penthouse                            ☐ Unliquidated
                                                                    ☐ Disputed

                                                                    **Basis for the claim:**

Coral Gables                    FL        33134                      **Attorney Fees**

Date or dates debt was incurred        2020-2021                    **Is the claim subject to offset?**
                                                                    ☑ No
Last 4 digits of account number    ___ ___ ___ ___                  ☐ Yes

---

**3.114**  Nonpriority creditor's name and mailing address          As of the petition filing date, the claim is:          $1,527.57
                                                                    *Check all that apply.*

Sara Leona Robertson                                               ☐ Contingent

1900 Tomahawk Drive                                               ☐ Unliquidated
                                                                    ☐ Disputed

                                                                    **Basis for the claim:**

Henderson                        NV        89074                     **wages**

Date or dates debt was incurred        Feb 16-29, 2020              **Is the claim subject to offset?**
                                                                    ☑ No
Last 4 digits of account number    ___ ___ ___ ___                  ☐ Yes

---

**3.115**  Nonpriority creditor's name and mailing address          As of the petition filing date, the claim is:          $4,500.00
                                                                    *Check all that apply.*

SeeCubic B.V.                                                      ☐ Contingent

Park Forum 1033 & 1035                                            ☐ Unliquidated

Eindhoven                                                         ☐ Disputed

The Netherlands 5657HJ                                             **Basis for the claim:**

                                                                    **goods, services**

Date or dates debt was incurred        2011-2020                   **Is the claim subject to offset?**
                                                                    ☑ No
Last 4 digits of account number    ___ ___ ___ ___                  ☐ Yes

---

**3.116**  Nonpriority creditor's name and mailing address          As of the petition filing date, the claim is:          $7,500.00
                                                                    *Check all that apply.*

SKC Haas Display Films Co.                                         ☐ Contingent

460,Chonheung-Ri,Songgo-Ub                                        ☐ Unliquidated

Chonan-City                                                       ☐ Disputed

Chungchongnam-Do 330-836, Korea                                   **Basis for the claim:**

                                                                    **goods, services**

Date or dates debt was incurred        2015-2016                   **Is the claim subject to offset?**
                                                                    ☑ No
Last 4 digits of account number    ___ ___ ___ ___                  ☐ Yes

---

TA-045

Debtor    **Stream TV Networks, Inc.**                                    Case number (if known)  **23-10763**

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.          Amount of claim

**3.117**  Nonpriority creditor's name and mailing address        As of the petition filing date, the claim is:                    $14,930.59
                                                                *Check all that apply.*

**Special Counsel**                                              ☐ Contingent

**Dept. CH 14305**                                              ☐ Unliquidated
                                                                ☐ Disputed

                                                                Basis for the claim:

**Palatine**                  IL      **60055-4305**            **Attorney Fees**

Date or dates debt was incurred      **2020**                   Is the claim subject to offset?
                                                                ☒ No
Last 4 digits of account number      ___ ___ ___ ___            ☐ Yes


**3.118**  Nonpriority creditor's name and mailing address        As of the petition filing date, the claim is:                   $143,448.99
                                                                *Check all that apply.*

**ST4M Electronics, Inc. Beijing Office**                       ☐ Contingent

**Room1102, Building313, Hui Zhong Bei Li**                     ☐ Unliquidated

**Beijing, Chaoyang District, China**                          ☐ Disputed

                                                                Basis for the claim:

                                                                **goods, services**

Date or dates debt was incurred      **2018-2020**             Is the claim subject to offset?
                                                                ☒ No
Last 4 digits of account number      ___ ___ ___ ___           ☐ Yes


**3.119**  Nonpriority creditor's name and mailing address        As of the petition filing date, the claim is:                   $10,313.46
                                                                *Check all that apply.*

**ST4M Electronics, Inc. Beijing Office**                       ☐ Contingent

**Room1102, Building313, Hui Zhong Bei Li**                     ☐ Unliquidated

**Beijing Chaoyang District China**                            ☐ Disputed

                                                                Basis for the claim:

                                                                **goods, services**

Date or dates debt was incurred      **2018-2020**             Is the claim subject to offset?
                                                                ☒ No
Last 4 digits of account number      ___ ___ ___ ___           ☐ Yes


**3.120**  Nonpriority creditor's name and mailing address        As of the petition filing date, the claim is:                   $3,877.66
                                                                *Check all that apply.*

**Stoit Groep B.V.**                                           ☐ Contingent

**Vestdijk 23**                                                ☐ Unliquidated

**Eindhoven**                                                  ☐ Disputed

**The Netherlands 5611**                                       Basis for the claim:

                                                                **goods, services**

Date or dates debt was incurred      **2020**                  Is the claim subject to offset?
                                                                ☒ No
Last 4 digits of account number      ___ ___ ___ ___           ☐ Yes

**TA-046**

Debtor    **Stream TV Networks, Inc.**                    Case number (if known)  **23-10763**

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.          **Amount of claim**

---

**3.121**  Nonpriority creditor's name and mailing address

**Stream TV International B.V.**

**Park Forum 1033 and 1035**

**Eindhoven**

**The Netherlands 5657HJ**

Date or dates debt was incurred    **2017-2020**

Last 4 digits of account number    __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

**$27,569.35**

---

**3.122**  Nonpriority creditor's name and mailing address

**Suby Joseph**

**48 Colleen Circle**

**Downingtown**          **PA      19335**

Date or dates debt was incurred    **2020**

Last 4 digits of account number    __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**wages**

Is the claim subject to offset?
☑ No
☐ Yes

**$2,158.50**

---

**3.123**  Nonpriority creditor's name and mailing address

**Suby Joseph**

**48 Colleen Circle**

**Downingtown**          **PA      19335**

Date or dates debt was incurred    **Feb 16-29, 2020**

Last 4 digits of account number    __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**wages**

Is the claim subject to offset?
☑ No
☐ Yes

**$3,608.74**

---

**3.124**  Nonpriority creditor's name and mailing address

**Suzhou Industrial Equipment Installation**

**No. 3, Caixiang Road**

**Suzhou, Jiangsu, China**

Date or dates debt was incurred    **2019**

Last 4 digits of account number    __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:
**goods, services**

Is the claim subject to offset?
☑ No
☐ Yes

**$55,447.78**

---

**TA-047**

Debtor   **Stream TV Networks, Inc.** _____   Case number (if known)   **23-10763** _____

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

| 3.125 | Nonpriority creditor's name and mailing address |
|---|---|

| As of the petition filing date, the claim is: | $105,227.59 |

Check all that apply.

**Synopsys**

690 East Middlefield Road

☐ Contingent
☐ Unliquidated
☐ Disputed

_____

**Basis for the claim:**
**goods, services**

Mountain View          CA      94043

Date or dates debt was incurred          **2019**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number     ___ ___ ___ ___

---

| 3.126 | Nonpriority creditor's name and mailing address |
|---|---|

As of the petition filing date, the claim is:          **$29,912.61**

Check all that apply.

**TD BANK, N. A.**

P.O.Box 16027

☐ Contingent
☐ Unliquidated
☐ Disputed

_____

**Basis for the claim:**
**loan**

Lewiston          ME      04243-9513

Date or dates debt was incurred          **2018-2020**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number     ___ ___ ___ ___

---

| 3.127 | Nonpriority creditor's name and mailing address |
|---|---|

As of the petition filing date, the claim is:          **$5,300.00**

Check all that apply.

**Three D Holograms Pvt. Ltd.**

307 Kilfire House

C-17 Dalia Industrial Area

New Link Road, Andheri-West

 Mumbai, Maharashtra India 00040-0053

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred          **8/30/2019**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number     ___ ___ ___ ___

---

| 3.128 | Nonpriority creditor's name and mailing address |
|---|---|

As of the petition filing date, the claim is:          **$420,000.00**

Check all that apply.

**Trans World International, LLC**

200 Fifth Ave 7th Floor

☐ Contingent
☐ Unliquidated
☐ Disputed

_____

**Basis for the claim:**
**loan**

New York          NY      10010

Date or dates debt was incurred          **2018-2019**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number     ___ ___ ___ ___

**TA-048**

Debtor    **Stream TV Networks, Inc.** _____    Case number (if known) **23-10763** _____

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill it out or submit this page.

**Amount of claim**

---

**3.129**   **Nonpriority creditor's name and mailing address**

**Triple Crown Consulting, LLC**

**10814 Jollyville Rd, Suite 100**

_____

**Austin**                    **TX**     **78759-0000**

Date or dates debt was incurred   **2019**

Last 4 digits of account number   ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim:   **goods, services**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

**$162,115.13**

---

**3.130**   **Nonpriority creditor's name and mailing address**

**U.S. Legal Support, Inc.**

**P.O. Box 4772**

_____

**Houston**                   **TX**     **77210-4772**

Date or dates debt was incurred   **2020**

Last 4 digits of account number   ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim:   **goods, services**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

**$17,011.38**

---

**3.131**   **Nonpriority creditor's name and mailing address**

**UHaul Moving and Storage of Cinnaminson**

**201 US Highway 130S**

_____

**Cinnaminson**               **NJ**     **08077**

Date or dates debt was incurred   **2020**

Last 4 digits of account number   ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim:   **goods, services**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

**$880.08**

---

**3.132**   **Nonpriority creditor's name and mailing address**

**US Compliance Services LLC**

**199 North Woodbury Road Suite # 103**

_____

**Pitman**                    **NJ**     **08071**

Date or dates debt was incurred   **2011-2019**

Last 4 digits of account number   ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim:   **goods, services**

Is the claim subject to offset?
- ☑ No
- ☐ Yes

**$165,281.93**

---

**TA-049**

Debtor    **Stream TV Networks, Inc.** _____    Case number (if known) __**23-10763**__

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the
previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.    **Amount of claim**

| 3.133 | **Nonpriority creditor's name and mailing address** |

| | **As of the petition filing date, the claim is:**
Check all that apply. | **$173,798.00** |

**Vayikra Capital LLC**

**1 Farmstead Road**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Short Hills**        **NJ**    **07078**        **loan**

**Date or dates debt was incurred**    _____    **Is the claim subject to offset?**

**Last 4 digits of account number**    ___ ___ ___ ___    ☑ No
☐ Yes

| 3.134 | **Nonpriority creditor's name and mailing address** |

**As of the petition filing date, the claim is:**
Check all that apply.    **$214.81**

**Via Licensing Corporation**

**1275 Market Street**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**San Francisco**        **CA**    **94103-1410**        **goods, services**

**Date or dates debt was incurred**    **2019-2020**    **Is the claim subject to offset?**

**Last 4 digits of account number**    ___ ___ ___ ___    ☑ No
☐ Yes

| 3.135 | **Nonpriority creditor's name and mailing address** |

**As of the petition filing date, the claim is:**
Check all that apply.    **$4,729.98**

**Vikas Kshetrapal**

**2287 Ashbourne Drive**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**San Ramon**        **CA**    **94583**        **wages**

**Date or dates debt was incurred**    **2020**    **Is the claim subject to offset?**

**Last 4 digits of account number**    ___ ___ ___ ___    ☑ No
☐ Yes

| 3.136 | **Nonpriority creditor's name and mailing address** |

**As of the petition filing date, the claim is:**
Check all that apply.    **$6,509.32**

**Vikas Kshetrapal**

**2287 Ashbourne Dr.**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**San Ramon**        **CA**    **94583**        **wages**

**Date or dates debt was incurred**    **Feb 16-29, 2020**    **Is the claim subject to offset?**

**Last 4 digits of account number**    ___ ___ ___ ___    ☑ No
☐ Yes

**TA-050**

Debtor    **Stream TV Networks, Inc.**                                    Case number (if known)  **23-10763**

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed.  Continue numbering the lines sequentially from the previous page.  If no additional NONPRIORITY creditors exist, do not fill out or submit this page.    **Amount of claim**

---

**3.137**  Nonpriority creditor's name and mailing address    As of the petition filing date, the claim is: *Check all that apply.*    **$972.00**

**Visual Apex, Inc.**

**7950 NE Day Road W, Suite B**
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Bainbridge Island**          **WA**    **98110**    **goods, services**

Date or dates debt was incurred    **10/21/2016**    Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___    ☑ No
☐ Yes

---

**3.138**  Nonpriority creditor's name and mailing address    As of the petition filing date, the claim is: *Check all that apply.*    **$4,947.49**

**Wah Woo Tan**

**243 Summerwind Drive**
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Milpitas**          **CA**    **95035**    **wages**

Date or dates debt was incurred    **Feb 16-29, 2020**    Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___    ☑ No
☐ Yes

---

**3.139**  Nonpriority creditor's name and mailing address    As of the petition filing date, the claim is: *Check all that apply.*    **$1,874.05**

**Wai Ming Chiu**

**1798 Cape Coral Dr.**
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**San Jose**          **CA**    **95133**    **wages**

Date or dates debt was incurred    **2019-2020**    Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___    ☑ No
☐ Yes

---

**3.140**  Nonpriority creditor's name and mailing address    As of the petition filing date, the claim is: *Check all that apply.*    **$5,053.11**

**Wai Ming Chiu**

**1798 Cape Coral Dr.**
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**San Jose**          **CA**    **95133**    **wages**

Date or dates debt was incurred    **Feb 16-29, 2020**    Is the claim subject to offset?

Last 4 digits of account number    ___ ___ ___ ___    ☑ No
☐ Yes

---

**TA-051**

Debtor    **Stream TV Networks, Inc.**                                Case number (if known) __23-10763__

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.          Amount of claim

---

| 3.141 | Nonpriority creditor's name and mailing address |
As of the petition filing date, the claim is: *Check all that apply.*           **$10,640.00**

**Walsh C.H.B. Inc**

**189 Sunrise Highway Suite # 302**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Rockville Centre**          **NY    11570**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2014-2019**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| 3.142 | Nonpriority creditor's name and mailing address |
As of the petition filing date, the claim is: *Check all that apply.*           **$56,316.40**

**Weida Freight System Co.**

**Flat 402, 4/F., Yee Kuk Indust. Ctr.**

**555 Yee Kuk Street**

**Cheung Sha Wan, Kowloon Hong Kong, China**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2019**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| 3.143 | Nonpriority creditor's name and mailing address |
As of the petition filing date, the claim is: *Check all that apply.*           **$10,383.77**

**Wharton Capital Partners**

**5720 Lagorce Drive**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Miami Beach**          **FL    33140**

**Basis for the claim:**
**loan**

Date or dates debt was incurred    **2018-2019**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| 3.144 | Nonpriority creditor's name and mailing address |
As of the petition filing date, the claim is: *Check all that apply.*           **$4,617.50**

**WiLine Networks Inc.**

**P.O. Box 102150**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Pasadena**          **CA    91189-2150**

**Basis for the claim:**
**goods, services**

Date or dates debt was incurred    **2019-2020**

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

**TA-052**

Case 23-10763-mdc    Doc 54    Filed 03/29/23    Entered 03/29/23 22:05:20    Desc Main
Document    Page 48 of 50

| Debtor | **Stream TV Networks, Inc.** | Case number (if known) | **23-10763** |
|---|---|---|---|

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

|  |  | **Amount of claim** |
|---|---|---|

| **3.145** Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$806.08** |

William Hennessey

436 Lee Place

☐ Contingent
☐ Unliquidated
☐ Disputed

| Exton | PA | 19341 |

**Basis for the claim:** goods, services

Date or dates debt was incurred    1/29/2020

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| **3.146** Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$372.00** |

Zach Lehman

1440 S. Stanley Ave.

☐ Contingent
☐ Unliquidated
☐ Disputed

| Los Angeles | CA | 90019 |

**Basis for the claim:** wages

Date or dates debt was incurred    12/13/2019

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| **3.147** Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$3,182.43** |

Zach Lehman

1440 S. Stanley Ave.

☐ Contingent
☐ Unliquidated
☐ Disputed

| Los Angeles | CA | 90019 |

**Basis for the claim:** wages

Date or dates debt was incurred    Feb 16-29, 2020

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

---

| **3.148** Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$2,058.00** |

Zeifang Hsu

101 Blaisdell Way

☐ Contingent
☐ Unliquidated
☐ Disputed

| Fremont | CA | 94536 |

**Basis for the claim:** wages

Date or dates debt was incurred    2/28/2020

**Is the claim subject to offset?**
☑ No
☐ Yes

Last 4 digits of account number    ___ ___ ___ ___

**TA-053**

Debtor    **Stream TV Networks, Inc.**                                         Case number (if known)    **23-10763**

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                **Amount of claim**

| 3.149 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: | $6,342.79 |

**Zeifang Hsu**

**101 Blaisdell Way**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Fremont                    CA    94536**

**Basis for the claim:**

**wages**

Date or dates debt was incurred    **Feb 16-29, 2020**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?

☑ No
☐ Yes

---

| 3.150 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: | $29,577.86 |

**Zygintas Papartis (EUR)**

**Sarmos g. 7-2**

**Vilnius 04126**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**goods, services**

Date or dates debt was incurred    **2019-2020**

Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?

☑ No
☐ Yes

**TA-054**

Debtor    **Stream TV Networks, Inc.**                                      Case number (if known)    **23-10763**

| **Part 4:** | **Total Amounts of the Priority and Nonpriority Unsecured Claims** |
|---|---|

5.    **Add the amounts of priority and nonpriority unsecured claims.**

|  |  | **Total of claim amounts** |
|---|---|---|
| 5a. | **Total claims from Part 1** | 5a.    **$216,576.01** |
| 5b. | **Total claims from Part 2** | 5b. **+**    **$20,137,677.18** |
| 5c. | **Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | 5c.    **$20,354,253.19** |

**TA-055**

**GLOBAL NOTES TO SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS OF
DEBTORS, STREAM TV NETWORKS, INC., CASE NO. 23-10763(mdc) AND
TECHNOVATIVE MEDIA, INC., CAUSE NO. 10764 (Joint Administration Requested)**

The Debtors develop their technology and conduct the majority of their business through their direct and indirect foreign and domestic subsidiaries. The Debtors provided capital to their direct and indirect foreign and domestic subsidiaries for the purpose of acquiring and developing assets and to conduct business operations. The Debtors direct interested parties to the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [Docket No. 48] ("Rajan Declaration") in which the Debtors' organizational and operational structure is described in greater detail.

In its bankruptcy schedules, the Debtors disclose and describe the assets, including their ownership interest in direct subsidiaries and their contracts, that the Debtors owned as of March 15, 2023 (the "Petition Date"). The Debtors' direct subsidiaries, in turn, hold or may hold ownership interests in the Debtors' indirect subsidiaries as depicted on the Debtor's Organization Chart included in the Rajans Declaration. The assets of the Debtors' direct and indirect subsidiaries are not included in the Debtors' bankruptcy schedules.

The Debtors intend to complete a recovery of assets which were previously and improperly transferred in contravention of express provisions of its corporate charter through an invalidated board settlement agreement as confirmed by the Delaware Supreme Court through an *en banc* unanimous decision on June 15, 2022. *See Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction").[1] The Delaware Supreme Court also held that the "agreement authorizing the secured creditors to transfer Stream's pledged assets . . . is **invalid** because Stream's unambiguous certificate of incorporation required the approval of Stream's Class B stockholders." *Id.*. at p. 34. (emphasis added).

---

[1] A debt resolution committee of the Debtor's Board of Directors purporting to act on the Debtor's behalf reached an unauthorized settlement enshrined in an agreement titled as the Omnibus Agreement, dated May 6, 2021, between the Debtor's senior secured lender, SLS Holdings VI, LLC ("SLS") and the Debtor's debt resolution committee, which was which approved by the Delaware Court of Chancery and then held to be invalid by the Delaware Supreme Court on appeal.  Prior to the Delaware Supreme Court ruling the SLS Holdings and its newly formed company,

The new company formed by the purported secured lenders,[2] SeeCubic, Inc. ("SeeCubic"),[3] asserted an ownership interest in all of the Debtor's assets and took possession of, and in some cases, destroyed the Debtors' assets. The Chancery Court, on remand and with direction from the Delaware Supreme Court to effectuate the dismissal and vacating of its prior injunctive relief, has made it clear that the assets must be returned **both in title and possession to the Debtors.**[4] Furthermore, the Chancery Court on August 10, 2022, issued an *Order Granting Partial Final Judgment* in favor of the Debtor. The order stated: "Pending transfer of the Assets from SeeCubic to Stream, SeeCubic and all those acting in concert with it shall not use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream." Rajan Declaration, Exhibit BB. Despite these clear directives, the purported secured lenders have resisted and continue to resist return of the assets.

The Debtors have also been alerted to SeeCubic's violation of intellectual property licenses which were held by the Debtors and were non-transferable, actions violating third party rights under applicable Federal and state law which cannot be remedied or cleansed by the invalidated settlement, even prior to its invalidation by the Delaware Supreme Court. Even before the Omnibus Agreement was invalidated, the transfers themselves were invalid under both a Phillips license to the Debtors and a Rembrandt 3D Holding Ltd. ("Rembrandt") license, both parties not subject to the settlement or any now invalidated injunctive relief by the Chancery Court.[5]

The Debtors have been subjected to continuous damage by the purported secured creditors, even after the Supreme Court decision. SeeCubic, the purported lenders, and Mr. Shad Stastney of SeeCubic and SLS, were held in contempt by the Delaware Court of Chancery in October 2022 for their orchestrated efforts to seize control of the Debtor's subsidiary, TechnoVative Media, Inc.,

---

[2] The Debtors contend that SLS Holdings VI, LLC ("SLS") and Hawk Investment Holdings Limited ("Hawk") hold secured debt convertible to equity or must pursue their claims in chapter 11 where they will be paid in full, if their claims are allowed.

[3] SeeCubic, Inc., a Delaware entity, took its name from a foreign Dutch subsidiary of the Debtors, SeeCubic B.V. (The Netherlands) ("SCBV") and is likely in violation of trademark laws protecting the Debtors and its foreign subsidiary).

[4] On August 9, 2022, nearly 8 weeks after the Delaware Supreme Court opinion, the Chancery Court issued a TRO against SeeCubic. Vice Chancellor Laster specifically stated his expectations: "SeeCubic will restore Stream's assets to Stream in accordance with the Rule 54(b) order. Once this has occurred, SeeCubic may seek to exercise any creditor's rights it possesses against Stream. SeeCubic must do so based on a status quo where Stream has title to and possession of its assets, not a status quo in which SeeCubic acquired possession based on a decision that the Delaware Supreme Court has held is erroneous."

[5] On February 21, 2023, Rembrandt filed suit in the U.S. District Court for the District of Delaware against parties using the Ultra-D technology without a Rembrandt license. It sued TechnoVative USA, which was under the direction of the Chancery Court-appointed Receiver, Hawk, and SeeCubic for trade secret violations and injunctive relief to prevent the sale of Stream's assets *Rembrandt 3D Holding Ltd v Technovative Media, Inc., Hawk Investment Holdings Ltd. and SeeCubic, Inc.*

in the months after the Supreme Court decision. In ¶ 3 of his October 3, 2022 Opinion, Vice Chancellor Laster wrote: "This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk." *See* Rajan Declaration, Exhibit AA.

SLS and SeeCubic possess some and claim to have obtained possession or control of other of the Debtor's assets before the Petition Date. The Debtor's investigation into the location and condition of its assets is ongoing. The Debtors have listed the assets that they believe they continue to own, unless otherwise expressly indicated in its bankruptcy schedules. The Debtors intend to pursue recovery of assets and to operate their business under the provisions of the Bankruptcy Code in this case.

Additional Notes:

1.     Because US GAAP treatment may not apply to the Debtor's assets located in foreign jurisdictions, the values provided for certain assets may differ from typical accounting standards.

2.     Funding advanced by the Debtors to their direct and indirect subsidiaries are reflected in intercompany loans.

3.     The Debtors' goodwill and similar intangible value is not reflected in the Debtors' bankruptcy schedules.

4.     SeeCubic BV (the Netherlands) is a subsidiary of the Debtors, SeeCubic BV (the Netherlands) is unrelated to and is a separate entity from SeeCubic Inc., a company newly formed in Delaware by SLS Holdings, Inc.

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA
READING DIVISION**

IN RE:                                                      CHAPTER **11**

**Stream TV Networks, Inc.**

DEBTOR(S)                                                   CASE NO    **23-10763**

## LIST OF EQUITY SECURITY HOLDERS

| Registered Name of Holder of Security<br>Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest<br>Registered |
|---|---|---|---|
| See Schedule attached | A | | |

### DECLARATION UNDER PENALTY OF PERJURY
### ON BEHALF OF A CORPORATION OR PARTNERSHIP

I, the _____**CEO and Director**_____ of the _____**Corporation**_____
named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: _March 29, 2023_____        Signature: _____

**Mathu Rajan**
**CEO and Director**

**TA-059**

| Holder | Class A Common Shares | Class B Preferred Shares | Warrants | Options/SARS | FD | Class B Voting | Class C Voting | Economic % | Voting % |
|---|---|---|---|---|---|---|---|---|---|
| Visual Semiconductor, Inc | 63,062 | - | | | 63,062 | - | 45,000,000 | 0.04% | 80.06% |
| Akshaya Holdings LLC | 5,021,551 | | | - | 5,021,551 | 19,253,216 | | 2.81% | 8.79% |
| Mathu Rajan | 18,200 | | - | | 18,200 | 18,200 | | 0.01% | 0.009% |
| Visual Technology Innovations, Inc | 52,562 | | - | | 52,562 | - | | 0.03% | 0.002% |
| Glasses-Free Technologies, Inc. | 9,273 | | - | | 9,273 | - | | 0.01% | 0.0004% |
| | | | | | | | | 2.889% | 88.855%    These companies/entities are controlled by Mathu Rajan and control 88.86% of the Company |
| Hawk Investment Holdings Limited | 89,201,430 | 336,645 | 399,566,883 | 9,500 | 489,114,458 | 1,091,538 | | 50.09% | 4.47% Post conversion as of Oct 2022 |
| Joseph Corso | 2,782,389 | | - | | 2,782,389 | 1,182,389 | | 1.56% | 0.65% |
| SLS Holdings VI, LLC | 13,583,605 | | 13,226,566 | | 26,810,171 | - | | 7.60% | 0.60% |
| Vayikra Capital LLC | 4,429,002 | - | 10,266,248 | | 14,695,250 | 495,691 | | 2.48% | 0.42% |
| Todd D Tuls | 1,669,062 | | 300,000 | | 1,969,062 | 739,062 | | 0.93% | 0.40% |
| Jeffrey A Grossman | 807,480 | | 50,000 | | 857,480 | 792,480 | | 0.45% | 0.39% |
| Tom Sego | 5,110,000 | | 26,668 | | 5,136,668 | 34,483 | | 2.86% | 0.24% |
| Billy J. Knott | 268,003 | | - | | 268,003 | 268,003 | | 0.15% | 0.13% |
| Estate of Harold A Sorgenti | 1,006,009 | - | | | 1,006,009 | 184,232 | | 0.56% | 0.13% |
| Hadron Master Fund | 2,666,668 | | 5,666,668 | | 8,333,336 | - | | 1.49% | 0.12% |
| MTL Shipping & Investment Ltd | 2,509,448 | | 12,985,942 | | 15,495,390 | - | | 1.40% | 0.11% |
| Raja Rajan | 2,500,000 | | | | 2,500,000 | - | | 1.40% | 0.11% |
| Charles William David Birchall | 2,300,000 | | 4,233,331 | | 6,533,331 | - | | 1.29% | 0.10% |
| Broughton Ltd. | 2,132,080 | | 497,316 | | 2,629,396 | - | | 1.19% | 0.09% |
| Alvaro Ramirez | 997,761 | - | | | 997,761 | 107,761 | | 0.56% | 0.09% |
| Pershing Nominees Ltd a/c CCCLT | 1,801,573 | | 861,971 | | 2,663,544 | - | | 1.01% | 0.08% |
| Sonny Mandell | 1,711,260 | | | | 1,711,260 | - | | 0.96% | 0.08% |
| Adolfo & Donna Carmona | 451,668 | - | 483,335 | | 935,003 | 125,000 | | 0.25% | 0.08% |
| Alastair Duncan Hadfield Crawford | 1,382,073 | | 1,164,584 | | 2,546,657 | - | | 0.77% | 0.06% |
| Jerry Schwartz | 114,018 | | - | | 114,018 | 114,018 | | 0.06% | 0.06% |
| Charles Lasley | 113,702 | | - | | 113,702 | 113,702 | | 0.06% | 0.06% |
| Lawrence Ciarcia | 113,702 | | - | | 113,702 | 113,702 | | 0.06% | 0.06% |
| Hallfield Holdings SA | 1,250,001 | | 833,335 | | 2,083,336 | - | | 0.70% | 0.06% |
| Vipul Patel | 1,128,492 | - | 900,003 | | 2,028,495 | 9,216 | | 0.63% | 0.05% |
| MWL International Ltd | 1,213,152 | | 3,866,684 | | 5,079,836 | - | | 0.68% | 0.05% |
| Nigel Hamilton-Smith | 1,066,426 | | 1,688,221 | | 2,754,647 | - | | 0.60% | 0.05% |
| Pepper Grove Holdings Limited | 1,055,005 | | 1,141,670 | | 2,196,675 | - | | 0.59% | 0.05% |
| Debt Opportunity Fund, LLC | 94,693 | | - | | 94,693 | 94,693 | | 0.05% | 0.05% |
| Total CFO, LLC | 94,693 | | - | | 94,693 | 94,693 | | 0.05% | 0.05% |
| St Peter Port Capital | 1,007,913 | | | | 1,007,913 | - | | 0.56% | 0.04% |
| Eugene Jhong and Jisun Rhee Trust | 86,206 | - | | | 86,206 | 86,206 | | 0.05% | 0.04% |
| Margaret Valentine | 75,000 | | - | | 75,000 | 75,000 | | 0.04% | 0.04% |
| Puddles 2 Limited | 786,337 | | - | | 786,337 | - | | 0.44% | 0.03% |
| Adrian Conrad Holmes | 785,006 | | 930,000 | | 1,715,006 | - | | 0.44% | 0.03% |
| William & Joanne Jellison | 88,966 | | - | | 88,966 | 68,966 | | 0.05% | 0.03% |
| Andrew James Roughley | 750,001 | | 8,000,000 | | 8,750,001 | - | | 0.42% | 0.03% |
| Mark Daniel Roughley | 750,001 | | 8,000,000 | | 8,750,001 | - | | 0.42% | 0.03% |
| Dennis Lavin | 725,000 | | 1,000,000 | | 1,725,000 | - | | 0.41% | 0.03% |
| Ian David Tanner | 675,000 | | 1,083,332 | | 1,758,332 | - | | 0.38% | 0.03% |
| Jaystyle Limited | 113,626 | | - | | 113,626 | 51,726 | | 0.06% | 0.03% |
| John McCrossin | 57,167 | | - | | 57,167 | 57,167 | | 0.03% | 0.03% |
| Barry Alan Rutledge | 56,851 | | - | | 56,851 | 56,851 | | 0.03% | 0.03% |
| Thomas L. Glen III | 56,851 | | - | | 56,851 | 56,851 | | 0.03% | 0.03% |
| TR Reddy | 56,851 | | - | | 56,851 | 56,851 | | 0.03% | 0.03% |
| Windsor International Corporation | 600,000 | | 2,800,000 | | 3,400,000 | - | | 0.34% | 0.03% |
| Sanford Lipstein | 54,498 | - | | | 54,498 | 54,498 | | 0.03% | 0.03% |
| Soniya Patel | 73,154 | - | | | 73,154 | 51,725 | | 0.04% | 0.03% |
| Neulight Living Trust | 589,267 | | - | | 589,267 | - | | 0.33% | 0.03% |
| Godefridus Vranken | 576,000 | | 300,000 | | 876,000 | - | | 0.32% | 0.03% |
| Emson Holdings Ltd | 570,000 | | 3,800,000 | | 4,370,000 | 51,166 | | 0.32% | 0.03% |
| Walsh CHB, Inc. | 51,166 | | - | | 51,166 | - | | 0.03% | 0.03% |

**TA-060**

| Holder | Class A Common Shares | Class B Preferred Shares | Warrants | Options/SARS | FD | Class B Voting | Class C Voting | Economic % | Voting % |
|---|---|---|---|---|---|---|---|---|---|
| Framse Holding GmbH | 515,002 | | 1,260,000 | | 1,775,002 | - | | 0.29% | 0.02% |
| Keith O. Newton | 55,734 | | - | | 55,734 | 45,734 | | 0.03% | 0.02% |
| Lisa Walsh | 509,878 | | - | | 509,878 | - | | 0.29% | 0.02% |
| Leonardo Zampatti | 500,000 | | 250,000 | | 750,000 | - | | 0.28% | 0.02% |
| Londer Securities S.A. | 500,000 | | 250,000 | | 750,000 | - | | 0.28% | 0.02% |
| Chris Monson / CWM Real Estate Services, Inc. | 43,207 | | - | | 43,207 | 43,207 | | 0.02% | 0.02% |
| Lester Amey | 43,104 | - | - | | 43,104 | 43,104 | | 0.02% | 0.02% |
| Michael T and Cheryl A Blakeslee | 42,937 | - | - | | 42,937 | 42,937 | | 0.02% | 0.02% |
| Silverwood Enterprises Limited | 121,383 | - | - | | 121,383 | 34,483 | | 0.07% | 0.02% |
| Edinburgh Capital Management | 465,000 | | 200,000 | | 665,000 | - | | 0.26% | 0.02% |
| David Weber | 41,160 | | - | | 41,160 | 41,160 | | 0.02% | 0.02% |
| Batten Trustee Ltd as Trustee of the Arrow Trust | 450,001 | | 833,335 | | 1,283,336 | - | | 0.25% | 0.02% |
| Keith Owen Claude Merrick | 450,001 | | 441,668 | | 891,669 | - | | 0.25% | 0.02% |
| Jan-Age Ronnestad | 95,748 | - | 160,040 | | 255,788 | 34,483 | | 0.05% | 0.02% |
| LRC 2011 Trust | 55,434 | | 16,670 | | 72,104 | 37,933 | | 0.03% | 0.02% |
| Intrinsyc Technologies Corporation | 415,346 | | - | | 415,346 | - | | 0.23% | 0.02% |
| Mark Dyer | 401,024 | | 200,512 | | 601,536 | - | | 0.22% | 0.02% |
| Kishore Ganji & Srilalitha Bhattaram | 54,483 | - | - | | 54,483 | 34,483 | | 0.03% | 0.02% |
| Harry Gierman | 44,483 | - | - | | 44,483 | 34,483 | | 0.02% | 0.02% |
| David Cohen | 35,269 | - | - | | 35,269 | 35,269 | | 0.02% | 0.02% |
| Dr Alex Ortolano | 34,500 | - | - | | 34,500 | 34,500 | | 0.02% | 0.02% |
| Owen Nutto | 34,300 | | - | | 34,300 | 34,300 | | 0.02% | 0.02% |
| Shadron Stastney | 360,339 | | 1,201,130 | | 1,561,469 | - | | 0.20% | 0.02% |
| Eamonn Manson | 351,024 | | 175,512 | | 526,536 | - | | 0.20% | 0.02% |
| Paul Stamatis Jr | 95,000 | - | - | | 95,000 | 25,000 | | 0.05% | 0.02% |
| Stephen M Andress | 49,313 | - | 33,335 | | 82,648 | 29,312 | | 0.03% | 0.02% |
| Laurence Catterson and Helen Tonar Pitt Catterson | 338,367 | | - | | 338,367 | - | | 0.19% | 0.02% |
| Bruno Widmer | 32,500 | - | - | | 32,500 | 30,000 | | 0.02% | 0.01% |
| Michael Haggiag Family Trust u/a dtd 1/6/2014 | 325,000 | | 350,000 | | 675,000 | - | | 0.18% | 0.01% |
| Miriam Mandell | 319,841 | | - | | 319,841 | - | | 0.18% | 0.01% |
| Mark Andrew Vully De Candole | 316,667 | | 150,000 | | 466,667 | - | | 0.18% | 0.01% |
| David P Lamoreaux | 29,870 | | - | | 29,870 | 28,620 | | 0.02% | 0.01% |
| Paul Fauci | 28,425 | | - | | 28,425 | 28,425 | | 0.02% | 0.01% |
| Fred A. Shabel | 135,999 | | - | | 135,999 | 17,156 | | 0.08% | 0.01% |
| Reyker Nominees Limited | 303,277 | | 234,972 | | 538,249 | - | | 0.17% | 0.01% |
| Mr Al and Mrs HA Patel A&M Settlement Trust | 27,500 | - | - | | 27,500 | 27,500 | | 0.02% | 0.01% |
| Sheila Lois Laboda | 27,288 | | - | | 27,288 | 27,288 | | 0.02% | 0.01% |
| David Taylor | 300,000 | | 150,000 | | 450,000 | - | | 0.17% | 0.01% |
| S Bruce Rubin | 42,931 | | 5,086 | | 48,017 | 25,431 | | 0.02% | 0.01% |
| Amlin Investments Ltd | 295,000 | | 408,330 | | 703,330 | - | | 0.17% | 0.01% |
| Leo Hindery, Jr | 292,596 | | 3,193,108 | 2,000,000 | 5,485,704 | - | | 0.16% | 0.01% |
| Timothy D.K. Simond | 292,501 | | 608,334 | | 900,835 | - | | 0.16% | 0.01% |
| Pepper J Frazier and Elizabeth P Frazier JT Ten | 26,250 | - | - | | 26,250 | 26,250 | | 0.01% | 0.01% |
| Guy H.A. Chisenhale-Marsh | 255,000 | | 215,000 | | 470,000 | - | | 0.14% | 0.01% |
| Joseph A Saiia | 78,515 | | - | | 78,515 | 17,245 | | 0.04% | 0.01% |
| Paul & Rachel Becker | 22,740 | | - | | 22,740 | 22,740 | | 0.01% | 0.01% |
| Sharon Kostaroff | 22,740 | | - | | 22,740 | 22,740 | | 0.01% | 0.01% |
| Lapis Ventures SAC Limited | 250,000 | | - | | 250,000 | - | | 0.14% | 0.01% |
| Sharad Patel | 249,000 | | 830,000 | | 1,079,000 | - | | 0.14% | 0.01% |
| Antoinette Garrison Trust | 69,992 | - | - | | 69,992 | 17,500 | | 0.04% | 0.01% |
| Robert N Garrison Trust | 69,992 | - | - | | 69,992 | 17,500 | | 0.04% | 0.01% |

**TA-061**

| Holder | Class A Common Shares | Class B Preferred Shares | Warrants | Options/SARS | FD | Class B Voting | Class C Voting | Economic % | Voting % |
|---|---|---|---|---|---|---|---|---|---|
| Sorgenti Investors, L.P. | 243,381 | | | | 243,381 | - | | 0.14% | 0.01% |
| Peter Thomas Kaursland | 227,499 | | 503,330 | | 730,829 | - | | 0.13% | 0.01% |
| Alkis P Zingas Trust | 20,000 | - | | | 20,000 | 20,000 | | 0.01% | 0.01% |
| Quaker Holdings L.P. | 213,494 | | 500,000 | | 713,494 | - | | 0.12% | 0.01% |
| Adolfo Carmona | 200,000 | | - | | 200,000 | - | | 0.11% | 0.01% |
| Cereals & Vegetable Oils Trading Corp FZE | 200,000 | | 1,066,664 | | 1,266,664 | - | | 0.11% | 0.01% |
| Leman Management Nominees Limited | 200,000 | | 100,000 | | 300,000 | - | | 0.11% | 0.01% |
| Jurgen Toorneman | 27,242 | - | | | 27,242 | 17,242 | | 0.02% | 0.01% |
| Antoinette Garrison | 17,500 | - | | | 17,500 | 17,500 | | 0.01% | 0.01% |
| Jacob Winigrad | 17,242 | - | | | 17,242 | 17,242 | | 0.01% | 0.01% |
| Sanford Lipstein, Trustee Eugene Lipstein | 17,173 | | - | | 17,173 | 17,173 | | 0.01% | 0.01% |
| James Marussich | 17,055 | | - | | 17,055 | 17,055 | | 0.01% | 0.01% |
| Larry Schmalz | 18,370 | - | | | 18,370 | 16,370 | | 0.01% | 0.01% |
| David Walpole, Helene Webb and The SRB Trustee Company Limited as Trustees of The DKM Walpole DT | 180,000 | | 600,000 | | 780,000 | - | | 0.10% | 0.01% |
| Mary C McBrearty | 16,250 | - | | | 16,250 | 16,250 | | 0.01% | 0.01% |
| Charles Neulight | 171,315 | | | | 171,315 | - | | 0.10% | 0.01% |
| Richard E. Carp | 54,292 | | - | | 54,292 | 11,370 | | 0.03% | 0.01% |
| Brooks W Garrison | 15,000 | | - | | 15,000 | 15,000 | | 0.01% | 0.01% |
| Robert N Garrison Jr | 15,000 | | - | | 15,000 | 15,000 | | 0.01% | 0.01% |
| MP Tavill Revocable Trust | 49,250 | - | 51,668 | | 100,918 | 11,250 | | 0.03% | 0.01% |
| Nicholas Toppin | 160,183 | | | | 160,183 | - | | 0.09% | 0.01% |
| Robert S French Revocable Trust 2018 | 20,043 | - | 19,500 | | 39,543 | 13,793 | | 0.01% | 0.01% |
| Pershing (CI) Nominees Limited a/c JCCLT | 157,269 | | - | | 157,269 | - | | 0.09% | 0.01% |
| Elizabeth P Frazier | 156,791 | | | | 156,791 | - | | 0.09% | 0.01% |
| Roberto Villaquiran | 156,539 | | | | 156,539 | - | | 0.09% | 0.01% |
| LBJ Investors, LP | 38,361 | | - | | 38,361 | 11,449 | | 0.02% | 0.01% |
| Charles J Caminada | 150,000 | | 75,000 | | 225,000 | - | | 0.08% | 0.01% |
| Frank Dearie and Cindy Dearie | 149,574 | | | | 149,574 | - | | 0.08% | 0.01% |
| Mark & Sherri Finnegan | 13,500 | - | | | 13,500 | 13,500 | | 0.01% | 0.01% |
| Bixx Tech Limited | 147,899 | | 333,335 | | 481,234 | - | | 0.08% | 0.01% |
| Anthony Wigram | 146,001 | | 195,000 | | 341,001 | - | | 0.08% | 0.01% |
| Spirit Shore Ventures, LLC | 20,000 | - | | | 20,000 | 12,500 | | 0.01% | 0.01% |
| Rafael E Osona and Gail E Osona | 12,931 | | - | | 12,931 | 12,931 | | 0.01% | 0.01% |
| David Lombardi | 40,311 | - | | | 40,311 | 10,094 | | 0.02% | 0.01% |
| Neil Thacker Maclachan | 140,000 | | 70,000 | | 210,000 | - | | 0.08% | 0.01% |
| Estate of Alfred Waber | 25,813 | | - | | 25,813 | 11,370 | | 0.01% | 0.01% |
| Susan Spratt and David Spratt | 35,000 | - | | | 35,000 | 10,000 | | 0.02% | 0.01% |
| Primorus Investments PLC | 133,333 | | - | | 133,333 | - | | 0.07% | 0.01% |
| Sebastian Andrew Marr | 133,333 | | | | 133,333 | - | | 0.07% | 0.01% |
| Timothy John Morton | 126,030 | | 683,233 | | 809,263 | - | | 0.07% | 0.01% |
| Bowman Sculpture International Ltd | 125,939 | | - | | 125,939 | - | | 0.07% | 0.01% |
| Peter Jay Gilmore and Susan Florence Gilmore | 11,437 | | - | | 11,437 | 11,437 | | 0.01% | 0.01% |
| Stuart Evan Horwich | 17,781 | - | 7,000 | | 24,781 | 10,781 | | 0.01% | 0.01% |
| Glen and Peggy Bordak | 11,370 | | - | | 11,370 | 11,370 | | 0.01% | 0.01% |
| Gregory P. Gifford | 11,370 | | - | | 11,370 | 11,370 | | 0.01% | 0.01% |
| John R. Bartos | 11,370 | | - | | 11,370 | 11,370 | | 0.01% | 0.01% |
| Nicholas Ercolano | 11,370 | | - | | 11,370 | 11,370 | | 0.01% | 0.01% |
| Joan Pileggi | 11,000 | | - | | 11,000 | 11,000 | | 0.01% | 0.01% |
| Martin Fasack | 34,514 | - | | | 34,514 | 8,621 | | 0.02% | 0.01% |
| The 2012 Sanford Lipstein Family Trust | 119,483 | | - | | 119,483 | - | | 0.07% | 0.01% |
| Keith Young | 119,108 | | | | 119,108 | - | | 0.07% | 0.01% |

**TA-062**

| Holder | Class A Common Shares | Class B Preferred Shares | Warrants | Options/SARS | FD | Class B Voting | Class C Voting | Economic % | Voting % |
|---|---|---|---|---|---|---|---|---|---|
| Jonathan Gellis | 10,813 | - | - | | 10,813 | 10,813 | | 0.01% | 0.01% |
| Leon J. Dutkiewicz, JR | 10,782 | - | - | | 10,782 | 10,782 | | 0.01% | 0.01% |
| Guy Spelman | 10,776 | - | - | | 10,776 | 10,776 | | 0.01% | 0.01% |
| Keith Gordon Marsden | 116,898 | | 133,335 | | 250,233 | - | | 0.07% | 0.01% |
| Newman Chittenden | 28,264 | - | | | 28,264 | 8,621 | | 0.02% | 0.01% |
| Mirdas Limited | 112,688 | | | | 112,688 | - | | 0.06% | 0.01% |
| Bruce Deluca | 10,000 | - | - | | 10,000 | 10,000 | | 0.01% | 0.00% |
| David Blomquist | 10,000 | - | - | | 10,000 | 10,000 | | 0.01% | 0.00% |
| Gordon Michael Howard | 10,000 | - | - | | 10,000 | 10,000 | | 0.01% | 0.00% |
| John W Quaintance III | 10,000 | - | - | | 10,000 | 10,000 | | 0.01% | 0.00% |
| Vincent A Pileggi | 10,000 | - | - | | 10,000 | 10,000 | | 0.01% | 0.00% |
| Sheila Laboda Revocable Trust | 53,013 | - | - | | 53,013 | 5,178 | | 0.03% | 0.00% |
| Christopher Matthews | 100,781 | | | | 100,781 | - | | 0.06% | 0.00% |
| Joseph S. Zuritsky | 100,781 | | | | 100,781 | - | | 0.06% | 0.00% |
| Grahame Paul Alan Lovett | 100,500 | | 268,000 | | 368,500 | - | | 0.06% | 0.00% |
| CSS Ltd | 100,001 | | 666,670 | | 766,671 | - | | 0.06% | 0.00% |
| CSS Recruitment | 100,001 | | | | 100,001 | - | | 0.06% | 0.00% |
| DEAR SPA | 100,001 | | 333,335 | | 433,336 | - | | 0.06% | 0.00% |
| Joel Pace Kallan | 100,001 | | 333,335 | | 433,336 | - | | 0.06% | 0.00% |
| Donald E Bates | 100,000 | | 250,000 | | 350,000 | - | | 0.06% | 0.00% |
| Hanson Holdings Lux S.à r.l. | 100,000 | | 50,000 | | 150,000 | - | | 0.06% | 0.00% |
| RAB Capital Holdings Limited | 100,000 | | | | 100,000 | - | | 0.06% | 0.00% |
| WB Nominees Limited | 100,000 | | 91,666 | | 191,666 | - | | 0.06% | 0.00% |
| George M. Ross Irrevocable Indenture of Trust dated as of July 29, 1998 | 98,564 | | | | 98,564 | - | | 0.06% | 0.00% |
| National Financial Services FBO Emilio DiSanluciano IRA | 8,862 | - | - | | 8,862 | 8,862 | | 0.00% | 0.00% |
| Peter Kaizer | 22,503 | - | - | | 22,503 | 7,394 | | 0.01% | 0.00% |
| Irwin Gruverman | 8,621 | - | - | | 8,621 | 8,621 | | 0.005% | 0.00% |
| John M Apathy & Susan G Apathy | 8,621 | - | - | | 8,621 | 8,621 | | 0.005% | 0.00% |
| Oz Ventures, LLC | 8,621 | - | - | | 8,621 | 8,621 | | 0.005% | 0.00% |
| RBC Capital Markets LLC Cust FBO David W Nock, Roth IRA | 8,621 | - | - | | 8,621 | 8,621 | | 0.005% | 0.00% |
| Warren Scott Hilton & Judith Kenney Hilton | 8,620 | - | - | | 8,620 | 8,620 | | 0.005% | 0.00% |
| RBC Capital Markets LLC Cust FBO Pieter Van Hoeven SEP IRA | 8,276 | - | - | | 8,276 | 8,276 | | 0.005% | 0.00% |
| S F Booth | 87,693 | - | - | | 87,693 | - | | 0.049% | 0.00% |
| Etta Winigrad | 16,941 | - | - | | 16,941 | 6,897 | | 0.009% | 0.00% |
| Jeffrey A. Dominick | 25,852 | - | - | | 25,852 | 5,719 | | 0.014% | 0.00% |
| Gary Ruchaber | 13,147 | - | - | | 13,147 | 6,897 | | 0.007% | 0.00% |
| Joel Vine | 81,278 | - | - | | 81,278 | - | | 0.045% | 0.00% |
| Larry Evans | 77,609 | - | - | 24,000 | 101,609 | - | | 0.043% | 0.00% |
| Jarl Saal | 7,000 | - | - | | 7,000 | 7,000 | | 0.004% | 0.00% |
| Scott Lindell | 6,897 | - | - | | 6,897 | 6,897 | | 0.004% | 0.00% |
| Young Park | 75,593 | | | | 75,593 | - | | 0.042% | 0.00% |
| Leonard I. Korman | 75,180 | | | | 75,180 | - | | 0.042% | 0.00% |
| Hugh Rokeby Holland | 75,001 | | 58,334 | | 133,335 | - | | 0.042% | 0.00% |
| Nicholas P Wentworth-Stanley | 75,001 | | 58,334 | | 133,335 | - | | 0.042% | 0.00% |
| Charles David Murch | 75,000 | | 250,000 | | 325,000 | - | | 0.042% | 0.00% |
| Fourys Co Ltd | 75,000 | | 250,000 | | 325,000 | - | | 0.042% | 0.00% |
| Guy Henry Toller | 75,000 | | 100,000 | | 175,000 | - | | 0.042% | 0.00% |
| Joseph J Karcsmar & Rene Laracuente | 75,000 | | 250,000 | | 325,000 | - | | 0.042% | 0.00% |
| Michael Gray | 75,000 | | 250,000 | | 325,000 | - | | 0.042% | 0.00% |
| Oliroma Holdings SRL | 75,000 | | 350,000 | | 425,000 | - | | 0.042% | 0.00% |
| Patrick Miles | 75,000 | | 250,000 | | 325,000 | - | | 0.042% | 0.00% |
| Yask sa | 75,000 | | | | 75,000 | - | | 0.042% | 0.00% |

**TA-063**

| Holder | Class A Common Shares | Class B Preferred Shares | Warrants | Options/SARS | FD | Class B Voting | Class C Voting | Economic % | Voting % |
|---|---|---|---|---|---|---|---|---|---|
| Ronald L Caplan | 74,505 | | | | 74,505 | - | | 0.042% | 0.00% |
| Diane L Buechel Exempt Marital Trust 5/6/09 | 74,430 | | | | 74,430 | - | | 0.042% | 0.00% |
| Alan Robert Orchard | 68,853 | | | | 68,853 | - | | 0.039% | 0.00% |
| Charles L. Orr | 68,281 | | | | 68,281 | - | | 0.038% | 0.00% |
| Kathryn Toller | 67,500 | | 195,000 | | 262,500 | - | | 0.038% | 0.00% |
| Ronald B. Mandell | 60,560 | | | | 60,560 | - | | 0.034% | 0.00% |
| Christopher Ernest Inns | 60,001 | | 120,000 | | 180,001 | - | | 0.034% | 0.00% |
| David Kenneth Michael Walpole | 60,000 | | 260,000 | 9,500 | 329,500 | - | | 0.034% | 0.00% |
| Lauterstein Consulting Inc. | 60,000 | | - | | 60,000 | - | | 0.034% | 0.00% |
| Richard Peter Pease | 60,000 | | - | | 60,000 | - | | 0.034% | 0.00% |
| Melvin B. Miller | 59,396 | | | | 59,396 | - | | 0.033% | 0.00% |
| Marjonjac LLC | 57,143 | | 166,665 | | 223,808 | - | | 0.032% | 0.00% |
| George Simon | 5,173 | - | - | | 5,173 | 5,173 | | 0.003% | 0.00% |
| Briana Deluca | 5,000 | - | - | | 5,000 | 5,000 | | 0.003% | 0.00% |
| Danielle Deluca | 5,000 | - | - | | 5,000 | 5,000 | | 0.003% | 0.00% |
| Jill Homorodean | 5,000 | - | - | | 5,000 | 5,000 | | 0.003% | 0.00% |
| Russell Malsam | 55,000 | | - | | 55,000 | - | | 0.031% | 0.00% |
| Sarah Caroline Drnec | 54,152 | | - | | 54,152 | - | | 0.030% | 0.00% |
| Mark Savarese and John Savarese JTWROS | 53,724 | | - | | 53,724 | - | | 0.030% | 0.00% |
| Walmer Capital Limited | 53,126 | | 331,399 | | 384,525 | - | | 0.030% | 0.00% |
| Brendan O'Neill | 9,507 | - | - | | 9,507 | 4,311 | | 0.005% | 0.00% |
| Kim Herold | 51,283 | | | | 51,283 | - | | 0.029% | 0.00% |
| Edward J Borkowski and Nancy B McCormick | 51,003 | | | | 51,003 | - | | 0.029% | 0.00% |
| Daniel Erlanger and Beth Erlanger | 50,620 | | - | | 50,620 | - | | 0.028% | 0.00% |
| Steven Anthony Sussman | 50,250 | | 67,000 | | 117,250 | - | | 0.028% | 0.00% |
| Stephen James Blackford | 50,100 | | 167,000 | | 217,100 | - | | 0.028% | 0.00% |
| Alan Wood | 50,000 | | 66,666 | | 116,666 | - | | 0.028% | 0.00% |
| Andrew Charles Finnemore Capon | 50,000 | | 25,000 | | 75,000 | - | | 0.028% | 0.00% |
| Elizabeth Anne Merrick | 50,000 | | 25,000 | | 75,000 | - | | 0.028% | 0.00% |
| Henry Guy Merrick | 50,000 | | 25,000 | | 75,000 | - | | 0.028% | 0.00% |
| Jacopo Franzan | 50,000 | | 166,665 | | 216,665 | - | | 0.028% | 0.00% |
| Josephine Linden | 50,000 | | 25,000 | | 75,000 | - | | 0.028% | 0.00% |
| Natasha Imogen Merrick | 50,000 | | 25,000 | | 75,000 | - | | 0.028% | 0.00% |
| Olivia Louise Merrick | 50,000 | | 25,000 | | 75,000 | - | | 0.028% | 0.00% |
| Pains Fireworks Limited | 50,000 | | 66,666 | | 116,666 | - | | 0.028% | 0.00% |
| Richard F.B. Milligan-Manby | 50,000 | | 25,000 | | 75,000 | - | | 0.028% | 0.00% |
| Matthew Hammond | 47,920 | | - | | 47,920 | - | | 0.027% | 0.00% |
| Tarlton Parsons | 47,667 | | - | | 47,667 | - | | 0.027% | 0.00% |
| Esther and Murray Alter | 47,500 | | 125,000 | | 172,500 | - | | 0.027% | 0.00% |
| Michele Laboda | 12,036 | - | - | | 12,036 | 3,454 | | 0.007% | 0.00% |
| Alane Laboda | 10,680 | - | - | | 10,680 | 3,454 | | 0.006% | 0.00% |
| Amy L Marz Revocable Trust | 10,680 | | - | | 10,680 | 3,454 | | 0.006% | 0.00% |
| Jacob T. Laboda | 10,680 | - | - | | 10,680 | 3,454 | | 0.006% | 0.00% |
| David Simon | 45,185 | | | | 45,185 | - | | 0.025% | 0.00% |
| Kevin John Gollop | 45,001 | | 210,000 | | 255,001 | - | | 0.025% | 0.00% |
| Brad Weiner | 44,711 | | | | 44,711 | - | | 0.025% | 0.00% |
| Gene Pendyke | 44,711 | | | | 44,711 | - | | 0.025% | 0.00% |
| Mactaggart & Mickel Investments Limited | 44,267 | | - | | 44,267 | - | | 0.025% | 0.00% |
| Edward Napier Tremayne Miles | 44,250 | | 147,500 | | 191,750 | - | | 0.025% | 0.00% |
| Paul Vincent Adams | | 43,110 | 43,110 | | 86,220 | - | | 0.024% | 0.00% |
| James Weinstein | 40,639 | | - | | 40,639 | - | | 0.023% | 0.00% |
| Andrew L Epstein | 40,000 | | 50,000 | | 90,000 | - | | 0.022% | 0.00% |
| PCL Investments | 37,792 | | | | 37,792 | - | | 0.021% | 0.00% |

**TA-064**

| Holder | Class A Common Shares | Class B Preferred Shares | Warrants | Options/SARS | FD | Class B Voting | Class C Voting | Economic % | Voting % |
|---|---|---|---|---|---|---|---|---|---|
| Connie J. Braden | 10,746 | - | - | | 10,746 | 2,587 | | 0.006% | 0.00% |
| Adam Bidwell | 36,000 | | 18,000 | | 54,000 | - | | 0.020% | 0.00% |
| Helen Jane Jenson | 36,000 | | 168,000 | | 204,000 | - | | 0.020% | 0.00% |
| Helene Kathleen Webb | 36,000 | | 168,000 | | 204,000 | - | | 0.020% | 0.00% |
| Lisa Ann Walpole | 36,000 | | 168,000 | | 204,000 | - | | 0.020% | 0.00% |
| James Kenneth Baudains | 35,964 | | | | 35,964 | - | | 0.020% | 0.00% |
| Rachel Baudains | 35,964 | | - | | 35,964 | - | | 0.020% | 0.00% |
| Keith B. Ward | 34,990 | | | | 34,990 | - | | 0.020% | 0.00% |
| Walter John Schoendorf Jr | - | 33,333 | - | | 33,333 | - | | 0.019% | 0.00% |
| Family Trust created under Stuart A. Marcus Revocable Trust dated 4-4-93, as amended | 32,117 | | | | 32,117 | - | | 0.018% | 0.00% |
| Geraldine M. Rosato | 31,240 | | | | 31,240 | - | | 0.017% | 0.00% |
| Joan Johnson, Trustee Under Declaration of Revocable Trust, December 12, 2012 | 30,812 | | | | 30,812 | - | | 0.017% | 0.00% |
| Linda E. Johnson | 30,812 | | | | 30,812 | - | | 0.017% | 0.00% |
| Mark Lombardi | 30,217 | | | | 30,217 | - | | 0.017% | 0.00% |
| Robert and Monique Currie | 30,217 | | | | 30,217 | - | | 0.017% | 0.00% |
| Andrew Lawley | 30,000 | | - | | 30,000 | - | | 0.017% | 0.00% |
| Andrew Mark Slinger | 30,000 | | 100,000 | | 130,000 | - | | 0.017% | 0.00% |
| Tammy S Maury and Steven C Maury | 30,000 | | 80,000 | | 110,000 | - | | 0.017% | 0.00% |
| Victoria Alice Slinger | 30,000 | | 100,000 | | 130,000 | - | | 0.017% | 0.00% |
| David Brookland and Valerie Brookland | 27,849 | | | | 27,849 | - | | 0.016% | 0.00% |
| Alvin Block | 27,426 | | | | 27,426 | - | | 0.015% | 0.00% |
| Frederic J Leonard | 26,851 | | - | | 26,851 | - | | 0.015% | 0.00% |
| Tracy Anne Pernice | 25,001 | | 33,334 | | 58,335 | - | | 0.014% | 0.00% |
| Jennifer and Eden Cahan | 25,000 | | - | | 25,000 | - | | 0.014% | 0.00% |
| Jo Ellen Spitz Trust | 25,000 | | - | | 25,000 | - | | 0.014% | 0.00% |
| Kenneth Hanover and Sylvia T Hanover JTWROS | 25,000 | | | | 25,000 | - | | 0.014% | 0.00% |
| William Philip Richards | 25,000 | | | | 25,000 | - | | 0.014% | 0.00% |
| Dale Phillips | 22,272 | | - | | 22,272 | - | | 0.012% | 0.00% |
| John R Clarke | 22,272 | | - | | 22,272 | - | | 0.012% | 0.00% |
| Elizabeth Lynn Bruce | 21,500 | | - | | 21,500 | - | | 0.012% | 0.00% |
| Edward M Snider Estate | 20,974 | | | | 20,974 | - | | 0.012% | 0.00% |
| Gerald Laboda | 20,158 | | | | 20,158 | - | | 0.011% | 0.00% |
| Jonathan and Elizabeth Raith | 20,133 | | | | 20,133 | - | | 0.011% | 0.00% |
| Jonathan Paul Speck | 20,005 | | | | 20,005 | - | | 0.011% | 0.00% |
| Rupert Corfield | 20,000 | | - | | 20,000 | - | | 0.011% | 0.00% |
| Jim Saltzman | 19,473 | | 17,850 | | 37,323 | - | | 0.011% | 0.00% |
| Howard M. Casper | 17,261 | | | | 17,261 | - | | 0.010% | 0.00% |
| Musser Foundation | 17,261 | | | | 17,261 | - | | 0.010% | 0.00% |
| Gordaldo Limited | 16,667 | | 1,041,667 | | 1,058,334 | - | | 0.009% | 0.00% |
| Eric Neulight and Caroline Neulight | 16,208 | | | | 16,208 | - | | 0.009% | 0.00% |
| Gary Ackerman and Valerie Ackerman | 16,208 | | 14,857 | | 31,065 | - | | 0.009% | 0.00% |
| Gregory Allen Doran and Jennifer Burke Doran | 16,208 | | | | 16,208 | - | | 0.009% | 0.00% |
| James Gorman and Megan Othersen Gorman | 16,208 | | - | | 16,208 | - | | 0.009% | 0.00% |
| Katie B Hauer | 16,208 | | - | | 16,208 | - | | 0.009% | 0.00% |
| Marc Bozzacco | 16,208 | | | | 16,208 | - | | 0.009% | 0.00% |
| Ray Terwilliger | 16,208 | | 14,857 | | 31,065 | - | | 0.009% | 0.00% |
| Euripides Psiloyenis | 15,000 | | 40,000 | | 55,000 | - | | 0.008% | 0.00% |
| Gerald Laboda Revocable Trust | 14,857 | | | | 14,857 | - | | 0.008% | 0.00% |
| Mi Sook Han | 13,551 | | | | 13,551 | - | | 0.008% | 0.00% |

**TA-065**

| Holder | Class A Common Shares | Class B Preferred Shares | Warrants | Options/SARS | FD | Class B Voting | Class C Voting | Economic % | Voting % |
|---|---|---|---|---|---|---|---|---|---|
| Ram K. Sreekakula and Vijaya L Sreekakula JTWROS | 13,551 | | | | 13,551 | - | | 0.008% | 0.00% |
| Peter Musser | 12,599 | | | | 12,599 | - | | 0.007% | 0.00% |
| Steve Atlas | 12,599 | | | | 12,599 | - | | 0.007% | 0.00% |
| Catherine M Mintzer | 12,500 | | - | | 12,500 | - | | 0.007% | 0.00% |
| Lawrence Mintzer | 12,500 | | - | | 12,500 | - | | 0.007% | 0.00% |
| Rose and James Tarangelo | 12,070 | | | | 12,070 | - | | 0.007% | 0.00% |
| Coralroot Limited | 12,000 | | - | | 12,000 | - | | 0.007% | 0.00% |
| Eugene J. Lipstein Trust | 11,924 | | | | 11,924 | - | | 0.007% | 0.00% |
| Albert, Abram & Ivan Nalibotsky, JT | 11,455 | | | | 11,455 | - | | 0.006% | 0.00% |
| Carl H Grossman | 10,500 | | 35,000 | | 45,500 | - | | 0.006% | 0.00% |
| Gerald A. Mandell | 10,488 | | | | 10,488 | - | | 0.006% | 0.00% |
| James W. and Elizabeth A. Smith | 10,488 | | | | 10,488 | - | | 0.006% | 0.00% |
| Judith Goldstein | 10,488 | | | | 10,488 | - | | 0.006% | 0.00% |
| Thomas R. Cronin Trust | 10,488 | | | | 10,488 | - | | 0.006% | 0.00% |
| Carol Fries | 10,044 | | | | 10,044 | - | | 0.006% | 0.00% |
| Cottage & Castle Ventures, Inc. | 10,044 | | | | 10,044 | - | | 0.006% | 0.00% |
| Daniel Southey | 10,044 | | | | 10,044 | - | | 0.006% | 0.00% |
| Robert and Debra DeCosta | 10,044 | | | | 10,044 | - | | 0.006% | 0.00% |
| Cheryl and Thomas Guerin | 10,000 | | - | | 10,000 | - | | 0.006% | 0.00% |
| Christopher Edward Catling | 10,000 | | 10,000 | | 20,000 | - | | 0.006% | 0.00% |
| Sarena L Snider | 8,794 | | | | 8,794 | - | | 0.005% | 0.00% |
| Ellen Rubin | 7,448 | | - | | 7,448 | - | | 0.004% | 0.00% |
| The 2012 Gail Lipstein Family Trust | 7,101 | | | | 7,101 | - | | 0.004% | 0.00% |
| Sang Don and Anthony Kim | 6,778 | | | | 6,778 | - | | 0.004% | 0.00% |
| Thomas R. Masseria | 6,778 | | | | 6,778 | - | | 0.004% | 0.00% |
| Brian & Robyn Carp | 6,048 | | | | 6,048 | - | | 0.003% | 0.00% |
| Estate of Leonard Siegel | 6,048 | | | | 6,048 | - | | 0.003% | 0.00% |
| Larry J. Goldsborough | 6,048 | | | | 6,048 | - | | 0.003% | 0.00% |
| Gary Jacobs | 5,250 | | 14,000 | | 19,250 | - | | 0.003% | 0.00% |
| Nisim Mirakov | 5,040 | | | | 5,040 | - | | 0.003% | 0.00% |
| Vinod and Sailaja Kuruvadi | 5,040 | | | | 5,040 | - | | 0.003% | 0.00% |
| Robert A. Zuritsky | 5,019 | | | | 5,019 | - | | 0.003% | 0.00% |
| Karen S Donovan | 5,000 | | 14,000 | | 19,000 | - | | 0.003% | 0.00% |
| Madan G Moudgal | 5,000 | | | | 5,000 | - | | 0.003% | 0.00% |
| Russell D Coon Jr | 5,000 | | - | | 5,000 | - | | 0.003% | 0.00% |
| Elizabeth Garrison Trust | 4,122 | | | | 4,122 | - | | 0.002% | 0.00% |
| Jacqueline B. Garrison Trust | 4,122 | | | | 4,122 | - | | 0.002% | 0.00% |
| Jennifer Garrison Trust | 4,122 | | | | 4,122 | - | | 0.002% | 0.00% |
| Kyle McBrearty Trust | 4,122 | | | | 4,122 | - | | 0.002% | 0.00% |
| Megan McBrearty Trust | 4,122 | | | | 4,122 | - | | 0.002% | 0.00% |
| Robert N. Garrison, III  Trust | 4,122 | | | | 4,122 | - | | 0.002% | 0.00% |
| Yeon Ho Kim | 4,062 | | | | 4,062 | - | | 0.002% | 0.00% |
| A2MI Trinity 2 Partners | 3,750 | | - | | 3,750 | - | | 0.002% | 0.00% |
| Silverplay Limited | 3,750 | | - | | 3,750 | - | | 0.002% | 0.00% |
| Warren Scott Hilton | 3,750 | | - | | 3,750 | - | | 0.002% | 0.00% |
| George Xixis | 2,500 | | - | | 2,500 | - | | 0.001% | 0.00% |
| Andrew Kim | 2,016 | | | | 2,016 | - | | 0.001% | 0.00% |
| Gary Edelman | 2,000 | | | | 2,000 | - | | 0.001% | 0.00% |
| Harry F Mcann | 1,356 | | - | | 1,356 | - | | 0.001% | 0.00% |
| John M Apathy | 1,250 | | | | 1,250 | - | | 0.001% | 0.00% |
| Bernard Spain | 1 | - | 87,920 | | 87,921 | - | | 0.000001% | 0.00% |
| Bernard Spain Family Partnership | 1 | - | 40,645 | | 40,645 | - | | 0.000001% | 0.00% |
| Don Freeman | 1 | - | | | 1 | - | | 0.000001% | 0.00% |
| Paul Kelly | 1 | - | 39,022 | | 39,023 | - | | 0.000001% | 0.00% |
| Remy Fox | 1 | - | 9,274 | | 9,275 | - | | 0.000001% | 0.00% |
| Renee Freeman | 1 | | | | 1 | - | | 0.000001% | 0.00% |

**TA-066**

| Holder | Class A Common Shares | Class B Preferred Shares | Warrants | Options/SARS | FD | Class B Voting | Class C Voting | Economic % | Voting % |
|---|---|---|---|---|---|---|---|---|---|
| Wendy Trow-Fox | 1 | - | 4,709 | | 4,710 | - | | 0.000001% | 0.00% |
| A.C.L.M. Luijks | - | | 35,500 | | 35,500 | - | | 0.0% | 0.00% |
| Accrued Agent Warrants | - | | 700,408 | | 700,408 | - | | 0.0% | 0.00% |
| AJ Yeh | - | | | 15,000 | 15,000 | - | | 0.0% | 0.00% |
| Amanda Von Ahnen | - | | | 100,000 | 100,000 | - | | 0.0% | 0.00% |
| Bart Barenbrug | - | | | 600,704 | 600,704 | - | | 0.0% | 0.00% |
| Blake Capital Investments Limited | - | | 18,303 | | 18,303 | - | | 0.0% | 0.00% |
| Blue Ocean Partners Ltd | - | | 950,000 | | 950,000 | - | | 0.0% | 0.00% |
| Bradley Woods & Co Ltd | - | | 250,000 | | 250,000 | - | | 0.0% | 0.00% |
| Bram Riemens | - | | | 532,276 | 532,276 | - | | 0.0% | 0.00% |
| Bud Robertson | - | | | 350,000 | 350,000 | - | | 0.0% | 0.00% |
| Dan Rink | - | | | 200,000 | 200,000 | - | | 0.0% | 0.00% |
| Don Freeman & Renee Freeman | - | - | 14,431 | | 14,431 | - | | 0.0% | 0.00% |
| Duncan Humphreys | - | | | 350,000 | 350,000 | - | | 0.0% | 0.00% |
| Eric Leenman | - | | | 7,907 | 7,907 | - | | 0.0% | 0.00% |
| Eric Singer | - | | 256,000 | | 256,000 | - | | 0.0% | 0.00% |
| Francisco Heredia | - | | | 7,265 | 7,265 | - | | 0.0% | 0.00% |
| Franklin Rodgers | - | | | 200,000 | 200,000 | - | | 0.0% | 0.00% |
| Geoval Consultants LLC | - | | 1,300,000 | | 1,300,000 | - | | 0.0% | 0.00% |
| Gollop Consulting LLC | - | | 67,134 | | 67,134 | - | | 0.0% | 0.00% |
| Grazina Seskeviciute | - | | | 469,090 | 469,090 | - | | 0.0% | 0.00% |
| Hans Wouters | - | | | 15,172 | 15,172 | - | | 0.0% | 0.00% |
| Hans Zuidema | - | | | 750,889 | 750,889 | - | | 0.0% | 0.00% |
| Island Investment Holdings | - | | 63,243 | | 63,243 | - | | 0.0% | 0.00% |
| Jack Wu | - | | | 60,000 | 60,000 | - | | 0.0% | 0.00% |
| Jasmin Zhang | - | | | 22,864 | 22,864 | - | | 0.0% | 0.00% |
| Jason Xu | - | | | 15,000 | 15,000 | - | | 0.0% | 0.00% |
| Jeffrey Chan | - | | | 19,708 | 19,708 | - | | 0.0% | 0.00% |
| Jing Cao | - | | | 17,505 | 17,505 | - | | 0.0% | 0.00% |
| Jolene Sun | - | | | 15,000 | 15,000 | - | | 0.0% | 0.00% |
| Joop Martens | - | | | 8,570 | 8,570 | - | | 0.0% | 0.00% |
| Kaushik Banerjee | - | | | 250,000 | 250,000 | - | | 0.0% | 0.00% |
| Kevin Cabot | - | | | 50,000 | 50,000 | - | | 0.0% | 0.00% |
| Leo Riley | - | | | 70,000 | 70,000 | - | | 0.0% | 0.00% |
| Lily Wang | - | | | 15,000 | 15,000 | - | | 0.0% | 0.00% |
| Linda Wang | - | | | 15,000 | 15,000 | - | | 0.0% | 0.00% |
| Liu Zhen | - | | | 75,000 | 75,000 | - | | 0.0% | 0.00% |
| Lixin Wang | - | | | 15,000 | 15,000 | - | | 0.0% | 0.00% |
| Lizzy Zhou | - | | | 75,000 | 75,000 | - | | 0.0% | 0.00% |
| Mark Chen | - | | | 50,000 | 50,000 | - | | 0.0% | 0.00% |
| Mark Groot | - | | | 37,507 | 37,507 | - | | 0.0% | 0.00% |
| Mark Hsu | - | | | 375,000 | 375,000 | - | | 0.0% | 0.00% |
| Mark J Coleman | - | | 1,687,975 | 1,000,000 | 2,687,975 | - | | 0.0% | 0.00% |
| Mark R Savarese | - | | 100,000 | | 100,000 | - | | 0.0% | 0.00% |
| Marten Voogt | - | | | 8,843 | 8,843 | - | | 0.0% | 0.00% |
| Martin Harwig | - | | | 33,793 | 33,793 | - | | 0.0% | 0.00% |
| Matt JJ Lo | - | | | 1,105,500 | 1,105,500 | - | | 0.0% | 0.00% |
| Michael Cremers | - | | | 35,536 | 35,536 | - | | 0.0% | 0.00% |
| Michael F Aguilar | - | | 3,000 | | 3,000 | - | | 0.0% | 0.00% |
| Mick McDonald | - | | | 470,432 | 470,432 | - | | 0.0% | 0.00% |
| Miriam Banken | - | | | 10,078 | 10,078 | - | | 0.0% | 0.00% |
| Misa Itaya | - | | | 15,000 | 15,000 | - | | 0.0% | 0.00% |
| Muni Mohan | - | | | 150,000 | 150,000 | - | | 0.0% | 0.00% |
| Mutlaq Alzayed | - | | 66,666 | | 66,666 | - | | 0.0% | 0.00% |
| Neel Erp | - | | | 8,220 | 8,220 | - | | 0.0% | 0.00% |
| Nicole Maneen | - | | | 100,000 | 100,000 | - | | 0.0% | 0.00% |
| Pamela Wang | - | | | 15,000 | 15,000 | - | | 0.0% | 0.00% |

**TA-067**

| Holder | Class A Common Shares | Class B Preferred Shares | Warrants | Options/SARS | FD | Class B Voting | Class C Voting | Economic % | Voting % |
|---|---|---|---|---|---|---|---|---|---|
| Patric Theune | - | | - | 84,751 | 84,751 | - | | 0.0% | 0.00% |
| Peter Bergmans | - | | - | 10,691 | 10,691 | - | | 0.0% | 0.00% |
| Peter Roelen | - | | - | 133,433 | 133,433 | - | | 0.0% | 0.00% |
| Qiqi Wang | - | | - | 15,000 | 15,000 | - | | 0.0% | 0.00% |
| Ragu Pati | - | | - | 150,000 | 150,000 | - | | 0.0% | 0.00% |
| Robert Petch | - | | 50,874 | | 50,874 | - | | 0.0% | 0.00% |
| Ronald Jacobs | - | | 250,000 | | 250,000 | - | | 0.0% | 0.00% |
| Rosie Zhang | - | | | 15,000 | 15,000 | - | | 0.0% | 0.00% |
| Russell Burke | - | | 7,500 | | 7,500 | - | | 0.0% | 0.00% |
| S Neelam | - | | | 150,000 | 150,000 | - | | 0.0% | 0.00% |
| Sacha Petrovic | - | | - | 7,286 | 7,286 | - | | 0.0% | 0.00% |
| Sara Robertson | - | | - | 75,000 | 75,000 | - | | 0.0% | 0.00% |
| Sheeba Rajesh | - | | - | 156,878 | 156,878 | - | | 0.0% | 0.00% |
| Simon Ford | - | | - | 200,000 | 200,000 | - | | 0.0% | 0.00% |
| Stefan Riemens | - | | - | 7,816 | 7,816 | - | | 0.0% | 0.00% |
| Suby Joseph | - | | - | 200,000 | 200,000 | - | | 0.0% | 0.00% |
| Tonneke Roelen | - | | - | 51,052 | 51,052 | - | | 0.0% | 0.00% |
| Toon Berkel | - | | - | 216,202 | 216,202 | - | | 0.0% | 0.00% |
| Vikas Kshetrapal | - | | - | 100,000 | 100,000 | - | | 0.0% | 0.00% |
| Walther Roelen | - | | - | 896,412 | 896,412 | - | | 0.0% | 0.00% |
| Wangling | - | | - | 15,000 | 15,000 | - | | 0.0% | 0.00% |
| Zhu Lin | - | | - | 60,000 | 60,000 | - | | 0.0% | 0.00% |
| Zygintas Papartis | - | | - | 197,038 | 197,038 | - | | 0.0% | 0.00% |
| **Total (Pre-HIHL Conversion)** | **178,355,839** | **413,088** | **513,385,367** | **12,521,418** | **704,675,712** | **26,970,380** | **45,000,000** | | |

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,<br><br>        Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |

| | |
|---|---|
| In re:<br><br>Technovative Media, Inc.,<br><br>        Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered)[1] |

# <u>MEMORANDUM</u>

## I.    INTRODUCTION

Before the Court for disposition are two motions by Hawk Investment Holdings Ltd.

("Hawk").  The first motion (the "Hawk Stay Relief Motion")[2] seeks relief from the automatic

stay in order to proceed with an action in the Delaware Court of Chancery (the "Delaware

Chancery Court") seeking relief pursuant to §225 of Title 8 of the Delaware Code (the "Section

225 Action") against debtors Stream TV Networks, Inc. ("Stream") and Technovative Media Inc.

("Technovative", and together with Stream, the "Debtors").  The second motion (the "Section

1112/1104 Motion") seeks an order, pursuant to §1112(b) of the United States Bankruptcy Code,

11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), converting the Debtors' chapter 11

bankruptcy cases to cases under chapter 7 of the Bankruptcy Code or dismissing them, or

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases.  Bankr. Docket No. 81.

[2] Bankr. Docket No. 16.

1

alternatively, appointing a trustee to administer the Debtors' bankruptcy cases pursuant to

§1104(a) of the Bankruptcy Code.

      For the reasons set forth herein, the Court will (i) grant the Section 1112/1104 Motion to

the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy

cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed, as

set forth below.

## II.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND[3]

      The history of the Debtors, their relationship with their creditors, and, in particular from

the Court's perspective, the events during these bankruptcy cases, are convoluted, and for the

most part, riddled with strife.  The docket in the Debtors' main case spans over 500 entries,

telling a story of near-endless conflict.[4]  The Court has spent an inordinate amount of time

dealing with expedited motion practice, emergency hearings, and drawn-out contested matters.

While the Court does not typically summarize the major activity in a case in order to explain a

decision, here it believes a lengthy summary is necessary in order to paint the picture of the

acrimony, relative lack of progress, and overlapping and simultaneous controversies these cases

have endured over the nearly ten months they have been pending.  Set forth below, therefore, is a

summary of the major events not only that led to the Debtors' bankruptcy cases, but also that

have transpired before this Court since the Debtors filed their bankruptcy petitions.

---

[3] The factual background recited herein is drawn from various pleadings filed on the docket as well as the
testimony and evidence adduced at Trial (as defined *infra*).  The Court notes, however, that to the extent
such facts as set forth in the parties' various pleadings are disputed, such disputes are irrelevant to the
Court's resolution of the pending motions, as the Court has drawn its conclusions from the record at Trial
and the procedural history of these cases.

[4] This does not even account for the approximately 120 docket entries in the adversary action the Debtors
filed in August 2023 against various parties, discussed *infra*.  *See* Adv. Pro. No. 23-00057.

A.    **Pre-Petition Events**

1.    **Formation of the Debtors**

Stream was founded in 2009 by Mathu Rajan ("Mr. Rajan") and Raja Rajan (together with Mr. Rajan, "the Rajans").  The company was founded to develop and commercialize a proprietary technology for viewing three-dimensional content without the need for 3D glasses or goggles ("Ultra-D").  Stream created Technovative, a wholly owned subsidiary, which in turn directly or indirectly owns various subsidiaries, including SeeCubic B.V. ("SCBV"), an entity formed under the laws of the Netherlands and which functions as the primary research and development engine for the business.[5]  Together, these subsidiaries own and hold rights in technology including Ultra-D.  Stream's Ultra-D technology was developed, in part, based on certain intellectual property, including a portfolio of glasses-free 3D patents licensed from Koninklijke Philips Electronics ("Philips").  Stream also has a technology license from Rembrandt 3d Holding Ltd. ("Rembrandt"), which allows it to use the Rembrandt technology incorporated into Stream's Ultra-D products (the "Rembrandt Licensing Agreement").

2.    **Funding from SLS and Hawk**

From 2011 to 2020, Stream's senior secured creditor, SLS Holdings VI, LCC ("SLS"), loaned Stream $6 million through a series of secured promissory notes (the "SLS Notes").  In return, Stream pledged all of its assets, and the assets of its wholly-owned subsidiaries, as security for the SLS Notes. Stream and SLS executed a security agreement which authorized SLS to take control of Stream's assets to satisfy the SLS Notes in the event Stream defaulted. Between 2011 and 2014, Shadron Stastney ("Mr. Stastney"), the principal of SLS, served as an outside director of Stream.  He rejoined the board as Vice Chairman in 2018 in a strategic role

---

[5] *See* Exhibit D-5.

TA-071

until resigning in January 2020.

Between 2014 and 2020, Stream's junior secured creditor, Hawk Investment Holdings Limited ("Hawk"), loaned Stream more than £50 million through a series of junior secured notes (the "Hawk Notes", and together with the SLS Notes, the "Notes").  Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted.  On January 29, 2018, Stream entered into a conversion agreement with Hawk, whereby the parties agreed to terms pursuant to which Stream would be permitted to convert the outstanding portion of the Hawk Notes to Stream equity (the "Hawk Conversion Agreement").  Stream and SLS contemporaneously entered into a parallel agreement with respect to conversion of the SLS Notes to Stream equity (the "SLS Conversion Agreement" and together with the Hawk Conversion Agreement, the "Conversion Agreements").

### 3.    Omnibus Agreement

In March 2020, Stream was notified it was in default under the SLS and Hawk Notes.  In May 2020, Stream, Hawk, SLS, and 52 of its stockholders entered into an Omnibus Agreement whereby Stream would transfer all of its assets to a newly formed entity, SeeCubic Inc. ("SeeCubic"), and in exchange, SLS and Hawk would no longer pursue a foreclosure, and their claims under the Notes would be entirely extinguished.  Mr. Stastney, who by then had left Stream, formed SeeCubic as a Delaware corporation to acquire Stream's assets pursuant to the Omnibus Agreement.

### 4.    Litigation Over the Omnibus Agreement

In September 2020, Stream filed suit against SeeCubic in the Delaware Chancery Court to invalidate the Omnibus Agreement.  Both Stream and SeeCubic moved for preliminary

injunctions whereby Stream sought to prevent SeeCubic from taking any actions to enforce the
Omnibus Agreement, and SeeCubic sought to compel Stream's compliance therewith.  In
December 2020, the Delaware Chancery Court issued an opinion finding that SeeCubic was
entitled to injunctive relief and barring Stream from failing to comply with the Omnibus
Agreement.  In September 2021, the Delaware Chancery Court granted SeeCubic's motion for
summary judgment (the "Summary Judgment Order"), declaring the Omnibus Agreement to be
valid and entering a permanent injunction preventing Stream from interfering with the
agreement.

In November 2021 Stream appealed the Delaware Chancery Court's ruling,[6] alleging that
the Delaware Chancery Court erred because Stream's unambiguous certificate of incorporation
required the approval of Stream's Class B stockholders for Stream's entry into the Omnibus
Agreement.  In June 2022, the Delaware Supreme Court vacated the Summary Judgment Order
on the grounds that the Omnibus Agreement was invalid without the approval of Stream's Class
B Stockholders.  The Delaware Supreme Court also found that (1) Hawk was a secured creditor
of Stream, (2) Stream had pledged all of its assets as security for the more than $50 million
Hawk lent to Stream, and (3) the Hawk Notes were executed in conjunction with security
agreements authorizing Hawk to take control of Stream's assets to satisfy the Hawk Notes if
Stream defaulted.

On remand, in September 2022, the Delaware Chancery Court ordered the parties to
unwind the Omnibus Agreement but confirmed that Hawk's and SLS's rights remained intact.

---

[6] On November 10, 2021, the Delaware Chancery Court issued an Order Entering Partial Final Judgment
Under Rule 54(b) (the "Partial Final Judgment Order"), effectively making the rulings in the Summary
Judgment Order final in order to permit appeal, finding that even though SeeCubic's conversion claim
remained unresolved, there was "no risk that after addressing [whether the Omnibus Agreement was
valid] on appeal, the Delaware Supreme Court might have to revisit the same issue in an appeal from a
final trial-level adjudication." *See* First Day Declaration, at Exhibit X.

In its opinion, the Court held that because the Omnibus Agreement did not validly transfer legal title of Stream's assets to SeeCubic and that SeeCubic would be required to transfer back to Stream the equity placed in the operating subsidiary, Technovative.

### 5.    Stream's Prior Bankruptcies

While the Omnibus Agreement litigation was playing out, on February 24, 2021, Stream filed a voluntary chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court").  On May 17, 2021, the Delaware Bankruptcy Court dismissed the case as a bad faith filing.  After dismissal, on May 23, 2021, three of Stream's purported unsecured creditors, including Rembrandt, filed an involuntary Chapter 7 bankruptcy petition against Stream.  On June 10, 2021, the Delaware Bankruptcy Court again dismissed the involuntary bankruptcy action as a bad faith filing, and imposed a twelve-month bar on Stream re-filing for bankruptcy.

### 6.    Mr. Rajan's Formation of VSI

Mr. Rajan formed Visual Semiconductor, Inc. ("VSI") in 2022, purportedly as a vehicle to raise new capital and support Stream.  Upon formation, Mr. Rajan was the CEO of VSI.  Mr. Rajan and members of his family are minority economic shareholders in VSI but have the majority of voting stock.

### 7.    The Proxy Notice, Marshaling Directive and Section 225 Action

On October 17, 2022, after ownership of the Technovative shares was transferred to Stream, in furtherance of the unwinding of the Omnibus Agreement, Hawk issued a Proxy Notice, purportedly pursuant to its rights under the Hawk Notes, to remove Mr. Rajan as the sole director of Technovative and replace him with Mr. Stastney. Hawk further directed Stream to marshal its collateral to prepare for a sale under the Uniform Commercial Code in order to

satisfy the outstanding indebtedness (the "Marshaling Directive"). Stream refused to comply with the Proxy Notice and Marshaling Directive, arguing that it had converted Hawk's secured debt to Stream equity pursuant to the Hawk Conversion Agreement, and therefore Hawk no longer possessed secured creditor rights pursuant to which it could issue the Proxy Notice or the Marshaling Directive.

On the same date, Hawk responded by filing the Section 225 Action to resolve whether Hawk validly appointed Mr. Stastney as the sole director of Technovative as of October 17, 2022. On October 20, 2022, the Delaware Chancery Court entered an order providing that, pending resolution of the Section 225 Action, Technovative was to operate according to the status quo, and by separate order, appointing a receiver to operate Technovative on a day-to-day basis (the "Receiver").

On November 13, 2022, Hawk moved for summary judgment in the Section 225 Action on the issue of whether Stream defaulted under the Hawk Notes. On November 29, 2022, the Delaware Chancery Court issued a decision finding that, notwithstanding the Supreme Court Opinion's reversal of the legal determination that the Omnibus Agreement was valid, the underlying factual findings were undisturbed, such that Stream was collaterally estopped from challenging whether (1) the Notes are valid and binding obligations of Stream; (2) Stream is in default under the Notes; (3) Hawk may exercise the "Secured Creditor Rights" under the Notes, including issuance of the Proxy Notice; (4) as of November 10, 2021, the Hawk Notes had not been converted or satisfied; and (5) any conversion of the Hawk Notes must be supported by new money, which had not occurred as of November 10, 2021 (the "Collateral Estoppel Opinion").

Trial in the Section 225 Action was scheduled to commence on March 23, 2023, but was stayed by the filing of the Debtors' instant bankruptcy petitions.

### B.    Debtors' Pending Bankruptcy Cases

#### 1.    The Filing of the Petitions

The Debtors each filed voluntary bankruptcy petitions (each, a "Petition" and together, the "Petitions") under chapter 11 of the Bankruptcy Code on March 15, 2023.[7]  Notwithstanding the dispute to be litigated over who is the rightful director of Technovative, Mr. Rajan signed both Stream's Petition and Technovative's Petition as Director.[8]  The Corporate Resolutions attached to each of the Petitions identified Mr. Rajan as a Director, Secretary and Chief Executive Officer of Stream and Technovative, respectively, and he executed the Corporate Resolutions as Secretary of each entity.

Attached to Stream's Petition was Official Form 204, setting forth a list of its 20 largest non-insider unsecured creditors.  Those creditors held purported claims totaling over $14 million.[9]  Attached to Technovative's petition was its Official Form 204, which listed only Rembrandt, with a claim purported claim of $10,000,000.00.

#### 2.    Hawk's Stay Relief Motion

Less than one week after the Petitions were filed, on March 20, 2023, Hawk filed the Hawk Stay Relief Motion.  Hawk seeks relief from stay to proceed with the Section 225 Action against the Debtors in the Delaware Chancery Court.  Hawk argues the Section 225 Action was

---

[7] Bankr. Docket No. 1; Bankr. Case No. 23-17064, Docket No. 1.

[8] On May 4, 2023, Stream filed an amended bankruptcy Petition, executed by Mr. Rajan as CEO and Director.  Bankr. Docket No. 186.  The amended Petition made two changes to the initial Petition.  First, it responded in the affirmative to Question 12, asking whether the debtor owns or has possession of any real property or personal property that needs immediate attention, and by attachment references the Bonding Equipment (defined *infra*) located in China.  Second, in response to Question 15 regarding its estimated assets, it reduced the range of value from $500,000,001-$1 billion to $100,000,001-$500,000,000.

[9] On April 12, 2023, the Office of the United States Trustee (the "U.S. Trustee") filed a statement stating that an unsecured creditors' committee had not been appointed due to lack of response from unsecured creditors regarding serving on a committee.  Bankr. Docket No. 100.

TA-076

days away from trial when the Petitions were filed, and the Delaware Chancery Court is already

intimately familiar with the dispute between Hawk and the Debtors and the governing Delaware

law.  Hawk asserts that the Section 225 Action will resolve issues of state law that, while

fundamental to the Debtors' bankruptcy cases, are most efficiently and appropriately resolved by

the Delaware Chancery Court, including (i) who was the rightful director of Technovative pre-

petition, and therefore whether Technovative's bankruptcy filing was authorized (the

"Technovative Director Issue"), and (ii) whether Stream's secured debt to Hawk was converted

to equity pre-petition (the "Debt Conversion Issue").[10]

On April 5, 2023, the Debtors objected to the Hawk Stay Relief Motion (the "Debtors'

Stay Relief Objection").[11]  The Debtors argue that Hawk's purpose in prosecuting the Section

225 Action is to obtain a declaration that it can exercise rights as a purported secured creditor of

Technovative, enabling it to conduct a sale of Technovative's assets under Article 9 of the

Uniform Commercial Code (and "Article 9 Sale").  The Debtors argue that even if Hawk were to

obtain such a declaration, it would be prohibited by the automatic stay from exercising any such

rights absent further stay relief, and that such a sale would eviscerate the Debtors' primary

assets, consisting of intellectual property held by their subsidiaries.  Rembrandt filed a joinder to

the Debtors' Stay Relief Objection.[12]

On April 14, 2023, the Court held an initial hearing on the Hawk Stay Relief Motion and

---

[10] Hawk argues that rulings by the Delaware Chancery Court will "result in a complete resolution of
issues surrounding (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS
Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any
current defense to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future
conversion of the Hawk Notes," which Hawk asserts are "all critical to the resolution of these Chapter 11
cases."  Hawk Stay Relief Motion, at 21.

[11] Bankr. Docket No. 78.

[12] Bankr. Docket No. 101.

determined that disputed facts would require an evidentiary trial. That trial (the "Trial") was initially scheduled to commence on May 22, but was then rescheduled to June 26.

### 3.    Debtors' Stay Violation Motion

On March 28, 2023, the Debtors filed an emergency motion seeking enforcement of the automatic stay (the "Stay Violation Motion")[13] and imposition of related sanctions against SeeCubic and SCBV, as well as certain entities and individuals purportedly acting on their behalf (the "SeeCubic Parties"). In general, the Debtors asserted that SeeCubic and SCBV were exercising possession and/or control over certain bonding equipment (the "Bonding Equipment") of the Debtors located at a warehouse in China, which the Debtors asserted was essential to their ability to receive client orders and commence production of their Ultra-D products. The Stay Violation Motion asserted that SeeCubic and SCBV, at the direction of Mr. Stastney, were interfering with the Debtors' repossession and relocation of the Bonding Equipment, in violation of the automatic stay and the Delaware Supreme Court's decision directing the unwinding of the Omnibus Agreement. The Stay Violation Motion also asserted that SeeCubic and SCBV, at the direction of Mr. Stastney, were exercising possession and control over other Stream assets (the "Other Stream Assets"), including Ultra-D demonstrator samples, engineering assets, laptops, and intellectual property and software, in violation of the automatic stay.

On April 5, 2023, the Debtors filed an amended stay violation motion (the "Amended Stay Violation Motion").[14] In addition to their assertions regarding SeeCubic and SCBV's interference with and control over the Bonding Equipment and Other Stream Assets, the Debtors asserted that Mr. Stastney, SLS, SeeCubic, and Hawk had initiated proceedings in Amsterdam

---

[13] Bankr. Docket No. 49.

[14] Bankr. Docket No. 76.

"to take certain measures preventing Debtors from managing its subsidiaries." The Debtors sought a directive from the Court that the SeeCubic Parties' possession and control over the Bonding Equipment and Other Stream Assets was to cease, and such estate property was to be turned over to the Debtors.[15]

On April 7, 2023, Debtors filed a supplement to the Amended Stay Violation Motion (the "Stay Violation Supplement"),[16] asserting that Mr. Stastney, SLS, SeeCubic, and Hawk had filed a joint legal action (the "Amsterdam Action"), apparently different from the summary proceeding described in the Amended Stay Violation Motion, seeking the removal of Mr. Rajan as a director and CEO of Stream's Dutch subsidiaries, in further violation of the automatic stay.

On April 12, 2023, SeeCubic objected to the Stay Violation Motion and the Amended Stay Violation Motion,[17] asserting that the Bonding Equipment and Other Stream Assets were not property of Debtors' estates, and even if they are, mere possession did not constitute violation of the automatic stay because it does not apply to the non-debtor Dutch subsidiaries. Hawk filed a joinder in support of SeeCubic's objection.[18]

The Court held an initial hearing on the Stay Violation Motion on April 14, 2023. With respect to the portions of that motion related to the Other Stream Assets and the Amsterdam Action, the Court reserved ruling pending additional information and evidence.[19] With respect to the Bonding Equipment, on July 13, 2023, the Court entered an order appointing my colleague,

---

[15] The Amended Stay Violation Motion did not seek specific relief with respect to the Amsterdam proceedings that were assumedly the reason for the amendment.

[16] Bankr. Docket No. 90.

[17] Bankr. Docket No. 105.

[18] Bankr. Docket No. 106.

[19] The Debtors followed with another emergency motion on April 18, 2023, seeking withdrawal of the Amsterdam Action in advance of a scheduled April 20 hearing in the Netherlands. Bankr. Docket No. 125. The Amsterdam court, however, thereafter postponed the scheduled hearing.

Judge Mayer, to mediate that dispute.[20]  To the Court's knowledge, this dispute remains in mediation.

### 4.    Hawk's Section 1112/1104 Motion

On April 6, 2023, Hawk filed the Section 1112/1104 Motion.  As noted *supra* and discussed in greater detail *infra,* the motion seeks either conversion or dismissal of the Debtors' bankruptcy cases pursuant to §1112(b) of the Bankruptcy Code, or alternatively, the appointment of a chapter 11 trustee to administer the Debtors' bankruptcy cases pursuant to §1104(a) of the Bankruptcy Code.

With respect to conversion or dismissal, Hawk argues that there are three statutorily-grounded bases for converting or dismissing the cases under §1112(b) of the Bankruptcy Code. First, Hawk argues there has been substantial and continuing loss to the Debtors' bankruptcy estates without likelihood of rehabilitation, as contemplated by §1112(b)(4)(A).  Second, Hawk argues there has been gross mismanagement of the estates, as contemplated by §1112(b)(4)(B). Third, Hawk argues the Debtors have engaged in the unauthorized use of cash collateral, as contemplated by §1112(b)(4)(D).[21]  In addition to these statutory grounds for finding cause to convert or dismiss, Hawk argues the Debtors lacked good faith in filing their bankruptcy cases, providing an alternate grounds for dismissal under §1112(b).  Finally, Hawk argues that Technovative's bankruptcy filing was unauthorized because Mr. Rajan was replaced as a director of Technovative prior to its Petition being filed, and therefore could not have authorized the filing on behalf of the entity.  After asserting that multiple grounds exist for conversion or dismissal, Hawk argues in the Section 1112/1104 Motion that the Court should dismiss the

---

[20] Bankr. Docket No. 294.

[21] As discussed *infra,* Hawk did not address the unauthorized use of cash collateral in its post-trial brief, and therefore the Court understands Hawk to no longer be asserting this basis for conversion or dismissal.

TA-080

Debtors' cases with prejudice, rather than convert them, because it would alleviate any fears of

the Debtors refiling, the Debtors are non-operational, and the both conversion and dismissal will

likely conclude with the sale of the Debtors' equity in their subsidiaries.[22]

    With respect to the appointment of a chapter 11 trustee, Hawk asserts that even if the

Court is not inclined to convert or dismiss the Debtors' cases, cause exists to appoint a trustee

based on the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and

gross mismanagement of the Debtors' businesses.  Hawk further argues that Mr. Rajan has

engaged in self-dealing for the benefit of VSI that has led to irreconcilable acrimony between the

Debtors' management and several stakeholders.

    On May 8, 2023, the Debtors filed an opposition to the Section 1112/1104 Motion (the

"Debtors' Section 1112/1104 Opposition").[23]  Rembrandt also filed an opposition to the Section

1112/1104 Motion (the "Rembrandt Section 1112/1104 Opposition").[24]

    As was the case with the Hawk Stay Relief Motion, the Section 1112/1104 Motion was

scheduled to be heard at the Trial commencing on May 22, and subsequently rescheduled to June

26.

### 5.    Debtors' Expedited Motion to Approve Employee Obligations

    On April 21, 2023, the Debtors filed an expedited motion (the "Employee Obligations

---

[22] As discussed *infra,* since filing the Section 1112/1104 Motion, Hawk's position has evolved, in that it now seeks conversion of the Debtors' cases rather than dismissal.

[23] Bankr. Docket 196.  The Debtors filed an initial response to the Section 1112/1104 Motion on April 10, 2023, *see* Bankr. Docket No. 94, based on and contesting Hawk's request that the motion be heard on an expedited basis.  The Court held an initial hearing on the motion on April 14, 2023, at which time it set a briefing schedule and a trial date.  The Debtors' Section 1112/1104 Opposition was filed in accordance with that briefing schedule.

[24] Bankr. Docket No. 193.

Motion")[25] seeking authority to make certain payments the Debtors characterized as employee

obligations.

First, the Debtors sought authority to pay various obligations in connection with the

employees of SCBV, including payroll, taxes, paid leave, benefits payments, etc.[26]  According to

the motion, there were 28 full-time, salaried employees of SCBV at the time of filing.  The

Debtors claimed that there were no pre-petition amounts owing to these employees, but that post-

petition payroll was about $180,000 per month.  The motion also sought to pay (a) six

independent contractors $193,000 for pre-petition services, as well ongoing post-petition fees of

$46,000 per month, (b) post-petition payroll taxes of $149,000 per month, (c) payroll processing

fees of $9,000 per month, and (d) pension contributions of $43,000 per month.  The Debtors also

sought to pay approximately $20,000 in pre-petition reimbursable business expenses to SCBV

employees.

The Employee Obligations Motion, however, sought additional relief unrelated to current

employee and independent contractor obligations.  It also sought authority to re-hire nine U.S.-

based Stream employees that purportedly left after the Delaware Chancery Court's Omnibus

Agreement decision in 2020, and who are now employed by VSI.  In connection with re-hiring

them, the Debtors sought to pay those employees approximately $30,000 in pre-petition wages

owed (subject to the $15,150 cap on pre-petition wages under §507(a)(4)).  The Debtors also

sought to pay certain independent service providers both pre-petition amounts owed, in the

amount of approximately $30,000 owed to one provider, and ongoing post-petition amounts of

approximately $10,000 per month.  The Debtors further sought to pay the re-hired employees'

---

[25] Bankr. Docket No. 134.

[26] The motion required expedited treatment because the post-petition compensation Debtors sought to pay
SCBV employees was coming due just four days later, on April 25.

post-petition payroll taxes of approximately $10,000 to $12,000 per month, as well as the pre-petition payroll taxes owing as necessary, up to $178,000.  The Debtors also sought to reinstate their paid leave program and benefit plans at a cost of approximately $23,000 per month, as well as pay approximately $267,000 in unreimbursed pre-petition business expenses.

In addition to the U.S.-based former Stream employees, the Debtors also sought to re-hire three Taiwan-based Stream employees who purportedly left after the Delaware Chancery Court's 2020 Omnibus Agreement decision as well, and who are also now employed by VSI.  In connection with these former employees, the Debtors sought authority to pay post-petition payroll costs of $7,000 and medical plan costs of about $3,000, but did not believe there were any pre-petition amounts owed.  The Debtors also sought authority to pay approximately $3,000 in unreimbursed pre-petition business expenses.

Finally, the Debtors stated that they had been using 15 independent contractors in China for various services through an entity called ST4M, Inc.  The Debtors sought authority to establish a Beijing-based subsidiary to employ these 15 individuals as full-time employees.  The gross payroll would be approximately $22,000 monthly, and the Debtors would also be required to pay approximately $29,000 quarterly for a state-sponsored health-plan.

As discussed *infra,* the Court held an emergency hearing on the Employee Obligations Motion on April 24, but limited its consideration to whether and what payments to current SCBV employees were needed on an expedited basis.

### 6.    Debtors' Expedited Stock Sale Motion

On the same day that they filed the expedited Employee Obligations Motion, the Debtors filed an expedited motion for authority to sell up to $10 million in unissued shares of Stream's

15

**TA-083**

Class A common stock to VSI to fund their post-petition operations (the "Stock Sale Motion").[27]
The Stock Sale Motion represented that VSI, formed by Mr. Rajan as a vehicle to raise new capital for Stream and to support Stream while fighting the transfer of Stream's assets pursuant to the Omnibus Agreement, had made pre-petition strategic investments in Stream, in addition to having engaged key Stream employees.  Per the Stock Sale Motion, VSI was prepared to fund the Debtors' post-petition product development and supply chain, but "as compensation for this support" Stream had entered into an exclusive distribution agreement (the "Distribution Agreement") whereby VSI would accept orders from and make delivery to third-party customers, issue a purchase order to Stream for 90% of the value of the third-party order, and retain the 10% difference as "margin for funding technical, business, and sales development." The Debtors represented that VSI would also assist with "productization of electronics," and asserted that the 10% fee was "industry standard for distribution agreements."

Together with the Debtor's expedited Employee Obligations Motion, the Court held an emergency hearing on the Stock Sale Motion on April 24, as discussed *infra.*

### 7.    Debtors' Emergency Financing Motion and Seecubic's Proposed Alternative Funding

As will be discussed in further detail *infra,* on April 25, 2023, the Debtors filed an emergency motion for the approval of debtor-in-possession financing from VSI as an alternative to the proposed sale of stock to VSI, in order to fund the SCBV payroll obligations coming due the following day.[28]  On the same day, SeeCubic filed an alternative funding motion that would have compelled SCBV, or alternatively the Debtors, to borrow under an existing line of credit from SeeCubic that had been put in place while the Receiver was managing Technovative and its

---

[27] Bankr. Docket No. 135.

[28] Bankr. Docket No. 156.

subsidiaries, including SCBV.[29]  Later that day, the Court held an eight-hour emergency hearing

on the alternative funding proposals that ended at approximately 11:00 p.m., after which it

determined that neither proposal would be approved.

**8.     Debtors' Motion to Retain Thomas Park as Chief Financial Officer**

On June 14, 2023, the Debtors filed a motion seeking authority to enter into an

employment agreement with Thomas Jung Ho Park ("Mr. Park") as Chief Financial Officer to

the Debtors (the "Park Retention Motion").[30]  The Debtors asserted in the Park Retention Motion

that, given their need to raise capital and the complexity of their businesses and structure of their

debt, it was necessary to have an experienced CFO to support the Debtors' financial operations

and successfully navigate the Debtors' businesses during their Chapter 11 cases and post-

emergence from bankruptcy.  Although the Debtors asserted that their entry into the employment

agreement with Mr. Park was within the ordinary course of their business, and therefore did not

require approval of the Court, after discussions with the United States Trustee the Debtors filed a

revised motion to employ Mr. Park on July 18, 2023.[31]

On July 25, 2023, Hawk filed an objection to the Park Retention Motion. In its objection,

Hawk argued that the Debtors neither provided a basis justifying the need for Mr. Park's

employment nor have the Debtors established that Mr. Park is not a disinterested person for the

purposes of §327 of the Bankruptcy Code. A hearing on the Park Retention Motion was

originally scheduled for August 16, 2023, but has been continued a number of times to allow for

Trial and other more pressing contested matters to go forward.

---

[29] Bankr. Docket No. 155.

[30] Bankr. Docket No. 234.

[31] Bankr. Docket No. 298.

**TA-085**

**9.    Debtors' Motion to Continue Trial Due to Mr. Rajan's Hospitalization**

On June 16, 2023, the Debtors filed an expedited motion to continue the Trial on the

Hawk Stay Relief Motion and the Section 1112/1104 Motion, scheduled to commence on June

26.[32]  The Debtors represented that Mr. Rajan was hospitalized after suffering a recent injury,

and upon his medical provider's instruction, would be unable to participate in or attend Trial,

whether remotely or in-person, nor would he be able to attend, remotely or in-person, his

deposition.  The Debtors therefore sought a continuation of the commencement of Trial for 45

days to allow Mr. Rajan to recuperate sufficiently to participate.  Hawk objected to the

continuation request, citing the prejudice a further delay would cause, and asserting that Mr.

Rajan's absence would not affect the outcome to the extent the pending motions entailed strictly

legal issues, as opposed to factual issues requiring testimony from Mr. Rajan.   On June 21,

2023, the Court held an expedited hearing on the Debtors' continuance request, at which time it

determined that Trial would proceed on June 26 to allow the parties to commence with the

presentation of evidence, but that Trial would need to be continued to allow Mr. Rajan to

recuperate sufficiently to be deposed and testify.

Trial then commenced from June 26 to June 29, and was subsequently continued on

August 15 and 17, and again on September 22 and 25, to permit Mr. Rajan's recuperation and

participation.

**10.    Debtors' Amendment to Stock Sale Motion**

On June 23, 2023, the Debtors filed an amendment to their Stock Sale Motion (the "Stock

Sale Motion Amendment").[33]  The Debtors informed the Court that they had continued to

---

[32] Bankr. Docket No. 236.

[33] Bankr. Docket No. 258.

**TA-086**

explore the sale of Class A common stock of Stream to third parties, one of which was a Chinese

company named Zhongsheng Group Holdings Ltd. ("Zhongsheng"). As a result, the Debtors had

entered into a non-binding term sheet with Zhongsheng on June 6, 2023 (the "Zhongsheng Term

Sheet"), pursuant to which Zhongsheng would invest $300 million in Stream through the

purchase of Stream Class A shares.

As discussed in further detail *infra*, a wave of motion practice followed the Stock Sale

Motion Amendment, and it later became one of the primary issues in the Trial.

### 11.    Debtors' Adversary Proceeding and TRO Motion

On August 12, 2023, with the resumption of Trial days away and in the midst of

contested hearings regarding discovery over the Zhongsheng Term Sheet, the Debtors filed an

adversary action ( the "Adversary Action") against a host of parties, including, among others,

Hawk, SLS, SeeCubic, and Mr. Stastney (collectively, the "Defendants).[34]  In their Complaint in

the Adversary Action, the Debtors allege that the Defendants have engaged in an effort to (a)

sabotage the Debtors' exercise of certain debt-to-equity conversion rights held against the

secured debtholders, (b) vitiate the Debtors' recapitalization, which would have rendered certain

Defendants' debt instruments obsolete; (c) restrict and/or interfere with the Debtors' ability to

raise funds and sell products, and (d) use their status as secured lenders to deny Stream the assets

and other business resources essential to its successful reorganization.

On September 1, 2023, the Debtors filed a motion in the United States District Court for

the Eastern District of Pennsylvania (the "District Court") to withdraw reference of the

Adversary Action from this Court.[35]  The Debtors followed that on September 28, 2023 with an

---

[34] Bankr. Docket No. 335; Adv. Pro. Docket No. 1.

[35] On November 16, 2023, the District Court denied the Debtors' request to withdraw the reference. *See*
Case No. 23-mc-135, at Docket No. 18.

emergency motion in the District Court (the "TRO Motion") for a temporary restraining order,
preliminary injunction, and permanent injunction. The District Court denied the motion on the
grounds that it was not properly filed in the District Court absent withdrawal of the reference of
the Adversary Action. Therefore on September 30, 2023, the Debtors refiled the TRO Motion in
the Adversary Action before this Court.[36]

By the TRO Motion, the Debtors assert that Mr. Stastney testified in mid-September in
the Amsterdam Action, during which he admitted that SeeCubic is in direct competition with
Stream, and is currently working with twelve or thirteen customers using the Ultra-D technology
developed by Stream. Stream alleges that this action by SeeCubic puts its technology licenses
with Philips and Rembrandt at risk because they strictly prohibit sub-licensing. The Debtors
further argue that SeeCubic's unauthorized use of the Philips and Rembrandt technology, as
embedded in Stream's technology, violates the Philips and Rembrandt licenses and presents the
potential of irreparable harm to Stream should Philips and Rembrandt decide to revoke their
respective licenses.

The Court held a contested evidentiary hearing on the TRO Motion over the course of
multiple days in October and November, after which the Court provided the parties certain dates
in December that were available for the conclusion of the hearing, and directed that they confer
regarding their mutual availability. The parties thereafter advised the Court that they had agreed
to postpone continuation of the TRO hearing, as well as multiple other matters that were
scheduled for hearing in December, until late January or early February to pursue settlement
discussions. On December 14, the Court held a status hearing with the parties to discuss the
impact of the proposed continuation on the status of the TRO hearing. The Court determined

---

[36] Adv. Pro. Docket No. 27.

20

**TA-088**

that the entry of a limited temporary restraining order was warranted, based strictly on the

evidence presented at the TRO hearing to that point and in light of the lengthy delay that

continuation of the hearing would cause to the Court's final resolution of the matter.  The Court

directed Debtors' counsel to prepare an agreed form of order reflecting the Court's ruling at the

status hearing.  Indicative of the acrimony that has stalled progress in this case at nearly every

turn, the parties subsequently advised the Court that they were unable to reach agreement

regarding the terms of a proposed order.  The Court therefore prepared an Order consistent with

its ruling at the December 14 status hearing, which was entered on January 4, 2024.[37]

### 12.   Trial on the Pending Motions

Commencing on June 26, the Court held Trial over eight days, concluding on September

25.  During the Trial, the Court heard testimony from Mr. Stastney, Mr. Park, Mr. Rajan, and

Christopher Michaels of Rembrandt.  Approximately 130 exhibits were admitted into evidence.[38]

### 13.   The Parties' Positions After Trial

At the Court's direction, Hawk, the Debtors, and Rembrandt submitted post-trial briefs

(each a "Post-Trial Brief") setting forth their positions in light of the evidence presented at

Trial.[39]

### a.   The Section 1112/1104 Motion

---

[37] Adv. Pro. Docket No. 119.

[38] The transcripts of the Trial span nearly 2,000 pages, which is merely a fraction of the pages of
transcripts that have accumulated from all of the contested hearings the Court has had to hold in these
cases.

[39] Although Rembrandt submitted post-trial briefing in opposition to the two pending motions, the
arguments therein relate largely to Rembrandt's history with the Debtors and its position with respect to
the Rembrandt license.  Although the Rembrandt license is a central feature of these cases, it does not
factor into the Court's analysis below regarding whether conversion, dismissal, or appointment of a
trustee is warranted and whether cause exists to grant Hawk stay relief for resolution of the Technovative
Director Issue and the Debt Conversion Issue.  The Court therefore will not summarize Rembrandt's
arguments here.

Hawk argues that the Court should order conversion of the Debtors' cases to chapter 7 for any of three independent reasons.[40]

First, Hawk argues that the evidence established that conversion is warranted under §1112(b)(4)(A), based on the substantial or continuing losses to the Debtors' estates and no reasonable prospect at rehabilitation.[41]  According to Hawk, the record evidence established that the Debtors are incurring substantial losses during the pendency of these cases in the form of accruing administrative expenses and post-petition payment obligations to Rembrandt, without any offsetting revenue, and have no reasonable likelihood of rehabilitation because they have never had any operations, as all of the value lies in their non-debtor operating subsidiaries (and to the extent Mr. Rajan testified regarding the Debtors' operations, these are actually taking place at the VSI level).

Next, Hawk argues that the evidence established conversion is warranted under §1112(b)(4)(B), based on the Debtors' gross mismanagement of the estates.[42]  Hawk argues that the evidence at Trial established the Debtors' gross mismanagement in a number of ways: (a) Mr. Rajan's breach of his fiduciary duties and conflicts of interest; (b) the Debtors' lack of

---

[40] In its Post-Trial Brief, Bankr. Docket No. 431, Hawk does not address its argument in the Section 1112/1104 Motion that conversion or dismissal is warranted under §1112(b)(4)(D), based on the Debtors' unauthorized use of cash collateral.  *See* Hawk Post-Trial Brief, at 42 (arguing that there are three bases under §1112(b) under which the Court can order conversion here: (i) substantial or continuing loss or diminution of the estate and absence of reasonable likelihood of rehabilitation under §1112(b)(4)(A); (b) gross mismanagement of the estate under §1112(b)(4)(B); and (c) lack of good faith in filing the Petitions).  In its Post-Trial Reply Brief, Bankr. Docket No. 436, Hawk acknowledges that it has not identified any cash collateral the Debtors used without permission, but attributes that to the Debtors' failure to adhere to their financial reporting and disclosure obligations.  *Id.* at 14. While the Court is not clear that Hawk is even advancing this basis for conversion or dismissal given its omission from the Hawk Post-Trial Brief, Hawk's concession in its reply brief seems to end the inquiry, and the Court therefore does not address it further herein.

[41] Hawk Post-Trial Brief, at 44-47.

[42] *Id.* at 48-57.

candor to the Court and interested parties; (c) the Debtors' "blatant gamesmanship" in their

requests for relief in this Court and the litigation that has ensued; and (d) likely fraud in the

fabrication of a purported funding transaction.

Finally, Hawk argues that the evidence established conversion is warranted based on the

Debtors' bad faith in commencing these cases.[43]  Hawk argues that the timing of the Debtors'

Petitions alone establishes *per se* bad faith because they were filed on the eve of trial in the

Section 225 Action as a bad faith litigation tactic.  Hawk further argues that under the totality of

the circumstances test used in the Third Circuit, twelve of the fourteen factors used support a

finding of bad faith.

Hawk argues that conversion of the Debtors' cases, rather than dismissal, is warranted so

that the Court may continue to oversee them but curtail Mr. Rajan's influence in administering

them.[44]  Barring conversion, Hawk argues that dismissal is appropriate because the existence of

cause has been established under §1112.  If, however, the Court is not inclined to either convert

or dismiss, Hawk argues the evidence establishes that appointment of a trustee is proper based on

Mr. Rajan's pattern of fraud and dishonesty in managing the Debtors, his gross mismanagement

not only of the estates, but also of the pre-petition Debtors, and the conflicts of interest between

Mr. Rajan and his roles with and interests in the Debtors and VSI that have revealed themselves

through the administration of these cases.[45]  Hawk argues that the costs of appointing a trustee

"are effectively nil" because Mr. Rajan's administration of the estates to date has been so

---

[43] *Id.* at 57-61.

[44] *Id.* at 62.  The Court notes Hawk's request for conversion rather than dismissal represents a change
from its preference for dismissal with prejudice as stated in the Section 1112/1104 Motion, but is
consistent with the evolved position Hawk took in its pre-trial brief filed in May.  *See* Bankr. Docket No.
195, at ¶¶23 to 42.

[45] *Id.* at 64-67.

harmful to creditors' prospects for recovery.

The Debtors argue that Hawk has failed to establish by a preponderance of the evidence that cause exists for conversion, dismissal, or the appointment of a trustee.[46]

First, the Debtors argue the evidence does not establish the absence of a reasonable likelihood of rehabilitation.  The Debtors assert that their proposed plan of reorganization,[47] the post-petition purchase orders they have procured, and Mr. Rajan's testimony at Trial regarding expected revenues to be generated from new and existing Stream customers belie Hawk's narrative of a non-operating entity that has no ability to rehabilitate.[48]  Moreover, the Debtors argue, the evidence does not establish substantial or continuing loss to the estates because operating expenses are being funded by VSI in exchange for Stream shares.[49]

The Debtors also argue that the evidence does not establish gross mismanagement of the estates supporting conversion or dismissal.  The Debtors assert that their efforts to obtain financing from VSI to fund operations pursuant to the Debtor DIP Motion were the subject of "extreme resistance" that ultimately resulted in the Court declining to approve the financing, and that they have retained Mr. Park to provide independent oversight of the Debtors' post-petition finances and internal systems, thereby buffering management of the estates with "another layer of independence to the Debtors' management team."[50]

With respect to Hawk's argument that the Petitions were filed in bad faith, thereby providing another basis for conversion or dismissal, the Debtors argue that the cases were filed to

---

[46] Debtors Post-Trial Brief, Bankr. Docket No. 432, at 2-3.

[47] *See* Bankr. Docket No. 293.

[48] Debtors Post-Trial Brief, at 11-16.

[49] *Id*. at 17-19.

[50] *Id.* at 19-21.

provide breathing room and to develop a plan of reorganization, not as a litigation tactic solely for purposes of staying the Section 225 Action.[51]

Just as they argue there is no basis for conversion or dismissal, the Debtors argue there is no basis for the appointment of a trustee. The Debtors cite Mr. Rajan's experience as a businessman, his intimate familiarity with the Debtors' business and related technology, and the post-petition retention of Mr. Park as reasons for finding that the Debtors' estates are better administered by current management.[52]

**b.    The Hawk Stay Relief Motion**

Hawk argues that cause exists to grant relief from stay to allow the Section 225 Action to proceed because its resolution "will determine: (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any available defense(s) to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future conversion of the Hawk Notes – all critical to the resolution of these Chapter 11 cases."[53] Relying on Mr. Stastney's Trial testimony regarding the late stage at which the Section 225 Action was when the Petitions were filed, the expenses that had been incurred getting to that point, and the extensive discovery that had been undertaken, Hawk argues that a quick resolution by the Delaware Chancery Court would be efficient and conserve judicial and estate resources.

The Debtors, in response, argue that relief from stay is not warranted. The Debtors first argue that Hawk has failed to articulate the exact relief and specific matters that it seeks to

---

[51] *Id.* at 22-26 (arguing that "virtually none" of the factors set forth in *Primestone Inv. Partners v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.),* 272 B.R. 554, 557 (D.De. 2002) for analyzing whether a filing was in bad faith are present here).

[52] *Id.* at 27.

[53] Hawk Post-Trial Brief, at 62-63.

TA-093

pursue in the Section 225 Action.[54]  Furthermore, they argue, the ultimate relief sought in that

action is to authorize Hawk to exercise rights under the Hawk Notes and the SLS Notes,

including pursuit of an Article 9 Sale of their purported collateral.[55]  Hawk cannot do so, the

Debtors argue, without resolution of the dispute regarding Stream's rights in connection with

ownership of 100% of Technovative shares, which are undisputedly estate property and therefore

subject to resolution by this Court rather than the Delaware Chancery Court.[56]  The Debtors

further argue that allowing the Section 225 Action to proceed would greatly prejudice the

Debtors by allowing Hawk to move forward with its plans to effectuate a sale of downstream

assets, thereby inflicting irreparable harm on the Debtors' ability to effectuate an orderly

reorganization process.  The Debtors also argue that they have strong defenses in the Section 225

Action, militating against relief.

## III.    DISCUSSION

### A.    Cause Exists and It Is In the Best Interest of Creditors and the Estates at This Stage to Appoint a Chapter 11 Trustee

#### 1.    Legal Standard for Dismissal or Conversion Under §1112(b)

Section 1112(b)(1) of the Bankruptcy Code sets forth the Court's power to convert or

dismiss a chapter 11 bankruptcy case:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

11 U.S.C. §1112(b).  The movant bears the initial burden to demonstrate cause by a

---

[54] Debtors Post-Trial Brief, at 28.

[55] *Id.*

[56] *Id.* at 29.

TA-094

preponderance of the evidence, and once shown, the burden shifts to the debtor to establish an

exception under §1112(b)(2).[57]  *In re Dr. R.C. Samanta Roy Institute of Science Technology,* 465

Fed. Appx. 93, 96-97 (3d Cir. 2011) ("[O]nce cause is found, the burden shifts to the opposing

party to show why dismissal or conversion would not be in the best interests of the estate and the

creditors."); *In re Mann Realty Assocs.,* 2019 WL 4780937, at *6 (M.D. Pa. Sept. 30, 2019)

("After cause is established, the burden shifts to the opposing party to identify unusual

circumstances that suggest conversion would not be in the best interests of the estate and its

creditors, and that there is a reasonable likelihood that a reorganization plan will be confirmed in

a reasonable time.");  *In re Vascular Access Centers, L.P.,* 611 B.R. 742, 761 (Bankr. E.D. Pa.

2020) (citing cases).

        The Bankruptcy Code sets forth a non-exclusive list of circumstances that constitute

"cause" for conversion or dismissal.  11 U.S.C. §1112(b)(4).  As discussed *supra,* Hawk's Post-

Trial Brief focuses on two of these circumstances: (A) substantial or continuing loss to or

diminution of the estate and the absence of a reasonable likelihood of rehabilitation; and (B)

gross mismanagement of the estate.

        A motion filed under §1112(b) necessitates a two-step analysis: (1) to determine if cause

exists to either dismiss the case or convert it to chapter 7, and (2) if so, which option is in the

best interests of creditors and the estate (unless appointment of a trustee under §1104 is in the

best interests).  *Camden Ordnance*, 245 B.R. at 798.  In considering whether to convert or

---

[57] Section 1112(b)(2) provides that the court may not convert or dismiss a case if the court finds and
identifies unusual circumstances establishing that converting or dismissing the case is not in the best
interests of creditors and the estate and the debtor or a party in interest establishes (1) there is a reasonable
likelihood a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or,
if not applicable, within a reasonable period and (2) the grounds for converting or dismissing the case
include an act or omission of the debtor other than under paragraph (4)(A) for which there exists a
reasonable justification for the act or omission; and that will be cured within a reasonable period of time
fixed by the court.

dismiss, a bankruptcy court may consider a variety of factors, including:

    (1)    whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

    (2)    whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

    (3)    whether the debtor would simply file a further case upon dismissal;

    (4)    the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors;

    (5)    in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

    (6)    whether any remaining issues would be better resolved outside the bankruptcy forum;

    (7)    whether the estate consists of a "single asset";

    (8)    whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

    (9)    whether a plan has been confirmed and whether any property remains in the estate to be administered;

    (10)    whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns; and

    (11)    consideration of the effect of dismissal under §349 of the Bankruptcy Code.

*In re Ramreddy, Inc.,* 440 B.R. 103, 115 (Bankr. E.D. Pa. 2009) (citing 7 COLLIER ON

BANKRUPTCY ¶1112.04[6]).

    Although §1112(b)(4)'s enumerated circumstances constituting cause are wide-ranging, a

court may consider other factors as they arise and may use its equitable powers to reach an

appropriate result in individual cases. *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.,* 245

B.R. 794, 798 (E.D. Pa. 2000) (quoting *Mechanical Maintenance, Inc.,* 128 B.R. 382, 386 (E.D.

Pa. 1991)). For example, it is well-settled that a debtor's inability to achieve confirmation of a

28

**TA-096**

plan, by itself, provides sufficient cause for dismissal or conversion of a chapter 11 case. *See,*
*e.g., 1121 Pier Village LLC,* 635 B.R. at 137 n.14; *In re 3 Ram, Inc.,* 343 B.R. 113, 117 n.14
(Bankr. E.D. Pa. 2006).

     Importantly, good faith is an implicit requirement in the filing of a chapter 11 bankruptcy
case, and a case not filed in good faith is subject to dismissal under §1112(b). *See, e.g., In re*
*SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir. 1999) (chapter 11 petitions are subject to
dismissal unless filed in good faith); *In re DCNC North Carolina I, LLC,* 407 B.R. 651, 661
(Bankr. E.D. Pa. 2009) (citing *SGL Carbon*).  The debtor bears the burden of proving good faith.
*Id.* (citing *In re PPI Enterprises (U.S.), Inc.,* 324 F.3d 197, 211 (3d Cir. 2003)).  In the business
bankruptcy context, the preservation and rehabilitation of a going concern or the maximizing of
the value of a debtor's estate for the benefit of creditors through an orderly liquidation are valid
bankruptcy purposes supporting a finding of good faith.  *Id.* (citing *In re Integrated Telecom*
*Express, Inc.,* 384 F.3d 108 (3d Cir. 2004)); *In re Team Systems International LLC,* 640 B.R.
296, 311 (Bankr. D. Del. 2022) ("The ultimate touchstone is whether the case is being used to
accomplish one of the basic purposes of chapter 11 – to preserve a going concern and/or to
maximize the property available to satisfy creditor claims.").  Whether a case should be
dismissed for lack of good faith is committed to the discretion of the bankruptcy court, and the
determination is a fact-intensive inquiry based on the totality of the circumstances.  *Id.* at 662
(citing *Integrated Telecom*).  The inquiry is facilitated, however, by factors courts use, the
presence of which suggests a case was not filed in good faith:

    (1)    the debtor has few or no unsecured creditors;

    (2)    there has been a previous bankruptcy petition by the debtor or a related entity;

    (3)    the prepetition conduct of the debtor has been improper;

(4)     the petition effectively allows the debtor to evade court orders;

(5)     there are few debts to non-moving creditors;

(6)     the petition was filed on the eve of foreclosure;

(7)     the foreclosed property is the sole or major asset of the debtor;

(8)     the debtor has no ongoing business or employees;

(9)     there is no possibility of reorganization;

(10)    the debtor's income is not sufficient to operate;

(11)    there was no pressure from non-moving creditors;

(12)    reorganization essentially involves the resolution of a two-party dispute;

(13)    a corporate debtor was formed and received title to its major assets immediately
        before the petition; and

(14)    the debtor filed solely to create the automatic stay.

*Id.* (citing *In re SB Properties, Inc.,* 185 B.R. 198, 204 (E.D. Pa. 1995)).

As discussed *supra,* the preservation and rehabilitation of a going concern is a valid

bankruptcy purpose supporting a finding of good faith, and the determination of whether a case

should be dismissed for lack of good faith is a fact-intensive inquiry based on the totality of

circumstances.

> **2.     It Has Been Established by a Preponderance of the Evidence and the
> History of These Cases that Current Management's Actions and
> Inactions Constitute Gross Mismanagement of the Estates**

Section 1112(b)(4)(B) provides that cause for conversion or dismissal exists where there

has been gross mismanagement of the estate.  11 U.S.C. §1112(b)(4)(B).  A debtor-in-possession

owes a fiduciary duty to its creditors, and gross mismanagement is a breach of that duty.  *In re*

*Ozcelebi,* 639 B.R. 365, 388 (Bankr. S.D. Tex. 2022).  Section 1112(b)(4)(B) focuses on the

conduct of the *estate's* affairs, not the pre-petition debtor's, and requires that the mismanagement

be gross in character, meaning that it is "'glaringly noticeable usually because of inexcusable badness or objectionableness.'" *In re 210 West Liberty Holdings, LLC,* 2009 WL 1522047, at *5 (Bankr. N.D. W.Va. May 29, 2009) (citing *Webster's Ninth New Collegiate Dictionary* 538 (1991)); see also *Ozcelebi,* 639 B.R. at 388 ("[W]hile 'gross mismanagement' is not defined by the Bankruptcy Code, Black's Law Dictionary defines 'gross' as 'beyond all reasonable measure; flagrant.' Given the plain language, a debtor's mismanagement must be beyond all reasonable measure.").

The above summary outlining the major activity in these cases, which have been pending for months, evidences the acrimony and overall lack of progress that has plagued these cases from their inception. Rather than moving expeditiously toward confirmation of a reorganizational plan that addresses creditor claims and formulates the Debtors' operations moving forward, these cases have stalled at virtually every turn. The Court has expressed its concern with the cases' lack of progress and direction on multiple occasions. Furthermore, the evidence at Trial on the pending motions crystalized the Court's primary and urgent concern with the administration of the Debtors' cases to date, *i.e.,* the plans, trustworthiness, and motivations of Mr. Rajan in his role as, for all intents and purposes, the singular figure in the Debtors' management. There are many examples, large and small, that highlight (a) the Court's lack of faith in Mr. Rajan's ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court, (b) the relatively directionless nature of these cases to date, and (c) the entrenched acrimony between the Debtors, Hawk, SLS, and SeeCubic that has permeated the cases and driven nearly all activity to date. The Court discusses the most glaring examples below.

### a. All Indications Are That the Purported $300 Million Transaction with Zhongsheng Was Not Real

From the early days of these cases, the Court repeatedly raised concerns about how the Debtors were being funded. Although the Debtors attempted to answer that question in part with an ill-conceived emergency financing through the sale of stock to VSI, they later proposed a $300 million transaction for the sale of Stream Class A stock to Zhongsheng. That transaction was suspect from the start given its timing on the eve of Trial, lack of detail, and non-binding nature, but the dearth and opacity of information the Debtors provided about it at Trial when pressed, together with their abandonment of the proposed transaction, leads this Court to believe it never truly existed, and either embellished or fabricated to portray the Debtors' cases and operations as sufficiently progressing.

The Debtors filed the purported Zhongsheng Term Sheet on the evening of June 23, i.e., the Friday prior to the start of the Trial on the pending Hawk Motions.[58] That term sheet, which states that it is non-binding, provides that Zhongsheng will invest $300 million in exchange for Class A Common Stock in Stream, resulting in Zhongsheng holding a 35% equity stake in Stream.[59] Attached to the Term Sheet was a draft Subscription Agreement providing for Zhongsheng's purchase of the Stream shares, with an initial $15 million tranche to be sold by an unspecified date in July 2023, and the balance of the sale to occur by December 31, 2023. According to the Debtors, they intended to use the first $30 million received from the sale of

---

[58] The Term Sheet was filed as an attachment to a two-page pleading styled as an amendment to the Stock Sale Motion. Incredibly to the Court, the Debtors stated their position therein that they believed the relief sought by the Stock Sale Motion was broad enough to cover the sale of $300 million in Stream shares to Zhongsheng, but were filing the amendment out of an abundance of caution. The Court questions whether the post-petition sale of $300 million in equity in a debtor could ever be covered under an ordinary course of business concept, but it is enough to say that it certainly is not here.

[59] See Bankr. Docket No. 258-1.

**TA-100**

Stream's Class A shares to fund their operations through confirmation.  As such, the Zhongsheng transaction was to fund the Debtors through the issuance of Stream securities rather than the incurrence of debt.

The authenticity of this transaction, however, quickly began to grow murky, particularly in light of the amount of the purported investment and its importance to the Debtors' cases.  Mr. Park testified at Trial less than a week later, on June 29, that he understood Zhongsheng to be a publicly traded entity on Hong Kong's Hang Seng Index, involved in the high-end auto dealership business but with a finance arm as well.[60]  Mr. Park wanted to make clear, however, that he was not involved in any negotiations with Zhongsheng related to the Term Sheet, despite serving as CFO and being tasked with raising capital for the Debtors.  Instead, the negotiations were handled by Mr. Rajan, and Mr. Park had not discussed the proposed deal with Mr. Rajan notwithstanding its enormous size and implications for the Debtors' finances.[61]

Following Mr. Park's testimony, Hawk sought more information about the Zhongsheng Term Sheet through discovery, and ultimately filed a motion to compel the Debtors to produce information sufficient to permit Hawk to depose a Zhongsheng representative about the purported transaction (the "Motion to Compel").[62]  By the Motion to Compel, Hawk made clear that it sought the information in order to, among other things, "evaluate the veracity of the Term Sheet."[63]  Although the Court denied the Motion to Compel, it entered an order (the "Discovery

---

[60] June 29, 2020 Hearing Transcript, 55:5 to 55:15.

[61] *Id.* at 55:21 to 56:9.  The idea that Mr. Park, as CFO, would not even discuss the proposed deal with Mr. Rajan, let alone be involved in the negotiations, is indicative of its specious nature, or otherwise speaks to the marginal role Mr. Park plays with the Debtors despite Mr. Rajan being their only other employee.

[62] CR-242.

[63] *See* Motion to Compel, at ¶17.

Order")[64] directing the Debtors to produce contact information for the individuals at Zhongsheng who negotiated the Zhongsheng Term Sheet, as well as documents and communications with Zhongsheng or any affiliate of Zhongsheng "including but not limited to letters of intent, proposals, and diligence materials between the Debtors and Zhongsheng Group Holdings Ltd. or any affiliate thereof."  After the Discovery Order was entered, Mr. Rajan submitted a Declaration in support of the legitimacy of the Zhongsheng Term Sheet (the "Zhongsheng Declaration").[65]  It is unnecessary to fully summarize the Zhongsheng Declaration, but in it Mr. Rajan states, *inter alia,* that (a) the Zhongsheng Term Sheet was the product of negotiations with William Wang and Tea Lee, both of Zhongzhi Enterprise Group ("ZEG"), an affiliate of Zhongsheng, and (b) contrary to Mr. Park's testimony, the Zhongsheng entity that is party to the Zhongsheng Term Sheet is a privately held company of the People's Republic of China, and is not the Zhongsheng entity publicly traded on the Hong Kong stock exchange.[66]

What came next was a motion by Hawk to hold the Debtors in contempt for failing to produce the information and documents required by the Discovery Order (the "Contempt Motion").[67]  Hawk alleged in the Contempt Motion that the Debtors only produced business cards in Mandarin for William Wang and Tea Lee, and that of the 4,300 pages of mostly unresponsive documents produced, only one document related to the Zhongsheng Term Sheet: a mobile phone or tablet screenshot of the Term Sheet's signature block, purportedly signed by Tea Lee on behalf of Zhongsheng, which was emailed from Jeff Shammah ("Mr. Shammah") of

---

[64] Bankr. Docket No. 322.

[65] CR-237.

[66] Although the Declaration is not entirely clear, the Court reads it to say that both the publicly-traded Zhongsheng and the privately-held Zhongsheng are affiliates of ZEG.

[67] Bankr. Docket No. 328.

Blue Ocean Partners Ltd.[68] to a Mark Savarese,[69] who then forwarded it to Mr. Rajan.  Hawk argued that the Debtors' failure to produce any communications or other documents related to the Zhongsheng Term Sheet violated the Discovery Order and the Debtors' obligations under the federal discovery rules.  The Court heard the Contempt Motion at the start of the continued Trial on August 15, but took the matter under advisement in order to proceed with evidence.[70]

Mr. Rajan testified in August at the continued Trial that the Zhongsheng Term Sheet evolved from a November 2022 term sheet Zhongsheng had entered into with VSI, and that once Stream filed for bankruptcy the parties simply agreed to revise the agreement to make Stream, rather than VSI, the counterparty.[71]  During his cross-examination in September, however, Mr. Rajan was pressed on the legitimacy of the Zhongsheng Term Sheet.  The Court found his testimony regarding his dealings with Zhongsheng difficult to believe.  For example:

- Although Mr. Rajan had stated on direct examination in August that he was meeting with William Wang in Boston that weekend to work on the Zhongsheng transaction,[72] by his cross-examination in September he testified that Zhongsheng's trip was delayed and would be occurring in October.[73]  Mr. Rajan gave no explanation for why the trip was delayed, and admitted he did not ask anyone from Zhongsheng to testify in support of the transaction's authenticity.  In

---

[68] Mr. Rajan testified that the Debtors retained Mr. Shammah, an investment banker, post-petition to negotiate the transaction with Zhongsheng, but acknowledged that no court approval for the retention was sought or granted.  *See* September 25, 2023 Hearing Transcript, at 32:17 to 33:12.

[69] As will be discussed *infra,* Mr. Savarese evidently holds a role with VSI, but none with the Debtors of which the Court has been made aware.

[70] Bankr. Docket No. 354.

[71] See August 17, 2023 Hearing Transcript, at 88:4 to 95:20; 99:25 to 100:7.

[72] *Id.* at 101:9 to 101:22.

[73] September 25, 2023 Hearing Transcript, at 60:13 to 60:23.

light of the questions Hawk was raising and the enormous amount of capital to be

infused into Stream under the proposed transaction, the Court finds it incredible

that Mr. Rajan would not (a) dig deeper into why Zhongsheng would was not able

to negotiate the transaction in August 2023, whether in Boston or otherwise, and

(b) at least request that a representative of Zhongsheng or ZEG testify at Trial in

support of the transaction.[74]

- WeChat messages were the only documentation Mr. Rajan had supporting his

  claim that William Wang and Tea Lee, as purported employees of ZEG, were

  nonetheless authorized to negotiate a $300 million deal on behalf of

  Zhongsheng.[75]

- Mr. Rajan confirmed his testimony given on direct examination that

  Zhongsheng's preferred method of communication was WeChat, but when

  pressed as to why no WeChat messages were produced evidencing those

  communications, Mr. Rajan hedged, testifying that he "[didn't] know if it was

  WeChat or if it was photographs and those various programs."[76]

- When asked whether he had received any financial information from Zhongsheng,

  Mr. Rajan responded that he wasn't sure and would have to "go back and check,"

  but acknowledged that as of his deposition on August 14 he had not received any

  financial information from Zhongsheng, did not know its gross revenues, did not

---

[74] The Debtors gave no reason why a purported $300 million transaction could only be negotiated in-person in Boston and only at some uncertain date in the future, nor why it would be too much to ask a Zhongsheng or ZEG representative to travel to the United States to testify.

[75] Presumably these are the same WeChat messages attached to his Zhongsheng Declaration.

[76] September 25, 2023 Heating Transcript, at 74:21 to 75:17.

**TA-104**

know how many auto dealerships it operated, or even what make of car it sold.[77]

- Mr. Rajan was pressed on his statements in the Zhongsheng Declaration that the privately-held Zhongsheng entity that signed the Term Sheet is distinct from the publicly-traded Zhongsheng entity.  When asked for an explanation as to why the same address in Dalian, China was given by both the publicly-traded entity in its 2021 Annual Report[78] for its corporate headquarters and by the privately-held entity in the Zhongsheng Term Sheet for its principal place of business, Mr. Rajan provided a convoluted response that provided no explanation at all.[79]

- Notwithstanding the enormity of the proposed transaction, which would infuse $300 million of funding into Stream for a 35% stake in the company, Mr. Rajan disclaimed its importance to the Debtors, testifying in September that funding is now not needed to implement the Debtors' proposed plan because Stream was receiving financing from VSI instead.[80]

The Court finds the entire picture that Mr. Rajan painted of the Zhongsheng transaction to be not credible.  The Court finds the almost complete lack of documentation and communications related to a purported $300 million transaction to be most damning and suggests

---

[77] *Id.* at 70:2 to 72:9.

[78] *See* CR-254 (page 2).

[79] September 25, 2023 Hearing Transcript, 146:14 to 147:8 ("The way it works in China is if you want to do business in China, you need a company in China where you do all your operations.  And what Stream TV believes from its understanding, is some of the shares from the China company were put into a Hong Kong company, traded on the Hong Kong Exchange.  The Hong Kong Exchange company is just a holding company, and Zhongsheng has shares and investments in the private company and no liquidity because they don't have no shares in the Hong Kong company.  They wanted shares in Stream TV, because we have all these POs, on the hope that we could eventually get Zhongsheng some liquidity.  They're two separate companies.").  The Court finds this response to be non-responsive and, in the context of the question asked, largely nonsensical.

[80] September 25, 2023 Hearing Transcript, at 191:22 to 192:2.

that the transaction was not real.  In light of that lack of documentation, and Hawk putting the

Debtors on notice in the Motion to Compel (if not earlier) that it questioned the existence of an

actual deal with Zhongsheng, it was incumbent upon the Debtors to substantiate the transaction's

existence and legitimacy.  Moreover, if the Zhongsheng transaction was both legitimate and

intended, even as an alternate source of funding, the Court concludes that the Debtors would or

should have viewed it as being of the utmost importance to have someone other than Mr. Rajan,

whether an individual from Zhongsheng, Mr. Shammah, or someone else, testify in support of its

authenticity.  They did not, and the Court finds Mr. Rajan's testimony was not believable and

was instead suggestive that the transaction was never real to begin with.[81]

The Court views this as an enormous problem for the Debtors.  Particularly in a case

where funding for the Debtors has been a stated concern from the outset, the Court's trust in the

Debtors' management was severely undermined both by their failure to satisfactorily substantiate

the Zhongsheng transaction after submitting it to the Court, and their willingness to walk away

from it after its bona fides came into doubt.[82]

### b.    The Debtors' Self-Imposed April Funding Crisis Nearly Left SCBV's Payroll Unfunded

Early in these cases, the Debtors' management created a funding fiasco that greatly

---

[81] The Court notes, anecdotally, that despite the authenticity of the Zhongsheng transaction being the subject of motion practice, hearings, and a significant portion of Mr. Rajan's trial testimony, the Debtors' Post-Trial Brief does not address the transaction at all, let alone why the evidence supports a finding that it was legitimate.

[82] On this, the Court agrees with Hawk's point in its Reply Brief that the logic of the alternative funding from VSI under the Debtors' proposed plan is difficult to square if the Zhongsheng transaction was real: "In other words, instead of waiting a few weeks for an investor to allegedly provide a $300 million investment for only a 35% share of the company, Mr. Rajan has opted to pursue an investment from his other company, VSI of $25 million (*i.e.,* nearly 1/10th that amount) for a 90% share of the company (*i.e.,* nearly three times the equity share).  In other words, if the Zhongsheng Term Sheet is genuine, Mr. Rajan has robbed these Debtors and their estates of $736.4 million in order to ensure that his other company, VSI, obtains voting control over the Debtors."  Hawk Post-Trial Reply Brief, at §B.5.

diminished the Court's confidence in Mr. Rajan's ability to guide the Debtors successfully in bankruptcy, and as importantly, in his ability to do so given his interest in and role with VSI.

Stream's Schedule A/B disclosed $2,362.50 in cash on hand as of the date its Petition was filed.[83]  The Debtors did not file a financing motion at the time their Petitions were filed, nor in the weeks thereafter.  The issue of how the Debtors were funding their cases was raised from an early stage by Hawk, and by no later than April 14, the Court raised the issue with the Debtors in light of the fact that April payroll was coming due for SCBV by the end of the month.[84]  At that time, the Court was advised that the Debtors had the means to fund their estates at a rate of at least $250,000 per month with cash from VSI, and that they would "have the appropriate documentation on file when we know how much money we actually need to do it."[85]  The Court advised the Debtors, given that §364(b) requires a motion and a hearing for debtor-in-possession financing, that "somebody needs to do something" to obtain funding for April payroll.[86]

On April 21, *i.e.,* one week after the Court raised its concerns as to case funding, the Debtors filed the expedited Stock Sale Motion.  The motion sought, among other things, authority to engage in what the Debtors asserted was the ordinary course sale of unissued Stream stock to VSI on an as-needed basis to fund their business operations.  In connection with that request for authority, the Debtors also sought authority to enter into a stock purchase agreement with VSI for the sale of up to $10 million in Stream stock.  According to the Debtors, they routinely sold shares of stock pre-petition to fund operations, and therefore did not need authority from the Court to do so post-petition, but did so "out of an abundance of caution to

---

[83] *See* Bankr. Docket No. 52.

[84] *See* April 14, 2023 Hearing Transcript, at 145:9 to 145:15; 163:2 to 163:6.

[85] *Id.* at 164:12 to 166:5.

[86] *Id.* at 173:5 to 173:10.

ensure their ability to continue selling and issuing new shares in Stream consistent with its pre-bankruptcy practices in order to bring valuable and necessary funds into these chapter 11 cases."[87]

Given what it understood to be a funding crisis with respect to payroll obligations at the SCBV level due on April 25, the Court heard the Stock Sale Motion on an emergency basis on April 24.  It was clear to the Court from the outset, as the Court advised the Debtors on the record at the hearing, that the circumstances creating a funding crisis with respect to the SCBV payroll was a self-created emergency, was foreseeable at the time the Petitions were filed, and should have been the subject of a first-day motion, rather than a motion filed days before payroll was coming due and packaged with a request for expedited approval of matters entirely irrelevant to funding SCBV and independent contracor payroll.[88]  Moreover, as the Court expressed at the hearing, the Debtors were only advising the Court for the first time on an emergency basis that they were proposing to sell shares to VSI to fund their post-petition operations, which the Court was not going to approve on an expedited basis.[89]

At that point in the April 24 hearing, the Debtors pivoted on-the-fly, seeking approval for emergency debtor-in-possession financing from VSI.[90]  It was unclear, however, whether VSI even had sufficient funds to cover the payroll-related amounts.[91]  Meanwhile, SeeCubic advised the Court that it was willing to fund the SCBV payroll under a pre-petition facility used to fund

---

[87] Stock Sale Motion, at ¶56.

[88] See April 24, 2023 Hearing Transcript, 6:19 to 6:25; 22:16 to 23:6.

[89] *Id.* at 38:23 to 39:3; 40:1 to 40:7.

[90] This was done only after the Debtors suggested the payroll be funded with money they were holding from pre-petition subscription agreements, which upon the Court's inquiry, was revealed to be funds not reported in the Debtors' filed Schedules.  *Id.* at 43:5 to 44:5.

[91] *Id.* at 55:19 to 56:1; 57:11 to 57:16.

SCBV while the Receiver was in place.[92]  The Court concluded that it was not going to choose between the two alternatives without evidence, and expressed concern over whether the Debtors were even the entity that had an obligation to fund SCBV's payroll in the first place.[93]  The Court therefore required the Debtors to file a financing motion by the end of the day with the proposed terms, and allowed SeeCubic to file a proposed alternative financing, both of which would be considered at an emergency evidentiary hearing the following day.

The Debtors filed their financing motion the following morning (the "Debtor DIP Motion"),[94] and SeeCubic filed its motion for approval of alternative funding (the "Seecubic Alternative Funding Motion").[95]  The Debtor DIP Motion sought authority either for (a) the Debtors to borrow approximately €872,000 from VSI on an unsecured basis to fund SCBV payroll obligations or, alternatively, (b) VSI's issuance of one or more unsecured senior promissory notes to SCBV directly, with either option being in exchange for Stream's entry into the Distribution Agreement with VSI, whereby VSI would accept orders and make delivery of Stream's products to customers and retain a 10% margin.  The SeeCubic Alternative Funding Motion proposed to fund SCBV's payroll obligations with a loan directly to SCBV under the pre-existing unsecured facility with SeeCubic, or alternatively, with an unsecured loan to the Debtors for the purpose of funding the SCBV payroll obligations.

The Court held a lengthy emergency evidentiary hearing on the alternative proposals later that day, at which Mr. Rajan testified on behalf of the Debtors and Mr. Stastney testified on behalf of SeeCubic.  Indicative of the Court's chief concern with the Debtors' proposal to obtain

---

[92] *Id.* at 66:18 to 67:13.

[93] *Id.* at 80:23 to 81:2.

[94] Bankr. Docket No. 156.

[95] Bankr. Docket No. 155.

financing from VSI, Mr. Rajan was also purporting to testify on behalf of VSI.[96]  Although the Debtors ultimately withdrew Mr. Rajan as a representative of VSI when the Court questioned how that could be, Mr. Rajan's dual role was indicative of the Court's trouble with the Debtors' emergency financing proposal:  the evidence at the hearing made clear to the Court that the proposal to have the Debtors incur $1 million in post-petition administrative debt to VSI was not only unnecessary given the availability of approximately €700,000 in funding directly from SeeCubic to non-debtor SCBV, but was also fatally flawed because Mr. Rajan was on both sides of the proposed transaction.[97]  As such, the Court denied the Debtor DIP Motion.  With respect to the SeeCubic Alternative Funding Motion, because SCBV was a non-debtor foreign company, the Court held that it could not direct SCBV to borrow from SeeCubic, but also would not approve an alternative debt financing from SeeCubic to the Debtors to fund payroll because the incurrence of such debt by the estates was unnecessary given the availability of the existing SeeCubic facility directly with SCBV.  The Court made clear to Mr. Rajan, however, that his fiduciary duties to the Debtors, their estates, and SCBV were implicated by the funding crisis, and recommended that he act consistent with them in approving SCBV's borrowing from SeeCubic under the pre-existing facility.[98]

The funding crisis in April was entirely of Debtors' management's own making.  As the Court observed on multiple occasions during the April 24 and 25 hearings, the Debtors knew when they filed their petitions that SCBV payroll would need to be funded in April.  They did not file a traditional financing motion at any point in the first month the cases were pending, and

---

[96] April 25, 2023 Hearing Transcript, at 52:14 to 54:9.

[97] *Id.* at 248:12 to 248:25.

[98] *Id.* at 253:15-17.

inexplicably waited until just days before the SCBV payroll was coming due to seek authority
for what they asserted was the ordinary course sale of $10 million in Stream shares to an entity
owned by Mr. Rajan, while also seeking other relief that was entirely unrelated to the funding
crisis.  When the Court made clear that no such transaction would be approved absent a full
opportunity for all parties and the Court to vet it, the Debtors proposed an insider financing
transaction with no notice to other parties in interest.  This necessitated an eleventh hour, full-
day hearing, only for the Court to conclude that there was no need for the financing at all.
Particularly given the Debtors' acknowledgement in seeking such relief of the value SCBV holds
and the calamitous effect its employees leaving would have, this funding crisis is further
evidence that the Debtors' management, and specifically Mr. Rajan, cannot be entrusted with the
management of the Debtors' estates.

> **c.**     **The Debtors Have Financed their Post-Petition Operations by
> the Transfer of Stream Shares to VSI Without Adequate
> Disclosure or Court Permission**

At the April 24 hearing on the Stock Sale Motion, given that the Debtors proposed to
fund their cases through the sale of Stream shares to VSI, the Court expressly asked whether the
Debtors had done so post-petition.  The Court was advised that they had not, and were waiting
for Court permission to do so.[99]  In fact, counsel for the Debtors acknowledged that "[W]e're
coming to you because we know that there are grave consequences to not getting permission
from the court.  So even when things are in the ordinary course people come to get permission,
and that's what we did."[100]  As discussed *supra,* the Court did not give that permission.

---

[99] See April 24, 2023 Hearing Transcript, at 28:10 to 28:15.

[100] *Id.* at 31:22 to 32:1.

Without approval of the Stock Sale Motion, and with no revenue and no financing, how the Debtors were funding their cases and operations remained opaque to the Court.  It became more clear, however, with Mr. Rajan's testimony at Trial.  Mr. Rajan testified that VSI had been paying all expenses of the Debtors since the inception of their bankruptcy cases, in exchange for shares in Stream.[101]  According to Mr. Rajan, Stream had been issuing shares to VSI every week or two since the Debtors' Petitions were filed.[102] In connection therewith, the Debtors had pre-petition subscription agreements with VSI, but also had entered into new, post-petition agreements.[103]  Mr. Rajan was not sure how many Stream shares had been issued to VSI since the filings, but believed all were pursuant to pre-petition, rather than post-petition, subscription agreements.[104]  Mr. Rajan was aware there was a motion pending by which the Debtors were seeking approval of post-petition subscription agreements the Debtors had already entered into with VSI, but claimed to not be sure if the post-petition subscription agreements were related to VSI's proposed role as plan sponsor or were the agreements proposed pursuant to the pending motion.[105]

As of Mr. Rajan's testimony in August, neither VSI's funding of the Debtors' post-petition operations nor the post-petition issuance of shares to VSI, whether pursuant to pre- or post-petition subscription agreements, had been disclosed in the Stream's monthly operating reports or otherwise.[106]  Mr. Rajan claimed that the failure to make these disclosures was an

---

[101] August 17, 2023 Hearing Transcript, at 205:21 to 206:1.

[102] *Id.* at 212:25 to 213:3.

[103] *Id.* at 206:2 to 206:8.

[104] *Id.* at 206:12 to 207:1.

[105] *Id.* at 246:19 to 247:2.

[106] *See* Bankr. Docket Nos. 224, 253, 300 (April, May, and June 2023 Monthly Operating Reports); August 17, 2023 Hearing Transcript, at 219:9 to 219:24; 224:6 to 224:13.

oversight due to his hospitalization, and would be corrected promptly, but as of his testimony at Trial in late September, no such corrections had been made.[107]

The Court found Mr. Rajan's testimony regarding the Debtors' post-petition issuance of shares to VSI to be evasive, and as a result, untrustworthy.[108] Mr. Rajan was pressed on whether VSI had been issued shares pursuant to post-petition subscription agreements, and was shown his deposition testimony stating that Stream was issuing new shares to VSI every two weeks or so pursuant to post-petition subscription agreements.[109] In response, Mr. Rajan asserted he was talking about pre-petition subscription agreements.[110] This is not believable and is belied by his testimony. Mr. Rajan admitted he attended the April hearing where representations were made to the Court that Stream shares were not being issued to VSI post-petition, but he nonetheless allowed Stream to do so. Mr. Rajan cannot fall back on a supposed belief that all shares issued were pursuant to pre-petition subscription agreements, because even if that was authorized or did not require authorization, he could not say with certainty that this is, in fact, what had happened. Moreover, his failure to promptly amend the Debtors' monthly operating reports to reflect both VSI's post-petition funding of the Debtors' operations and the issuance of shares to VSI is unacceptable and was without any legitimate excuse.[111] This casual approach to what was clearly a highlighted concern of the Court at the outset of the case is further evidence that Mr. Rajan has administered these estates with an eye towards what he personally wants to

---

[107] See September 25, 2023 Hearing Transcript, at 14:12 to 15:12.

[108] *See, e.g.,* August 17, 2023 Hearing Transcript, at 252:4 to 252:11; 253:23 to 254:4.

[109] *See* CR-231, at 140:10 to 141:13.

[110] August 17, 2023 Hearing Transcript, at 254:6 to 254:17.

[111] Given the Debtors' proposed retention of Mr. Park dating back to May 2023, Mr. Rajan's hospitalization in June and July cannot serve as a basis for failing to amend the Debtors' schedules by late September.

accomplish and disclose, rather than acting consistent with his obligations to the Court and the estates' creditors.

### d.    The Debtors Have Proposed Certain Major Transactions in these Cases Benefitting VSI without Clear Benefit to the Debtors or the Estates

The Court has had concerns nearly from the inception of these cases about the relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles.  Certain transactions the Debtors have proposed have only reinforced that concern.  As discussed *supra,* the proposed funding transaction with VSI in April would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI.  It was therefore denied.  The unauthorized post-petition issuance of shares in Stream to VSI also raises serious questions about the administration of these cases for the benefit of VSI.  These, however, were not the only instances where the Court's trust in the Debtor's management has deteriorated in light of transactions the Debtors have proposed either at the eleventh hour or under cover of more innocuous requests for relief that seem to benefit VSI without justification.

### i.    The Distribution Agreement

A central feature of the Stock Sale Motion, and subsequently the Debtor DIP Motion, that created serious questions about how and for whose benefit these cases are being administered was the request for approval of the Distribution Agreement to be given to VSI, purportedly in exchange for its financial support in funding the Debtors' product development and supply chain. As stated in the Stock Sale Motion, under the agreement, VSI "will accept orders from and make delivery to third-party customers … VSI will then issue back-to-back purchase orders to Stream for 90% of the value of those third-party orders, retaining a 10% margin for funding technical, business, and sales development.  In essence, VSI will act as a distributor for Stream to these

**TA-114**

customers."[112]  This was not the first time, however, that the Court was hearing about the

proposed Distribution Agreement.  In a declaration filed in support of the Debtors' Stay

Enforcement Motion, filed on April 13 (the "Stay Enforcement Declaration"),[113] Mr. Rajan

disclosed VSI's willingness to fund the Debtors' post-petition operations in exchange for the

Distribution Agreement.[114]  At a hearing on April 14 on the Stay Enforcement Motion, the Court

questioned why the Debtors need a distributor for their product.  However, the Distribution

Agreement was not the focus of that hearing, which, as discussed *supra,* was largely the urgent

need for the Debtors' to fund their cases.

       In response to the Court's admonition at that hearing to the Debtors that funding needed

to be procured, the Debtors filed the Stock Sale Motion a week later, and it was there that they

sought (on an expedited basis) approval of the Distribution Agreement.  The agreement was then

the subject of Mr. Rajan's testimony at the hearing on the Debtor DIP Motion on April 25.  Mr.

Rajan was asked directly whether the Distribution Agreement was part of the compensation VSI

was to receive for providing post-petition funding to the Debtors.[115]  Mr. Rajan evaded,

responding that the Distribution Agreement "is an aspirational hope.  The Court has to – we

submitted it for approval to the Court."[116]  Only upon the Court's inquiry did Mr. Rajan affirm

that the Distribution Agreement was part of VSI's proposed compensation to fund the Debtors.

---

[112] See Stock Sale Motion at ¶¶25, 26 (internal paragraph numbering omitted).  The motion goes on to represent that "In addition to financial support, VSI will assist Debtors with productization of electronics, an area in which Stream needs support.  VSI will also assist Debtors with translating computer software and hardware code, designing chips for use in end-user products, and supporting Debtors' customers with integration of those chips into end-user products."  *Id.* at ¶27.

[113] Bankr. Docket No. 114-1.

[114] Bankr. Docket No. 114-1, at ¶12.

[115] April 25, 2023 Hearing Transcript, at 93:11 to 93:13.

[116] *Id.* at 93:14 to 93:16.

Notwithstanding that the Debtors ultimately filed the motion seeking approval of the Distribution Agreement, the Court found the way it was done disconcerting. The agreement was disclosed in a declaration from Mr. Rajan in support of the Stay Enforcement Motion, wholly unrelated to the Debtors' funding proposal. Only when the Court questioned its necessity was the Stock Sale Motion filed, which sought the agreement's approval on an expedited basis. When that relief was denied, the Debtors pivoted to include it in the Debtor DIP Motion. At no point during Mr. Rajan's testimony in connection with that motion did the Debtors present a cogent business justification for VSI acting as a distributor of the Debtors' product for a 10% share of the sales. In the end, the Court was left with the distinct impression that the Debtors sought to enter into the Distribution Agreement while attracting little attention to it, and once attention was drawn, failed to have a compelling reason for allowing VSI to benefit from the Debtors' product sales. The Debtors argue that the Distribution Agreement is "beneficial to the Estates because VSI can provide support to the Debtors in terms of funding, customer contracts, technical know-how in the areas of electronic productization, translating computer software and hardware code, designing chips for use in end-user products, and integration of those chips into end-user products."[117] They cite to a portion of Mr. Rajan's Trial testimony that does not touch on any of those supposed benefits, but even if it did, the Court is troubled by (a) the Debtors' failure to explain why VSI's proposed financing was not subject to a note with market-rate interest, rather than a significant cut of the Debtors' product sales, and (b) the Debtors seeking approval of the agreement on an expedited basis and in a landscape where other emergencies the Debtors had created were the focus of the Court and other interested parties.

---

[117] Debtors' Post-Trial Brief, at ¶27.

### ii.        The Licensing Covenant

The Court also has concerns regarding the Debtors' post-petition Licensing Covenant with Rembrandt, entered into post-petition in August.[118]  Pursuant to the Licensing Covenant, Rembrandt agreed that it would not issue a license to the Rembrandt IP (a defined term) to Hawk, SeeCubic, Mr. Stastney, or a host of related entities and parties.  The Court understands the Debtors' desire for such an agreement, given those parties' adversarial relationship with the Debtors' and their competing interests.  Importantly, however, it also bars the licensing of the Rembrandt IP to any current or former subsidiary of Stream as well.[119]  In exchange, Stream and VSI[120] agreed to pay Rembrandt $3.6 million, payable in several installments.[121]  The Licensing Covenant addressed Stream and VSI's motivation to enter into it: "[T]he VSI Parties want the plan for reorganization to have an optimal chance of success and to ensure that it is clear that the VSI Parties will have the sole right to commercialize the technology and products developed by Stream among the lenders, creditors and shareholders of Stream … [T]he VSI Parties would like to enter into a Licensing Covenant with Rembrandt to prevent certain lenders, creditors, and shareholders of Stream [from] attempting to commercialize the technology and products developed by Stream."[122]

---

[118] CR-222.

[119] Licensing Covenant, at §B.2.

[120] Reinforcing their lock-step alliance under the Licensing Covenant and the interrelationship between them, Stream and VSI are defined together under the agreement as the VSI Parties.

[121] *Id.* at §C.2.  Those installments were to commence on September 1, 2023.  At Trial, Mr. Rajan confirmed that Stream and VSI are jointly and severally liable for the payments under the Licensing Covenant.  Stream and VSI also agreed to an increase in the number of units Rembrandt can obtain.  *Id.* at §D.1 to D.3.

[122] *Id.* at fifth, sixth Whereas clauses.

The Court recognizes VSI's proposed role as plan sponsor, and as Mr. Rajan acknowledged during his testimony, if the Debtors' proposed plan is confirmed VSI will own 90% of Stream's equity.[123] The Court is nonetheless alarmed about the propriety and motivations of Stream entering into a post-petition transaction that is intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries. The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia,* Stream's subsidiaries. While Mr. Rajan may assert that the purpose of the Licensing Covenant is "stopping the use of our technology by companies who do not own our technology, specifically SeeCubic of Delaware, to stop the use of our technology to compete against us,"[124] the Licensing Covenant goes beyond that, precluding the issuance of a license to any Stream subsidiary notwithstanding the possibility that there may be a business reason for doing so at some point in the future.[125] Rather than simply preventing SeeCubic from competing with the Debtors, the Licensing Covenant benefits a non-debtor insider third-party while requiring the Debtors to make significant post-petition payments to Rembrandt. Moreover, not only did Mr. Rajan confirm that Stream is jointly and severally liable for the payments under the Licensing Covenant,[126] but as Hawk notes, the obligation to make payments under the Licensing Covenant is not conditioned on confirmation of the proposed plan, and in fact the agreement contemplates its effectiveness even if a plan is not confirmed.[127]

---

[123] September 25, 2023 Hearing Transcript, at 51:10 to 51:12.

[124] *Id.* at 51:1 to 51:5.

[125] As Hawk argues, the Licensing Covenant limits the potential avenues to capitalize on the Debtors' assets by foreclosing the issuance of a license to a downstream subsidiary. Hawk Post-Trial Brief, at 50.

[126] *Id.* at 41:8 to 41:10.

[127] Licensing Covenant, at §C.5.

Each of these transactions have had the taint of benefit to VSI without clear benefit to the Debtors and their estates.  Where Mr. Rajan stands on both sides of those transactions, they only add to the Court's conclusion that he has breached his fiduciary duties in proposing them without being able to articulate how they are a reasonable exercise of his business judgment.

**e.    There Has Been Little to Substantiate Mr. Rajan's Claims of Hundreds of Millions of Dollars in Nascent Purchase Orders Coming to Stream**

From the outset, Mr. Rajan has been touting the numerous deals and purchase orders the Debtors are on the verge of obtaining.  Like the Zhongsheng transaction, however, there has been precious little evidence, other than Mr. Rajan's self-serving testimony, offered to verify the existence of these deals, or even the negotiation of such deals.  After listening to Mr. Rajan's testimony, and having almost no other evidence against which to measure the veracity of his claims, the Court was left with the firm impression that Mr. Rajan was engaging in hyperbole at best, or fabrication at worst, in testifying regarding Stream being on the verge of obtaining customer commitments worth hundreds of millions of dollars.

**i.    The VSI Purchase Orders Were Not Substantiated by Anything Other than Mr. Rajan's Testimony**

On April 13, the Debtors filed Mr. Rajan's Stay Enforcement Declaration, in which he represented that Stream had secured two post-petition purchase orders totaling $138,600,000 in gross revenues, and attached the purchase orders as exhibits.[128]  The securing of those purchase orders was given as a primary reason the Debtors needed to repossess the Bonding Equipment as soon as possible.  Both orders are from VSI, the first dated March 20, 2023, in the amount of $12,600,000 ("VSI Purchase Order #1"), and the second dated April 11, 2023, in the amount of

---

[128] Stay Violation Declaration, at ¶8. Mr. Rajan stated his opinion that revenues to be derived from these two purchase orders will allow the Debtors to successfully reorganize. *Id.* at ¶15.

**TA-119**

$126,000,000 ("VSI Purchase Order #2" and together with the VSI Purchase Order #1, the "VSI Purchase Orders"). Joseph Corso ("Mr. Corso"), under limited power of attorney, executed the VSI Purchase Order #1 on behalf of VSI, and Mr. Savarese, under limited power of attorney, executed the VSI Purchase Order #2 on behalf of VSI.

During the Trial, Mr. Rajan testified that the VSI Purchase Order #1 is for Cystar International Limited ("Cystar") as the third-party customer.[129] A purchase order from Cystar to VSI was issued on the same date as VSI Purchase Order #1, which Mr. Rajan testified he negotiated on behalf of VSI.[130] Mr. Rajan testified that the VSI Purchase Order #2 is for Southern Telecom as the third-party customer.[131]

Mr. Rajan also testified at Trial about the role an entity he referred to as BOE had in the VSI Purchase Orders. According to Mr. Rajan, BOE is the "number 1 panel company in the world," and BOE introduced Stream to a number of BOE's customers, "and those customers have become customers of Stream TV."[132] Two of those customers, according to Mr. Rajan, are Cystar and Southern Telecom.[133] Mr. Rajan testified that under an August 2018 agreement between Stream and BOE's factory entity by the name of Hefei Xinsheng Optoelectronics Technology Co. Ltd. ("BOE"),[134] BOE agreed to introduce Stream to customers, vendors, and suppliers, as well as providing purchase order financing to Stream.[135] Mr. Rajan testified that the

---

[129] August 17, 2023 Hearing Transcript, 47:7 to 47:16; Exhibit D-18. As noted *supra*, Mr. Rajan also disclosed in his Stay Violation Declaration the Distribution Agreement with VSI. The VSI Purchase Orders were made in connection with this Distribution Agreement. *See* Stay Violation Declaration, at ¶12.

[130] August 17, 2023 Hearing Transcript, 53:6 to 53:11.

[131] *Id.* at 63:23 to 65:14; Exhibit D-19; Exhibit D-21.

[132] August 15, 2023 Hearing Transcript at 201:3 to 201:7.

[133] *Id.* at 201:9; 205:24 to 206:1.

[134] Exhibit D-3.

[135] August 15, 2023 Hearing Transcript, 205:8 to 206:2; September 25, 2023 Hearing Transcript, 154:8 to

**TA-120**

2018 agreement is still in effect, and that Stream "has calls with BOE at least three to four times a week [and] meetings, at least once to twice a week, either in China or the United States."[136] According to Mr. Rajan, BOE "help[s] us with customers. They help us with vendors. They're helping us with supply chain finance. They're ramping up more introductions and they're also working on their own sales activities."[137]

The VSI Purchase Orders are, on their face, clearly for a considerable sum and require considerable production from Stream.[138] The Debtors have repeatedly stated that the importance of these purported deals to the Debtors' reorganization and success going forward is fundamental, but it is beyond dispute that the VSI Purchase Orders are not traditional contracts with the panoply of provisions governing performance of the parties' agreement. They also do not provide for any further commitment by Cystar and Southern Telecom. At Trial, however, Mr. Rajan testified that Cystar wants to increase its order from the 10,000 units under the VSI Purchase Order #1 to "about 75 to 100,000 once he gets the bonding machine, which is about $140 million in revenue if he goes up to 100,000."[139] Likewise, Mr. Rajan testified that Southern

---

155:15. Mr. Rajan pointed to Articles 4 and 5 of the BOE agreement as binding them to provide purchase order financing. August 17, 2023 Hearing Transcript, at 189:2 to 192:2.

[136] August 15, 2023 Hearing Transcript, at 208:25 to 209:6.

[137] *Id.* at 209:4 to 209:10.

[138] Mr. Rajan testified that, without the Bonding Equipment, it had made arrangements with an entity called Fuji-Prem to provide the bonding services needed to meet the production requirement under the VSI Purchase Orders and "for most of our customers." August 15, 2023 Hearing Transcript, at 193:6 to 193:19; August 17, 2023 Hearing Transcript, at 28:21 to 28:23.

[139] August 15, 2023 Hearing Transcript, 201:15 to 201:17. Consistent with the Court's concern regarding Mr. Rajan's tendency to be loose with the purported sales he expects, he later testified that Cystar's "plan, once they receive the bonding machine is to increase their order to 75 to 100,000 units, which is over 100 million in revenue." *See* September 25, 2023 Hearing Transcript, at 31:2 to 31:6. He also testified that the VSI Purchase Order #1 was for "14 million, but Stream TV believes it's going to be increased to about 75 million." *Id.*, at 156:1 to 156:3.

Telecom wants to increase its order from the 100,000 units under the VSI Purchase Order #2 to "about 300,000 TVs."[140]

SeeCubic signaled almost immediately that it questioned the legitimacy of the VSI Purchase Orders.[141]  Beyond Mr. Rajan's testimony, however, the Debtors did nothing to establish their bona fides.  It seemingly would have been both very easy and very urgent for the Debtors, given the consequences if Hawk is successful in obtaining dismissal, conversion, or appointment of a trustee, to provide witness testimony from Cystar, Southern Telecom, and/or BOE to substantiate, at the very least, the VSI Purchase Orders, if not the asserted interest of Cystar and Southern Telecom in greatly increasing purchases going forward.  This is particularly true with respect to Southern Telecom, as Mr. Rajan testified that it is a "big supporter" of Stream, and in addition to allegedly placing an order for 100,000 units, is interested in a merger or acquisition as well as cross-marketing activity.[142]  Despite that level of purported support and interest in Stream, however, the Debtors did not bring anyone from Southern Telecom to substantiate the VSI Purchase Order #2.  At a bare minimum, the Court would have expected the Debtors to put on the testimony of Mr. Corso and/or Mr. Savarese, each of whom purportedly bound VSI, to establish that the VSI Purchase Orders are legitimate.[143]  The Debtors instead

---

[140] *Id.* at 202:1 to 202:10; *see also id.* at 194:3 to 194:6 ("Southern Telecom has indicated that they are going to increase their order from 100,000 TVs, which is $140 million in revenues to about 300,000, which would push us to 400 million in revenue.").

[141] April 14, 2023 Hearing Transcript, 64:23 to 66:17.

[142] August 15, 2023 Hearing Transcript, 202:12 to 203:8.

[143] In their post-trial reply brief, *see* Bankr. Docket No. 437, the Debtors argue that it is disingenuous for Hawk to point out that VSI did not appear at Trial to provide supporting testimony.  *Id.* at 19.  It is true that the Debtors attempted, at the eleventh hour, to add Tom Sego, a purported independent board member of VSI, and Bud Robertson, a current VSI employee, to their witness list in advance of the resumption of the Trial on August 15.  *See* Bankr. Docket No. 334.  It is also true that Hawk requested that neither witness be permitted to testify given the late notice and extremely limited windows of time the Debtors were proposing to make Mr. Sego and Mr. Robertson available for depositions.  *See* Bankr. Docket No. 327.  After a hearing the Court barred both Mr. Sego and Mr. Robertson from testifying.

relied only Mr. Rajan, whose credibility with this Court has been greatly diminished. While the Debtors may have had their reasons for doing so, that gap in substantiation left the Court with the unanswered questions regarding the veracity of the VSI Purchase Orders and Mr. Rajan's claims that Cystar and Southern Telecom intend to exponentially increase the amount of product purchased from Stream. Unfortunately, in the context of so many other instances where the Court has concerns regarding Mr. Rajan's truthfulness, this is just another example.

### ii. The Debtors Offered No Supporting Evidence for the Other Potential Customers and Deals Mr. Rajan Touted During Trial

Mr. Rajan testified at Trial regarding a host of other deals and partnerships on which he alleged the Debtors were working and/or were imminent:

- Mr. Rajan testified at Trial on August 15 that there are "eight or nine" other customers interested in the same unit that Cystar is ordering, including Google, and that a company from Thailand would be making an offer that morning.[144]

- Mr. Rajan alluded to other deals with "Hisense and some other brands, like Chunghwa Telecom, which will be ordering once we get the samples from [Fuji-Prem]."[145] Mr. Rajan subsequently testified that Chunghwa Telecom wants to purchase 60,000 units.[146]

---

Bankr. Docket No. 343. Even if the Court had permitted their testimony, however, neither VSI witness was proposed to testify regarding the legitimacy of the VSI Purchase Orders. *See* Bankr. Docket No. 327-1 (Exhibit A).

[144] *Id.* at 201:18 to 201:24.

[145] *Id.* at 203:5 to 203:8.

[146] *Id.* at 217:6 to 217:12.

- Mr. Rajan testified that the Debtors were in negotiations with Lenovo, Sony, and Samsung, and had just received a request for a price quotation from LG.[147]  Mr. Rajan subsequently testified that he was in negotiations with LG for the sale of 5,000,000 units.[148]

- Mr. Rajan also named other potential customers Skyworth, Highsense, Huawei, and Vizio.[149]  According to Mr. Rajan, Skyworth is "expected to order TVs in the two to three million unit range."[150]

- Mr. Rajan testified that Stream was in discussions with Bosch, with which it had a pre-petition deal for an automotive-based product that allegedly fell apart once SeeCubic took control of Stream's assets under the Omnibus Agreement.[151]  Mr. Rajan acknowledged, however, that Bosch is not a current customer of Stream.[152]

- Mr. Rajan testified that in addition to Bosch, Stream was in discussions with other potential customers for an automotive-based product, including Geely, Honda, Nissan, and Toyota.

- Mr. Rajan testified about certain other expressions of interest Stream has received for its product from Cystar, IQH3D, BBack Inc., and Sunny Hill Technology Ltd. ("Sunny Hill"), and the Debtor introduced into evidence letters from each of those

---

[147] *Id.* at 203:22 to 204:6.

[148] *Id.* at 219:8 to 219:10.

[149] *Id.* at 217:15 to 217:24.

[150] August 17, 2023 Hearing Transcript, at 30:7 to 30:13.

[151] August 15, 2023 Hearing Transcript, at 219:21 to 220:12.  The pre-petition agreement with Bosch was admitted as Exhibit D-4.

[152] August 17, 2023 Hearing Transcript, at 25:6 to 25:14.

companies purportedly expressing such interest.[153]  Three of four of these letters, however, were issued pre-petition, and the fourth, from Sunny Hill, was dated only days after the Debtors filed for bankruptcy.[154]

- Mr. Rajan testified that he understood, based on a February 2023 discussion with Google, that once Stream provides Google with a lens sample Google had ordered pre-petition but that was never provided, Google would be interested in resuming discussions on acquisition of various sizes of Stream's units, which Mr. Rajan stated are both "very high margin type" and "very easy to do, very easy to make, and it's a very easy project."[155]

- Mr. Rajan testified regarding his post-petition negotiations with "various large content companies and sports leagues" on cross-marketing deals, but asserted he was subject to a strict non-disclosure agreement and could not reveal the names of the sports leagues.[156]

- Mr. Rajan testified that he had "probably 100 customer meetings" since the Debtors' Petitions were filed, but provided no additional detail.[157]

After listening to Mr. Rajan's testimony regarding these purported customers and relationships, the Court found his testimony not credible.  Rather, it appeared to the Court that Mr. Rajan was "name-dropping" large players in the television and panel space, but had nothing to verify that Stream has had any post-petition discussions or negotiations with these parties, let

---

[153] *Id.* at 68:25 to 77:3

[154] Exhibits D-44 to D-47s D-44 to D-47.

[155] August 15, 2023 Hearing Transcript, 214:7 to 217:1.

[156] August 17, 2023 Hearing Transcript, at 120:1 to 120:22.

[157] *Id.* at 121:6 to 121:10.

alone is on the precipice of transactions with them.  Rather, on cross-examination, despite having referred to many of these parties as customers of Stream, Mr. Rajan acknowledged that Stream was not "at a contract stage yet" with respect to any of the parties about which he testified.[158] Moreover, although the Debtors have repeatedly stressed the need to regain the Bonding Equipment so that they may begin meeting production requirements. Mr. Rajan testified that alternative bonding arrangements had been made with Fuji-Prem to meet production needs, and therefore that the yet-unresolved dispute over the Bonding Equipment would not seem to be an impediment to at least some of these purported deals having come to fruition.[159]  Particularly where Mr. Rajan represented that the deals in the works would result in hundreds of millions, if not billions, of dollars of revenue for the Debtors, the Court is confounded that the Debtors did not produce *any* potential contract-counterparty to corroborate Mr. Rajan's claims.  In that void, the Court was left with only Mr. Rajan's assertions, which the Court found not credible.

> **f.     The Net Effect of the Debtors' Conduct in These Cases, By and Through Mr. Rajan, Is That the Court Has No Faith in the Debtors' Ability to Effectively Manage These Bankruptcy Cases**

The Court's discussion of the general procedural history of these cases, specific events that have transpired, and representations the Debtors, and specifically Mr. Rajan, have made, is intended to illustrate the cloud of mistrust and mystery that has hung over these cases virtually from the beginning.  In arguing that Mr. Rajan has engaged in gross mismanagement of the estates, Hawk points to much of the same conduct and actions by the Debtors during these cases that the Court has cited above, including (a) the Debtors' proposed entry into the Distribution

---

[158] August 17, 2023 Hearing Transcript at 164:13 to 165:11.

[159] The Court notes that the Debtors did not provide any agreement or other documentary evidence of an agreement with Fuji-Prem.

**TA-126**

Agreement with VSI, (b) the VSI Purchase Orders using VSI as an intermediary with customers

for a 10% fee, (c) the transfer of Stream shares to VSI in exchange for funding the Debtors' post-

petition operations without Court approval, (d) the entry into the Rembrandt License Covenant

for the purpose of steering licensed intellectual property from Rembrandt to VSI, and (e) the

failure to file accurate monthly operating reports, and the failure to timely correct them.[160]  Hawk

asserts that Mr. Rajan has administered these cases for the benefit of VSI, rather than creditors,

and that this blatant breach of fiduciary duty, together with failing to disclose proposed

agreements and transactions until the eleventh hour, and in the case of the Zhongsheng Term

Sheet, fabricating the transaction entirely, constitutes gross mismanagement of the Debtors'

estates warranting conversion or dismissal.

       The already-discussed transactions and requested relief that appear to be primarily for the

benefit of VSI are reason enough to find that Mr. Rajan has engaged in gross mismanagement of

the Debtors' estates.  Another glaring example, however, is the Debtors' failure to revise

knowingly false monthly operating reports, on which the Court and all interested parties rely in

assessing the Debtors' post-petition performance and prospects, until December, months after the

initial MORs were filed.  Furthermore, as discussed *infra*, the Revised MORs (as defined herein)

appear to represent facts regarding payments VSI has made on behalf of Stream that contradicts

Mr. Rajan's testimony at Trial, leaving the Court and interested parties unclear as to the Debtors'

post-petition operations and finances.  A debtor-in-possession's fiduciary duties include the duty

to keep the Court and creditors informed about the status and condition of its business.  *See In re*

*Gateway Access Solutions, Inc.,* 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007).  Monthly operating

reports are "the lifeblood of Chapter 11, enabling creditors to keep tabs on the debtor's post-

---

[160] Hawk Post-Trial Brief, at 49-56.

petition operations." *In re Kholyakva,* 2008 WL 3887653, at *4 (Bankr. E.D. Pa. 2008). They

are designed to allow the U.S. Trustee and creditors to monitor business operations during

chapter 11 and to avoid continued business operations that generate losses and administrative

insolvency. *In re Domiano,* 442 B.R. 97, 106 (Bankr. M.D. Pa. 2010). Importantly in the

context of these cases, the failure of a debtor to properly report income and expenses constitutes

evidence of gross mismanagement under §1112(b)(4)(B). In *Domiano,* the court found the

debtor's monthly operating reports had been completed in cursory, if not casual fashion, omitted

significant information, and were completed "in such a summary fashion that creditors are left to

guess as to much of the Debtors' operations and financial results … The MORs have not been

completed in a fashion consistent with the Debtors' fiduciary duties." *Id.* The *Domiano* court

found that this was grounds for conversion due to the debtor's gross mismanagement of the

estate.

Mr. Rajan's flippant explanation for why VSI's millions of dollars in payments on behalf

of Stream in exchange for Stream shares was not disclosed on its MORs is unacceptable. The

Court does not attribute any credibility to Mr. Rajan's explanation that this lack of disclosure

was due to an oversight or attributable to his hospitalization. There is no reason that Mr. Park, as

the nominal CFO of the Debtors, or someone else with knowledge of the Debtors' operations and

finances should not have ensured the disclosure of the funding arrangement with VSI in the

MORs. The fact that it was not done, that it became clear only at Trial, and that the Debtors did

not file the Revised MORs until *December* is a breach of the Debtors' fiduciary duties to the

estates' creditors and its disclosure obligations to the Court. The Court simply does not believe

Mr. Rajan that the lack of disclosure was an oversight.[161]

---

[161] On September 28, 2023, the U.S. Trustee submitted a proposed Rule 2004 consent order (the "Rule
2004 Order"), providing for, *inter alia*, authorization to examine the Debtors regarding post-petition

In sum, apart from this fundamental breach of the Debtors' disclosure obligations and the Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has been littered with questions about the role and involvement of VSI, the Debtors' ability to operate independently of VSI, and whether Mr. Rajan is able to differentiate his role with the Debtors from his role with VSI. Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony at Trial was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness to draw distinction between the entities and his roles with each.[162] It has consistently appeared that he cannot, and the Debtors' transactions and requested relief outlined herein are indicative of his inherent conflict of interest. The result has been delay, confusion, mistrust, and unending acrimony that has led to the Court's assessment that, even if the Debtors have a reasonable likelihood of rehabilitation, they have made little progress to date in attaining it under Mr. Rajan's stewardship.

Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness. *See In re 210 West Liberty Holdings, LLC,*

---

payments made by or on behalf of the Debtors, the issuance of shares from Stream and/or Technovative to VSI, and any post-petition agreement between the Debtors and VSI for VSI to fund the Debtors' subsidiaries, including SCBV. Bankr. Docket No. 428. On October 3, 2023, the Court entered the Rule 2004 Order. Bankr. Docket No. 433. On December 29, 2023, the U.S. Trustee filed a motion to dismiss the Debtors' bankruptcy cases (the "UST Dismissal Motion"), based on their failure to file timely and complete monthly operating reports and other required reports, failure to provide accurate information in the initial MORs or the Revised MORs, and failure to comply with the Rule 2004 Order's terms regarding document production and appearing for examination. *See* Bankr. Docket No. 534. While the Debtors have not yet had opportunity to respond to the UST Dismissal Motion, and the Court has not yet held a hearing on it, its filing in and of itself is further evidence of the lack of cooperation and conflict that has permeated these cases, and only reinforces the Court's conclusion that Mr. Rajan cannot serve as a productive and responsible steward of the Debtors' bankruptcy estates.

[162] *See, e.g.,* August 17, 2023 Hearing Transcript, at 151:14 to 153:25.

2009 WL 1522047, at *5.  The nearly ten months since the Debtors filed their Petitions have

been marred by delay, conflict, suspect proposals, lack of transparency, and lack of candor.

While the delay has been the result of numerous circumstances, the Court will not permit this to

continue under Mr. Rajan's watch.  The only question for the Court is whether the Debtors' cases

should be dismissed, converted, or a trustee should be appointed to determine what value the

Debtors' operations hold, and what claims, if any, should be pursued, and how the cases move

expeditiously to reorganization or liquidation.  As discussed *infra*, notwithstanding current

management's gross mismanagement of the Debtors' estates, the Court believes conversion or

dismissal is not in the best interests of creditors at this time.

### 3.    It Has Not Been Established by a Preponderance of Evidence That There is Both Substantial or Continuing Loss to the Debtors' Estates and No Reasonable Likelihood of Rehabilitation

Section 1112(b)(4)(A) of the Bankruptcy Code provides that cause for conversion or

dismissal exists where there is substantial or continuing loss to or diminution of the estate **and**

the absence of a reasonable likelihood of rehabilitation.  It is written in the conjunctive, and

therefore both components must be shown.  *See, e.g., In re 1121 Pier Village LLC,* 635 B.R. 127,

137 n.14 (Bankr. E.D. Pa. 2022); *In re Northeast Family Eyecare, P.C.,* 2002 WL 1836307, at *3

(Bankr. E.D. Pa. July 22, 2002) (stating that the subsection codifies a "two-prong test"); *In re

Route 202 Corp.,* 37 B.R. 367, 372 (Bankr. E.D. Pa. 1984).

In determining whether a loss to, or diminution of, the estate exists, a court must make a

full evaluation of the present condition of the estate, not merely look at the debtor's financial

statements.  *In re Plasterer*, 2023 WL 6217801, at *6 (Bankr. E.D.N.Y. Sept. 25, 2023) (stating

that even where a debtor shows positive cash flow, continuing loss to or diminution of the estate

can also be established by an actual depreciation in the value of property of the estate).

Importantly, §1112(b)(4)(A) requires not only a consideration of whether a debtor is suffering continuing losses but whether the debtor's business prospects justify continuing the chapter 11 case. *In re EnCap Golf Holdings, LLC,* 2008 WL 4200324, at *9 (D.N.J. Sept. 4, 2008); *see also In re Andover Covered Bridge, LLC,* 553 B.R. 162, 175 (B.A.P. 1st 2016) ("'Rehabilitation' in this context means whether the debtor will be able to reestablish its business.").

Hawk argues that the Debtors have no operations, no expenses, and no sources of financing, and the Debtors' own filings prove the estates are suffering catastrophic losses during these cases based on over $7 million in administrative expenses incurred.[163]  Hawk further argues that to the extent there are any operations, they are at the VSI level, and without operations the Debtors cannot establish a business plan based on future operations, and therefore are *per se* unable to rehabilitate.[164]

The Court agrees with Hawk that, based on the Debtors' originally-filed monthly operating reports (the "MORs") from March through June, it would appear that Stream has no expenses, employees, or financing.  Stream's originally-filed April, May, and June MORs reflect little cash on hand, no full-time employees, no receipts, very little in disbursements, and no disbursements made by a third party for the benefit of the estate.[165]  Mr. Rajan had his explanation for that at Trial.  With respect to employees, Mr. Rajan testified in August that the Debtors had retained independent contractors through VSI to work on its projects.[166]  Mr. Rajan

---

[163] Hawk Post-Trial Brief, at 45-46 (citing $750,000 in legal fees incurred, approximately $75,000 in salary for Mr. Park, and $6 million in post-petition obligations to Rembrandt under the Licensing Covenant and related subscription agreement).

[164] *Id.* at 46.

[165] Bankr. Docket Nos. 224, 253, 300; August 17, 2023 Hearing Transcript, at 196:20 to 200:3.

[166] August 17, 2023 Hearing Transcript, at 202:18 to 205:2.  While the Court cannot verify that based only on Mr. Rajan's testimony, it is consistent with representations made in the Employee Obligation Motion.

alleged that the failure to make this clarification in the MORs was "an oversight" that would be revised by the following week.[167]  With respect to expenses and financing, Mr. Rajan testified, as discussed *supra,* that VSI was paying all expenses of Stream since its bankruptcy was filed, in exchange for Stream shares.[168]  Mr. Rajan acknowledged, however, that none of the $1.5 to $2 million in expenses that VSI had allegedly paid on behalf of Stream were disclosed in the April, May, or June MORs.[169]  Mr. Rajan again claimed that this was an oversight that would be corrected the following week.[170]

On December 8, 2023, the Debtors *finally* filed revised Stream MORs for March, April, May, and June 2023 (the "Revised MORs").[171]  Those Revised MORs still reflect no full-time employees, as do subsequent MORs.  Attached to the Revised MORs, however, are letters from a Daniel Rink, Director of VSI, to Mr. Park, asserting the expenses VSI paid on behalf of Stream during the months of March, April, May, and June.  According to those letters,[172] and as reflected in the Revised MORs, VSI paid expenses, and asserted it was entitled to Stream Class A shares, in the following amounts: (a) $85,161.53 in expenses for March, in exchange for 56,774 Stream shares; (b) $331,134.30 in expenses for April, in exchange for 220,756 Stream

---

[167] No amended or corrected MORs had been filed as of late September, which Mr. Rajan attributed to "going back and forth with the trustee."  September 25, 2023 Hearing Transcript, 14:24 to 15:12.

[168] *Id.* at 205:21 to 206:4.

[169] *Id.* at 214:14 to 219:14.

[170] Mr. Rajan seemed to claim that the reason for this oversight was his three-month hospitalization, but also acknowledged that he was not the only individual involved with the Debtors that was aware of the expenses being paid by VSI.  *Id.* at 219:22 to 219:24.  The Court therefore attributes very little weight to Mr. Rajan's explanation.

[171] Bankr. Docket Nos. 502, 503, 505, 512.

[172] Each of the letters is dated December 7, 2023, the day before the Revised MORs were filed and months after the expenses were purportedly paid.  No explanation is provided for why the letters were not issued substantially contemporaneously with the end of each month, particularly where the subject of the letters has been a hot-button issue in the case since Trial.

shares; (c) $200,910.46 in expenses for May, in exchange for 133,940 Stream shares; and (d)

$243,871.98 in expense for June, in exchange for 162,581 Stream shares. This totals

approximately $861,078 in expenses purportedly paid by VSI, which is the cumulative total

Stream discloses in its Revised June MOR for disbursements made by a third party. Attached to

each letter is a breakdown of the general categories of expenses purportedly paid.

The July MOR, filed after Mr. Rajan's August testimony, reflects approximately

$750,000 in July third-party disbursements.[173] No letter from VSI is attached to the July MOR.

Furthermore, the July MOR confusingly disclosed roughly the same figure for a cumulative total,

seemingly in contradiction to Mr. Rajan's testimony in August that VSI had paid $1.5 to $2

million in expenses on behalf of Stream, and certainly in contradiction to the Revised MORs that

represent over $861,000 in third-party disbursements for the three-and-a-half months prior to

July. In September, Mr. Rajan testified that the cumulative total as of the end of July being the

same as the figure for July alone could be harmonized because disbursements through the end of

July had been approximately $750,000, whereas by the time he testified in mid-August the

disbursements had apparently grown to $1.5 to $3 million.[174] This testimony is clearly

contradicted by the Revised MORs, and is just another example of what the Court perceives as

Mr. Rajan's propensity to come up with justifications or explanations on-the-fly when

confronted with facts or information that seemed to contradict his prior statements.

The August MOR discloses only $556 in third-party payments,[175] while the September MOR

discloses approximately $104,000 in third-party payments.[176]

---

[173] Bankr. Docket No. 399.

[174] September 25, 2023 Hearing Transcript, at 31:3 to 32:16.

[175] Bankr. Docket No. 459.

[176] Bankr. Docket No. 460. Perhaps even more confusingly, the Debtors separately filed a supplement
(the "MOR Supplement") to the August and September MORs, which among other things, attached

Hawk's point is well-taken that Stream's original MORs for April, May, and June, reflecting no employees, no post-petition receipts, and little cash on hand, are indicative of a non-operating entity.[177]  Moreover, the Court agrees with Hawk that the Debtors' estates have continued to incur significant administrative expenses, not the least of which are asserted counsel fees, while the MORs reflect no post-petition revenue.  However, notwithstanding that it is being done without having first obtained the Court's permission, the unrefuted testimony from Mr. Rajan is that the Debtors' post-petition operating expenses are being paid by VSI in exchange for Stream shares rather than debt.  Moreover, Mr. Rajan testified as to the nature of the $750,000 in disbursements VSI made on behalf of the estate in August: "That's money for payroll.  That's money for electronics to get ready for production.  Also, we had to get a backup [bonding] deal put in place so we can get the production started on the TVs.  So it's mainly operational expenses to get things started."[178]  Mr. Rajan also testified that the purported work is being done by independent contractors rather than Stream employees, and the letters from VSI attached to the Revised MORs purport to identify consultant payroll expenses totaling approximately $434,000. Hawk cites to no rule prohibiting a debtor from executing its business model with independent contractors, rather than full-time employees.

---

letters from VSI to Mr. Park stating that VSI had identified $2,000 and $219,000 in transfers from VSI to Stream in August and September, respectively, pursuant to a stock purchase agreement dated July 10, 2023, and as a result directed Stream to issue 1,333 and 146,000 shares of Stream Class A shares to VSI. Bankr. Docket No. 463.  The MOR Supplement also includes a statement that payments were made by VSI on Stream's behalf in August that were not included in the August MOR, that shares were issued to VSI in November in exchange for those payments, and that such payments will be reflected in the November MOR.  No explanation was given as to why they would not be reflected in an amended August MOR.

[177] In its Post-Trial Brief Hawk also argues that Stream is a non-operating entity based on the First Day Declaration and the Debtors' corporate organizational chart reflecting that Stream owns 99.9% of Technovative shares.  Hawk Post-Trial Brief at 2.  This fact alone does not establish that Stream is not an operating entity.

[178] September 25, 2023 Hearing Transcript, 162:22 to 163:2; *see also id.* at 173:18 to 174:3.

Therefore, with some indication of operational activity and financing by Stream, the

Court cannot conclude that the Debtors are *per se* unable to rehabilitate.  The Court is keenly

aware of the fact that the Revised MORs, on which the Court places some reliance in arriving at

this conclusion, were filed two-and-a-half months *after* the Trial concluded and appear to

conflict with Mr. Rajan's testimony at Trial.  Hawk has had no opportunity to probe the veracity

of the representations made in the Revised MORs, which represents a considerable handicap in

Hawk being able to meet its evidentiary burden.  However, as discussed *infra*, the timing of the

Revised MORs and their seeming contradiction to Mr. Rajan's testimony is simply more grounds

for the Court's determination that Mr. Rajan cannot continue to administer these estates.  While

the Court found not credible Mr. Rajan's testimony regarding the Debtors' current and

prospective deals, where the Court is required to evaluate both the present condition of the

estates and the Debtors' business prospects going forward, it simply does not believe there has

been sufficient and transparent information from the Debtors' management to determine at this

stage that there is no reasonable likelihood of rehabilitation.

### 4. It Has Not Been Established by a Preponderance of the Evidence that the Debtors' Petitions Were Filed in Bad Faith

As a general matter, Hawk's argument is that the Debtors filed their bankruptcy cases on

the eve of trial in the Section 225 Action with no other impetus for filing, but rather simply as a

litigation tactic to stay what Hawk believes will be an adverse ruling from the Delaware

Chancery Court.  Hawk asserts that not only is this *per se* bad faith, but that under the Third

Circuit's fourteen-factor analysis for bad faith filings, twelve of the factors support a finding of

lack of good faith here.[179]

---

[179] Hawk Post-Trial Brief, at 59-60.

**TA-135**

It is beyond dispute that the Debtors filed their Petitions with trial in the Section 225

Action imminent.  Hawk goes too far, however, in arguing that Mr. Rajan "confirmed the 225

Action was the reason for filing," citing to his First Day Declaration[180] as evidence.  That

declaration explained, from Mr. Rajan's perspective, the history of the Omnibus Agreement, its

invalidation by the Delaware Supreme Court, the failure of Hawk and SeeCubic to comply with

the return of the Debtors' assets, and the events leading to the Section 225 Action.  When Mr.

Rajan states in his First Day Declaration that "[t]he irreparable harm" of this chain of events

necessitated the Debtors' bankruptcy filings, he did not confirm that the Section 225 Action was

the reason for filing.[181]  He clearly was referencing a broader series of events, of which the

Section 225 Action was only the most recent.  As such, there is no grounds for a finding of *per se*

bad faith based on the timing of the Debtors' Petitions alone.

The Court also disagrees that Hawk has established by a preponderance of the evidence

that a majority of the factors used in the Third Circuit to analyze whether a filing was in bad faith

are present here.  Clearly the Debtors have previously filed for bankruptcy.  The Delaware

Bankruptcy Court's reasoning in dismissing those prior cases, however, is not a matter of record

in these proceedings.  Furthermore, while the current cases were filed on the eve of trial in the

Section 225 Action and imposed a stay on that proceeding, the Court cannot conclude that the

Debtors filed these cases solely to evade a Chancery Court order that would wrest control of

Technovative from the Debtors.  The Debtors have significant creditors other than Hawk,

SeeCubic, and SLS,[182] and as Hawk and SeeCubic have noted a number of times during these

---

[180] *See* Bankr. Docket No. 48 (the "First Day Declaration").

[181] *Id.* at ¶¶90 to 94.

[182] Although the claims of Hawk, SeeCubic, and SLS, as well as Rembrandt's asserted claim of over $1.2 billion, dominate the claims register, other claims of sizeable amounts have also been filed.  Moreover, as discussed above, Stream's Petition was accompanied by Official Form 204, representing that Stream's

cases, Stream had virtually no funds of its own at the time of its Petition with which to satisfy claims.  Mr. Rajan testified regarding the Stream assets to be used in obtaining and fulfilling potential post-petition product orders,[183] as well as the Debtors' need to regain possession of the Bonding Equipment.[184]  Together these reflect a need for the breathing spell afforded debtors and an intention to use bankruptcy for a purpose other than avoiding an adverse judgment in the Section 225 Action.  Moreover, although Hawk argues that the Section 225 Action the Debtors seek to avoid will determine who can control Technovative and the operating subsidiaries, and therefore the majority of the value of the enterprise, Mr. Rajan asserts that the Debtors do not need SCBV to execute the Debtors' business plan because they have their own electronics and bonding arrangements.[185]  Therefore, assuming that is accurate, an adverse ruling in the 225 Action would not necessarily torpedo the Debtors' ability to reorganize.  Finally, as discussed herein, the Court is not prepared at this stage, based on the evidence before it and the history of these cases, to conclude that there is no possibility of reorganization.  The lack of clarity the Debtors' management has created regarding the Debtors' operations, future prospects, and sources of funding leaves this Court unable to determine whether the Debtors have the assets and operations to successfully reorganize, but the Court will not foreclose that possibility at this stage.

Based on the evidence and in consideration of the factors used to determine whether a case has been filed in bad faith, the Court finds Hawk has not established by a preponderance of the evidence that the Debtors lacked good faith in filing their Petitions.

---

unsecured creditors held over $14 million is asserted claims.

[183] August 17, 2023 Hearing Transcript, at 128:6 to 129:23.

[184] *Id.* at 191:6 to 191:20.

[185] August 17, 2023 Hearing Transcript, 138:25 to 138:6.

> **5.    The Court Will Not Dismiss or Convert the Debtors' Chapter 11
> Cases at this Stage Because a Chapter 11 Trustee is Needed to
> Administer the Debtors' Cases**

Having found that the Debtors' have grossly mismanaged the estates, cause exists to

convert or dismiss the cases under §1112(b) of the Bankruptcy Code.  As discussed *supra,*

however, that provision requires conversion or dismissal unless the Court determines the

appointment of a trustee is in the best interests of the estate under §1104(a).  Section 1104(a) of

the Bankruptcy Code governs the appointment of a trustee in chapter 11 cases, providing that the

court **shall** order the appointment of a trustee:

> (1)    For cause, including fraud, dishonesty, incompetence, or gross mismanagement of
> the affairs of the debtor by current management, either before or after the
> commencement of the case, or similar cause … or

> (2)    If such appointment is in the interests of creditors, any equity security holders,
> and other interests of the estate….

11 U.S.C. §1104(a) (emphasis added).  The appointment of a trustee is an extraordinary remedy,

representing a rare exception to the rule that the debtor remains in possession throughout its

reorganization because current management "is generally best suited to orchestrate the process of

rehabilitation for the benefit of creditors and other interests in the estate."  *In re Marvel*

*Entertainment Group, Inc.,* 140 F.3d 463, 471 (3d Cir. 2004).  As such, the party moving for

appointment of a trustee under §1104(a) must overcome that presumption by clear and

convincing evidence, and the determination is made on a case-by-case basis.  *BELFOR USA*

*Grp., Inc. v. Salem Consumer Square OH LLC (In re Salem Consumer Square OH LLC),* 629

B.R. 562, 575 (Bankr. W.D. Pa. 2021).  Once the movant establishes cause for the appointment

of a trustee, however, the burden shifts to the debtor to establish an exception under §1112(b)(2)

of the Bankruptcy Code.[186]

---

[186] Under §1112(b)(2), the court may not convert or dismiss a case if the court finds and identifies unusual

That said, a chapter 11 debtor's invocation of the protections afforded under the
Bankruptcy Code comes with a trade-off: "in exchange for the authority to continue to manage
the affairs of a company, a debtor-in-possession owes fiduciary duties to its creditors and the
estate, including the duty of care to safeguard assets, the duty of loyalty, and the duty of
impartiality." *In re Morningstar Marketplace, Ltd.,* 544 B.R. 297, 303 (Bankr. W.D. Pa. 2016)
(citing *Marvel Entertainment*).  And because the rights of a debtor to manage the reorganization
process are not absolute, they may be forfeited if these fiduciary duties are neglected. *Id.* (citing
*In re Eurospark Industries, Inc.,* 424 B.R. 621 (Bankr. E.D.N.Y. 2010)).  The willingness of
courts to leave debtors in possession is premised upon an assurance that the officers and
managing employees can be depended upon to carry out the fiduciary responsibilities of a
trustee, and where a debtor-in-possession is unwilling or unable to do so, it is necessary to
appoint an independent trustee who will.  *See, e.g., In re Vascular Access Centers, L.P.,* 611 B.R.
742, 764 (Bankr. E.D. Pa. 2020) (citing *Fifth Third Bank v. Circulatory Ctrs. of Am., LLC (In re
Circulatory Ctrs. of Am., LLC*, 579 B.R. 752 (Bankr. W.D. Pa. 2017) and *Marvel
Entertainment*).

The list of situations in §1104(a)(1) is not an exclusive list of what constitutes cause to
appoint a trustee, and situations that have been found to support a finding of cause for the
appointment of a trustee include conflicts of interest, misuse of assets and funds, inadequate
recordkeeping and reporting, failure to file required documents, lack of adequate disclosure, lack

---

circumstances establishing that converting or dismissing the case is not in the best interests of creditors
and the estate and the debtor or a party in interest establishes (1) there is a reasonable likelihood a plan
will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or, if not applicable,
within a reasonable period and (2) the grounds for converting or dismissing the case include an act or
omission of the debtor other than under paragraph (4)(A) for which there exists a reasonable justification
for the act or omission; and that will be cured within a reasonable period of time fixed by the court.  The
Debtors have not established any such unusual circumstances, although as discussed *infra,* the Court
concludes that the appointment of a trustee, rather than conversion or dismissal, is proper at this stage.

of appropriate cost controls, transgressions related to taxes, failure to make required payments,

lack of credibility and creditor confidence, and breaches of fiduciary duty.  *Id.*; *see also*

*Morningstar Marketplace,* 544 B.R. at 303; *Marvel Entertainment,* 140 F.3d at 471 (finding the

district court did not err in appointing trustee where the debtor's management was unable to

resolve conflicts with estate creditors).  Appointment of a trustee is mandatory if cause is found

under §1104(a)(1), but a bankruptcy court has wide discretion to determine what specific

conduct establishes cause.  *Morningstar Marketplace,* 544 B.R. at 303.  By contrast, §1104(a)(2)

envisions a flexible standard giving discretion to appoint a trustee when doing so would serve the

estate's and parties' interests.  *Vascular Access Centers,* 611 B.R. at 765 (*citing Marvel*

*Entertainment*).   Among the factors which may be considered in appointing a trustee under

§1104(a)(2) are (a) the untrustworthiness of the debtor, (b) the debtor-in-possession's past and

present performance and prospects for rehabilitation, (c) the confidence – or lack thereof – of the

business community and of creditors in present management, and (d) the benefits derived from

the appointment of a trustee balanced against the cost of the appointment.  *Id.; see also*

*Morningstar Marketplace,* at 304 (citing *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir.

1989)).

     Without needing to address whether the Debtors mismanaged their affairs pre-petition, as

Hawk asserts, clear and convincing evidence of the Debtors' gross mismanagement of their

estates, through Mr. Rajan, has resulted in a situation where the Court has no faith in Mr. Rajan

administering the Debtors' estates consistent with his fiduciary duties and obligations to this

Court.  Simply put, based on the history of these cases outlined above, the conflicted role of Mr.

Rajan with both the Debtors and VSI, and the Court's assessment of Mr. Rajan's credibility

throughout this case, the Court does not trust Mr. Rajan's interest in or ability to maintain the

integrity of these bankruptcy proceedings.  Months into the case, the Court lacks confidence that it has been given transparent information regarding what the Debtors are actually doing, who is doing it, at what stage those efforts are, and how that is being accomplished, and the evidence the Court has that the Debtors are operating is Mr. Rajan's testimony and the Revised MORs and July MOR, themselves in conflict, representing that VSI funded certain unspecified Stream expenses in the first months of the case, none of which instills confidence in the Court.  While the Court is not ready to wholly discount these meager signs of a path toward reorganization, it has reached the point where it needs more clarity and more progress, far more quickly, and does not believe this is possible with Mr. Rajan in charge of the estates.  Therefore the appointment of a trustee pursuant to both §§1104(a)(1) and (a)(2) is warranted.  *See Vascular Access Centers,*, 611 B.R. at 769 (finding appointment of trustee was appropriate under both §§1104(a)(1) and (a)(2) based on the Court's determination that the debtor's principal and manager lacked credibility and trustworthiness and had engaged in self-serving conduct both before and during the debtor's bankruptcy case).

The Court is not convinced conversion or dismissal is appropriate at this stage.  Because of the dearth of information, transparency, and relief sought by the Debtors to date, the Court remains unclear what assets and potential value the Debtors' operations hold.  The replacement of Mr. Rajan at the helm of the Debtors' estates and the appointment of a trustee to evaluate the Debtors' assets, potential deals, potential claims, etc. is needed.  It is clear there needs to be a neutral, unconflicted party to deal with VSI at arms-length, including determining if there are pre- or post-petition claims that lie against VSI.  A trustee is also needed to evaluate, resolve, and/or litigate the claims of Hawk, SLS, SeeCubic, Rembrandt, and others.  If these cases have any chance of succeeding, it will be because there is transparency to the Court and creditors and

an impartial third-party evaluating assets, claims, and the Debtors' reorganizational prospects. A
trustee will obviously come with a cost, but the Court believes the value of an unconflicted,
third-party neutral to assess the state of the Debtors' operations, potential transactions, and
claims, and efficiently determine whether and how the Debtors can achieve reorganization, more
than offsets these costs. *See Vascular Access Centers,* 611 B.R. at 769 (finding that the cost of
appointment of a chapter 11 trustee would be greatly outweighed by the benefits derived from
such appointment and would result in a more efficient reorganization while ensuring the integrity
of the process).

Although cause exists under §1112(b)(4)(B) to convert or dismiss the Debtors' cases, the
Court believes the appointment of a trustee to evaluate the Debtors' operations, prospects, and
ability to successfully reorganize, and to implement such reorganization if possible, is in the best
interests of creditors and the estate at this time. The Court will therefore exercise the
extraordinary remedy of appointing a chapter 11 trustee pursuant to §1104(a) of the Bankruptcy
Code.

B.    **Cause Exists to Grant Hawk Relief from Stay to Allow the Section 225
      Action to Resolve Certain Issues Critical to the Debtors' Bankruptcy Cases**

The Court may grant relief from the stay under §362(d)(1) for cause, including the lack of
adequate protection of an interest in property. 11 U.S.C. § 362(d)(1). Cause is an intentionally
broad and flexible concept which must be determined on a case-by-case basis. *In re Brown*, 311
B.R. 409, 412-413 (E.D. Pa. 2004) (citing *In re Marchant,* 256 B.R. 572, 576 (Bankr. W.D. Pa.
2000)). As such, the test to be applied is a totality of the circumstances test based upon the
particular facts of the case. *Buncher Co. v. Flaberg Solar US Corp. (In re Flaberg Solar US
Corp.)*, 499 B.R. 475, 482-83 (Bankr. W.D. Pa. 2013) (citing *O'Neal Steel, Inc. v. Chatkin (In re
Chatkin)*, 465 B.R. 54, 59 (Bankr. W.D. Pa. 2012)). In applying the test, courts in this district

TA-142

have employed a variety of factors to determine whether cause exists to permit a non-debtor

party to proceed with litigation in another forum:

> Given the broad discretion accorded to the bankruptcy court as described in *Brown,* it is therefore, not surprising that some courts have designed lists of "factors" to be considered in determining whether "cause" exists under §362(d)(1). For example, in *In re Granati,* the court identified four (4) factors to be considered:
>
> (1)    whether only issues of state law are involved;
>
> (2)    whether judicial economy will be promoted;
>
> (3)    whether the litigation will interfere with the bankruptcy case; and
>
> (4)    whether the estate can be protected by requiring that any judgment obtained be enforced only through the bankruptcy court.
>
> 271 B.R. 89, 93 (Bankr.E.D.Va. 2001) (citing *In re Robbins,* 964 F.2d 342 (4th Cir.1992)).
>
> Other courts have developed a checklist of twelve (12) factors to be considered:
>
> (1)    Whether the relief will result in a partial or complete resolution of the issues.
>
> (2)    The lack of any connection with or interference with the bankruptcy case.
>
> (3)    Whether the non-bankruptcy proceeding involves the debtor as a fiduciary.
>
> (4)    Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases.
>
> (5)    Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation.
>
> (6)    Whether the action primarily involves third parties.
>
> (7)    Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee or other interested parties.

**TA-143**

(8)     Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c).

(9)     Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f).

(10)    The interest of judicial economy and the expeditious and economical determination of litigation for the parties.

(11)    Whether the non-bankruptcy proceedings have progressed to the point where the parties are prepared for trial.

(12)    The impact of the stay on the parties and the "balance of hurt."

*See In re Sonnax Industries, Inc.,* 907 F.2d 1280 (2d Cir.1990); *In re Curtis,* 40 B.R. 795, 800 (Bankr. D. Utah 1984) (citations omitted). *See also In re Brown,* 311 B.R. at 413 (approving bankruptcy court's use of factors set forth in *Sonnax* in ruling on § 362(d) motion).

The relevance and weight of the various overlapping factors outlined above will depend upon the circumstances of the particular bankruptcy case involved. Not all of the factors may be relevant in a particular case; the factors that are relevant may not be entitled to equal weight. Thus, the decision whether to grant relief from the automatic stay to an unsecured creditor is not a mechanical or mathematical exercise.

*In re Chan*, 355 B.R. 494, 499–500 (Bankr. E.D. Pa. 2006).[187]

---

[187] The Debtors have cited to *In re Tribune Co.,* 418 B.R. 116, 126 (Bankr. D. Del. 2009) for the following three-prong test for determining whether cause exists to lift the stay to continue litigation: (1) whether any great prejudice to either the bankruptcy estate or the debtor will result from continuation of the civil suit; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor, and (3) whether the creditor has a probability of prevailing on the merits. The *Tribune* decision cited the test as being generally relied upon in that district. *Id.* A "balancing of the harms" analysis has been recognized in this district as well. *See In re Cinelli,* 2014 WL 4106030, at *2 (E.D. Pa. Aug. 21, 2014) ("The first step to consider is whether there will be prejudice to either the estate or the debtor if the stay is lifted on the one hand and hardship to the movant if the stay continues on the other hand. Then, these two potential harms are weighed. The decision to lift the stay depends on where the scale tips."); *In re Glunk,* 342 B.R. 717 (Bankr. E.D. Pa. 2006) (recognizing the "balancing of the harms" analysis used by courts). The *Chan* decision recognized that underlying guidepost, but employed the "different, more multi-faceted" approach for determining whether cause exists that looks to multiple factors. 355 B.R. at 499. That approach has been cited by decisions rendered since *Chan* was decided*, see, e.g., In re Schaffer,* 597 B.R. 777, 791, n.18 (Bankr. E.D. Pa. 2019), and it is the approach this Court takes as well.

Hawk filed the Stay Relief Motion at the outset of the case, but the Court determined it needed an evidentiary record to resolve it.  The path to obtaining that record has been tortured at times, but the circumstances that Hawk argued warranted stay relief early in the case have not changed – the Section 225 Action is ripe to be heard.  It will resolve the Technovative Director Issue and the Debt Conversion Issue, two issues critical to these bankruptcy cases going forward but governed by Delaware law for which the Delaware Chancery Court, while not a specialized tribunal *per se,* certainly has unique and established expertise.  If Hawk were successful with respect to both of those issues, it has acknowledged that it will still need to return to this Court for permission to proceed with an Article 9 Sale of its collateral under the Notes.  As such, resolution of the Technovative Director Issue and the Debt Conversion Issue will not prejudice the interests of other estate creditors by allowing Hawk to foreclose on Technovative assets without this Court's authority.  On the other hand, resolution of those will greatly advance resolution of the Debtors' bankruptcy cases by providing clarity regarding the status of the Technovative filing and whether, and to what extent, Hawk is a secured creditor of the Debtors.

As such, based on consideration of the factors used to determine whether causes exists to permit non-bankruptcy litigation to proceed, the Court finds Hawk has established, and the Debtors have not rebutted, that allowing the Section 225 Action to proceed to resolution with respect to the Technovative Director Issue and the Debt Conversion Issue will aid in administration of the Debtors' bankruptcy cases.  Relief from stay will therefore be granted to permit the parties to proceed before the Delaware Chancery Court on those two issues.

## IV.    CONCLUSION

For the reasons discussed above, the Court will (i) grant the Section 1112/1104 Motion to the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy

**TA-145**

cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed

solely with respect to the Technovative Director Issue and the Debt Conversion Issue.  The U.S.

Trustee will be directed to immediately begin the process for appointing a chapter 11 trustee, and

in the interim, Mr. Rajan is no longer authorized to take any action on behalf of the Debtors'

estates.  To the extent the Debtors must take any urgent action, the Debtors shall identify any

such actions needed to the U.S. Trustee, who may confer with Mr. Rajan in addressing such

matters but who is not obligated to act in conformity with Mr. Rajan's instruction or desired

outcome.

An Order consistent with this Memorandum shall be entered.

Dated:  January 5, 2024

MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

78

**TA-146**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **In re:** | : **Chapter 11** |
|  | : |
|  | : **Bankruptcy No. 23-10763 (AMC)** |
| **Stream TV Networks, Inc.,** *et al.* | : **(Jointly Administered)[1]** |
|  | : |
| **Debtors.** | : **Hearing Date: June 26, 2024** |
|  | : **Hearing Time: 12:30 p.m.** |
|  | : **Hearing Place: Courtroom #4** |

**MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE
FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT AND
MUTUAL RELEASE WITH HAWK INVESTMENT HOLDINGS, LTD., AS
COLLATERAL AGENT FOR THE SECURED NOTEHOLDERS OF SEECUBIC, INC.,
PURSUANT TO FED. R. BANKR. P. 9019(a) AND 11 U.S.C. § 105(a)**

William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the bankruptcy

estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative"

when referred to with Stream, the "Debtors"), by and through his counsel, Obermayer Rebmann

Maxwell & Hippel LLP, files this Motion for Entry of an Order Approving a Settlement Agreement

and Mutual Release (the "Agreement") with Hawk Investment Holdings, Ltd. ("Hawk"), as

Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic" or in conjunction with

the Trustee, Hawk and SeeCubic may be generally referred to as "Party" or collectively as the

"Parties") and SeeCubic pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) (the

"Motion"), and in support thereof, respectfully avers as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A),

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

(B), (K) and (O).

3.      The statutory basis for the relief requested herein is Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(a).

## BACKGROUND

**A.      Bankruptcy Procedural Background.**

4.      On March 15, 2023, (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.  (the "Bankruptcy Code").

5.      On March 20, 2023, Hawk filed a motion for relief from the automatic stay (the "Hawk Stay Relief Motion") to proceed with an action against the Debtors (D.I. #16) in the Delaware Court of Chancery (the "Delaware Chancery Court") under § 225 of Title 8 of the Delaware Code (the "225 Action").

6.      On April 5, 2023, the Debtors filed an objection to the Hawk Stay Relief Motion (D.I. #78).

7.      On April 6, 2023, Hawk filed a motion pursuant to sections 1112/1104 of the Bankruptcy Code, seeing dismissal or conversion of the Debtors' cases, or alternatively, the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code (the "1112/1104 Motion") (D.I. #94).

8.      In the 1112/1104 Motion, Hawk argued that cause existed to appoint a trustee based upon the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of their businesses.

9.      The Debtors filed an opposition to the 1112/1104 Motion on May 8, 2023 (D.I. #193).

10.     On January 5, 2024, the Court entered an order, which, among other things, (1)

2

granted the 1112/1104 Motion with respect to the appointment of a Chapter 11 trustee, and (2) granted the Hawk Stay Relief Motion to allow the Section 225 Action to proceed (the "Trustee Order") (D.I. #549).

11.    The Trustee Order instructed the United States Trustee's Office to immediately begin the process of appointing a Chapter 11 trustee and set a status hearing for January 24, 2024 (the "Status Hearing").

12.    On January 9, 2024, the Office of the United States Trustee filed a notice of appointment of William A. Homony to serve as the chapter 11 trustee as well as an application for the entry of an Order approving the appointment of the Trustee.  (D.I. #554 and #553, respectively).

13.    On January 12, 2024, the Bankruptcy Court entered an Order Approving the Appointment of the Trustee (D.I. #558).

14.    On January 17, 2024, the Trustee filed an Application to Employ Miller Coffey Tate LLP as his accountants/advisors (D.I. #566) and that Application was approved on February 15, 2024 (D.I. # 586).

15.    On January 17, 2024, the Trustee filed an Application to Employ Obermayer Rebmann Maxwell & Hippel LLP as his counsel (D.I. #564) and that Application was approved on January 29, 2024 (D.I. # 577).

16.    On January 31, 2024, the Trustee filed an Application to Employ Steven M. Coren and Coren & Ress, P.C. as his litigation counsel (D.I. # 579) and that Application was approved on February 15, 2024 (D.I. # 587).

4875-7966-5596 v1
318450713.5

**B.**     **The 225 Action and Chancery Court Litigation.**

17.     At the time of the Trustee's appointment, the 225 Action was pending in the Delaware Chancery Court.

18.     Prior to the commencement of the 225 Action, a contingent of the Debtors' secured creditors entered into an Omnibus Agreement (the "Omnibus Agreement"), which the Delaware Court of Chancery upheld as validly effectuating a foreclosure.

19.     In June 2022, the Delaware Supreme Court voided the Omnibus Agreement and reversed the the decision of the Delaware Court of Chancery.

20.     Thereafter, Hawk sought to exercise certain of its rights as a secured creditor of the Debtors through the exercise of proxy rights in pursuit of a foreclosure sale under Article 9 of the UCC.

21.     The Debtors contested that Hawk had validly exercised its proxy rights resulting in Hawk's institution of the 225 Action to determine the proper composition of Technovative's board of directors.

22.     Numerous issues were raised in the 225 Action, including, *inter alia*, whether Hawk's secured position had been converted from debt to equity pursuant to certain conversion agreements. Hawk alleges that collateral estoppel precludes the Trustee from advancing certain positions, a premise which the Trustee disputes. The Debtors contest Hawk's positions and allege that the Hawk secured debt was converted to equity.

23.     In any event, but for the settlement (the "Settlement") embodied in the Agreement, the ultimate determination of Hawk's status—and its impact on the Debtors—likely would require extensive and extremely expensive continuing litigation in the Delaware Chancery Court, the Delaware Supreme Court, this Court and perhaps other courts—the outcome of which is

4

unpredictable.

24.      To prevail in the 225 Action, the Debtor must overcome significant factual and legal challenges, and its ability to do so is far from guaranteed.

25.      On March 1, 2024, the Trustee filed an expedited motion to reinstate the automatic stay in connection with the 225 Action.  On April 1, 2024, the Bankruptcy Court entered a consent order granting the Trustee's motion, thereby affording the Trustee and his advisors additional time to prepare for and defend the 225 Action.

26.      If the Agreement is not approved, the trial of the 225 Action likely would commence on July 31, 2024.  Hawk will seek relief that, if awarded, may substantially prejudice the Debtors' estates, and perhaps leave nothing for other creditors.

C.      **The Pending Adversary/Injunction Proceedings Against Hawk**.

27.      After the Petition Date, the Debtors instituted a proceeding in bankruptcy court against Hawk and others (the "Adversary").

28.      In the Adversary, the Debtors alleged, *inter alia*, that certain shareholders and their secured lenders (the "Secured Creditors") conspired to and did exert control wrongfully over Debtor property.  The Adversary further alleges that the defendants, including the Secured Creditors and SeeCubic, and certain board members interfered with employees and investors, while conspiring to cause the Debtors to breach their loan agreements with the Secured Creditors pursuant to which the Debtors were loaned more than $50,000,000.00 (US).[2]

29.      The Debtors also allege that the Omnibus Agreement, which resulted in the transfer of certain assets to SeeCubic and the decision by board members to enter and consummate same, breached fiduciary duties to the Debtors.  The Debtors complain that the Secured Creditors used

---

[2] In addition to the Adversary and the 225 Action, the Settlement resolves all Pending Litigation Matters, as that term is defined in the Agreement.

4875-7966-5596 v1
318450713.5

their power and position to shift ownership away from the principals of the Debtors, and to wrongfully secrete, remove and convert assets of the Debtors.

**D.    The Trustee's Efforts to Bring Value into the Estates.**

30.    In the relatively brief period since his appointment, the Trustee and his professionals have: (i) reviewed and analyzed volumes of documents relating to Debtors and their foreign subsidiaries; (ii) reviewed the extensive filings and hearing transcripts in the bankruptcy cases; (iii) investigated and analyzed Debtors' Adversary, (iv) investigated and analyzed the Delaware Chancery Court cases including the 225 Action and the Delaware Supreme Court case, and (v) interviewed Debtors' bankruptcy counsel, Delaware counsel, Netherlands counsel, and other representatives.

31.    Since appointed, the Trustee has been faced with a "melting ice cream cone."

32.    Debtors have no money, faltering operations, and potentially valuable operations held by a foreign subsidiary—an indirect subsidiary of Technovative in the Netherlands known as SeeCubic BV ("SCBV").

33.    Debtors have been unable to fund SCBV, whose expenses have been funded post-petition by the Secured Creditors.

34.    It is widely recognized that the principal value of Debtors' assets resides in SCBV, its employee knowhow and operations, and Debtors' downstream IP.

35.    Unable to secure a DIP loan or to fund SCBV, SCBV employees in the Netherlands were close to leaving, and SCBV recently was on the verge of shutting down—to the substantial detriment of Debtors and their ability to garner value for the benefit of Debtors' bankruptcy estates.

36.    Because of the substantial and unliquidated secured claims and the disputes connected thereto, the Trustee was unable to obtain third-party debtor in possession financing to

4875-7966-5596 v1
318450713.5

begin operations, fund SCBV and/or fund case administration, including prosecution of the 225 Action and the Adversary.

37.    It quickly became clear to the Trustee that Debtors' capital stack was in disarray, and that continuing litigation over debt-to-equity conversion and other matters would be risky, costly, and perhaps leave the estates without unencumbered assets to market or sell.

38.    As the Trustee investigated the Debtors' cash needs and available resources, it quickly became apparent that Stream was not selling televisions or technology and had no reliable revenue sources to fund operations or the bankruptcy proceedings. Rather, Debtors' principal had been attempting to finance Stream through bootstrap equity raises in a non-debtor company known as Visual Semiconductor, Inc. or "VSI". The Trustee made clear that neither the Debtors' estates nor the Trustee would participate in post-petition equity raises.

39.    The Trustee met unsuccessfully with Debtors' principal to explore a viable plan of reorganization.

40.    After a presentation of the Debtors' technology and the principal's envisioned future use of the technology, the Trustee awaited both a proposal for Debtor in Possession Financing (a "DIP") and exit plan financing from the Debtors' principal, with proof of financial wherewithal, which would allow the secured claims (if any) to be satisfied once determined and provide a return to unsecured creditors. In the Trustee's business judgment, no such viable proposals were presented.

41.    The Trustee also met with Rembrandt 3D Holding Ltd. ("Rembrandt"), who is alleged to be one of the Debtor's largest unsecured creditors and a third party interested in the technology owned by or licensed to the Debtors. No offer to purchase or to provide a DIP was forthcoming, though Rembrandt continues to express interest in Debtors' property.

4875-7966-5596 v1
318450713.5

**TA-153**

42.    After open and robust discussion and negotiation, the Trustee has entered into the Agreement, and seeks Bankruptcy Court approval under Federal Rule of Bankruptcy Procedure 9019.

**E.    The Proposed Settlement With Hawk (as Agent for the Secured Creditors).**

43.    The Trustee has interacted and negotiated with interested parties, including Debtors' principal, Rembrandt, and Hawk.  From the outset, the Trustee made clear that he would entertain only realistic proposals, coupled with proof of the financial ability to fund.

44.    In the Trustee's business judgment, only Hawk made a viable proposal.

45.    The Settlement proposal embodied in the Agreement leaves open the possibility that others who have expressed interest, including the Debtors' principal and Rembrandt, will have the opportunity to present a potentially higher or better offer when Debtor property is exposed to sale.

46.    The Settlement with Hawk takes into account possible claims against Hawk, the prospect of litigating with Hawk into the future, the risk inherent in litigating with Hawk about the nature and extent of its liens while trying to administer the Bankruptcy Cases, and the importance of achieving a recovery for unsecured creditors in a reasonable time.

47.    The Settlement reflects the substantial efforts of the Trustee and his advisors and the advisors of Hawk to achieve a commonsense resolution of the bankruptcy and related proceedings as expeditiously as possible, while minimizing further administrative expenses.

48.    In the Trustee's business judgment, the time is right to attempt a full resolution, which results in payments to creditors, rather than continued administration of potentially insolvent bankruptcy estates.

49.    Significantly, the Trustee is faced with millions of dollars in administrative

4875-7966-5596 v1
318450713.5

expenses before money can be made available for unsecured creditors.

50.    Under the circumstances, the Trustee has determined that the Agreement provides the best alternative for the bankruptcy estates.

51.    Accordingly, the Trustee and Hawk seek to settle all claims between Debtors' estates and the Secured Creditors, while the Trustee undertakes a process to market and sell substantially all the Debtors' assets, including the Secured Creditors' collateral[3] under Section 363 of the Bankruptcy Code.

**F.    The Settlement**

52.    A detailed description of the terms of the Settlement and Agreement are set forth below and a copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein.

53.    Treatment of Secured Claims:

a.    Upon the entry of the order approving the 9019 Motion, the Hawk Claim shall be deemed an allowed Secured Claim, secured by the Collateral as more fully set forth in Claim No. 6 and the supporting documentation, in the amount of $180 million, subject to increase as set forth in the Agreement (such amount, the "Allowed Secured Claim"). The Trustee waives the right to object to any portion of the Allowed Secured Claim or to seek the conversion or subordination of such claim for so long as the applicable provision of the Agreement remains valid and binding on the Parties.

b.    The Allowed Secured Claim shall increase on a dollar-for-dollar basis for documented and evidenced amounts actually advanced to fund the operations of

---

[3] For the avoidance of doubt, the Secured Creditors' collateral excludes all claims and causes of action against third parties including but not limited to Chapter 5 claims against third parties and causes of action and D&O claims and any resulting proceeds therefrom.

4875-7966-5596 v1
318450713.5

SeeCubic, B.V. ("SCBV") between the Trustee's appointment date and the sale

Closing in accordance with Section 6 of the Agreement, which advanced amounts

shall not constitute administrative expenses of the Debtors' estates and shall only

increase the Allowed Secured Claim.

c.  Upon the entry of the order approving the 9019 Motion, the proofs of claim of

SLS Holdings VI, LLC [Claim No. 9 on the official claims docket of Stream and

Claim No. 2 on the official claims docket of TMI] and the proofs of claim of

SeeCubic, Inc. [Claim No. 14 on the official claims docket of Stream and Claim

No. 3 on the official claims docket of TMI] shall be deemed withdrawn of record

with no further order of the Bankruptcy Court necessary to effectuate such

withdrawal.

54.     Sale of the Debtors' Assets.  The Trustee has sought approval of the retention of an

investment banker to market the Collateral.  The Trustee shall seek entry of the Bidding Procedures

Order on an expedited basis to obtain approval thereof concurrently with the entry of the 9019

Order. Subject to documentation satisfactory to Hawk (and drafted in consultation with Hawk),

SCI shall serve as the stalking horse bidder for the Collateral, with such bid (the "Stalking Horse

Bid") and Asset Purchase Agreement (the "Stalking Horse APA") attached to the Bidding

Procedures.  Subject to documentation satisfactory to Hawk and the Trustee, the Stalking Horse

Bid shall consist of a credit bid of the Allowed Secured Claim in the amount of $150 million.  The

Secured Creditors waive the right to seek or obtain a "breakup fee" or a "topping fee" or any other

bid protections as part of the Stalking Horse Bid.

55.     The Bidding Procedures shall specify that in order for any bid other than the

Stalking Horse Bid to constitute a "Qualifying Bid" such bid shall include:

10

    a.    A bid deposit in the amount of 10% of the proposed aggregate purchase price (the "Bid Deposit"), and

    b.    Evidence satisfactory to the Trustee of its financial wherewithal to consummate a Sale in the amount of the proposed purchase price.

56.    The Bidding Procedures shall specify that Qualifying Bids may include both cash and non-cash consideration, subject to the following conditions:

    a.    The cash component shall be no less than $120 million,

    b.    The non-cash component of the bid shall be backed by a letter of credit or other security, over which Hawk shall have consultation rights as to the sufficiency and form of such security, and

    c.    The Bid Deposit shall be 10% of the aggregate purchase price, including both the cash component and the non-cash component of the bid.

57.    To the extent the Trustee receives any other Qualified Bids (exclusive of the Stalking Horse Bid which will be deemed a Qualified Bid), SCI may participate in the Auction. Any overbid submitted by SCI in excess of the Stalking Horse Bid at the Auction shall be in cash only. For the avoidance of doubt, SCI cannot utilize any of the remaining Allowed Secured Claim as part of any overbid; however, its overbid may include a credit bid up to $150 million.

58.    Trustee/Estate Carve out. With respect to any sale that closes as contemplated by, and in accordance with, the terms of the Agreement, the Secured Creditors will provide a carve-out ("Carve-Out") in the form of cash from the sale proceeds of their collateral, or SeeCubic shall fund the Carve-Out if the Secured Creditors' Stalking Horse Bid or any subsequent overbid is determined to be the winning bid, as follows:

11

    a.  $7,500,000.00 and an additional 10% of each dollar in excess of the Stalking Horse Bid for the benefit of the Debtors' estates paid as follows:

        i.  $1,000,000.00 paid to the Trustee upon entry of an Order approving the Agreement (ie: the 9019 Motion);

        ii.  $1,500,000.00 paid to the Trustee upon approval of the bidding procedures; and

        iii.  The Trustee shall receive the balance of the Carve-Out (*i.e.*, the Carve-Out minus the Carve-Out Advance) at Closing:

            1.  In the event SCI is the successful bidder, by SCI in cash at Closing.

            2.  In the event a third party is the successful bidder, from the cash proceeds of the purchase price.

    b.  Trustee to retain rights to the $1 million bond posted by the Debtors in the DE Chancery Court.

    c.  Trustee to retain all claims and cause of action not released against third-parties including but not limited to Chapter 5 claims and causes of action and any claims against the Debtors' directors and officer (collectively "Litigation Claims") and any resulting proceeds from said Litigation Claims.

    c.  The bankruptcy estates and/or any trustee or disbursing agent retain the right to object to claims against the bankruptcy estates.

    d.  The Secured Creditors will provide the Trustee with documentation regarding SeeCubic's financial ability to fund the Carve-Out.

    e.  The Secured Creditors will be allowed a subordinate unsecured deficiency claim subordinated to all other general unsecured creditors (the "Deficiency Claim") to

4875-7966-5596 v1
318450713.5

the extent that the Secured Creditor Distribution is not sufficient to satisfy the Allowed Secured Claim in full. The Secured Creditors' Deficiency Claim will be recognized as an impaired unsecured claim which the Secured Creditor shall be entitled to vote on confirmation of any Trustee Plan.

54.    Releases.

   a.    Included in the Agreement and the 9019 Motion (as defined below), the Trustee, Debtors and the Debtors' estates and the Secured Creditors (released parties to be further defined in the 9019 Motion and agreement, but will include the foregoing as well as any named defendants in any action currently pending initiated by the Debtors who participate by granting releases to the Debtors and Trustee) will exchange customary mutual general releases, effective upon the closing of any sale of the Debtors' assets as contemplated by, and in accordance with, the Agreement (whether such sale is to the Secured Creditors or a third party), including, for the avoidance of doubt, dismissal with prejudice all causes of action and claims currently pending in any other federal or state court (or analogous foreign jurisdiction) currently pending in the United States or abroad, and excluding any obligations created under the Agreement or ultimate asset purchase agreement. The Secured Creditors agree to not file any further pleadings in the Debtors' pending bankruptcy cases subsequent to a sale closing and receipt of any sale proceeds from the Trustee, except to enforce or otherwise seek an interpretation of the Agreement and the sale documents.

**RELIEF REQUESTED**

55.    The Trustee respectfully requests entry of an Order approving the Settlement and

13

the Agreement pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 9019.

56.    The discussion of the terms contained in the Agreement is intended as a summary only and all parties in interest are encouraged to read the Agreement in its entirety.

57.    To the extent that there are discrepancies between the summary contained in the Motion and the terms contained in the Agreement, the terms of the Agreement shall control.

58.    Federal Rule of Bankruptcy Procedure 9019(a) provides "on motion by the trustee and after notice and a hearing, the Court may approve a compromise or settlement.  The decision to approve or disapprove a settlement is within the sound discretion of the bankruptcy judge." *See*, *In re Martin*, 91 F.3d 389, 393 (3rd Cir. 1996).

59.    The Debtors seek approval, pursuant to Bankruptcy Code § 105 and Fed. R. Bankr. P. 9019, of the Settlement of the claims among the Parties as set forth in the Agreement.

60.    In *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, *reh'g denied*, 391 U.S. 909 (1968), the Supreme Court instructed as to those factors to be considered in determining whether to approve a settlement.  The factors outlined by the Supreme Court in *Anderson* have been uniformly summarized as follows:

        a.    the probability of success in the litigation;

        b.    the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it;

        c.    the difficulties, if any, to be encountered in the matter of collection; and

        d.    the paramount interest of the creditors.

*See*, *Martin*, 91 F.3d at 393; *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998); *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997); *In re Pennsylvania Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987).

61.     Bankruptcy Rule 9019 authorizes this Court to approve the settlement entered into by the Debtor.  The decision whether to accept or reject a compromise is committed to the sound discretion of the Bankruptcy Court, "which must determine if the compromise is fair, reasonable, and in the interest of the estate."  *See*, *Louis's*, 211 B.R. at 801.  *See also*, *In re Neshaminy Office Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

62.     The settlement need not be the best that the debtor could have achieved but must only fall "within the reasonable range of litigation possibilities."  *See*, *In re Penn Central Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979).  In making its determination, a court is not to substitute its own judgment for that of the debtor.  *See*, *Neshaminy Office Bldg.*, 63 B.R. at 803.  Moreover, it is not necessary for the court to conduct a truncated trial of the facts of the merits underlying the dispute.  *See Grant Broadcasting*, 71 B.R. at 396.  *See also*, *In re A&C Properties*, 784 F.2d 1377, 1384 (9th Cir.), cert. denied, 479 U.S. 854 (1986).  Rather, the court need only "canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness."  *See*, *Neshaminy Office Bldg.*, 62 B.R. at 803 (*quoting*, *In re W.T. Grant Co.*, 4 B.R. 53, 69 (S.D.N.Y. 1977)).

63.     Here, the Agreement clearly falls within the range of reasonableness for purposes of satisfying Bankruptcy Rule 9019 criteria.

64.     The dispute between the Parties involves numerous, complex issues.  The Agreement resolves these matters in a manner which, in the exercise of the Trustee's business judgment, is appropriate and beneficial to the Bankruptcy Estates.

65.     Faced with insolvent estates and understanding fully the complex and wasting collateral picture and the challenged capital structure of the Debtors, the Trustee has reasonably elected a path that minimizes additional administrative expenses and avoids the substantial

4875-7966-5596 v1
318450713.5

additional expenses to be incurred with continuing a litigation-based path to recovery—a path that is speculative and fraught with peril.

66.    If the Agreement is not approved, Debtors' property likely will devalue and waste, rendering it even more likely that creditors will receive nothing.

67.    The looming hearing on the 225 Action may further limit the Trustee's options should the proceedings not end in Debtors' favor.

68.    Moreover, a further delay in these Bankruptcy Cases will exponentially increase administrative expenses, to the prejudice of creditors.

69.    Simply stated, litigation is time-consuming, costly, and uncertain.  The Trustee cannot, in his exercise of business judgment, expose creditors to that risk when there is a potential for an assured recovery through settlement, and a chance for others who have shown interest to bid on the assets being put up for sale.  The potential for an overbid recovery further enhances creditor's potential opportunities.

70.    Without the Agreement, the Trustee will be unable to conduct a realistic sale process, as it would be forced to fight with Hawk over the nature and extent of Hawk's secured claims.

71.    If the Agreement is not approved, Debtors' estates will face stiff headwinds, without money to continue operations or fund case administration, and a future of hotly contested litigation whose outcomes are unpredictable.

72.    Accordingly, the Trustee believes that the Agreement is in the best interests of the Debtors' estates and requests that it be approved by this Court.

## **NOTICE**

73.    The Trustee's counsel has served this Motion and Notice of Motion, Response

16

Deadline and Hearing Date upon: (a) the Office of the United States Trustee, (b) counsel to the former debtor in possession, (c) counsel to the signatories to the Agreement, and (d) all parties who have requested notice pursuant to Fed. R. Bankr. P. 2002. The Trustee's counsel has also served the Notice of Motion, Response Deadline and Hearing Date upon all of the Debtor's creditors.

**WHEREFORE**, the Trustee respectfully requests that this Honorable Court enter an Order (i) granting the relief sought in the Motion; (ii) approving the Agreement and the Settlement contained therein; (iii) authorizing the Trustee to move forward with the Agreement and Settlement, and (iv) granting such other and further relief it deems just and proper.

Respectfully submitted,

*/s/ Michael D. Vagnoni*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066
Facsimile: (215) 665-3165
E-mail addresses:
edmond.george@obertmayer.com
michael.vagnoni@obermayer.com
*Counsel to William Homony, Chapter 11 Trustee*

Dated: May 6, 2024

4875-7966-5596 v1
318450713.5

**TA-163**

# Exhibit A

## SHARING AND CARVE-OUT AGREEMENT

This Sharing and Carve-out Agreement (this "Agreement") is entered into as of May 6, 2024 by and between (a) William A. Homony, solely in his capacity as the Chapter 11 Trustee ("Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("TMI" and, together with Stream, the "Debtors") and (b) (i) Hawk Investment Holdings, Ltd. ("Hawk"), in its capacity as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SCI") and (ii) all other individuals and entities individually who execute a Release Supplement annexed hereto (collectively, the "Interested Parties"). The Trustee and Hawk are referred to herein together as the "Parties" and each individually as a "Party" (unless the context indicates otherwise).

## RECITALS

**WHEREAS,** from 2011 through 2020, SLS Holdings VI, LLC ("SLS" and, together with Hawk, the "Secured Creditors") and Hawk lent Stream funds pursuant to a series of promissory notes, with respect to which Hawk has filed proof of Claim No. 6-1 on the Official Proof of Claim Docket in the Stream's case (the "Hawk Claim") asserting a claim secured by substantially all of the Debtors' property (the "Collateral");

**WHEREAS,** on March 15, 2023, the Debtors initiated the bankruptcy cases captioned as *In re Stream TV Networks, Inc*., Case No. 23-10763 (Bankr. E.D. Pa.) (the "Chapter 11 Cases"), before the United States Bankruptcy Court of the Eastern District of Pennsylvania (the "Bankruptcy Court"), under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

**WHEREAS,** prior to the Petition Date, the Secured Creditors, the Debtors, and certain other entities were party to several pending litigation matters, including, but not limited to: (a) *Stream TV Networks, Inc. v. Stastney*, Case No. 22-00851-CJB (D. Del.) (the "District Court Action"), (b) *Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc.*, C.A. 2022-0930-JTL (Del. Ch.) (the "225 Action"),

**WHEREAS,** after the Petition Date, the Debtors initiated the adversary proceeding against the Secured Creditors and other Interested Parties captioned as *Stream TV Networks, Inc. v. Stastney*, AP No. 23-00027-mdc (Bankr. E.D. Pa.) (the "Adversary Proceeding" and, together with the District Court Action, the 225 Action, and all other pending litigation matters to which the Parties are party to, the "Pending Litigation Matters");

**WHEREAS,** Hawk filed a motion with the Bankruptcy Court seeking relief from the automatic stay to conclude the 225 Action on March 20, 2023 [ECF No. 16] (the "Stay Relief Motion") and a motion to appoint a chapter 11 trustee on April 6, 2023 [EF No. 83] (the "Trustee Motion");

1

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 171 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 3 of 25

**WHEREAS,** on January 5, 2024, the Bankruptcy Court granted Hawk limited relief under the Stay Relief Motion and the Trustee Motion, appointing the Trustee in these Chapter 11 Cases and granting relief from the automatic stay to conclude the 225 Action;

**WHEREAS,** upon the Trustee's appointment, the Trustee engaged in extensive investigation, review, and analysis of the various Pending Litigation Matters, the Hawk Claim, the Debtors' need for funding, and other disputes and aspects of the relationship between the Secured Creditors and the Debtors;

**WHEREAS,** during the Trustee's investigation, on March 1, 2024, the Trustee filed an expedited motion to reinstate the automatic stay in connection with the 225 Action and on April 1, 2024, the Bankruptcy Court entered a consent order granting the Trustee's motion;

**WHEREAS,** the Trustee and Hawk have engaged in good faith negotiations in an attempt to resolve the several disputes between the Debtors, Hawk, SLS, SCI, and several other parties that have arisen over the course of the dealings of the several parties;

**WHEREAS,** the Trustee, Hawk, and the Interested Parties have reached an agreement to ensure the orderly disposition of the Collateral, funding of the Chapter 11 Cases, a recovery mechanism for unsecured creditors and the release of any and all claims, whether monetary or otherwise, between Hawk, SLS, SCI, the Debtors, and the Interested Parties;

**WHEREAS,** Parties now wish to fully and finally resolve these matters by mutual agreement;

**NOW, THEREFORE,** for and in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.  <u>Settlement Generally; Cooperation</u>.

    a)  The Trustee shall use his best efforts to consummate a sale of the Collateral under section 363 of the Bankruptcy Code as contemplated under this Agreement (any such sale, a "<u>Sale</u>"), which he shall endeavor to close (the "<u>Closing</u>") no later than August 2, 2024 (subject to further extension by written agreement of Hawk and the Trustee, the "<u>Outside Closing Date</u>"), in accordance with the provisions of the Agreement.

    b)  The Parties and their attorneys, advisors and other agents and professionals, shall cooperate in good faith to support the Sale with the goal of maximizing the proceeds of the same. The Parties acknowledge the Sale will be only of the Debtors' interests in the Collateral, on an "as is where is" basis, without any warranty express or implied. The Parties hereby acknowledge and agree that such support shall include cooperating in providing requested diligence materials, if available, and reasonably responding to diligence inquiries in a timely manner consistent with this goal, as well as supporting (and not objecting to) the entry of an order approving this Agreement (the "<u>9019 Order</u>") and an

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 172 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 4 of 25

order (the "<u>Bidding Procedures Order</u>") establishing bidding procedures (the "<u>Bidding Procedures</u>") so long as such Bidding Procedures' terms are in accordance with this Agreement. The Parties acknowledge that the Trustee has limited access to records to provide all requested due diligence, but will use his best efforts to assist.

2.    <u>Treatment of Secured Creditors' Claims</u>.

a)   Upon the entry of the 9019 Order, the Hawk Claim shall be deemed an allowed Secured Claim, secured by the Collateral[1] as more fully set forth in Claim No. 6-1 and the supporting documentation, in the amount of $180 million, subject to increase as set forth below (such amount, the "<u>Allowed Secured Claim</u>"). The Trustee waives the right to object to any portion of the Allowed Secured Claim or to seek the conversion or subordination of such claim for so long as this provision remains valid and binding on the Parties.

b)   The Allowed Secured Claim shall increase on a dollar-for-dollar basis for documented and evidenced amounts actually advanced to fund the operations of SeeCubic, B.V. ("SCBV") between the Trustee's appointment date and the sale Closing in accordance with Section 6 hereof, which advanced amounts shall not constitute administrative expenses of the Debtors' estates and shall only increase the Allowed Secured Claim as set forth herein.

c)   Upon the entry of the 9019 Order, the proofs of claim of SLS Holdings VI, LLC [Claim No. 9 on the official claims docket of Stream and Claim No. 2 on the official claims docket of TMI] and the proofs of claim of SeeCubic, Inc. [Claim No. 14 on the official claims docket of Stream and Claim No. 3 on the official claims docket of TMI] shall be deemed withdrawn of record with no further order of the Bankruptcy Court necessary to effectuate such withdrawal.

3.    <u>Sale of Debtor's Assets</u>.  The Trustee shall pursue a Sale, subject to the following parameters:

a)   The Trustee shall seek approval of the retention of an investment banker to market the Collateral.

b)   The Trustee shall seek entry of the Bidding Procedures Order on an expedited basis to obtain approval thereof concurrently with the entry of the 9019 Order.

c)   Subject to documentation satisfactory to Hawk (and drafted in consultation with Hawk), SCI shall serve as the stalking horse bidder for the Collateral, with such bid (the "<u>Stalking Horse Bid</u>") and Asset Purchase Agreement (the "<u>Stalking Horse APA</u>") attached to the Bidding Procedures.

---

[1] For the avoidance of doubt, Collateral excludes any and all claims and cause of action against third-parties including but not limited to Chapter 5 claims and causes of action and any claims against the Debtors' directors and officer (collectively "Litigation Claims") and any resulting proceeds from said Litigation Claims.

3

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 173 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 5 of 25

d) Subject to documentation satisfactory to Hawk and the Trustee, the Stalking Horse Bid shall consist of a credit bid of the Allowed Secured Claim in the amount of $150 million.  The Secured Creditors waive the right to seek or obtain a "breakup fee" or a "topping fee" or any other bid protections as part of the Stalking Horse Bid.

e) The Bidding Procedures shall specify that in order for a bid to constitute a "Qualifying Bid" such bid shall include:

    i. A bid deposit in the amount of 10% of the proposed aggregate purchase price (the "Bid Deposit"), and

    ii. Evidence satisfactory to the Trustee of its financial wherewithal to consummate a Sale in the amount of the proposed purchase price.

f) The Bidding Procedures shall specify that Qualifying Bids may include both cash and non-cash consideration, subject to the following conditions:

    i. The cash component shall be no less than $120 million,

    ii. The non-cash component of the bid shall be backed by a letter of credit or other security, over which Hawk shall have consultation rights as to the sufficiency and form of such security, and

    iii. The Bid Deposit shall be 10% of the aggregate purchase price, including both the cash component and the non-cash component of the bid.

g) To the extent the Trustee receives any other Qualified Bids (exclusive of the Stalking Horse Bid which will be deemed a Qualified Bid), SCI may participate in the Auction.  Any overbid submitted by SCI in excess of the Stalking Horse Bid at the Auction shall be in cash only.  For the avoidance of doubt, SCI cannot utilize any of the remaining Allowed Secured Claim as part of any overbid; *however*, its overbid may include a credit bid up to $150 million.

4. <u>Trustee Carve-Out</u>.

a) With respect to any Sale that closes in accordance with the Section 3, the Secured Creditors shall carve out of the proceeds of the Collateral $7,500,000 plus 10% of every additional dollar by which the ultimate purchase price at the conclusion of the Auction, exceeds the Stalking Horse Bid up to the amount of the Allowed Secured Claim (the "Carve-Out").

b) SCI shall pay a portion of the Carve-Out (such portion, the "Carve-Out Advance") to the Trustee according to the following schedule:

    i. $1,000,000.00 within two business days of the entry of the 9019 Order; and

4

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 174 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 6 of 25

      ii.   $1,500,000.00 within two business days of the entry of the Bidding Procedures Order.

c) The Trustee shall receive the balance of the Carve-Out (*i.e.*, the Carve-Out minus the Carve-Out Advance) at Closing:

      i.   In the event SCI is the successful bidder, by SCI in cash at Closing.

      ii.   In the event a third party is the successful bidder, from the cash proceeds of the purchase price.

d) The Bidding Procedures and Sale Order shall provide that in the event a third party is the successful bidder, the Secured Creditors shall receive the "Secured Creditor Distribution" within five (5) business days of the Closing of a Sale, which "Secured Creditor Distribution" shall equal the purchase price minus the Carve-Out.  The Secured Creditor Distribution shall not exceed the amount of the Allowed Secured Claim.

e) Any sale proceeds in excess of the amount necessary to satisfy the Allowed Secured Claim in full (after giving effect to the Carve-Out) shall be retained by the Trustee.

5.   <u>Support of the Carve-Out</u>.  In support of the Carve-Out, the Parties further agree:

a) The Secured Creditors shall provide the Trustee with documentation regarding SCI's financial ability to fund the Carve-Out in the event the Stalking Horse Bid is the prevailing bid and sufficient to support any overbid.

b) The bankruptcy estates and/or any trustee or disbursing agent retain the right to object to claims against the bankruptcy estates other than the Allowed Secured Claim.

c) The Secured Creditors will be allowed a subordinate unsecured deficiency claim subordinated to all other general unsecured creditors (the "<u>Deficiency Claim</u>") to the extent that the Secured Creditor Distribution is not sufficient to satisfy the Allowed Secured Claim in full.  The Secured Creditors' Deficiency Claim will be recognized as an impaired unsecured claim which the Secured Creditor shall be entitled to vote on confirmation of any Trustee Plan.

d) The Secured Creditors agree to support and not oppose any Plan filed by the Trustee and that on or before the deadline to do so, each shall submit a written acceptance of any Plan containing terms consistent with this Agreement, in the full value of the Allowed Secured Claim and/or Deficiency Claim.

e) Notwithstanding any provision herein to the contrary, the Trustee shall retain rights to the $1 million bond posted by or on behalf of the Debtors in the 225 Action.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 175 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 7 of 25

6.    <u>Funding of SCBV</u>.  Until and through the Outside Closing Date (as such may be extended with the consent of the Secured Creditors in their sole discretion), SCI shall continue to fund all costs and expenses of SCBV incurred in the ordinary course of business and consistent with SCBV's operations during the pendency of these Chapter 11 Cases (and including any employee claims arising therefrom); *provided, however,* immediately upon a breach of this Agreement by the Trustee, SCI shall no longer have any obligations to continue funding SCBV.

7.    <u>Releases</u>.  Effective as of the Closing of any Sale:

a)    Each of (i) Hawk and (ii) SCI, on behalf of themselves and their respective partners, general partners, limited partners, affiliates, parents, subsidiaries, predecessors, successors, and all of the foregoing entities' current and former officers, directors, managers, managing directors, equity holders, investors, beneficiaries, employees, agents, attorneys, advisors, insurers and reinsurers, and (iii) separately and individually, any Interested Party signatory to the Release Supplement annexed hereto (collectively, the "<u>Creditor Releasing Parties</u>"), hereby release and discharge (i) the Trustee, (ii) the Debtors, and (iii) the Debtors' estates, and (iv) any attorneys, agents, and advisors retained by the Trustee in connection with these Chapter 11 Cases (all of the foregoing, the "<u>Trustee Released Parties</u>") from any and all claims, liabilities, demands, accounts, reckonings, or causes of action, whether known or unknown, matured or unmatured, domestic or foreign, arising from, relating to, or in connection with these Chapter 11 Cases, the various actions listed in Section 8 of this Agreement and the subject matter thereof, and the Secured Creditors' extension of credit to and/or investment in the Debtors' businesses, including efforts to enforce rights with respect to same, including but not limited to the Omnibus Agreement, dated as of May 6, 2020, and the ensuing litigation and related subject matter; *provided, however,* the Creditor Releasing Parties do not release or discharge the Trustee Released Parties from any claims, liabilities, demands, accounts, reckonings, or causes of action arising from, relating to, the Trustee Released Parties' obligations arising under this Agreement or the Stalking Horse APA and the other documents to be executed in connection therewith.

b)    The Trustee, on behalf of (i) himself, (ii) the Debtors, (iii) the Debtors' estates and (iv) any attorneys, agents, and advisors retained by the Trustee in connection with these Chapter 11 Cases (collectively, the "<u>Trustee Releasing Parties</u>"), hereby release and discharge (i) Hawk and (ii) SCI, individually and their respective partners, general partners, limited partners, affiliates, parents, subsidiaries, predecessors, successors, and all of the foregoing entities' current and former officers, directors, managers, managing directors, equity-holders, investors, beneficiaries, employees, agents, attorneys, advisors, insurers and reinsurers, and (iii) separately and individually, any Interested Party signatory to the Release Supplement annexed hereto (all of the foregoing, the "<u>Creditor Released Parties</u>") from any and all claims, liabilities, demands, accounts, reckonings, or causes of action, whether known or unknown, matured or unmatured, domestic or foreign, arising from, relating to, or in connection with these Chapter 11 Cases, the various actions listed in Section 8 of this Agreement

6

Case 2:24-cv-02727-JMG   Document 19-1   Filed 02/18/25   Page 176 of 341

Case 23-10763-amc   Doc 630-1   Filed 05/06/24   Entered 05/06/24 16:51:04   Desc
Exhibit A   Sharing and Carve-Out Agreement   Page 8 of 25

and the subject matter thereof, and the Secured Creditors' extension of credit to and/or investment in the Debtors' businesses, including efforts to enforce rights with respect to same, including but not limited to the Omnibus Agreement, dated as of May 6, 2020, and the ensuing litigation and related subject matter; *provided, however,* the Trustee Releasing Parties do not release or discharge the Creditor Released Parties from any claims, liabilities, demands, accounts, reckonings, or causes of action arising from, relating to, the Creditor Released Parties' obligations arising under this Agreement or the Stalking Horse APA and the other documents to be executed in connection therewith.

c) Entry of the 9019 Order shall constitute the Bankruptcy Court's approval of the releases included in this provision, which shall only become effective upon the Closing of any sale of the Collateral and receipt by the Trustee of the entire Carve-Out.  The Bankruptcy Court's entry of the 9019 Order shall constitute the Bankruptcy Court's finding that the foregoing release is: (a) in exchange for the good and valuable consideration provided by the Creditor Released Parties; (b) a good faith settlement and compromise of the claims and causes of action released by the Trustee and Debtors' estates; (c) in the best interests of the Trustee, the Debtors, the Estates, and all holders of claims and interests against the estates in these Chapter 11 Cases; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Trustee and after due notice and opportunity for hearing; and (f) a bar to any of the Trustee, the Debtors, the post-effective date Debtors under any plan of reorganization (if any), or the Debtors' estates asserting any claim or cause of action hereby released.

d) Only those individuals and entities listed as named defendants in any of the Pending Litigation Matters may execute a Release Supplement to become an "Interested Party" if they so choose; *provided however*, contemporaneously with the execution of this Agreement, each of Shadron L. Stastney, Arthur Leonard Robert "Bob" Morton, Alastair Crawford, Patric Theune, SCBV, and SLS shall execute Release Supplements and without the fully executed Release Supplement from each of the individuals and entities set forth above, this Agreement shall be null and void and of no legal effect.  To become effective, such individuals or entities must execute the Release Supplement and deliver it to the Trustee and Hawk on or before ten (10) days prior to the entry of the 9019 Order.

8.   <u>Dismissal of Pending Litigation Matters</u>.

a) As of the date hereof, the Debtors are party to the Pending Litigation Matters, including but not limited to:

   i.   The 225 Action;

   ii.   The Adversary Proceeding;

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 177 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 9 of 25

       iii.    The District Court Action; and

       iv.    Any other pending litigation matters currently pending in any federal or state court (or analogous foreign jurisdiction), including, but not limited to, any actions pending in the Netherlands with respect to control of SCBV.

b) Upon the entry of the 9019 Order, the Pending Litigation Matters will be or will remain stayed indefinitely while the Parties pursue the consummation of the Sale.

c) On or within 14 calendar days of the Closing, the Trustee and/or Hawk as appropriate, shall obtain dismissal with prejudice of each of the Pending Litigation Matters.

9.    <u>Agreement Subject to Bankruptcy Court Approval</u>.  The Parties hereby agree and acknowledge that this Agreement remains subject to Bankruptcy Court approval under Federal Rule of Bankruptcy Procedure 9019, and this Agreement shall have no binding effect on any of the Parties until entry of an order approving it pursuant thereto (such an order, the "9019 Order").

10.    <u>Consent to Exclusive Jurisdiction of Bankruptcy Court</u>.  The Parties hereby agree that the Bankruptcy Court shall have exclusive jurisdiction to interpret and implement the terms of this Agreement.

11.    <u>Governing Law</u>.  This Agreement is to be governed by and construed in accordance with the laws of the State of Delaware without giving effect to the conflict of laws principles thereof.

12.    <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder shall survive the Closing.

13.    <u>No Admissions</u>.  It is understood by the Parties that this Agreement constitutes a compromise of potential, unresolved, and disputed claims. This Agreement, and the negotiation thereof, shall in no way constitute, be construed as, or be evidence of an admission or concession of any violation of any statute or law; of any fault, liability, or wrongdoing; or of any infirmity in the claims or defenses of the Parties with regard to any of the complaints, claims, allegations, or defenses asserted or that could have been asserted in the Action or in connection with the subject matter of this Agreement or the Action. This Agreement shall not be used, directly or indirectly, in any way, in litigation or other proceedings between the Parties, and this Agreement shall not be admissible as evidence in any legal proceeding between the Parties, other than in litigation or a proceeding to enforce the terms of this Agreement.

14.    <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 178 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 10 of 25

15.    <u>Complete Agreement</u>.  The Parties hereby represent and warrant that no promise or inducement not contained herein has been offered to them, that this Agreement constitutes the entire agreement between them related to the subject matter hereof, and supersedes all prior agreements, oral, or written, among the Parties with respect thereto. The Parties further represent that this Agreement is executed without any reliance upon any statement or representation by the other, their respective agents, representatives, or attorneys not set forth herein.

16.    <u>Effect of Breach</u>.

a)    In the event a breach of this Agreement by either Party, the non-breaching Party shall be entitled to terminate this Agreement in its entirety in its sole discretion and this Agreement shall be null and void; *provided, however,* that any documented and evidenced amounts actually advanced to fund SCBV in accordance with Section 6 hereof shall survive such termination remain an Allowed Secured Claim that is not subject to conversion under the Hawk Conversion Agreement or SLS Conversion Agreement.

b)    In the event this Agreement is terminated for any reason other than a breach by the Secured Creditors, (a) Section 2 of this Agreement shall remain in full force and effect, and the Secured Creditors shall have an Allowed Secured Claim as defined herein, and (b) the Carve-Out Advance shall be deemed an allowed administrative claim against the estate as of the date the Secured Creditors made the advance, subordinate to the allowed fees and expenses of the Chapter 11 Trustee and his retained professionals.  .

c)    In the event the Secured Creditors breach this Agreement, the Trustee shall be entitled to retain any portion of the Carve-Out previously received for the benefit of the Debtors' estates.

17.    <u>Amendment; Non-Waiver</u>.  This Agreement shall not be amended or modified except by a written amendment signed by each of the Parties, approved by the Bankruptcy Court, which writing expressly states that it is intended to be an amendment to or modification of this Agreement. No other writing, irrespective of its content, and no course of conduct will act as an amendment or modification of this Agreement. Any waiver by a Party of its rights hereunder shall be effective only if in writing, and no waiver shall be implied by a party's action(s) or inaction(s). No failure or delay on the part of any Party in the exercise of any right or privilege hereunder shall operate as a waiver thereof or of the exercise of any other right or privilege hereunder, nor shall any single or partial exercise of any such right or privilege preclude other or further exercise thereof or of any other right or privilege.

18.    <u>Successors and Assigns</u>.  The obligations and duties of the Parties under this Agreement may not be assigned or transferred absent written consent of each Party, unless specifically stated otherwise. This Agreement shall be binding upon the Parties and their respective affiliates, successors and assigns.

19.    <u>Severability</u>.  In the event that any provision of this Agreement should be held to be void, voidable, or unenforceable in a particular instance and such provision does not affect the

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 179 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 11 of 25

basis of the bargain of the Parties hereunder, such provision shall be severed in such instance, and the remaining portions hereof shall remain in full force and effect.  Furthermore, in lieu of such severed provision, there shall be added automatically in any such instance as a part of this Agreement, a provision as similar to the severed provision as may be possible and be legal, binding, and enforceable.

20.    <u>Cooperation/Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties and their attorneys, advisors, and other agents and professionals agree to cooperate in good faith to execute and deliver all other instruments and perform any acts, in addition to the matters herein specified, as may be appropriate or necessary from time to time, to effectuate and implement the terms of this Agreement. The Parties and their attorneys, advisors and other agents and professionals agree not to take any actions, either directly or indirectly through any other agent or party, reasonably calculated to frustrate implementation of this Agreement or otherwise impair the rights of any Party thereunder.

21.    <u>Multiple Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which constitute one and the same agreement. The signature pages from any counterpart may be appended to any other counterpart to assemble fully executed counterparts.  Counterparts of this Settlement Agreement also may be exchanged via electronic mail or facsimile, and an electronic, photocopied, or .pdf version of any Party's authorized signature shall be deemed to be an original signature for all purposes.

22.    <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

23.    <u>Interpretation and Rules of Construction</u>.  This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Parties were each represented by counsel during the negotiations, drafting, and execution of this Agreement.

*[Signature Pages to Follow]*

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 180 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 12 of 25

IN WITNESS WHEREOF, the parties hereto have caused this Sharing Agreement to be duly executed as of the date first written above.

WILLIAM A. HOMONY,
solely in his capacity as Chapter 11 Trustee
of the estates of Stream TV Networks, Inc. and
Technovative Media Inc.

By: _____

Printed Name: _William A. Homony_

Title: _Chapter 11 Trustee_


HAWK INVESTMENT HOLDINGS LIMITED,
a Guernsey holding company, as Collateral Agent

By: _____

Printed Name: _____

Title: _____


SEECUBIC, INC.,
a Delaware corporation, as Stalking Horse Bidder

By: _____

Printed Name: _____

Title: _____


*[Signature Page to Sharing Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Sharing Agreement to be duly executed as of the date first written above.

WILLIAM A. HOMONY,
solely in his capacity as Chapter 11 Trustee
of the estates of Stream TV Networks, Inc. and
Technovative Media Inc.

By: _____

Printed Name: _____

Title: _____


HAWK INVESTMENT HOLDINGS LIMITED,
a Guernsey holding company, as Collateral Agent

By: _____
                    *AUTHORISED SIGNATORIES*

Printed Name: *FOR : ALBANY DIRECTORS LIMITED*

Title: *DIRECTOR .*


SEECUBIC, INC.,
a Delaware corporation, as Stalking Horse Bidder

By: _____

Printed Name: _____

Title: _____


*[Signature Page to Sharing Agreement]*

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 182 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 14 of 25

IN WITNESS WHEREOF, the parties hereto have caused this Sharing Agreement to be duly executed as of the date first written above.

WILLIAM A. HOMONY,
solely in his capacity as Chapter 11 Trustee
of the estates of Stream TV Networks, Inc. and
Technovative Media Inc.

By: _____

Printed Name: _____

Title: _____

HAWK INVESTMENT HOLDINGS LIMITED,
a Guernsey holding company, as Collateral Agent

By: _____

Printed Name: _____

Title: _____

SEECUBIC, INC.,
a Delaware corporation, as Stalking Horse Bidder

By: _____

Printed Name:  Shad L. Stastney

Title:  Chairman and CEO

*[Signature Page to Sharing Agreement]*

**TA-177**

## **Annex**

### Release Supplement

This RELEASE SUPPLEMENT (the "Release Supplement") to the Sharing and Carve-Out Agreement, dated as of _____, 2024 (as may be amended, supplemented, restated, or otherwise modified from time to time, the "Sharing Agreement"), by and among (a) William A. Homony, solely in his capacity as the Chapter 11 Trustee of the bankruptcy estates of Stream TV Networks, Inc. and Technovative Media Inc., and (b) Hawk Investment Holdings, Ltd. and SeeCubic Inc., is executed and delivered by the party executing the signature page hereto (the "Interested Party") and shall be effective only upon the satisfaction of the conditions precedent as set forth in the Sharing Agreement. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Sharing Agreement.

1.   <u>Agreement to Release</u>. The Interested Party hereby affirmatively opts into the Sharing Agreement solely with respect to granting and obtaining the Releases, in its/his/her individual capacity and including the Interested Party's respective partners, general partners, limited partners, affiliates, parents, subsidiaries, predecessors, successors, and all of the foregoing entities' current and former officers, directors, managers, managing directors, equity holders, investors, beneficiaries, employees, agents, attorneys, advisors, insurers and reinsurers, as set forth in Section **[7]** of the Sharing Agreement, which is incorporated herein by reference in its entirety.

2.   <u>Representations and Warranties</u>. The Interested Party hereby represents and warrants that it has full authority to enter into this Release Supplement and no material consent or approval of, or any registration or filing with, any other person or entity is required for it to do so.

3.   <u>Representation by Counsel</u>. The Interested Party hereby acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with execution this Release Supplement and the releases contemplated hereby, and it is no relying on the statement or representation of any of the Parties to the Sharing Agreement (or their counsel) in exercising its/his/her right to execute this Release Supplement.

4.   <u>Reservation of Rights; Non-Consent to Jurisdiction</u>. Nothing herein shall be deemed or construed as (a) a waiver or release of any claim or right by the Interested Party other than as expressly set forth herein and in Section **[7]** of the Sharing Agreement, (b) a consent by the Interested Party to the jurisdiction of any court within the United States or abroad, or (c) an election of remedies or choice of law.

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

***Signature Block for Individuals:***

Signature: _____ Li. deenvoi _____

Printed Name: ARTHUR LEONARD ROBERT MORTON

Date: 2nd May 2024

***Signature Block for Entities:***

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

318513638.2

**TA-179**

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

***Signature Block for Individuals:***

Signature: _____

Printed Name: ___Asaf Gola_____

Date: ___5/02/24_____

***Signature Block for Entities:***

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

318513638.2

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 187 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 19 of 25

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

**Signature Block for Individuals:**

Signature: _____

Printed Name: KEVIN JOHN GOLLOP

Date: 05-02-2024.

**Signature Block for Entities:**

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

318513638.2

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 188 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 20 of 25

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

### *Signature Block for Individuals:*

Signature:

Printed Name:  Patrick Miles

Date:   2nd May 2024

### *Signature Block for Entities:*

Entity Name:

Jurisdiction:

Signature:

Name:

Title:

Date:

*[Signature Page to Release Supplement to Sharing Agreement]*

318513638.2

**TA-183**

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 189 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 21 of 25

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

### *Signature Block for Individuals:*

Signature: _____

Printed Name: _____

Date: _____

### *Signature Block for Entities:*

Entity Name: ___SeeCubic BV___

Jurisdiction: ___Netherlands___

Signature: ___[signature]___

Name: ___Shad L. Stastney___

Title: ___Director A___

Date: ___30 April 2024___

*[Signature Page to Release Supplement to Sharing Agreement]*

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 190 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 22 of 25

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

*Signature Block for Individuals:*

Signature: _____

Printed Name: Shad L. Stastney

Date: April 30, 2024

*Signature Block for Entities:*

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 191 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 23 of 25

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

### *Signature Block for Individuals:*

Signature: _____

Printed Name: _____

Date: _____

### *Signature Block for Entities:*

Entity Name: SLS Holdings VI, LLC

Jurisdiction: Delaware

Signature: *[signature]*

Name: Shad L. Stastney

Title: Managing Member

Date: April 30, 2024

*[Signature Page to Release Supplement to Sharing Agreement]*

**TA-186**

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 192 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 24 of 25

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

### *Signature Block for Individuals:*

Signature: _____

Printed Name: Patric Theune_____

Date: 1 May 2024_____

### *Signature Block for Entities:*

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 193 of 341

Case 23-10763-amc    Doc 630-1    Filed 05/06/24    Entered 05/06/24 16:51:04    Desc
Exhibit A    Sharing and Carve-Out Agreement    Page 25 of 25

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

### Signature Block for Individuals:

Signature: _____

Printed Name: KRZYSZTOF KABACINSKI

Date: MAY 02, 2024

### Signature Block for Entities:

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)[1]** |
|  | : |  |

**ORDER**

**AND NOW,** upon consideration of the Motion of William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" or in conjunction with Stream, the "Debtors"), for Entry of an Order Approving a Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic"), Pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) (the "Motion");[2] and the Court having jurisdiction to consider the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the required and necessary parties; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

4875-7966-5596 v1
318450713.5

Court having determined that the relief requested is in the best interests of the Debtors, their estates, creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor; it is hereby **ORDERED** that:

1.      The Motion is **GRANTED**.

2.      The Agreement is **APPROVED**, subject to the conditions and requirements for effectiveness set forth therein.

3.      All objections to the Motion have been considered and are hereby overruled.

4.      The Settlement represents a valid exercise of the Trustee's business judgment, having been informed by extensive research, investigation, and negotiation by the Trustee and other parties in interests.

5.      Upon the entry of this Order, the proof of claim of Hawk Investment Holdings Ltd. [Claim No. 6 on the official claims docket of Stream] shall be deemed allowed in the amount of $180 million (subject to increase as set forth in the Agreement) with no further order of the Bankruptcy Court necessary to effectuate the same.

6.      Upon the entry of this Order, the proofs of claim of SLS Holdings VI, LLC [Claim No. 9 on the official claims docket of Stream and Claim No. 2 on the official claims docket of TMI] and the proofs of claim of SeeCubic, Inc. [Claim No. 14 on the official claims docket of Stream and Claim No. 3 on the official claims docket of TMI] shall be deemed withdrawn of record with no further order of the Bankruptcy Court necessary to effectuate such withdrawal and SLS Holdings VI, LLC and SeeCubic, Inc. shall not have an allowed claim against the bankruptcy estates of the Debtors.

7.      The Settlement and Agreement are in the best interest of the Debtors' estates and all of the Debtors' stakeholders.

2

8.      The Parties are authorized to take all actions necessary to effectuate and consummate the Agreement including, without limitation, the execution and delivery of any documents, agreements, or other instruments.

9.      This Order and the Agreement shall be binding on the Parties, the Debtors' estates, all creditors and parties-in-interest, and any trustee or plan administrator appointed in this case.

10.     Notice of the Motion as provided therein shall be deemed good and sufficient notice, service was proper and parties in interest were afforded adequate opportunity to file opposition to the Motion and appear at the Hearing, and the requirements of the Federal Rules of Bankruptcy Procedure and Local Rules of Bankruptcy Procedure are satisfied by such notice.

11.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order and consummation of the Agreement.

**BY THE COURT:**

Date: _____            _____
                                HONORABLE ASHELY M. CHAN,
                                UNITED STATES BANKRUPTCY JUDGE

3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.,** *et al*. | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

### CERTIFICATE OF SERVICE

I, Michael D. Vagnoni, Esquire, do hereby certify that on the 6th day of May, 2024 a copy of the Motion for Entry of an Order Approving a Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic") Pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) (the "Motion") Pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) and Notice of Motion, Response Deadline and Hearing Date were served upon the parties on the attached list in the manner indicated thereon.

> */s/ Michael D. Vagnoni*
> Edmond M. George, Esquire
> Michael D. Vagnoni, Esquire
> Obermayer Rebmann Maxwell & Hippel LLP
> Centre Square West
> 1500 Market Street, Suite 3400
> Philadelphia, PA  19102
> Telephone: (215) 665-3066
> Facsimile: (215) 665-3165
> E-mail addresses:
> edmond.george@obertmayer.com
> michael.vagnoni@obermayer.com
> *Counsel to William Homony, Chapter 11 Trustee*

Dated: May 6, 2024

4875-7966-5596 v1
318450713.5

**TA-192**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)**[1] |
|  | : |  |

**PRAECIPE TO SUBSTITUTE EXHIBIT "B" TO MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR (I) AN ORDER (A) APPROVING THE BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) ESTABLISHING THE NOTICE PROCEDURES AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND SCHEDULING A SALE BY AUCTION, (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULING A SALE HEARING, (E) GRANTING EXPEDITED CONSIDERATION PURSUANT TO LOCAL RULE OF BANKRUPTCY PROCEDURE 5070-1(g), AND (F) GRANTING RELATED RELIEF, AND (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF**

TO THE CLERK OF BANKRUPTCY COURT:

Kindly substitute the attached for Exhibit "B" – The Placeholder for the Asset Purchase Agreement to the Motion of William A. Homony in His Capacity as Chapter 11 Trustee for (I) an Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially all of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling a Sale by Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.* Case No. 23-10764 (AMC) (D.I. #81).

Rule of Bankruptcy Procedure 5070-1(g), and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief, which was filed with the Court on September 30, 2024, at Docket No. 750, in the above-captioned matter.


Dated:  November 11, 2024         By: */s/ Michael D. Vagnoni*
                                 Edmond M. George, Esquire
                                 Michael D. Vagnoni, Esquire (*pro hac vice*)
                                 OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
                                 Centre Square West
                                 1500 Market Street, Suite 3400
                                 Philadelphia., PA 19102
                                 Telephone: (215) 665-3066
                                 Facsimile: (215) 665-3165
                                 E-mail:  edmond.george@obermayer.com
                                         michael.vagnoni@obermayer.com

                                 *Counsel to William A. Homony Chapter 11 Trustee*

4864-4811-3144 v1

# EXHIBIT "B"

**ASSET PURCHASE AGREEMENT**

by and among

**STREAM TV NETWORKS, INC.,**

and

**TECHNOVATIVE MEDIA INC.,**

as Sellers,

and

**SEECUBIC, INC.,**

as Buyer

Dated as of November [  ], 2024

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...................................................................................................3
    Section 1.1    Certain Defined Terms...........................................................3
    Section 1.2    Other Definitions ...................................................................11

ARTICLE II PURCHASE AND SALE ...............................................................................12
    Section 2.1    Purchase and Sale of Transferred Assets ..............................12
    Section 2.2    Excluded Assets .....................................................................15
    Section 2.3    Assumed Liabilities...............................................................16
    Section 2.4    Excluded Liabilities ...............................................................17
    Section 2.5    Seller Maintained Transferred Assets....................................18
    Section 2.6    Consideration .........................................................................19
    Section 2.7    Closing ...................................................................................19
    Section 2.8    Tax Allocation .......................................................................20
    Section 2.9    Withholding ...........................................................................20

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER ......................21
    Section 3.1    Organization...........................................................................21
    Section 3.2    Authority................................................................................21
    Section 3.3    No Conflict; Filings and Consents.........................................21
    Section 3.4    Transferred Assets .................................................................23
    Section 3.5    Brokers...................................................................................23
    Section 3.6    Exclusivity of Representations and Warranties .....................23

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER..............................24
    Section 4.1    Organization...........................................................................24
    Section 4.2    Authority................................................................................24
    Section 4.3    No Conflict; Filings and Consents.........................................24
    Section 4.4    No Third Party Intellectual Property Rights ..........................25
    Section 4.5    Brokers...................................................................................26
    Section 4.5    Exclusivity of Representations and Warranties .....................26

ARTICLE V COVENANTS..................................................................................................26
    Section 5.1    Conduct of Business Prior to the Closing...............................26
    Section 5.2    Access to Information.............................................................27
    Section 5.3    Notification of Certain Matters...............................................28
    Section 5.4    Consents and Filings; Further Assurances..............................28
    Section 5.5    Refunds and Remittances.......................................................29
    Section 5.6    No Successor Liability............................................................29
    Section 5.7    Sale Free and Clear................................................................29

Section 5.8     Bankruptcy Court Milestones; Alternative Transactions............................30
Section 5.9     Intellectual Property Registrations.............................................................31
Section 5.10    Name Change ............................................................................................31

ARTICLE VI TAX MATTERS...................................................................................................32

Section 6.1     Transfer Taxes ..........................................................................................32
Section 6.2     Tax Cooperation.........................................................................................32
Section 6.3     Straddle Periods........................................................................................32
Section 6.4     Tax Treatment ...........................................................................................34
Section 6.5     Tax Elections .............................................................................................34
Section 6.6     Bulk Sales..................................................................................................34

ARTICLE VII CONDITIONS TO THE CLOSING ...................................................................35

Section 7.1     Mutual Conditions ......................................................................................35
Section 7.2     Conditions to Obligations of Sellers..........................................................35
Section 7.3     Conditions to Obligations of Buyer ............................................................35

ARTICLE VIII TERMINATION .................................................................................................36

Section 8.1     Termination Rights .....................................................................................36
Section 8.2     Effect and Manner of Termination .............................................................37

ARTICLE IX GENERAL PROVISIONS ...................................................................................38

Section 9.1     Nonsurvival of Representations, Warranties and Covenants.....................38
Section 9.2     Indemnification ……………………………………………………………………38
Section 9.2     Fees and Expenses ...................................................................................38
Section 9.3     Transition of Permits..................................................................................38
Section 9.4     Amendment and Modification ....................................................................38
Section 9.5     Waiver........................................................................................................38
Section 9.6     Notices.......................................................................................................39
Section 9.7     Interpretation..............................................................................................40
Section 9.8     Entire Agreement .......................................................................................41
Section 9.9     Parties in Interest.......................................................................................41
Section 9.10    Governing Law ...........................................................................................41
Section 9.11    Submission to Jurisdiction; Waiver of Jury Trial .......................................42
Section 9.12    No Recourse...............................................................................................42
Section 9.13    Assignment; Successors............................................................................42
Section 9.14    Enforcement...............................................................................................43
Section 9.15    Severability ................................................................................................43
Section 9.16    Counterparts...............................................................................................43
Section 9.17    Publicity......................................................................................................43

**Exhibits**

Exhibit A       Form of Sale Order

ii

Exhibit B      Form of Bid Procedures Order
Exhibit C      Form of Assignment Agreement
Exhibit D      Form of IP Assignment Agreement
Exhibit E      Form of Domain Transfer Agreement

**Schedules**

Schedule A      Disclosure Schedules

iii

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT**, dated as of November [●], 2024 (this "Agreement"), is by and among Stream TV Networks, Inc., a Delaware corporation ("Stream"), Technovative Media Inc., a Delaware corporation ("Technovative" and, together with Stream, the "Debtors" or "Sellers"), by and through William A. Homony, solely in his capacity as Chapter 11 trustee of the bankruptcy estates of Stream and Technovative (the "Trustee") and not individually, and SeeCubic, Inc., a Delaware corporation, or its designee ("SeeCubic" or "Buyer" and, together with Sellers, the "Parties").

## RECITALS

WHEREAS, on March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code commencing cases that are being jointly administered under Case No. 23-10763 (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on March 20, 2023, Hawk Investment Holdings, Ltd. ("Hawk") filed a motion for relief from the automatic stay (the "Hawk Stay Relief Motion") to proceed with an action against the Debtors in the Delaware Court of Chancery (the "Delaware Chancery Court") under § 225 of Title 8 of the Delaware Code (the "225 Action");

WHEREAS, on April 6, 2023, Hawk, as Collateral Agent for the secured noteholders of SeeCubic, filed a motion pursuant to sections 1112/1104 of the Bankruptcy Code, seeking dismissal or conversion of the Bankruptcy Cases, or, alternatively, the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code (the "1112/1104 Motion");

WHEREAS, on May 19, 2023, Hawk filed proof of claim No. 6-1 on the Official Proof of Claim Docket (the "Hawk Claim") asserting a claim secured by substantially all of the Debtor's property (the "Collateral") and asserting the Debtors were indebted to SeeCubic in at least the amount of $178,432,069.68, subject to additional accruing interest, fees, and expenses;

WHEREAS, in the 1112/1104 Motion, Hawk argued that cause existed to appoint a trustee based upon the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of their businesses;

WHEREAS, on January 5, 2024 (the "Appointment Date"), the Bankruptcy Court entered an order, which, among other things, (i) granted the 1112/1104 Motion solely with respect to the appointment of a Chapter 11 trustee, and (ii) granted the Hawk Stay Relief Motion to allow the Section 225 Action to proceed [Docket No. 549] (the "Trustee Order");

WHEREAS, the Trustee Order instructed the United States Trustee's Office to immediately begin the process of appointing a Chapter 11 trustee;

WHEREAS, on January 9, 2024, the Office of the United States Trustee filed a notice of appointment of William A. Homony to serve as the Chapter 11 trustee as well as an application for the entry of an Order approving the appointment of the Trustee;

WHEREAS the Trustee has, since the Appointment Date, been performing the duties of a trustee for the Debtors in accordance with Section 1106 and the applicable provisions of Section 704 of the Bankruptcy Code;

WHEREAS, on January 12, 2024, the Bankruptcy Court entered an Order Approving the Appointment of the Trustee and the Trustee accepted such appointment;

WHEREAS, pursuant to Sections 105, 1106, and 1108 of the Bankruptcy Code and Bankruptcy Rule 9019, the Trustee may operate the Debtors' businesses and file a motion seeking approval of a compromise or settlement;

WHEREAS, on May 6, 2024, the Trustee filed a motion under Bankruptcy Rule 9019 and section 105 of the Bankruptcy Code (the "Settlement Motion") seeking entry of an order approving that certain Sharing and Carve-Out Agreement, dated May 6, 2024, by and between Trustee, Buyer, Hawk, in its capacity as collateral agent for the secured noteholders of Buyer and certain other parties thereto, Case 23-10763, Doc 630-1 (the "Settlement Agreement"), pursuant to which, Trustee shall, among other things, use his best efforts to consummate a "as-is-where-is" sale of the Collateral by auction, if needed under the Bid Procedures, under Section 363 of the Bankruptcy Code and the Trustee shall endeavor to close by August 2, 2024;

WHEREAS, on June 5, 2024, the Bankruptcy Court entered an order granting the Settlement Motion, approving the Settlement Agreement, and authorizing the Trustee's entry into the Settlement Agreement and certain Carve-Out Advance payments have been made thereunder;

WHEREAS, the Settlement Agreement provides, among other things, that, the Buyer shall act as the Stalking Horse Bidder (as defined in the Settlement Agreement), and the Hawk Claim shall be deemed an allowed, secured claim, secured by the Collateral in the amount of $180,000,000, subject to increase as provided herein (the "Allowed Secured Claim");

WHEREAS, the Settlement Agreement further provides, among other things, that, the stalking horse bid ("Stalking Horse Bid") shall consist of a credit bid by SeeCubic of the Allowed Secured Claim in the amount of $150,000,000 (the "Credit Bid Amount");

WHEREAS, Trustee believes, after consultation with his professionals and consideration of available alternatives, that, in light of the current circumstances, that entering into an agreement for the Stalking Horse Bid for the sale of the Debtors' right, title, and interest, if any, in substantially all of the Debtors' assets, on an "as is, where is" basis as provided herein, is necessary to preserve and maximize value and is in the best interest of the Debtors, and their respective estates;

WHEREAS, Sellers desire to sell to Buyer (or any Designated Buyers) all of the Transferred Assets, and Buyer (or any such Designated Buyers) desires to purchase from Sellers the Transferred Assets, other than the Excluded Assets, free and clear of any and all Encumbrances, on the terms and subject to the conditions hereof, on an "as is, where is" basis, without any warranty of any kind, express or implied, including as to merchantability or fitness for a particular purpose, as further set forth in Section 3.6;

WHEREAS, the execution and delivery hereof and Sellers' ability to consummate the transactions contemplated hereby are subject to, among other things, the Bankruptcy Court's entry of the Sale Order under, among others, Sections 105, 363, and 365 of the Bankruptcy Code, as further set forth herein;

WHEREAS, the Parties desire to consummate the transactions contemplated hereby as promptly as practicable after the Bankruptcy Court enters the Sale Order; and

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements hereunder, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    <u>Certain Defined Terms</u>. As used herein, each of the following underlined terms has the meaning specified in this <u>Section 1.1</u>:

"<u>Action</u>" means any action, arbitration, audit, charge, claim, complaint, demand, dispute, investigation, notice of violation, legal proceeding, litigation or similar proceeding (whether civil, criminal, administrative, arbitral or investigative), petition, subpoena or suit, by or before any Governmental Authority relating to the Transferred Assets.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"<u>Affiliate Claim</u>" means any General Claim held, owned, or assertible by or on behalf of any the Debtors or either or both of the Debtor's estates against Buyer or any other Affiliate of any Seller.

"<u>Alternative Sale Action</u>" means (i) accepting or entering into any contract, agreement, arrangement or understanding (whether or not legally binding) with any Person relating to, or that would be reasonably expected to lead to, an Alternative Transaction or (ii) committing to (conditionally or otherwise) enter into or consummate any Alternative Transaction.

"<u>Alternative Transaction</u>" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, consolidation or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of a material portion of Sellers' assets, in a transaction or series of transactions with one (1) or more Persons other than Buyer (or any Designated Buyer), in each case, except as set forth in the Bid Procedures.

"<u>Ancillary Agreements</u>" means, collectively, the Contracts to be executed in connection with the transactions contemplated hereby, including the Assignment Agreement, the IP Assignment Agreement, the Domain Transfer Agreement, and the Settlement Agreement.

"<u>Antitrust Law</u>" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions have the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated hereby.

"<u>Auction</u>" has the meaning set forth in the Bid Procedures.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, Sections 101 et seq., as in effect or as may be amended from time to time.

"<u>Bid Procedures</u>" means the bidding procedures set forth and approved in the Bid Procedures Order, as entered by the Bankruptcy Court.

"<u>Bid Procedures Hearing</u>" means the hearing conducted by the Bankruptcy Court to approve the Bid Procedures Order.

"<u>Bid Procedures Order</u>" means an Order of the Bankruptcy Court approving the Bid Procedures, substantially in the form of <u>Exhibit B</u>, with such changes as may be required by the Bankruptcy Court that are in form and substance acceptable to Buyer.

"<u>Books and Records</u>" means all documents of, or otherwise in the possession, custody or control of, or used by, any Seller and turned over to the Trustee, including all files, instruments, papers, books, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, lists of past, present and/or prospective customers, supplier lists, regulatory filings, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), data, reports (including environmental reports and assessments), plans, mailing lists, price lists, marketing information and procedures, advertising and promotional materials, books and records and papers relating to Taxes (including Tax Returns), equipment records, warranty information, architects agreements, construction contracts, drawings, plans and specifications, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information), in each case, whether or not in electronic form.

"<u>Business</u>" means any business conducted by the Debtors or any of their Subsidiaries.

"<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by applicable Law to be closed in the city of New York, New York.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 209 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 10 of 49

"<u>Buyer Material Adverse Effect</u>" means with respect to the Transferred Assets, any event, change, circumstance, development, effect, occurrence that would prevent, or materially impede Buyer's consummation of the transactions contemplated hereby or by the Ancillary Agreements.

"<u>Claim</u>" shall have the meaning ascribed to such term under Section 101(5) of the Bankruptcy Code.

"<u>Code</u>" means the Internal Revenue Code of 1986.

"<u>Contract</u>" means any written or oral contract, agreement, insurance policy, lease, license, sublicense, sales order, purchase order, instrument, indenture, note, bond or other evidence of indebtedness, or other commitment, that is binding on any Person or any part of its assets or properties under applicable Law.

"<u>Controlled Group Liability</u>" means any and all Liabilities of Sellers and their ERISA Affiliates, if any (i) under Title IV of ERISA, (ii) under Section 302 of ERISA, (iii) under Sections 412 or 4971 of the Code, (iv) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code, (v) under any a "multiemployer plan," as defined in Section 3(37) or 40001(a)(3) of ERISA, or (vi) under corresponding or similar provisions of non-U.S. Laws.

"<u>Designated Buyer</u>" means any Affiliate of Buyer designated by Buyer to Sellers at least seven (7) Business Days prior to the Closing Date.

"<u>Employee Benefit Plans</u>" if any such plan or plans exist, means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which Stream is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other employment, consulting or other individual agreement, plan, practice, policy, contract, program and arrangement, in each case, (1) which is sponsored or maintained by Stream or any of its ERISA Affiliates, if any in respect of any current or former employees, directors, independent contractors, consultants or leased employees of Stream or (2) with respect to which Stream has any actual or contingent Liability.

"<u>Encumbrance</u>" means any lien, pledge, Claim, interest, encumbrance, right, Liability, security interest, mortgage, deed of trust, hypothecation, preference, debt, suit, license, option, right of first refusal, right of way, encroachment, occupancy right, preemptive right, community property interest, easement, and judgment, order, and decree of any court, tax (including foreign, state, and local tax), covenant, and restriction of any nature, against any Person or its assets, including, without limitation, any debt arising under or out of, in connection with, or in any way relating to, any act or omissions, obligation, demand, guarantee, de facto

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 210 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 11 of 49

merger claim, cause of action (whether in law or in equity, under any law), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases or the facts and legal theories giving rise thereto or asserted therein, whether known or unknown, contingent, or matured, perfected or unperfected, liquidated, or unliquidated, statutory or non-statutory, legal, or equitable, or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Transferred Assets, the operation of any of the Debtors' businesses before the effective time of the Closing.

"Environmental Law" means any Law related to pollution, the protection of, restoration or remediation of or prevention of harm to the environment or natural resources, or the protection of human health and safety, ecological planning or zoning including Laws related to: (i) the exposure to Hazardous Materials, (ii) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Materials or (iii) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means all employers, trades or businesses (whether or not incorporated) that would be treated together with Sellers as a single employer for purposes of Section 4001 of ERISA or Section 414 of the Code.

"Excluded Assets" means those Assets reasonably identified in Section 2.2 hereof and listed in Section 2.2(k) of the Disclosure Schedules.

"Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction (i) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (ii) if a timely appeal shall have been filed or sought, either (1) no stay of the Order shall be in effect, (2) no motion or application for a stay of the Order shall be filed and pending or such motion or application shall have been denied or (3) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court Order or timely motion to seek review or rehearing of such Order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that Buyer in its sole discretion may treat any Order for which a motion or application for a stay is filed or pending as a Final Order by affirmatively agreeing to such treatment in a writing signed by Buyer.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 211 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 12 of 49

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Governmental Authority" means any government, court (including the Bankruptcy Court), regulatory or administrative agency, commission or authority or other governmental instrumentality, whether federal, state or local, domestic, non-U.S. or multinational, or any contractor acting on behalf of such agency, commission, authority or governmental instrumentality.

"Hazardous Materials" means any material, substance, chemical or waste (or combination thereof) that (i) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Law related to pollution, waste, or the environment or (ii) can form the basis of any Liability under any Law related to pollution, waste or the environment.

"Intellectual Property" means all intellectual property and intellectual property rights and rights in confidential information of every kind and description throughout the world, including all U.S. and non-U.S (i) trade names, trademarks and service marks, business names, corporate names, domain names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("Trademarks"), (ii) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions and extensions thereof ("Patents"), (iii) copyrights and copyrightable subject matter (whether registered or unregistered) ("Copyrights"), (iv) rights in computer programs (whether in source code, object code or other form) and software systems, algorithms, databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing ("Software"), (v) confidential or proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies, (vi) rights of publicity, privacy rights, and rights to personal information, (vii) all rights in the foregoing and in other similar intangible assets, (viii) all applications and registrations for any of the foregoing and (ix) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation related to any of the foregoing.

"IRS" means the Internal Revenue Service of the United States.

"Law" means any laws (statutory, common or otherwise), constitutions, treaties, conventions, ordinances, codes, rules, regulations, Orders or other similar requirements enacted, adopted, promulgated or applied by a Governmental Authority.

"Lease" means with respect to the Transferred Assets, a lease, sublease, sub-sublease, license, or purchase option with respect to any Asset to which a Seller is a party as lessee, sublessee, sub-sublessee, option holder or other similar capacity.

"Leased Real Property" means each parcel of real property subject to a Lease.

"Liability" means any assessment, Claim of any kind or nature, commitment, damage, deficiency, demand, fine, interest, liability (including any indebtedness), obligation,

7

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 212 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 13 of 49

penalty, loss, charges, damages, Orders, cost or expenses, in each case, whether accrued, absolute, contingent or otherwise, known or unknown, or due or to become due, and whether or not required to be recorded or reflected on a balance sheet under GAAP.

"Material Adverse Effect" means with respect to the Transferred Assets, any event, change, or occurrence or state of facts that, individually or in the aggregate, (i) has had, or would reasonably be expected to have, a material adverse effect on the Transferred Assets, each taken as a whole, or (ii) prevents, or materially impedes Sellers' consummation of the transactions contemplated hereby or by the Ancillary Agreements; provided that, in the case of the foregoing clause (i), any event, change, circumstance, development, effect, occurrence or state of facts arising from any of the following shall not be a Material Adverse Effect and shall not be considered in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur:

(1)    general changes or developments in the industry in which the Business operates;

(2)    changes in general economic, financial market or geopolitical conditions;

(3)    natural disasters, acts of terrorism, sabotages, military actions or wars;

(4)    changes in any applicable Laws or GAAP or interpretations thereof;

(5)    the announcement, pendency or consummation of the transactions contemplated hereby;

(6)    the filing of the Bankruptcy Cases and any actions approved by the Bankruptcy Court;

(7)    any action taken by Sellers which is required hereby (except for compliance with Section 5.1); or

(8)    changes with respect to the identification of the Transferred Assets.

"Order" means any judgment, decree, injunction, rule, order, decision, decree, ruling, settlement, mediation agreement, arbitration decision, corporate integrity agreement or assessment of any arbitrator or Governmental Authority.

"Permit" means any franchise, grant, authorization, business license, permit, easement, variance, exception, consent, certificate, approval, registration, clearance, order or provider number issued or granted by any Governmental Authority or pursuant to any applicable Law.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 213 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 14 of 49

"<u>Representatives</u>" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"<u>Retained Causes of Action</u>" means Actions that are Excluded Assets that arise under the Bankruptcy Code, as provided in Section 2.2(e), or applicable state law, including but not limited to the Chapter 5 Causes of Action and any Action(s) against third parties, including but not limited to, the Debtors' principals (including but not limited to Mathu Rajan), officers, directors, stockholders, agents, employees, or affiliates and any Action(s) against any entity owned or controlled by the Debtors' principals, officers, directors, stockholders, agents, employees, or affiliates. For the avoidance of doubt, Retained Causes of Action shall not include any Actions, Claims or Causes of Actions that have been released or waived under the Settlement Agreement.

"<u>Required Approvals</u>" means any Consent, whether from any Governmental Authority or Contract counterparty, that Buyer determines (and communicates in writing to Sellers) is required in connection with the transactions contemplated hereby following the Closing.

"<u>Sale Hearing</u>" means the hearing conducted by the Bankruptcy Court to approve the Sale Order and the transactions contemplated hereby.

"<u>Sale Motion</u>" means a motion filed with the Bankruptcy Court seeking, among other things, approval of the Bidding Procedures Order and the Sale Order, which shall be in form and substance acceptable to Buyer in its sole discretion.

"<u>Sale Order</u>" means an Order of the Bankruptcy Court substantially in the form of <u>Exhibit A</u>, with such changes as may be required by the Bankruptcy Court that are in form and substance acceptable to Buyer in its sole and absolute discretion.

"<u>Seller Benefit Plan</u>" means each Employee Benefit Plan that is solely sponsored or maintained by Stream.

"<u>Subsidiary</u>" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

"<u>Successful Bidder</u>" shall have the meaning set forth in the Bid Procedures Order.

"<u>Tax Return</u>" means any return, document, declaration, report, claim for refund, statement, information statement or other information or filing related to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 214 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 15 of 49

"Tax" or "Taxes" means (i) any and all U.S. federal, state and local, non-U.S. and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, withholding, payroll, employment, pension plan, social security, fringe, fringe benefits, health, disability, excise, estimated, severance, stamp, occupation, premium, property, capital stock, unclaimed property, escheat, inventory, windfall profits, wealth, net wealth, net worth, export and import fees and charges, registration fees, tonnage, vessel, deposits, alternative or add-on minimum or estimated taxes, fees, assessments, customs, duties, levies, tariffs, imposts, tolls or charges imposed by any Governmental Authority, together with any interest, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed with respect thereto, or related thereto, wherever and whenever imposed, (ii) any and all liability for the payment of any items described in clause (i) above arising from, through, with respect to or attributable to, a place of business, permanent establishment or a branch, or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary or other similar group (or being included) in any Tax Return related to such group, (iii) any and all liability for the payment of any amounts as a result of any successor or transferee liability, in respect of any items described in clause (i) or (ii) above and (iv) any and all liability for the payment of any items described in clause (i) or (ii) above as a result of, or with respect to, any express or implied obligation to indemnify any other Person pursuant to any tax sharing, tax indemnity or tax allocation agreement or similar agreement or arrangement with respect to taxes.

"Third Party" means any Person who is not a Party or an Affiliate thereof.

Section 1.2    Other Definitions. As used herein, each capitalized term listed below has the meaning identified in the Section set forth opposite such term below.

1112/1104 Motion................................................................Recitals
225 Action..........................................................................Recitals
245A Election .....................................................................Section 6.5(a)(ii)
245A Election Agreement....................................................Section 6.5(a)(ii)
245A Subsidiary..................................................................Section 6.5(a)(i)
Acquired Subsidiaries .........................................................Section 2.1(c)
Agreement...........................................................................Preamble
Allocation............................................................................Section 2.8
Allocation Statement...........................................................Section 2.8
Allowed Secured Claim .......................................................Recitals
Assignment Agreement........................................................Section 2.7(b)(i)
Bankruptcy and Equitable Exceptions ..................................Section 3.2
Bankruptcy Cases................................................................Recitals
Bankruptcy Court.................................................................Recitals
Buyer...................................................................................Preamble
Carve-Out............................................................................Recitals
Closing.................................................................................Section 2.7(a)
Closing Date........................................................................Section 2.7(a)
Collateral.............................................................................Recitals
Consent ...............................................................................Section 3.3(b)

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 215 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 16 of 49

Credit Bid Amount ................................................................Recitals
Debtors ................................................................................Preamble
Delaware Chancery Court ....................................................Recitals
Disclosure Schedules ...........................................................Article III
Domain Transfer Agreement ...............................................Section 2.7(b)(ii)
End Date ..............................................................................Section 8.1(c)(i)
Excluded Assets ..................................................................Section 2.2
Excluded Liabilities ............................................................Section 2.4
Filing ...................................................................................Section 3.3(b)
General Claims ....................................................................Section 2.1(b)(i)
Governed Claims .................................................................Section 9.10
Hawk ...................................................................................Recitals
Hawk Claim .........................................................................Recitals
Hawk Stay Relief Motion ....................................................Recitals
Inventory .............................................................................Section 2.1(a)(xiv)
IP Assignment Agreement ...................................................Section 2.7(b)(ii)
Legal Restraint ....................................................................Section 7.1(a)
Milestones ...........................................................................Section 5.8(b)
Non-Periodic Taxes .............................................................Section 6.3
Parties ..................................................................................Preamble
Periodic Taxes .....................................................................Section 6.3
Petition Date ........................................................................Recitals
Purchase Price .....................................................................Section 2.6
Rembrandt ...........................................................................Section 2.2(k)
SeeCubic .............................................................................Preamble
Seller Maintained Transferred Asset ...................................Section 2.5(a)
Sellers ..................................................................................Preamble
Settlement Agreement ..........................................................Recitals
Settlement Motion ...............................................................Recitals
Specified Consents ..............................................................Section 3.3(b)(ii)
Specified Filings .................................................................Section 3.3(b)(ii)
Straddle Period ....................................................................Section 6.3
Stream .................................................................................Preamble
Technovative .......................................................................Preamble
Transfer Taxes .....................................................................Section 6.1
Transferred Assets ...............................................................Section 2.1
Transferred Interests ...........................................................Section 2.1(c)
Trustee .................................................................................Preamble
Trustee Order ......................................................................Recitals
U.S. Tax Resident ...............................................................Section 6.5(a)(i)

TA-210

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 216 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 17 of 49

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of Transferred Assets</u>. On the terms and subject to the conditions hereof and, subject to approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing, each Seller, as applicable, shall sell, assign, transfer, convey and deliver to Buyer (or any Designated Buyers), and Buyer (or any such Designated Buyers) shall purchase and accept, all of such Sellers' right, title and interest in, to or under the Transferred Assets, other than the Excluded Assets, free and clear of any Encumbrances, on an "as is, where is" basis, without any warranties of any kind, express or implied, including as to merchantability or fitness for a particular purpose, as further set forth in Section 3.6. Buyer acknowledges and accepts that neither the Sellers nor the Trustee have the ability to deliver to Buyer, the bonding equipment presently located in a warehouse in China or other Transferred Assets not in the Sellers' or the Trustee's possession or control. As used herein, "<u>Transferred Assets</u>" means:

(a)    all rights, properties and assets of Stream of every kind and description, wherever located, real, personal, or mixed, tangible or intangible, to the extent owned, leased, licensed, used, held for use or claimed by Stream, as the same shall exist on the Closing Date, including the following (in each case, to the extent owned, leased, licensed, used or held for use by Stream):

(i)    all accounts receivables (whether current or noncurrent), notes receivables or other receivables, including any security, Action (exclusive of Retained Causes of Action), General Claim, remedy or other right related thereto, including all accounts receivables as to which any Subsidiary of Stream is an obligor or is otherwise responsible or liable and which are owed or payable to Stream;

(ii)    all promissory notes, chattel paper, letter-of-credit rights and related instruments;

(iii)    all investment property;

(iv)    all credits, prepaid expenses, security deposits, other deposits, refunds, claims for refunds, prepaid assets or charges, rebates, setoffs and recoupments;

(v)    all Intellectual Property, with the exception of any Intellectual Property included as an Excluded Asset identified in Section 2.2 hereof and listed in Section 2.2(k) of the Disclosure Schedules hereof, including Intellectual Property listed in Section 2.1(a)(vi) of the Disclosure Schedules, and all rights of Stream including all rights to sue for and recover and retain damages for present and past infringement thereof, and in the case of any trademarks, all goodwill appurtenant thereto, and all other intangible property;

(vi)    all tangible assets and personal property, including all machinery, equipment, apparatus, appliances, implements, computers and computer-related hardware, files, documents, network and internet and information technology systems-related equipment, including all servers and computers used to develop and maintain code in various operating environments and all development environments and software currently residing on such

12

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 217 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 18 of 49

computers, wherever located, including the items listed in Section 2.1(a)(i) of the Disclosure Schedules;

(vii)    all rights and interests of Stream under nondisclosure or confidentiality invention and Intellectual Property assignment covenants executed for the benefit of Stream with current or former employees, consultants or contractors of Stream, noncompete or nonsolicitation agreements with employees and agents of Stream or with third parties;

(viii)    all Books and Records of Stream or related to the other Transferred Assets;

(ix)    all insurance benefits, including any right, claim or proceeds, of Stream or related to any other Transferred Asset, including all insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any of the Transferred Assets and all rights and claims of Stream to any such insurance proceeds, condemnation awards or other compensation related thereto;

(x)    all general intangibles, goodwill and other intangible assets associated with the Business or the Transferred Assets;

(xi)    all Permits to the extent the transfer thereof to Buyer (or any Designated Buyer) is not prohibited by applicable Law;

(xii)    all inventory, raw materials, work-in-process, finished goods, supplies, samples (including samples held by any sales representatives or agents), components, packaging materials and other inventories ("Inventory");

(xiii)    all telephone, telex and telephonic facsimile numbers, email address, post-office box number and other directory listings used by Stream; and

(xiv)    all rights, assets and properties listed in Section 2.1(a)(xvi) of the Disclosure Schedules; and

(b)    all rights, properties and assets of Stream in the following (in each case, to the extent owned, leased, licensed, used or held for use by Stream):

(i)    all direct, indirect, or derivative Actions (other than the Retained Causes of Action), rights, claims, rebates, refunds, causes of action, hearings, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution, defenses and other similar rights against any Person, including Buyer or any of its Affiliates (whether known and unknown, matured and unmatured, accrued or contingent, regardless of whether any of the foregoing are currently exercisable or arise from or relate to events, changes, circumstances, developments, effects, occurrences or states of facts occurring or existing as of or prior to the Petition Date), including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) (collectively, "General Claims"), which shall include (1) any General Claims for past infringement or misappropriation of Intellectual Property, (2) any General Claims arising under or related to the other Transferred

13

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 218 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 19 of 49

Assets or the Business and (3) all accounts receivables, notes receivables or other receivables owed to a Seller by Buyer or any of its Affiliates; and

(ii)    prior to the Appointment Date, any and all legal privileges owned by Stream, any communications privileged under the attorney–client privilege, the attorney work-product doctrine or any self-auditing privilege or policy of a Governmental Authority, however, to the extent that any pre Appointment Date privileged communications or other documents are required by the Trustee to defend the Trustee or the Sellers' bankruptcy estates, the Trustee shall be permitted to use such privileged communications for that purpose;

(c)    all shares of capital stock, equity interests, or other ownership interests (including any securities convertible into, exchangeable or exercisable for any such interests) in any Person directly owned or otherwise held by Technovative, including all of the outstanding equity, membership, partnership or other ownership interests in Technology Holdings Delaware LLC, a Delaware limited liability company, Media Holdings Co, LLC, a Delaware limited liability company and Ultra-D Ventures C.V., a Commanditaire Vennootschap under the laws of Curacao (the "Acquired Subsidiaries" and such interests, the "Transferred Interests");

provided, however, that (x) notwithstanding the foregoing, Transferred Assets shall not include any Excluded Assets and (y) a single right, asset or property may be within more than one (1) of Sections 2.1(a) - 2.1(d) and such fact does not imply that such right, asset or property shall be transferred more than once or that any duplication of such right, asset or property is required.

Section 2.2    Excluded Assets. As used herein, "Excluded Assets" means the following:

(a)    All cash and cash equivalents including but not limited to the Carve-Out;

(b)    any right, property or asset set forth as an Excluded Asset in a written notice delivered by Buyer to Sellers prior to the Closing Date;

(c)    any shares of capital stock, equity interests or other ownership interests in Technovative beneficially owned or otherwise held by Stream;

(d)    the $1 million bond posted by or on behalf of the Debtors in the 225 Action;

(e)    all avoidance claims or causes of action available to Sellers under Chapter 5 of the Bankruptcy Code (including Sections 510, 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law and any claims against third parties including but not limited to Debtors' directors, officers, owners, members or shareholders, and any causes of action against any entity owned or controlled by the Debtors' directors, officers, owners, members or shareholders relating to conduct prior to the Closing and any resulting proceeds from such claims or causes of action;

(f)    copies of any Books and Records that any Seller is required by applicable Law to retain;

14

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 219 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 20 of 49

(g)    except as set forth in Section 2.1(d)(ii) all Tax assets (including Tax refunds, Tax rebates, Tax credits, prepaid Taxes, Tax attributes or other Tax benefits) of Sellers related to the other Excluded Assets or the Excluded Liabilities;

(h)    all Third Party General Claims to the extent related to any Excluded Asset or any Excluded Liability;

(i)    all Contracts (including all Seller Benefit Plans and Leases) of Stream and all assets, trusts and funding arrangements related thereto;

(j)    any grant of rights or license by Rembrandt 3D Holding Ltd. ("Rembrandt") or affiliates to Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, any amendment thereto, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction;

(k)    any physical assets that contain or include Rembrandt Intellectual Property, to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction; and

(l)    [the rights, assets and properties listed in Section 2.2(m) of the Disclosure Schedules.]

Section 2.3    Assumed Liabilities. Except as otherwise set forth herein, in accordance with 363(f) of the Bankruptcy Code, at the Closing, notwithstanding any provision in this Agreement, the Ancillary Agreements or any other writing to the contrary, Buyer (or any Designated Buyer) shall not assume any Liability of Sellers (or any predecessor of Sellers, or any prior owner of all or part of the Business or Transferred Assets) of whatever nature, whether absolute, accrued, contingent or otherwise, and whether presently in existence or arising hereafter, whether or not relating to the Transferred Assets. For the avoidance of doubt, Buyer (or any Designated Buyer) shall not assume or agree to pay, perform or discharge the Excluded Liabilities, however, the Buyer (or any Designated Buyer) assumes any liability to the extent that there is any claim or cause of action alleging that any Intellectual Property of any third party, including but not limited to the Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer (or any Designated Buyer) as part of the Transferred Assets at Closing through the sale pursuant to this Agreement.

Section 2.4    Excluded Liabilities. As used herein, "Excluded Liabilities" means all Liabilities of each Seller, whether arising on, prior to or after the Closing Date, including the following:

(a)    All Liabilities for Taxes solely related to or arising from or with respect to (i) the Transferred Assets or the operation of the Business, in each case, that are incurred in, or attributable to, any taxable period, or portion thereof (in accordance with Section 6.3), ending on or prior to the Closing Date, including any such Taxes which are not due or assessed until after the Closing Date but which relate to a pre-Closing Date taxable period, (ii) the transactions

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 220 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 21 of 49

contemplated hereby, including any Transfer Taxes for which any Seller is responsible pursuant to Section 6.1 or (iii) the Excluded Assets or Excluded Liabilities;

(b)    all Liabilities of any Seller resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law;

(c)    unless otherwise assumed under this Agreement, all Liabilities under any Contract or Permit of Sellers, whether accruing prior to, at, or after the Closing Date, in each case;

(d)    except as otherwise set forth herein, all Liabilities under or relating to any grant of rights or license by Rembrandt or Affiliates of Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable;

(e)    all Liabilities arising from, resulting from or related to (i) the employment or service or termination of employment or service of any current or former employees, officers, directors or service providers of Sellers by Sellers or their respective Affiliates, whenever arising, (ii) any Seller Benefit Plans, whenever arising (including pension or retirement Liability of Sellers to their current or former employees) and (iii) any Controlled Group Liability, whenever arising;

(f)    all Liabilities of Sellers arising in the Bankruptcy Cases;

(g)    all indebtedness of Sellers for borrowed money, or guarantees thereof, including Liabilities with respect to notes, bonds, indentures, letters of credit or similar Contracts or instruments of Sellers;

(h)    all Liabilities to distribute to any Seller's equity holders or otherwise apply all or any part of the consideration received hereunder;

(i)    all Liabilities in respect of obligations for indemnification or advancement of expenses, of any current or former officer or director of any Seller;

(j)    all Liabilities arising under any Environmental Law or any other Liability in connection with any environmental, health, or safety matters, including any such Liability arising from or related to (i) the ownership or operation of the Business or the Transferred Assets on or before the Closing Date, (ii) any action or inaction of Sellers or any other Person related to the Business or Transferred Assets, (iii) any formerly owned, leased or operated properties of Sellers or (iv) any condition first occurring or arising on or before the Closing Date with respect to the Business or the Transferred Assets;

(k)    except as specifically provided in the Settlement Agreement, all Liabilities for (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Cases (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Sellers, and any

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 221 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 22 of 49

official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Cases), (ii) costs and expenses of Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated hereby or by the Ancillary Agreements and (iii) except as otherwise set forth in this Agreement, including in Section 2.3, all costs and expenses arising from or related to any third-party claims against Sellers, pending or threatened, including any warranty or product claims;

(l)    any Liabilities hereunder or under the Ancillary Agreements;

(m)    all drafts or checks outstanding at the Closing under which Sellers are obligated; and

(n)    except as otherwise set forth herein, and unless related to or caused by Buyer, all Liabilities arising from or related to any Action, claim, investigation, cause of action or dispute brought, commended, arising or threatened against any Seller or arising from or related to the ownership or operation of the Transferred Assets or the Business prior to the Closing.

Section 2.5    <u>Seller Maintained Transferred Assets</u>.

(a)    To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this <u>Section 2.5</u>, Sellers shall sell, assign, transfer, convey and to the extent possible, deliver to Buyer (or any Designated Buyers) all of the Transferred Assets and Buyer (or any such Designated Buyers) shall assume and accept all of the Transferred Assets from Sellers on and "as is, where is" basis, pursuant to Section 3.6, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of any Encumbrance. Notwithstanding any other provision hereof or of any Ancillary Agreement to the contrary, this Agreement shall not constitute an agreement to sell, assign, transfer, convey or deliver any right, asset or property if such sale, assignment, transfer, conveyance or delivery would, after giving effect to the Sale Order and the Bankruptcy Code, (i) without the Consent of a Third Party, which Consent has not been obtained prior to the Closing, constitute a breach of any Contract to which Seller is a party or to which such right, asset or property is bound or would in any way adversely affect the rights of Buyer or Sellers with respect thereto or (ii) would violate any applicable Law (any such right, asset or property, a "<u>Seller Maintained Transferred Asset</u>").

(b)    If the Closing is consummated and there are any Seller Maintained Transferred Assets, (i) Sellers shall use their commercially reasonable efforts, and Buyer shall use commercially reasonable efforts to cooperate with Sellers, to obtain any applicable Consent or to remove any restriction under applicable Law, as applicable, to the sale, assignment, transfer, conveyance or delivery to Buyer (or any Designated Buyers) of each such Seller Maintained Transferred Asset, and (ii) subject to the approval of the Bankruptcy Court, Sellers and Buyer (or any Designated Buyer) shall enter into a Contract under which (1) Buyer (or any Designated Buyer) would obtain, through a subcontracting, sublicensing or subleasing arrangement or otherwise, the claims, rights and benefits of Sellers under such Seller Maintained Transferred Asset, (2) Sellers would enforce for the benefit of Buyer (or any Designated Buyer), any and all claims, causes of action, rights and benefits of Sellers against any Person with respect

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 222 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 23 of 49

to such Seller Maintained Transferred Asset and (3) Sellers shall promptly pay to Buyer (or any Designated Buyer) when received all monies received by Sellers with respect to such Seller Maintained Transferred Asset. If and when such Consent is obtained or such restriction under applicable Law is removed, such Seller Maintained Transferred Asset shall be deemed sold, assigned, transferred, conveyed and delivered to Buyer (or any Designated Buyer) in accordance herewith. The Parties shall treat any Seller Maintained Transferred Asset as having been sold to Buyer (or any Designated Buyer) as of the Closing for all applicable Tax purposes to the extent permitted by applicable Law. Each of Sellers and Buyer agrees to notify the other parties promptly in writing if it determines that such treatment (to the extent consistent with the relevant arrangement agreed to by such Seller and Buyer pursuant to this Section 2.5(b)) is not permitted for any Tax purposes under applicable Law. Where such treatment is not so permitted, and subject to the terms of any relevant arrangement agreed to by Sellers and Buyer pursuant to this Section 2.5(b) (and without duplication of any such Taxes economically borne by Buyer or any of its Affiliates pursuant thereto), (i) Buyer (or any Designated Buyer) shall indemnify and hold harmless the applicable Seller for any Taxes imposed on such Seller or any of its Affiliates with respect to any such Seller Maintained Transferred Asset for any taxable period or portion thereof (in accordance with Section 6.3) beginning after the Closing Date (determined on a "with and without" basis) and (ii) Seller and its Affiliates shall promptly pay to Buyer (or any Designated Buyer) any Tax refund or credit received with respect to any such Seller Maintained Transferred Asset for any taxable period beginning after the Closing Date or portion thereof (in accordance with Section 6.3) (determined on a "with and without" basis).

Section 2.6    Consideration. The consideration for the sale and transfer of the Transferred Assets from Sellers to Buyer (or any Designated Buyers), shall be the sum of (i) the Credit Bid Amount, plus (ii) any Cure Costs (the "Purchase Price").

Section 2.7    Closing.

(a)    Buyer and Sellers shall consummate the transactions contemplated hereunder (the "Closing") electronically (including by email) by the exchange of required closing deliveries at 9:00 a.m. on the third (3rd) Business Day after the entry of the Sale Order or on such other date, and time and at such other place as Buyer and Sellers may mutually agree in writing. As used herein, the "Closing Date" means the date on which the Closing occurs.

(b)    At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer (and any Designated Buyers):[1]

(i)    a bill of sale, assignment and assumption agreement, substantially in the form of Exhibit C (the "Assignment Agreement"), duly executed by Sellers or the Trustee on behalf of the Debtors;

(ii)    (1) an Intellectual Property assignment agreement, substantially in the form of Exhibit D (the "IP Assignment Agreement"), and (B) a domain transfer agreement

---

[1] **Note to Draft**: Subject to further discussions.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 223 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 24 of 49

substantially in the form of Exhibit E (the "Domain Transfer Agreement"), in each case duly executed by the applicable Sellers;

(iii)    a certified copy of the Sale Order;

(iv)    a valid IRS Form W-9 duly executed by each Debtor;

(v)    a duly executed certificate of the Trustee certifying the satisfaction of the conditions set forth in Section 7.3(a), Section 7.3(b) and Section 7.3(d);

(vi)    the Transferred Assets by making the Transferred Assets available to Buyer (or any Designated Buyers) at their present location, except for any demonstration units which shall be delivered as directed in writing by Buyer;

(vii)    assignments of the Transferred Interests; and

(viii)    all other documents, instruments or writings of conveyance as Buyer may reasonably request to consummate the transactions contemplated hereby and by the Ancillary Agreements.

(c)    At or prior to the Closing, Buyer shall deliver or cause to be delivered to Sellers:

(i)    payment of the remaining balance of the Carve-Out to Trustee pursuant to and in accordance with Section 4I(i) of the Settlement Agreement;

(ii)    the Assignment Agreement, duly executed by Buyer (or any Designated Buyers);

(iii)    the IP Assignment Agreement and the Domain Transfer Agreement, in each case duly executed by Buyer (or any Designated Buyers); and

(iv)    a duly executed certificate of an executive officer of Buyer certifying the satisfaction of the conditions set forth in Section 7.2(a).

Section 2.8    Tax Allocation. The Purchase Price (plus any other amounts to the extent properly taken into account as consideration under the Code) shall be allocated among the [applicable Transferred Assets][2] in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (any such allocation, an "Allocation"). Buyer shall prepare and deliver to the Debtors a statement (the "Allocation Statement") setting forth the Allocation as promptly as reasonably practicable following the Closing Date. The Trustee shall have thirty (30) days following their receipt of the Allocation Statement to review and provide comments to Buyer and Buyer agrees to consider in good faith any reasonable comments provided by the Trustee. Buyer shall not be obligated to incorporate the Trustee's comments and revise the Allocation Statement unless Buyer, in its reasonable discretion, determines that such

---

[2]    **Note to Draft**: Subject to ongoing review.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 224 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 25 of 49

incorporation is necessary or appropriate. If the Trustee does not provide any comments within such period, Sellers shall be deemed to have accepted the Allocation Statement as prepared by Buyer. The Allocation shall be adjusted, as necessary, by Buyer to reflect any subsequent adjustments to the portion of the Purchase Price and any other consideration payable to any Seller pursuant to this Agreement, to the extent properly taken into account under the Code. Buyer and each Seller agrees to (a) timely file in a manner consistent with the Allocation with each relevant Governmental Authority all forms and Tax Returns required to be filed in connection with the applicable Allocation (including the filing of IRS Form 8594 with a U.S. federal income Tax Return for the taxable year that includes the date of the Closing), (b) be bound by the applicable Allocation for the purpose of determining Taxes, (c) prepare and file all Tax Returns on a basis consistent with the applicable Allocation, and (d) not take any position inconsistent with the applicable Allocation in any Tax Return, in any audit or proceeding related to Taxes before any Governmental Authority or in any report made for Tax purposes; provided, however, that notwithstanding anything in this Section 2.8 to the contrary, (a) the Sellers and the Buyer (and any Designated Buyers) shall be permitted to take a position inconsistent with the applicable Allocation if required to do so by a "determination" within the meaning of Section 1313 of the Code and (b) the Buyer (and any Designated Buyers) or the Sellers shall be permitted to settle, solely on its own behalf, any proposed Tax deficiency or adjustment by any Governmental Authority based upon or arising out of the Allocation.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**
**OF THE SELLERS**

[Except as disclosed in Schedule A (collectively, the "Disclosure Schedules"), in each case, subject to Section 9.7(k),] Sellers represent and warrant to Buyer as follows:

Section 3.1    Organization. Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization or formation.

Section 3.2    Authority. Trustee on behalf of itself and each Seller has all necessary entity power and authority (a) to execute and deliver this Agreement and each Ancillary Agreement to which it is or shall be a party and (b) subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, to perform and comply with its covenants and agreements hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Each Seller's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party, such Seller's performance and compliance with its covenants and agreements hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on such Seller's part, and no other proceedings on such Seller's part are necessary to authorize this Agreement or any Ancillary Agreement to which it is or shall be a party, such Seller's performance of or compliance with its covenants and agreements hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby. Subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, each Seller has duly executed and delivered this Agreement and each Ancillary Agreement to which it is or shall be a party and, assuming Buyer's due authorization, execution and delivery hereof and thereof, as applicable, this Agreement and each Ancillary Agreement to which it is or shall be a party is such Seller's

20

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 225 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 26 of 49

legal, valid and binding obligation, enforceable against it in accordance with the terms hereof or thereof, except as limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally, by general equitable principles (regardless of whether enforcement is sought in a proceeding of law or in equity) or by the discretion of any Governmental Authority before which any Action seeking enforcement may be brought (the "Bankruptcy and Equitable Exceptions").

Section 3.3    No Conflict; Filings and Consents.

(a)    Each Seller's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party does not, such Seller's performance of and compliance with its covenants and agreements hereunder and thereunder shall not, and the consummation of the transactions contemplated hereby and thereby shall not, require such Seller to make any registration, declaration, notice, report, submission or other filing (each, a "Filing") with or to, or to obtain any consent, approval, waiver, license, permit, franchise, authorization or Order ("Consent") of, any Governmental Authority, except for the following:

(i)    any Filings with or to or Consents of the Bankruptcy Court;

(ii)    [the Filings and Consents listed in Section 3.3(b)(ii) of the Disclosure Schedules (respectively, the "Specified Filings" and the "Specified Consents"); and][3]

(iii)    any Filings or Consents the failure of which to make or obtain would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 3.4    Transferred Assets.

(a)    Each Debtor, as applicable, unless stated otherwise, has good, valid, marketable and indefeasible title to the Transferred Assets and owns and possesses all interests in, including the right to use, each of the Transferred Assets (or, with respect to licensed Transferred Assets a valid license to use), in each case, the transfer shall be free and clear of any and all Encumbrances, on an "as is, where is" basis, without any warranty of any kind, express or implied, including as to merchantability or fitness for a particular purpose, as further set forth in Section 3.6. Buyers acknowledge that certain Intellectual Property may be subject to superior rights of Rembrandt as Licensor, and that Sellers cannot transfer any interest in the Transferred Assets that is not owned by the Sellers.

(b)    Subject to the Sale Order, at the Closing, (i) Sellers, as applicable, shall transfer to Buyer (or any Designated Buyers) all of their respective right, title and interest in, to and under the Transferred Assets and (ii) and Buyer (or any such Designated Buyers) shall acquire good, valid, marketable and indefeasible title to the Transferred Assets, in each case, free and clear of any Encumbrance.

---

[3]    **Note to Draft**: Subject to ongoing discussion.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 226 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 27 of 49

Section 3.5    <u>Brokers</u>. Except as set forth in <u>Section 3.5</u> of the Disclosure Schedules, no other broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers. SSG Capital Advisors, LLC, as the Trustee's Investment Banker, is entitled to a commission for the conduct of the Sale as provided in its engagement with the Trustee.

Section 3.6    <u>Exclusivity of Representations and Warranties</u>. SELLERS ARE CONVEYING THE TRANSFERRED ASSETS AS IS, WHERE IS, AND WITH ALL FAULTS, AND, EXCEPT AS EXPRESSLY SET FORTH IN THIS <u>ARTICLE III,</u> NONE OF SELLERS OR ANY OF THEIR AFFILIATES OR REPRESENTATIVES IS MAKING ANY REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE WHATSOEVER, ORAL OR WRITTEN, EXPRESS OR IMPLIED (ALL OF WHICH SELLER HEREBY DISCLAIMS) AS TO FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, DESIGN, QUALITY, LAYOUT, PHYSICAL CONDITION, OPERATION, COMPLIANCE WITH SPECIFICATIONS, ABSENCE OF LATENT DEFECTS, OR COMPLIANCE WITH LAWS AND REGULATIONS (INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO HEALTH, SAFETY AND THE ENVIRONMENT), OR ANY OTHER MATTER AFFECTING OR RELATING TO THE CONDITION OF THE ASSETS.  BUYER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, BUYER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION, AND EVALUATION OF THE TRANSFERRED ASSETS BY BUYER AND BUYER WILL HAVE NO RIGHT TO BE INDEMNIFIED BY OR OTHERWISE BRING ANY ACTION AGAINST SELLERS WITH RESPECT TO ANY MATTER AFFECTING OR RELATING TO THE CONDITION OF THE TRANSFERRED ASSETS, OR ANY PORTION THEREOF.  THE PROVISIONS OF THIS SECTION 3.6 SHALL SURVIVE CLOSING AND THE TERMINATION OF THIS AGREEMENT.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

Section 4.1    <u>Organization</u>. Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization or formation and has all necessary entity power and authority to own, lease and operate its properties and assets and to carry on its businesses as currently conducted.

Section 4.2    <u>Authority</u>. Buyer has all necessary entity power and authority and financial ability (a) to execute and deliver this Agreement and each Ancillary Agreement to which it is or shall be a party and (b) subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, to perform and comply with its covenants and agreements hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Buyer's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party, Buyer's performance and compliance with its covenants and agreements hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been

22

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 227 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 28 of 49

duly authorized by all necessary action on Buyer's part, and no other proceedings on Buyer's part are necessary to authorize this Agreement or any Ancillary Agreement to which it is or shall be a party, Buyer's performance of or compliance with its covenants and agreements hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby. Subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, Buyer has duly executed and delivered this Agreement and each Ancillary Agreement to which it is or shall be a party and, assuming Buyer's due authorization, execution and delivery hereof and thereof, as applicable, this Agreement and each Ancillary Agreement to which it is or shall be a party is Buyer's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof or thereof, except as limited by the Bankruptcy and Equitable Exceptions.

Section 4.3    No Conflict; Filings and Consents.

(a)    Buyer's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party does not, Buyer's performance of and compliance with its covenants and agreements hereunder and thereunder shall not, and the consummation of the transactions contemplated hereby and thereby shall not, (i) violate the constituent documents of Buyer, (ii) subject to making the Filings and obtaining the Consents contemplated by Section 4.3(b), violate any Law or (iii) breach, result in the loss of any benefit under, be a default (or an event that, with or without notice or lapse of time, or both, would be a default) under, result in the termination, cancelation or amendment of or a right of termination, cancelation or amendment under, accelerate the performance required by, or result in the creation of any Encumbrance on any of the respective properties or assets of Buyer under, any Contract to which Buyer is a party or by which any asset of Buyer is bound or affected, except, in the case of the foregoing clauses (ii) and (iii), as would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

(b)    Buyer's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party does not, Buyer's performance of and compliance with its covenants and agreements hereunder and thereunder shall not, and the consummation of the transactions contemplated hereby and thereby shall not, require Buyer make any Filing with or to, or to obtain any Consent of, any Governmental Authority, except for the following:

(i)    any Filings with or to or Consents of the Bankruptcy Court;

(ii)    [the Specified Filings and the Required Approvals (including the Specified Consents); and]

(iii)    any Filings or Consents the failure of which to make or obtain would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

Section 4.4    Third Party Intellectual Property Rights.

(a)    Buyer has reviewed all of the Sellers' Intellectual Property and has confirmed, and hereby represents, that neither the Intellectual Property nor any of the Transferred Assets contain any Intellectual Property rights or other rights of a third party.

23

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 228 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 29 of 49

(b)     Pursuant to Section 3.6 hereof, Buyer is relying solely upon Buyer's own inspection, examination, and evaluation of the Transferred Assets, including but not limited to the Intellectual Property. Buyer acknowledges and agrees that Buyer will have no right to be indemnified by or otherwise bring any action against Sellers with respect to any matter affecting or relating to third party Intellectual Property rights or other third party rights in the Transferred Assets.

(c)     The provisions of this Section 4.4 shall survive closing and the termination of this agreement.

Section 4.5    <u>Brokers</u>. SSG Capital Advisors, LLC as investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer. No other broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer.

Section 4.6    <u>Exclusivity of Representations and Warranties</u>. Neither Buyer nor any of its Affiliates or Representatives is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this <u>Article IV</u>, and Buyer hereby disclaims any such other representations or warranties.

## ARTICLE V
## COVENANTS

Section 5.1    <u>Conduct of Business Prior to the Closing</u>.

(a)     Except (x) as otherwise expressly required hereby, (y) as required by applicable Law (including an Order of the Bankruptcy Court) or (z) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), prior to the Closing, Sellers shall not:

(i)     fail to maintain, or allow to lapse, or abandon any Intellectual Property owned by or registered to, licensed to or held for use by a Seller or enter into or become bound by, terminate or materially amend or modify any Contract relating to the acquisition or disposition or granting of any license with respect to any such Intellectual Property, or otherwise subject to an Encumbrance any such Intellectual Property (including by the granting of any covenant-not-to-sue or covenant-not-to-assert);

(ii)     (1) enter into any Contract or (2) modify, amend, extend or terminate any Contract which is identified as a Transferred Asset in Section 2.2 of the Disclosure Schedules, or waive, release or assign any rights or claims thereunder;

(iii)     (1) enter into agreements or arrangements providing for capital expenditure or expenditures or otherwise commit to do so, or (2) fail to make any capital expenditure or expenditures in accordance with such capital budget;

24

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 229 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 30 of 49

(iv)    commence, waive, release, assign, compromise or settle any Action (other than the Retained Causes of Action) (for the avoidance of doubt, including with respect to matters in which a Seller is a plaintiff, or in which any of their officers or directors in their capacities as such are parties) affecting the Business or the Transferred Assets that is not a Retained Cause of Action;

(v)    cancel or fail to use commercially reasonable efforts to maintain any of insurance policy covering the Transferred Assets, if any, any right, asset or property that would be a Transferred Asset if existing on the Closing Date;

(vi)    pursue or seek, or fail to use commercially reasonable efforts to oppose any Person in pursuing or seeking, a conversion of the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code, the appointment of a trustee under Chapter 11 (other than the Trustee) or Chapter 7 of the Bankruptcy Code or the appointment of an examiner with enlarged powers;

(vii)    take or cause to be taken any action that would reasonably be expected to materially delay, materially impede or prevent the consummation of the transactions contemplated hereunder;

(viii)    (1) reject or terminate any Contract or seek Bankruptcy Court approval to do so or (2) fail to use commercially reasonable efforts to oppose any action by a third party to terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any such Contract;

(ix)    with respect to any Transferred Asset, (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases or (2) fail to use reasonable best efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(x)    settle, pursue, monetize, relinquish, or otherwise dispose of or seek to dispose of the Affiliate Claims other than in accordance with the terms hereof; or

(xi)    agree or authorize, in writing or otherwise, to take any of the foregoing actions.

Section 5.2    Access to Information. Upon reasonable notice, each Seller shall provide Buyer and its Representatives reasonable access, during normal business hours throughout the period prior to the Closing, to such Seller's properties, books, records, Tax Returns (and all Tax Books and Records, including note papers and work papers, related thereto), personnel and Representatives, and during such period, such Seller shall cause to be furnished promptly to Buyer and its Representatives all readily available information concerning the Business as Buyer may reasonably request; provided, however, that such access and disclosure shall not be required to the extent it would violate any applicable Law or would jeopardize any attorney client privilege or the attorney work product doctrine; provided, further, that, if any such access or disclosure is limited for the reasons described in the foregoing proviso, such Seller shall use commercially reasonable efforts to find a way to allow such access and disclosure to the extent doing so would not be (in the good faith belief of Sellers after

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 230 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 31 of 49

consultation with outside counsel) reasonably be likely to cause a violation of applicable Law or such privilege to be jeopardized with respect to such information.

Section 5.3    <u>Notification of Certain Matters</u>. Each Party shall promptly notify the other Parties in writing of any event, change, circumstance, development, effect, occurrence or state of facts of which it becomes aware that would or is reasonably likely to result in any of the conditions set forth in <u>Article VII</u> becoming incapable of being satisfied prior to the End Date.

Section 5.4    <u>Consents and Filings; Further Assurances</u>.[4]

(a)    Each Party shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the transactions contemplated hereby and by the Ancillary Agreements and to confirm Buyer's (or any Designated Buyer's) ownership of the Transferred Assets as promptly as reasonably practicable, including using commercially reasonable efforts to obtain all Consents of Governmental Authorities or other Third Parties necessary, proper or advisable in connection therewith. Without limiting the generality of the foregoing, the Parties shall use commercially reasonable efforts to (i) obtain from Governmental Authorities all Consents that are necessary for the consummation of the transactions contemplated hereby and by the Ancillary Agreements and Buyer's (or any Designated Buyer's) operation of the Business and the Transferred Assets, (ii) promptly make all necessary Filings with or to Governmental Authorities that are related hereto or to the Ancillary Agreements or the transactions contemplated hereby or thereby, (iii) comply at the earliest reasonably practicable date with any request by a Governmental Authority for additional information, documents or other materials received by each of them or any of their Affiliates, (iv) reasonably cooperate with each other in connection with any such Filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith). This <u>Section 5.4(a)</u> does not apply with respect to Taxes.

(b)    Each Party shall promptly notify the other Parties of any communication it or any of its Affiliates receives from any Governmental Authority related to the matters that are the subject hereof and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority. No Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties the opportunity to attend and participate at such meeting. Subject to applicable Law, the Parties shall provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby. This <u>Section 5.4(b)</u> does not apply with respect to Taxes, however, notwithstanding the foregoing, to the extent the Buyer

---

[4] <u>**Note to Draft**</u>: Subject to update.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 231 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 32 of 49

receives communication from any Governmental Authority related to Taxes attributable to or associated with a pre-Closing Date taxable period, or to the extent the Sellers receive communication from any Governmental Authority related to Taxes attributable to or associated with a post-Closing Date taxable period, either Party shall timely share such correspondence with the other Party.

(c)    From time to time after the Closing, Sellers and Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in Buyer (or any Designated Buyers) all the right, title and interest in, to or under the Transferred Assets, to provide Buyer (or any Designated Buyers) and Sellers all rights and obligations to which they are entitled.

Section 5.5    Refunds and Remittances.

(a)    After the Closing, if Sellers or any of their Affiliates receive any refund or other amount that is a Transferred Asset or is otherwise properly due and owing to Buyer (or any Designated Buyers) in accordance with the terms hereof, Sellers promptly shall remit, or shall cause to be remitted, such amount to Buyer (or any Designated Buyers).

(b)    In the event that, after the Closing Date, either Party reasonably believes Sellers or any of their Affiliates have retained ownership of an asset intended to be conveyed to Buyer (or any Designated Buyers) as a Transferred Asset as contemplated hereby, for no additional consideration to Sellers or any of their Affiliates, Sellers shall convey, assign or transfer promptly such Transferred Asset to Buyer (or any Designated Buyers), and the Parties hereto shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Transferred Asset to Buyer (or any Designated Buyers).

Section 5.6    No Successor Liability. The Parties intend that, to the fullest extent permitted by Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Buyer (or any Designated Buyers) shall not be deemed to: (i) be the successor of any Seller, (ii) have, *de facto*, or otherwise, merged with or into any Seller, (iii) be a mere continuation or substantial continuation of any Seller or its enterprise(s) or (iv) be liable for any acts or omissions of any Seller in the conduct of the Business or arising under or related to the Transferred Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Buyer (or any Designated Buyers) shall not be liable for any Encumbrance against any Seller or any of any Seller's predecessors or Affiliates, and Buyer (or any Designated Buyers) shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Transferred Assets or any Liabilities of Sellers arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 5.6 shall be reflected in the Sale Order.

Section 5.7    Sale Free and Clear. Sellers acknowledge and agree, and the Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 232 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 33 of 49

concurrently with the Closing, all then existing or thereafter arising Encumbrances against or created by Sellers,, or the bankruptcy estates, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets, and (b) Buyer (or any Designated Buyer) is not successor to any Seller or the bankruptcy estates by reason of any theory of law or equity, and Buyer (or any Designated Buyer) shall not assume or in any way be responsible for any Liability or Claim of Sellers, any of their Affiliates and/or the bankruptcy estates, except as expressly provided in this Agreement. On the Closing Date, the Transferred Assets shall be transferred to Buyer (or any Designated Buyers) free and clear of all Encumbrances to the fullest extent permitted by Section 363 of the Bankruptcy Code.

Section 5.8    Bankruptcy Court Milestones; Alternative Transactions.

(a)    Sellers shall consult with Buyer and Hawk regarding the Bankruptcy Cases, including regarding the Sale Motion, the Bid Procedures Hearing, the Bid Procedures Order, the Sale Hearing, the Sale Order, and any other Filings with or to the Bankruptcy Court, any hearing before the Bankruptcy Court and any Order of the Bankruptcy Court related to the transactions contemplated hereby or by the Ancillary Agreements and the Bankruptcy Cases in connection therewith, and Sellers shall provide Buyer and Hawk with copies of any material Filings to be filed by Sellers in the Bankruptcy Cases that are related to in any way to this Agreement, the Ancillary Agreements or any transaction contemplated hereby or thereby at least three (3) Business Days prior to the making of any such Filing. Sellers shall provide Buyer and Hawk with prompt notice of (i) the filing of any objection to (or any threat or notice of intention of any Person to file any objection to) this Agreement, the Ancillary Agreements, any transaction contemplated hereby or thereby, the Bid Procedures or Buyer or (ii) the commencement of (or any threat or notice of intention of any Person to commence), any Action that relates in any way to this Agreement, the Ancillary Agreements, any transaction contemplated hereby or thereby, the Bid Procedures or Buyer.

(b)    The Parties agree that the following are the milestones (the "Milestones") to be satisfied in connection with the Bankruptcy Cases, and Sellers shall use reasonable efforts to cause the Milestones to be satisfied:

(i)    not later than November 13, 2024, the Bankruptcy Court shall have held the Bid Procedures Hearing and entered the Bid Procedures Order;

(ii)    the deadline for submission of Qualified Bids (as defined in the Bid Procedures) shall be no later than November 15, 2024;

(iii)    if any other Qualified Bid (as defined in the Bid Procedures) is submitted prior to the bid deadline set forth in the Bid Procedures, Sellers shall have commenced the Auction on or before November 18, 2024; and

(iv)    not later than December 7, 2024, the Bankruptcy Court shall have entered the Sale Order.

(c)    Sellers shall promptly (and in no event later than twenty-four (24) hours after receipt) advise Buyer in writing if either Seller or any of such Seller's Affiliates or Representatives receives any inquiry, request for nonpublic information, discussion or

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 233 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 34 of 49

negotiation that is reasonably expected to lead to or that contemplates or relates to, or any proposal that is for, an Alternative Transaction, in each case, together with a written summary of the material terms and conditions thereof, the identity of the Person making any such inquiry, request for nonpublic information, discussion, negotiation or proposal and any draft agreement provided by such Person. Buyer as Secured Creditor shall have only consultation rights, and shall have no ability to object to or impede any Alternate Transaction, but retains the right to assert its Allowed Secured Claim and negotiate with the sponsor of the Alternate Transaction for the treatment of its Allowed Secured Claim.

(d)     In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Sellers shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from such orders. Sellers agree to take all action as may be reasonable and appropriate to defend against such appeal or stay request and Sellers and Buyer agree to use their commercially reasonable efforts to obtain an expedited resolution of such appeal or stay request; provided that nothing herein shall preclude the Parties from consummating the transactions contemplated hereby if the Sale Order shall have been entered and has not been stayed and Buyer, in its sole and absolute discretion, waives in writing the condition that the Sale Order be a Final Order.

(e)     After the Bankruptcy Court's entry of the Sale Order, neither Buyer nor Sellers shall take any action which is intended to or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

(f)     None of Sellers or Buyer shall file any pleading or take any other action in the Bankruptcy Court with respect hereto or the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby that is inconsistent with performing and carrying out the provisions hereof or thereof in accordance with the terms and subject to the conditions herein and therein; provided, however, that the foregoing shall not limit Buyer's rights and remedies hereunder or Buyer's right to advocate for the approval hereof and against any Alternative Transaction.

Section 5.9     Intellectual Property Registrations. After the Closing Date, Sellers shall use commercially reasonable efforts to effect the necessary change of ownership and recordals with all patent, trademark, and copyright offices and domain name registrars and other similar authorities (a) where Intellectual Property of Stream is still recorded in the name of legal predecessors of Stream or any Person other than Stream or (b) where the relevant recordals of the patent, copyright, and trademark offices, and domain name registrars, and other similar authorities, with respect to Stream Intellectual Property, are materially incorrect for any other reason.

Section 5.10     Name Change. Sellers shall, as promptly as practicable (but in no event later than twenty (20) Business Days) after the Closing, cease using and displaying their existing corporate names or any trademarks that are included in the Transferred Assets (including, for the avoidance of doubt, any trademarks held by Subsidiaries of Sellers), and in furtherance of such requirement, Debtors shall use commercially reasonable efforts to, no later than twenty (20) Business Days after the Closing, legally change their corporate and business

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 234 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 35 of 49

names to names that are not confusingly similar to such trademarks or existing names of the Debtors, and file notices of such name changes with the Bankruptcy Court. Subject to the approval of the Bankruptcy Court to change such Debtor's name for purposes of the Bankruptcy Cases (which approval the Sellers shall seek and use commercially reasonable efforts to obtain promptly following the Closing), under no circumstance shall Sellers, after the Closing, use or otherwise exploit the trademarks included in the Transferred Asset or any other indicia confusingly similar to the trademarks included in the Transferred Assets, copyrights included in the Transferred Assets, or any work substantially similar to the copyrights included in the Transferred Assets, as a source identifier in connection with any Seller product, service or corporate, business or domain name.

## ARTICLE VI
## TAX MATTERS

Section 6.1    <u>Transfer Taxes</u>. Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes payable in connection with the sale or transfer of the Transferred Assets pursuant to this Agreement (such Taxes, "<u>Transfer Taxes</u>") shall (to the extent not subject to an exemption under the Bankruptcy Code, including Section 1146(a) of the Bankruptcy Code) be borne and split equally between Buyer and Sellers. Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce or eliminate any such Transfer Taxes, and shall each sign and file (or cause its respective Affiliates to sign and file) all documentation with the relevant Governmental Authority related to such Transfer Taxes as it may be required to sign or file under applicable Law. The Party responsible under applicable Law for filing the Tax Returns with respect to such Transfer Taxes shall prepare and file all necessary Tax Returns or other documents with respect thereto and shall promptly provide a copy of any such Tax Returns or other documents to the other Parties.

Section 6.2    <u>Tax Cooperation</u>. Buyer (or any Designated Buyers) and Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as reasonably practicable, such information (including access to Books and Records related to Taxes) and assistance related to the Business, the Transferred Assets as is reasonably necessary for determining any Liability for Taxes, the filing of all Tax Returns, the making of any election related to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding related to any Tax; <u>provided</u>, <u>however</u>, that Buyer and its Affiliates (or Designated Buyers and their Affiliates) shall not be required to disclose the contents of their Tax Returns to any Person. Any reasonable expenses incurred in furnishing such information or assistance pursuant to this <u>Section 6.2</u> shall be borne by the Party requesting it.

Section 6.3    <u>Straddle Periods</u>. For purposes hereof, with respect to any Transferred Asset or the Business, Sellers and Buyer shall apportion the liability for property Taxes, ad valorem Taxes and similar Taxes imposed on a periodic basis ("<u>Periodic Taxes</u>") and for Taxes that are either (i) based upon or related to income or receipts, (ii) imposed in connection with any sale, transfer or assignment or any deemed sale, transfer or assignment of property (real or personal, tangible or intangible), or (iii) payroll or similar Taxes with respect to any employee, or independent contractor associated with any Transferred Asset or the Business

30

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 235 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 36 of 49

("Non-Periodic Taxes") for any taxable period which begins on or before, and ends after, the Closing Date (a "Straddle Period") applicable to any Transferred Asset or the Business in accordance with this Section 6.3. Periodic Taxes shall be apportioned between Sellers and Buyer (or any Designated Buyers) as of the Closing Date, with Buyer (or any Designated Buyer) liable for that portion of the Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes hereof be deemed attributable to the portion of the Straddle Period beginning after the Closing Date) equal to the Periodic Taxes for such Straddle Period multiplied by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of calendar days in such entire Straddle Period. The Non-Periodic Taxes shall be apportioned between Sellers and Buyer (or any Designated Buyers) as of the Closing Date, with Buyer (or any Designated Buyer) liable for that portion of the Non-Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes hereof be deemed attributable to the portion of the Straddle Period beginning after the Closing Date) equal to the amount that would be payable in the portion of the Straddle Period beginning after the Closing Date if the taxable year or period ended at the end of the day on the Closing Date; provided, however, that exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for amortization or depreciation, shall be allocated to the portion of the Straddle Period beginning after the Closing Date (notwithstanding that such exemptions, allowances or deductions may under applicable Law be determined solely at the end of the Straddle Period) by multiplying the total amount of such exemption, allowance, or deduction for such Straddle Period by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of calendar days in such entire Straddle Period. Sellers shall be liable for that portion of the Periodic Taxes and Non-Periodic Taxes for a Straddle Period for which Buyer (or any Designated Buyer) is not liable under the preceding sentences (which portion of such Taxes shall for purposes hereof be deemed attributable to the portion of the Straddle Period ending on the Closing Date). The party hereto responsible under applicable Law for paying a Tax described in this Section 6.3 shall be responsible for administering the payment of such Tax. With respect to any Periodic Taxes or Non-Periodic Taxes imposed with respect to any Transferred Asset or the Business that are allocable to Buyer (or any Designated Buyer) under this Agreement, to the extent such Periodic Taxes or Non-Periodic Taxes were paid by any Seller or any Affiliate thereof, Buyer (or any Designated Buyer) shall pay to Sellers such Periodic Taxes or Non-Periodic Taxes no later than ten (10) Business Days following receipt of written notice from Sellers; and with respect to any Periodic Taxes or Non-Periodic Taxes imposed with respect to any Transferred Asset, or the Business that are allocable to Sellers under this Agreement, to the extent such Periodic Taxes or Non-Periodic Taxes were paid by Buyer or any Affiliate thereof, Sellers shall pay to Buyer (or any Designated Buyer) such Periodic Taxes or Non-Periodic Taxes no later than ten (10) Business Days following receipt of written notice from Buyer (or any Designated Buyers).

Section 6.4    Tax Treatment. Buyer and Sellers shall, consistently treat the transactions hereunder for all Tax purposes as a fully taxable disposition of the Transferred Assets.

Section 6.5    Tax Elections.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 236 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 37 of 49

(a)    At Buyer's sole option, but only as would not be reasonably anticipated to generate a material Tax liability for which Debtors would be liable under the terms of this Agreement:

(i)    for any Subsidiary of Technovative that is treated as a foreign corporation for U.S. federal income Tax purposes (each, a "245A Subsidiary"), Buyer, Debtor and their respective Affiliates shall cooperate in good faith to determine each "U.S. tax resident" within the meaning of Treasury Regulations Section 1.245A-5(i)(29) that will be a "United States shareholder" within the meaning of Section 951(b) of the Code at the end of the Closing Date that owns directly or indirectly stock of such 245A Subsidiary and is described in Treasury Regulations Section 1.245A-5(e)(3)(i)(C)(1) (each, a "U.S. Tax Resident");

(ii)    Buyer shall enter into and shall use reasonable best efforts to cause all U.S. Tax Residents to enter into (and take all steps necessary to enter into), a written, binding agreement as described in Treasury Regulations Section 1.245A-5(e)(3)(i)(C)(2) (a "245A Election Agreement") with applicable Debtors and their relevant Affiliates to make an election pursuant to Treasury Regulations Section 1.245A-5(e)(3) to close the taxable year of such 245A Subsidiary, effective as of the Closing Date (such an election, a "245A Election"). Buyer shall prepare a form of a 245A Election Agreement and shall consider in good faith any reasonable comments or proposed changes by Debtors. To the extent able to do so under applicable Law, Buyer shall represent that the information provided is complete and that the U.S. Tax Residents identified are the only direct or indirect shareholders of the 245A Subsidiary that are required for purposes of making a valid 245A Election; and

(iii)    Debtors and their Affiliates shall timely file, or cause to be timely filed, valid 245A Elections.

(b)    In the event that Debtors and their Affiliates file the 245 Election, Debtors, Buyer and their respective Affiliates shall not take any position inconsistent with the taxable year of the applicable 245A Subsidiary as closing for all purposes of the Code and Treasury Regulations thereunder on the date of the "extraordinary reduction amount" or "tiered extraordinary reduction amount" (as each are defined in Treasury Regulations Section 1.245A-5) on any Tax Return or in any in any audit or proceeding related to Taxes before any Governmental Authority or otherwise.

Section 6.6    Bulk Sales. Notwithstanding any other provisions herein, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer (or any Designated Buyer).

## ARTICLE VII
## CONDITIONS TO THE CLOSING

Section 7.1    Mutual Conditions. The respective obligations of each Party to consummate the Closing shall be subject to the satisfaction (or waiver by Buyer and Sellers, if permissible under applicable Laws) of the following conditions:

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 237 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 38 of 49

(a)     no Governmental Authority shall have issued a preliminary, temporary or permanent Order that is in effect and prevents, makes illegal or prohibits the consummation of any of the transaction contemplated hereby (any such Law or Order, a "Legal Restraint");

(b)     [(1) all Specified Filings shall have been made in accordance with applicable Law and (2) all Specified Consents, shall have been obtained in form and substance reasonably acceptable to Buyer;]

(c)     the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, and each of the Bid Procedures Order and the Sale Order shall be a Final Order.

Section 7.2    Conditions to Obligations of Sellers. The obligation of Sellers to consummate the Closing are further subject to the satisfaction (or waiver by Sellers, if permissible under applicable Law) of the following conditions:

(a)     Each representation and warranty in Article IV (read, for purposes of this Section 7.2(a) only, without giving effect to any qualifier as to materiality, "material" or "Buyer Material Adverse Effect") shall be true and correct in all respects as of the Closing as if made as of the Closing (except to the extent any such representation or warranty expressly speaks as of the date hereof or any other specific date, in which case such representation or warranty shall have been true and correct in all respects as of such date), except where the failure of such representation and warranty to be true and correct at such time has not, individually or in the aggregate, resulted in a Buyer Material Adverse Effect;

(b)     Buyer shall have performed or complied in all material respects (in all respects with respect to any covenant or agreement that is qualified by materiality) with each covenant or agreement required to be performed or complied with by it hereunder at or prior to the Closing; and

(c)     Sellers shall have received the documents listed in Section 2.7(c)(ii) – Section 2.7(c)(iv).

Section 7.3    Conditions to Obligations of Buyer. The obligations of Buyer to consummate the transactions contemplated hereby shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

(a)     each representation and warranty in Article III (read, for purposes of this Section 7.3(a) only, without giving effect to any qualifier as to materiality, "material" or "Material Adverse Effect") shall be true and correct in all respects as of the Closing as if made as of the Closing (except to the extent any such representation or warranty expressly speaks as of the date hereof or any other specific date, in which case such representation or warranty shall have been true and correct in all material respects as of such date), except where the failure of such representation and warranty to be true and correct at such time has not, individually or in the aggregate, resulted in a Material Adverse Effect;

(b)     each Seller shall have performed or complied in all material respects (in all respects with respect to any covenant or agreement that is qualified by materiality) with each

33

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 238 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 39 of 49

covenant or agreement required to be performed or complied with by it hereunder at or prior to the Closing;

(c)    all Required Approvals shall have been obtained in form and substance reasonably acceptable to Buyer;

(d)    there shall not have occurred a Material Adverse Effect in connection with the Transferred Assets;

(e)    Buyer shall have received the documents listed in <u>Section 2.7(b)</u>; and

(f)    Sellers shall have received the Consents of the Third Parties set forth in <u>Section 7.3(f)</u> of the Disclosure Schedules and delivered to Buyer evidence thereof, in form and substance reasonably acceptable to Buyer.

**ARTICLE VIII**
**TERMINATION**

Section 8.1    <u>Termination Rights</u>.

(a)    <u>Termination by Mutual Consent</u>. Buyer and Sellers shall have the right to terminate this Agreement at any time prior to the Closing by mutual written consent.

(b)    <u>Termination by Either Buyer or Sellers</u>. Buyer, on the one hand, or Sellers, on the other hand, shall have the right to terminate this Agreement at any time prior to the Closing if:

(i)    a Legal Restraint is in effect that has become final and nonappealable;

(ii)    the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; or

(iii)    Buyer is not the [Winning Bidder].

(c)    <u>Termination by Buyer</u>. Buyer shall have the right to terminate this Agreement at any time prior to the Closing if:

(i)    the Closing shall not have been consummated prior to 5:00 p.m. on December 10, 2024 (the "<u>End Date</u>"), subject to extension by written consent of Hawk and the Trustee; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 8.1(c)(i) shall not be available to Buyer if the failure of the Closing to have occurred prior to 5:00 p.m. on the End Date was primarily caused by, or primarily resulted from, Buyer's breach of any of its covenants or agreements hereunder;

(ii)    any Seller breaches any of its covenants or agreements hereunder or violates the terms of the Settlement Agreement or Sale Order, or if any of the representations or warranties in <u>Article III</u> fails to be true and correct, which breach or failure (1) would give rise

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 239 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 40 of 49

to the failure of a condition in Section 7.1 or Section 7.3 and (2) is not reasonably capable of being cured by such Seller within ten (10) days after receipt by such Seller of written notice from Buyer of such breach or failure or, if reasonably capable of being cured during such ten (10) day period, is not cured by such Seller within such ten (10) day period;

(iii)    any Seller or any of its Affiliates or Representatives takes any Alternative Sale Action;

(iv)    any Milestone is not satisfied;

(v)    a Material Adverse Effect has occurred;

(vi)    any Required Approvals are denied;

(vii)    any Seller withdraws or seeks authority to withdraw the Sale Motion; or

(viii)    for any reason (including an Order of the Bankruptcy Court) Buyer is unable or legally prohibited, pursuant to Section 363(k) of the Bankruptcy Code or otherwise, to credit bid the amount agreed in the Settlement Agreement.

(d)    Termination by Sellers. Sellers shall have the right to terminate this Agreement at any time prior to the Closing if Buyer violates the terms of the Settlement Agreement or breaches any of its covenants or agreements hereunder, or if any of the representations or warranties in Article IV fails to be true and correct, which breach or failure (i) would give rise to the failure of a condition in Section 7.1 or Section 7.2 and (ii) is not reasonably capable of being cured by Buyer within ten (10) days after receipt by Buyer of written notice from Sellers of such breach or failure or, if reasonably capable of being cured during such ten (10) day period, is not cured by Buyer within such ten (10) day period.

Section 8.2    Effect and Manner of Termination.

(a)    If this Agreement is terminated under Section 8.1, this Agreement shall be void and of no force or effect, without any Liability on the part of any Party, whether arising prior to or after such termination, based on or related to this Agreement or the negotiation, execution, performance or subject matter hereof (whether in contract or in tort or otherwise, or whether at law (including at common law or by statute) or in equity); provided, however, that this Section 8.2 and Article IX shall survive any such termination and remain in full force and effect and no such termination shall relieve any Party of any willful, knowing and material breach hereof occurring prior to such termination.

(b)    This Agreement may be terminated only pursuant to Section 8.1. In order to terminate this Agreement under Section 8.1 (except for Section 8.1(a)), the Party desiring to terminate this Agreement shall give written notice of such termination to the other Parties, specifying the provision hereof pursuant to which such termination is effected.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 240 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 41 of 49

## ARTICLE IX
## GENERAL PROVISIONS

Section 9.1    <u>Nonsurvival of Representations, Warranties and Covenants</u>. The respective representations, warranties and covenants of Sellers and Buyer contained herein and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; <u>provided</u> that this <u>Section 9.1</u> shall not limit any covenant or agreement of the Parties that by its terms requires performance after the Closing.

Section 9.2    <u>Indemnification</u>. Buyer (or any Designated Buyer) shall indemnify and hold harmless the Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors and/or employees for any claim or cause of action alleging that any Intellectual Property of any third party, including but not limited to the Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer (or any Designated Buyer) as part of the Transferred Assets at Closing through the sale pursuant to this Agreement including the defense thereof. The indemnity provided for herein shall be broadly construed to include but shall not be limited to the reimbursement of all costs, professional fees and expenses including legal fees, when incurred by the Trustee, and all expert fees, court costs, and expenses. In addition, in the event that the Sellers' bankruptcy estates, the Trustee or his Court approved professionals, their members, officers, directors and/or employees are sued by any third party as a consequence of (i) the Closing, (ii) the transfer of the Transferred Assets, or (iii) the utilization of the Transferred Assets, including but not limited to, the Rembrandt Intellectual Property, Buyer (or any Designated Buyer) will immediately enter a defense on behalf of the Sellers, the Sellers' bankruptcy estates, the Trustee or his Court approved professionals, their members, officers, directors and/or employees. Buyers (or any Designated Buyer) may join any lawsuit with any other proceeding involving the same or affiliated plaintiffs. Notwithstanding any other provision contained herein, this Section 9.2 shall survive Closing. Buyer (or any Designated Buyer) shall have the right to assume control of or direct the defense against any claim, cause of action, or lawsuit covered by this Section 9.2 and to select counsel to represent Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors, and/or employees (the "<u>Indemnified Parties</u>") with respect to any claim, cause of action, or lawsuit covered by this Section 9.2 and shall use its reasonable efforts in any such defense. The Indemnified Parties shall have the right to approve or reject any counsel proposed by Buyer (or any Designated Buyer) selects, which approval shall not be unreasonably withheld. Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors, and/or employees shall use reasonable efforts to cooperate with Buyer (or any Designated Buyer) and its chosen counsel in the defense of any such claim, cause of action, or lawsuit.

Section 9.3    <u>Fees and Expenses</u>. Except as otherwise provided herein (including <u>Section 5.4(a)</u> and <u>Section 6.1</u>), all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be borne and paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 9.4    <u>Transition of Permits</u>. To the extent that Buyer (or any Designated Buyer) has not obtained all of the Permits that are necessary for Buyer (or any Designated

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 241 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 42 of 49

Buyer) to take title to all of the Transferred Assets at the Closing and thereafter operate all aspects of the Business at the Closing, Sellers shall, to the extent permitted by applicable Laws, use commercially reasonable efforts to maintain after the Closing such Permits that Buyer reasonably requests, at Buyer's sole expense, until Buyer (or any Designated Buyer) has obtained such Permits.

Section 9.5    Amendment and Modification. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 9.6    Waiver. No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 9.7    Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day after the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent by email during regular business hours on a Business Day and, if not, then on the following Business Day or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day after the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid, in each case, at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Parties under this Section 9.6):

    (i)  if to Sellers, to:

        William A. Homony, Chapter 11 Trustee
        8 Penn Center, Suite 950
        1628 John F. Kennedy Blvd.
        Philadelphia, PA 19103
        Email:        bhomony@mctllp.com

        with a copy (which shall not constitute notice) to:

        Obermayer Rebmann Maxwell & Hippel LLP
        Centre Square West
        1500 Market Street, Suite 3400

        Philadelphia, PA  19102
        Attention:    Michael D. Vagnoni
        Email:        michael.vagnoni@obermayer.com

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 242 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 43 of 49

(ii) if to Buyer and/or Hawk, to:

SeeCubic, Inc.
1732A Marsh Road, Suite 124
Wilmington, Delaware 19810
Attention:    Shad L. Stastney
Email:        shadron.stastney@seecubic.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
320 South Canal Street
Chicago, Illinois 60606
Attention:    James J. Mazza, Jr.
Email:        james.mazza@skadden.com

and

K&L Gates LLP
301 Hillsborough St, Ste. 1200
Raleigh, North Carolina 27603
Attention:    Margaret R. Westbook
Email         margaret.westbrook@klgates.com

Section 9.8      Interpretation.

(a)      No Strict Construction. The Parties have been represented by counsel during the negotiation and execution hereof and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in a Contract or other document shall be construed against the Party drafting such Contract or document. Each Party has participated in the drafting and negotiation hereof. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any of the provisions hereof.

(b)      Time Periods. When calculating the period of time prior to which, within which or after which any act is to be done or step taken pursuant hereto, (i) the date that is the reference date in calculating such period shall be excluded and (ii) if the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. Unless expressly provided otherwise, the measure of a period of a month(s) or a year(s) for purposes hereof shall be that date of the following month or year corresponding to the starting date; provided that if no corresponding date exists, the measure shall be that date of the following month or year corresponding to the next day following the starting date.

(c)      Dollars. Unless otherwise specifically indicated, any reference herein to "$" means U.S. dollars.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 243 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 44 of 49

(d)  <u>Gender and Number</u>. Any reference herein to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e)  <u>Articles, Sections and Headings</u>. When a reference is made herein to an Article or a Section, such reference shall be to an Article or a Section hereof unless otherwise indicated. The table of contents and headings herein are for reference purposes only and shall not affect in any way the meaning or interpretation hereof.

(f)  <u>Include</u>. Whenever the words "include," "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation."

(g)  <u>Hereof</u>. The words "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used herein shall refer to this Agreement as a whole and not to any particular provision hereof.

(h)  <u>Extent; Or</u>. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." The word "or" shall not be exclusive.

(i)  <u>Laws</u>. Any Law defined or referred to herein means such Law as from time to time amended, modified or supplemented prior to the date hereof, and includes all rules and regulations promulgated under such Law.

(j)  <u>Persons</u>. References to a person are also to its successors and permitted assigns.

(k)  <u>Exhibits and Disclosure Schedule</u>. The Exhibits hereto and the Disclosure Schedules are incorporated and made a part hereof and are an integral part hereof. Each capitalized term used in any Exhibit or in the Disclosure Schedules but not otherwise defined therein has the meaning given to such term herein. The Disclosure Schedules shall be organized, for purposes of convenience only, into sections that correspond to the Sections hereof. Any item in any section of the Disclosure Schedule that corresponds to a Section in <u>Article III</u> shall apply to and qualify such Section and any other Section in <u>Article III</u> if such item's relevance to such other Section is reasonably apparent.

(l)  <u>Time</u>. Unless specified otherwise herein, any reference herein to a specific time shall be to such time in the North American Eastern Time Zone.

Section 9.9    <u>Entire Agreement</u>. This Agreement, the Settlement Agreement and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor the Settlement Agreement or any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

39

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 244 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 45 of 49

Section 9.10    <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of each Party hereto, and nothing herein, express or implied, is intended to or shall confer upon any Person (including employees of Sellers) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason hereof.

Section 9.11    <u>Governing Law</u>. Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement, and all Actions, claims and causes of action (whether in contract or in tort or otherwise, or whether at law (including at common law or by statute) or in equity) that may be based on, arise out of or relate hereto or the negotiation, execution, performance or subject matter hereof (collectively, "<u>Governed Claims</u>") shall be governed by the Laws of the State of [Delaware] applicable to agreements made and to be performed solely therein, without giving effect to principles of conflicts of law.

Section 9.12    <u>Submission to Jurisdiction; Waiver of Jury Trial</u>. Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms hereof and to decide any Governed Claims and (b) any and all Governed Claims shall be filed and maintained only in the Bankruptcy Court. The Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court for, and irrevocably waive the defense of an inconvenient forum to the maintenance of, any Governed Claim; <u>provided</u>, <u>however</u>, that, if the Bankruptcy Case is closed, (i) each Party irrevocably agrees that any Governed Claim shall be heard and determined in the Court of Chancery of the State of Delaware or, to the extent such court does not have subject matter jurisdiction, the U.S. District Court for the District of Delaware or, to the extent such court does not have subject matter jurisdiction, the Superior Court of the State of Delaware and (ii) each Party hereby irrevocably submits to the exclusive jurisdiction and venue of the courts set forth in the foregoing clause (i) for, and irrevocably waives the defense of an inconvenient forum to the maintenance of, any Governed Claim. Each Party further agrees that notice provided under <u>Section 9.6</u> shall constitute sufficient service of process and waives any argument that such service is insufficient. Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any Governed Claim, (1) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (2) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (3) that (A) the suit, action or proceeding in any such court is brought in an inconvenient forum, (B) the venue of such suit, action or proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. **EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY GOVERNED CLAIM.**

Section 9.13    <u>No Recourse</u>. Notwithstanding any provision hereof or of any Ancillary Agreement, by its acceptance of the benefits hereof, each Party agrees and acknowledges on its own behalf and on behalf of its respective Affiliates that (a) no Person, other than the Parties, have Liabilities hereunder, (b) this Agreement and the Ancillary Agreements may be enforced only against the Parties, (c) no Governed Claim may be brought against any Person that is not a Party and (d) no Party shall have any right of recovery related to

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 245 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 46 of 49

a Governed Claim against any former, current, or future direct or indirect equity holders, controlling persons, directors, officers, employees, agents, Affiliates, members, managers, general or limited partners, Representatives or assignees of any Party.

Section 9.14    Assignment; Successors. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers, and any such assignment without such prior written consent shall be null and void; provided, however, that no assignment shall limit Buyer's obligations hereunder. Notwithstanding the foregoing, Buyer may assign any of its rights or delegate any of its obligations hereunder to any of its Affiliates without obtaining the prior written consent of any Person. This Agreement shall be binding on, inure to the benefit of and be enforceable by, the Parties and their respective successors and permitted assigns.

Section 9.15    Enforcement. The Parties agree that irreparable damage would occur in the event that any of the provisions hereof were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each Party shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches hereof and to enforce specifically the terms and provisions hereof. Each Party hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

Section 9.16    Severability. Whenever possible, each provision or portion of any provision hereof shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision hereof is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 9.17    Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall be one (1) and the same instrument. Delivery of an executed counterpart hereof by facsimile or other electronic transmission (including email or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) shall be effective as delivery of an original counterpart hereof.

Section 9.18    Publicity. Except with respect to any dispute between or among the Parties regarding this Agreement or the transactions contemplated hereby, from and after the date hereof, the Parties shall consult with each other before making any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither Buyer nor Sellers shall make any press release or any public statement prior to obtaining Sellers' (in the case of Buyer) or Buyer's (in the case of Sellers) written approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent disclosure may be required by applicable Law.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 246 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 47 of 49

[SIGNATURE PAGES FOLLOW]

**TA-241**

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed as of the date first written above by a duly authorized person thereof.

**TRUSTEE**

By: _____
        Name:

**STREAM TV NETWORKS, INC.**

By: _____
        Name:
        Title:

**TECHNOVATIVE MEDIA, INC.**

By: _____
        Name:
        Title:

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 248 of 341

Case 23-10763-amc    Doc 795-1    Filed 11/11/24    Entered 11/11/24 21:38:27    Desc
Exhibit Asset Purchase Agreement    Page 49 of 49

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed as of the date first written above by a duly authorized officer thereof.

**SEECUBIC, INC.**

By: _____
    Name:
    Title:

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)[1]** |
| | : | |

**OBJECTION OF WILLIAM A. HOMONY, CHAPTER 11 TRUSTEE, TO VISUAL
SEMICONDUCTOR, INC.'S MOTION FOR EXPEDITED
CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE OF
MOTION TO RECONSIDER AND/OR CLARIFY NOVEMBER 14, 2024 ORDER
QUASHING THE REMAINING VSI DISCOVERY (D.I. #805)**

William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", or collectively with Stream, the "Debtors"), by and through his counsel, Obermayer Rebmann Maxwell & Hippel LLP, files this objection ("Objection") to Visual Semiconductor, Inc.'s ("VSI") Motion for Expedited Consideration, Shortened Time, and Limited Notice (the "Motion to Expedite") of Motion to Reconsider and/or Clarify November 14, 2024, Order Quashing the Remaining VSI Discovery (the "Motion to Reconsider") (D.I. #805). In support thereof, the Trustee respectfully represents as follows:

I.    **BACKGROUND**

1.    On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

1

2.      After almost a year of "acrimony" and "relative lack of progress", on January 5,

2024, this Court entered a Memorandum and Order which, among other things, appointed a

Chapter 11 trustee and granted the Debtors' secured creditor Hawk Investment Holdings Limited

("Hawk") relief from the automatic stay to permit litigation against the Debtors pending in the

Delaware Court of Chancery under § 225 of Title 8 of the Delaware Code (the "225 Action") to

proceed (the "Trustee Order" and "Trustee Opinion") (D.I. #549 and #548, respectively).

3.      On January 9, 2024, the Office of the United States Trustee filed a Notice of

Appointment of William A. Homony to serve as the Chapter 11 trustee (the "Appointment Date")

as well as an Application for the Entry of an Order Approving the Appointment of the Trustee.

(D.I. #554 and #553 respectively).

4.      On January 12, 2024, the Bankruptcy Court entered an Order granting the

Application to Appoint the Trustee (D.I. #558).

5.      After significant and lengthy investigation and consultations with his professionals,

certain of the Debtor's subsidiaries, Mathu Rajan ("Rajan"), VSI, Rembrandt 3D Holding Ltd.

("Rembrandt"), and the Debtors' secured creditors, and further considering the significant legal

and factual challenges involved in the 225 Action, the risk it posed to the Debtors' assets and any

creditor recovery, and the ongoing need to fund the operations of its research and development

subsidiary, SCBV, the Trustee decided that, in his reasonable business judgment, settling the

disputes with the Debtors' secured creditors including, but not limited to, the 225 Action and the

Adversary Proceeding and providing a process to market and sell the Debtors' Assets was in the

best interest of the Debtors' creditors and stakeholders.

6.      Through the Trustee's substantial efforts, the Trustee reached a settlement with

Hawk as collateral agent for the secured creditors (collectively, the "Secured Creditors"), resolving

2

several disputes between the parties and providing for a carve-out valued in the minimum amount of $9,000,000.00 for the Debtors' estates, and a mechanism for the Debtor's assets to be exposed to a sale process, whereby the true value of the assets could be assessed by exposing them to the market (the "Hawk Settlement").

7.      On May 6, 2024, the Trustee filed a Motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure to approve the Hawk Settlement (the "9019 Motion") (D.I. #630).

8.      This Court conducted an evidentiary hearing on the 9019 Motion on June 5, 2024, in which the Trustee testified at length and was cross-examined by both VSI and Rembrandt and ultimately approved the Hawk Settlement (the "9019 Order") (D.I. #653) over the objections of VSI and Rembrandt (D.I. #642 and #643, respectively).

9.      Subsequently, on July 10, 2024, VSI filed a Motion to Reconsider the 9019 Order (the "9019 Reconsideration Motion") (D.I. #702).

10.      On July 26, 2024, VSI filed a Notice of Oral Deposition Subpoena Duces Tecum for the Trustee, seeking the deposition of the Trustee on August 9, 2024, and the production of certain documents relating to, *inter alia*, the 9019 Motion and the Settlement with Hawk (D.I. #712).

11.      On August 24, 2024, VSI filed an Amended Notice of Oral Deposition Subpoena Duces Tecum for the Trustee, seeking the deposition of the Trustee on September 3, 2024, and the production of certain documents relating to, *inter alia*, the 9019 Motion and the Settlement with Hawk (D.I. #718).

12.      Thereafter, on August 29, 2024, the Trustee filed a Motion to Quash and for Protective Order, seeking to quash the July 26th and August 24th Subpoena Duces Tecum for the Trustee (the "Motion to Quash") (D.I. #724).

4934-9427-6866 v1

13.    Pursuant to the Hawk Settlement, on September 30, 2024, the Trustee filed a Sale

Motion with this Court seeking authorization and approval of the Stalking Horse APA and the Bid

Procedures in connection with the sale of substantially all of the Debtors' assets on an "as is,"

"where as" basis, without any warranty of any kind, express or implied (the "Sale Motion").

14.    October 11, 2024, VSI filed another Subpoena Duces Tecum directed at the Trustee

(the "October Subpoena") that set a deposition date of October 29, 2024, and required document

production by October 24, 2024 (D.I. #761).

15.    October 30, 2024, the Court held a hearing on the Motion to Quash and entered an

order that, *inter alia*, suspended a ruling on topics and documents sought through the October

Subpoena pending a resolution of the 9019 Reconsideration Motion (D.I. #777).

16.    Thereafter, on November 13, 2024, the Court held a hearing and approved the

Bidding Procedures and the Stalking Horse APA with SeeCubic, Inc. ("SeeCubic"), once again,

over the objections of VSI and Rembrandt (D.I. #788 and #789, respectively).

17.    On November 14, 2024, the Court entered an order denying the 9019

Reconsideration Motion and quashing the discovery sought through the October Subpoena (D.I.

#805).

18.    The order approving the Bidding Procedures was entered on November 20, 2024

(the "Bidding Procedures Order") (D.I. #811).

19.    The Bidding Procedures Order, *inter alia*, set a Bid Deadline of December 2, 2024,

at 12:00 p.m. (EST), the Auction for December 3, 2024, and the Sale Hearing for December 4,

2024. *See Id.*

20.    Now, on November 27, 2024, less than one (1) week before the Sale Hearing and on the evening before the Thanksgiving holiday, VSI filed the Motion to Reconsider and the Motion to Expedite (D.I. #826 and #827, respectively).

21.    VSI reached out to the Trustee seeking his consent for the Expedited Consideration of the Motion to Enforce, and the Trustee declined to consent for a number of reasons, as explained below.

## II.    **ARGUMENT**

22.    Though the Motion to Expedite does not clearly state, the Motion to Reconsider is actually a motion to enjoin the sale scheduled for hearing on December 4, 2024.

23.    The Motion to Expedite is nothing more than VSI's latest desperate attempt to stall the sale of the Debtors' assets and postpone the Sale Hearing, which should be denied on multiple grounds.

24.    VSI's efforts to date, including the various discovery requests, are indicative of its ultimate goal – to delay the Debtors' Chapter 11 cases and prevent the sale of the Debtors' assets to anyone other than VSI.

25.    It is difficult to explain procedurally how inappropriate the Motion to Reconsider actually is - the Trustee will respond appropriately when required.  However, the request for expedited consideration must be denied.

26.    First, VSI has failed to articulate why, less than one (1) week before the Sale Hearing and at 3:00 p.m. on Thanksgiving eve, the instant emergency came into existence and why the Motion to Reconsider and the Motion to Expedite needed to be filed at this time.

27.    Indeed, the need for expedited consideration of the Motion to Reconsider has been entirely fabricated by VSI.

4934-9427-6866 v1

**TA-248**

28.    The Court entered the order denying the 9019 Reconsideration Motion and quashing the discovery sought through the October Subpoena on November 14, 2024 (D.I. #805), yet it took VSI nearly two (2) weeks to file the Motion to Reconsider.

29.    If the Motion to Reconsider was so urgent as to require an expedited hearing, VSI should have filed it weeks ago.

30.    Clearly, VSI did not see the Motion Reconsider as urgent until they needed it to be; when it would serve VSI best and directly threaten the Sale Hearing.

31.    Second, VSI has failed to meet the procedural requirements for expedited consideration.

32.    L.B.R. 5070-1(g)(A) requires VSI to state with particularity the reasons why expedited consideration is needed.

33.    The controversy only became an emergency when VSI chose to raise an issue intended to derail the Trustee's preparation for the hearing on the Sale Motion and thwart the sale of the Debtors' assets.

34.    VSI asserts that expedited consideration of the Motion to Reconsider is needed "so as not to jeopardize VSI's due process rights in these proceedings." - however, VSI fails to explain how this is so, failing to provide any factual or other support for this proposition (D.I. #827, ¶ 6).

35.    The Motion to Expedite goes on to confusingly state that it must be granted because the relief sought at the Sale Hearing "entitles VSI to discovery before the Sale Hearing" but, once again, fails to explain why this is the case (D.I. #827, ¶ 8).

36.    Further, the Motion to Expedite baselessly states in a conclusory fashion, that the Motion to Reconsider being heard on an expedited basis is "in the best interest of all effected

6

parties and creditors as VSI is trying to prevent the Trustee from destroying the value' IP will be destroyed." (D.I. #827, ¶ 9).

37.    This claim is unsupported and entirely unfounded; VSI's alleged concern is entirely disingenuous as the proposed Stalking Horse APA will provide substantial value to the Debtors and their creditors.

38.    Finally, upon information and belief, VSI has failed to contact the United States Trustee concerning its availability and the request for expedited consideration as required pursuant to L.B.R. 5070-1(f)(1).

39.    Indeed, there is no statement in the Motion to Expedite that VSI reached out to the United States Trustee.

III.    **CONCLUSION**

WHEREFORE, and for the foregoing reasons, the Trustee respectfully requests this Court deny the Motion to Expedite and grant such other relief as it deems equitable and just.


Respectfully Submitted,


Dated: November 29, 2024        By: */s/ Michael D. Vagnoni*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066
Facsimile: (215) 665-3165
E-mail:  edmond.george@obermayer.com
                michael.vagnoni@obermayer.com

*Counsel to William A. Homony Chapter 11 Trustee*

7

4934-9427-6866 v1

**TA-251**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)[1]** |
| | : | |

**OMNIBUS RESPONSE OF WILLIAM A. HOMONY, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE, TO THE OBJECTIONS TO THE TRUSTEE'S MOTION FOR,** *INTER ALIA***, AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF**

William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", and collectively with Stream, the "Debtors"), by and through his counsel, Obermayer Rebmann Maxwell & Hippel LLP, files this omnibus response (the "Response") to the Objections of Visual Semiconductor, Inc. ("VSI") (the "VSI Objection") and Rembrandt 3D Holding Ltd. ("Rembrandt") (the "Rembrandt Objection" and, collectively with the VSI Objection, the "Objections") to the Trustee's Motion for, *inter alia*, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief (the "Sale Motion") (D.I. #750)[2]. In support thereof, the Trustee respectfully states as follows:

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

1

## I.   PRELIMINARY STATEMENT

1.      As more fully described in the Sale Motion and below, the Trustee intends to conduct a Sale of substantially all of the Debtors' assets consisting of the Stream assets identified in the asset purchase agreement filed in connection with the Sale Motion (the "APA") and the ownership interests of Technovative in its downstream subsidiaries, Technology Holdings Delaware LLC, Media Holdings Co, LLC, and Ultra-D Ventures C.V. (D.I. #791-1) (the "Non-Debtor Subsidiaries", collectively the "Assets") for the benefit of the Debtors' estates and their creditors.

2.      To be clear, the Trustee is not transferring any property owned by the Non-Debtor Subsidiaries, including any intellectual property rights (as those assets are not the property of the Debtors' estates); only Technovative's equity interest in the Non-Debtor Subsidiaries.

3.      The Debtors themselves own no intellectual property rights as is made clear by the Debtors' Schedules of Assets and Liabilities, signed under penalty of perjury by the Debtors' former CEO Mathu Rajan ("Rajan") (now ironically in control of VSI taking completely contrary positions).

4.      Since his appointment, the Trustee and his professionals have spent significant time evaluating the Debtors' options in accordance with his duties under the Bankruptcy Code and the mandate contained in the order appointing him and, with the absence of any real operations or revenue, determined that a settlement of claims against the Debtors' secured creditors and an orderly sale of the Debtors' Assets best serves the interests of all stakeholders in the Debtors' bankruptcy cases.

5.      The Sale and the sale process approved by this Court is necessary to maximize the value of the Debtors' Assets by exposing them to the market.

2

6. To that effect, the Court has already approved the procedures related to the marketing, bidding, and sale process for the Debtors' Assets.

7. Despite this, VSI and Rembrandt filed the Objections as desperate, last-ditch attempts to undermine the Trustee's objective, good faith efforts to bring order to the Debtors' bankruptcy cases and secure funds to make distributions to creditors for the sole purpose of putting the Debtors back in the control of Rajan through VSI. As this Court has already made clear, Rajan has engaged in self-dealing, has grossly mismanaged the Debtors' estates, and has been an impediment to any proposed rehabilitation or reorganization of the Debtors.

8. The Objections are primarily an attempt to reargue the merits of the Trustee's settlement which gives rise to the sale the Trustee now seeks approval of – a settlement which this Court approved over VSI and Rembrandt's objection, not to mention the denial of VSI's motion to reconsider the approval of that settlement.

9. Indeed, the integrity of the Objections must also be called into question due to this Court's lengthy findings in the Trustee Opinion, as defined below, which established, and as set forth in greater detail below, that Rajan, VSI, and Rembrandt have engaged in numerous efforts to orchestrate a way, by any means possible, to maintain Rajan's control over the Debtors. Rajan and VSI have demonstrated over and over that they have a complicated relationship with the truth and are not to be trusted.

10. In short, the Objections are nothing more than the latest in a long history of concentrated efforts by Rajan, VSI, and Rembrandt to prevent the sale of the Debtors' assets and further drag out the Debtors' cases.

4889-9066-4446 v5

**TA-254**

## II.    **BACKGROUND**

11.    The factual and procedural background of these cases are well known to this Court, and to the extent not stated herein, the Trustee incorporates the factual and procedural background contained in the Trustee Opinion, as defined below, and the Sale Motion.

### A.    **Procedural History**

12.    On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").[3]

13.    After almost a year of "acrimony" and "relative lack of progress", on January 5, 2024, this Court entered a Memorandum and Order which, among other things, appointed a Chapter 11 trustee and granted the Debtors' secured creditor Hawk Investment Holdings Limited ("Hawk") relief from the automatic stay to permit litigation against the Debtors pending in the Delaware Court of Chancery under § 225 of Title 8 of the Delaware Code (the "225 Action") to proceed (the "Trustee Order" and "Trustee Opinion") (D.I. #549 and #548, respectively). A true and correct copy of the Trustee Opinion is attached as Exhibit "A" hereto.

14.    As described in further detail below, this Court held, in relevant part, that, due to the gross mismanagement and lack of transparency under Rajan's leadership, (i) a Chapter 11 trustee must be appointed to administer the Debtors' cases, and (ii) Rajan was no longer authorized to act on behalf of the Debtors' estates. (D.I. #548).

---

[3] As set forth in greater detail below, these bankruptcy cases are not Rajan's first attempt to use the Bankruptcy Courts to regain control of the Debtors' assets.  Stream was involved in two prior bankruptcy cases, the first being a Chapter 11 case initiated by the Stream TV Debtor on February 24, 2021 and docketed at In re: Stream TV Networks, Inc., Bankr. D. Del. No. 21-10433-KBO (the "Delaware Voluntary Bankruptcy Case") and the second being an involuntary Chapter 7 case initiated on May 23, 2021 by, inter alia, purported creditor Rembrandt 3D Holding Ltd. ("Rembrandt"), docketed at In re Stream TV Networks, Inc., Bankr. D. Del. 21-10848 (the "Delaware Involuntary Bankruptcy Case").

15.     Despite its concerns with Rajan and the general administration of the Debtors'

cases, the Court opted not to dismiss the Debtors' cases and instead decided to appoint a trustee:

> The Court is not convinced conversion or dismissal is appropriate at
> this stage… The replacement of Mr. Rajan at the helm of the
> Debtors' estates and the appointment of a trustee to evaluate the
> Debtors' assets, potential deals, potential claims, etc., is needed… <u>If
> these cases have any chance of succeeding, it will be because there
> is transparency to the Court and creditors and an impartial third-
> party evaluating assets, claims, and the Debtors' reorganizational
> prospects</u>. A trustee will obviously come with a cost, but the Court
> believes the value of an unconflicted, third-party neutral to assess
> the state of the Debtors' operations, potential transactions, and
> claims and efficiently determine whether and how the Debtors can
> achieve reorganization, more than offsets these costs.

Trustee Opinion, at 73-74 (emphasis added).

16.     On January 9, 2024, the Office of the United States Trustee filed a Notice of

Appointment of William A. Homony to serve as the Chapter 11 trustee (the "Appointment Date")

as well as an Application for the Entry of an Order Approving the Appointment of the Trustee (the

"Application") (D.I. #554 and #553 respectively).

17.     On January 12, 2024, the Bankruptcy Court entered an Order granting the

Application to appoint the Trustee (D.I. #558).

18.     After significant and lengthy investigation and consultations with his professionals,

certain of the Debtors' subsidiaries, Rajan, VSI, Rembrandt, and the Debtors' secured creditors,

and further considering the significant legal and factual challenges involved in the 225 Action, the

risk it posed to the Debtors' assets and any creditor recovery, and the ongoing need to fund the

operations of its research and development subsidiary, SeeCubic BV ("SCBV"), the Trustee

decided that, in his reasonable business judgment, settling the disputes with the Debtors' secured

creditors including, but not limited to, the 225 Action and the adversary proceeding initiated by

the Debtors to, *inter alia*, enjoin the Debtors' secured lenders, individuals associated with the

secured lenders and SCBV (the "Adversary Proceeding") and providing a process to market and sell the Debtors' Assets was in the best interest of the Debtors' creditors and stakeholders.

19.    Through the Trustee's substantial efforts, the Trustee reached a settlement with Hawk, as collateral agent for the secured creditors (collectively, the "Secured Creditors"), resolving several disputes between the parties and providing for carve out valued in the minimum amount of $9,000,000.00 for the Debtors' estates, and a mechanism for the Debtors' Assets to be exposed to a sale process, whereby the true value of the assets could be assessed by exposing them to the market (the "Hawk Settlement").[4]

20.    On May 6, 2024, the Trustee filed a Motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure to approve the Hawk Settlement (the "9019 Motion") (D.I. #630).

21.    This Court conducted an evidentiary hearing on the 9019 Motion on June 5, 2024, during which the Trustee presented evidence that the Hawk Settlement satisfied the *Martin* factors[5], established the facts and reasoning that had informed his decision, making a sound business judgment in entering into the Hawk Settlement and was cross-examined by both VSI and Rembrandt.  Ultimately, this Court approved the Hawk Settlement (the "9019 Order") (D.I. #653) over the objections of VSI and Rembrandt (D.I. #642 and #643, respectively).

22.    Pursuant to the Hawk Settlement, on September 30, 2024, the Trustee filed the Sale Motion with this Court seeking authorization and approval of the Stalking Horse APA and the Bid Procedures in connection with the sale of substantially all of the Debtors' assets on an "as is", "where is" basis, without any warranty of any kind, express or implied.

---

[4] The salient terms of the Hawk Settlement are set forth in the Sale Motion. See Sale Motion at ¶ 30.
[5] *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).

23.    The Sale Motion explicitly stated that the Trustee does not intend to sell or assign the Rembrandt License as a part of the Stalking Horse APA and intends to object to the Rembrandt claims in the Debtors' bankruptcy cases and raise counterclaims in connection therewith.

24.    Thereafter, on November 13, 2024, the Court held a hearing and approved the Bidding Procedures and the Stalking Horse APA with SeeCubic Inc. ("SeeCubic"), once again, over the objections of VSI and Rembrandt (D.I. #788 and #789, respectively).

25.    The order approving the Bidding Procedures was entered on November 20, 2024 (D.I. #811).

26.    The Bidding Procedures Order also set a deadline of November 22, 2024, at 4:00 p.m. (EST) for the filing of objections specifically to the sale of the Debtor's Assets and a deadline of November 29, 2024, for the filing of responses to any objections. (D.I. #811).[6]

27.    On November 22, 2024, VSI and Rembrandt filed the Objections, which incredibly attempt to reargue the merits of the Hawk Settlement and spend an inordinate amount of time attempting to deflect attention from the conspiratorial and collusive actions of Rajan, VSI and Rembrandt, ignoring this Court's observations about Rajan's spectacular failures as a fiduciary as reflected in the Trustee Opinion.

**B.    Rajan, VSI, and Rembrandt's Collusive Actions**

28.    The Objections, along with the statements and arguments contained therein, stand in stark contrast to the Court's findings in the Trustee Opinion and the history of the Debtors' cases, which established that Rajan, VSI, and Rembrandt have a long history of obfuscating the truth and acting in their own interest – not in the interest of the Debtors' bankruptcy estates.

---

[6] Additionally, the Bidding Procedures Order set a deadline of the Sale Hearing, December 4, 2024, for objections, and responses thereto, based solely on the identity of the Successful Bidder at the Auction.

4889-9066-4446 v5

29.     In the Trustee Opinion, this Court found, *inter alia*, that: (i) the Debtors, under the watch and leadership of Rajan, breached their fiduciary duties to creditors and disclosure obligations to the Court in failing to disclose that VSI had made millions of dollars of payments on behalf of the Debtors in return for Debtor stock; (ii) Debtors' management, specifically Rajan, contemporaneously and improperly acted as a fiduciary of the Debtors and VSI; (iii) "Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony at trial was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness to draw distinctions between the Debtors and VSI and his roles with each"; and (iv) "Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness." Trustee Opinion at 60-61.

30.     Throughout these cases, there have been particular concerns with the integrity of Rajan's dealings with VSI and Rembrandt:

> [T]he Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has been littered with questions about the role and involvement of VSI, the Debtors' ability to operate independently of VSI, and whether Mr. Rajan is able to differentiate his role with the Debtors from his role with VSI.

Trustee Opinion at 56 (emphasis added).

31.     The Court explicitly noted that VSI's actions and involvement in the Debtors' cases were a driving force behind appointing the Trustee. Trustee Opinion at 46-51.

32.     Rajan's alignment with VSI and Rembrandt to the detriment of the Debtors has continued, unabated, since the entry of the Trustee Opinion and has been in full display before this Court as VSI and Rembrandt attempt to seize any opportunity to throw roadblocks in the Trustee's

4889-9066-4446 v5

path to selling the Assets in order to pay creditors. Simply put, Rajan has continued to engage in the same conduct the Court found so troubling in the Trustee Opinion.

### i.  VSI's Control Over the Debtors

33.     It is well established that Rajan served as the controlling force of both VSI and the Debtors.

34.     Despite having control over VSI and the Debtors, Rajan used the Debtors' bankruptcies to avoid the realities of the 225 Action and then to actively advance the interests of VSI at the expense of the real creditors, the Debtors, and their estates.

35.     It is clear from documents produced by the Debtors' bankruptcy counsel that VSI exhibited control over the Debtors even in the early stages of the Debtors' bankruptcy cases.

36.     For example, on July 8, 2023, the Debtors' bankruptcy counsel emailed VSI's attorneys at Akerman LLP attaching template documents for formulation of a Chapter 11 plan and related agreements, which they aptly described as "really VSI's deal."   True and correct copies of the emails are attached as Exhibit "B" hereto.

37.     VSI's control over the Debtors included VSI's Akerman attorneys issuing instructions to the Debtors' counsel concerning an adversary proceeding filed by the Debtors against certain of the Debtors' secured creditors and equity holders.  *See* Exhibit "C" attached hereto. (July 2023 email chain between Debtors' attorneys and VSI's attorneys at Akerman in which an Akerman attorney states that delay in drafting the complaint "is ridiculous.  Client [i.e., VSI,] wants i[t] filed tomorrow"); *see also, e.g.,* Exhibit "D" attached hereto (8/4/23 email from Debtors' attorney to various Debtor principals, VSI principals, Debtor attorneys, and Akerman attorneys stating that "Mathu and Bud tell me that VSI wants to have relief ASAP on several fronts – we need to get that list and make sure we are asking for injunctive relief").

38.    Upon information and belief, the "Bud" in the August 8, 2023 e-mail is Charles M.
"Bud" Robertson ("Mr. Robertson"), the same individual who submitted the declaration in support
of VSI's Objection in which he stated he has served in various roles with Stream, SCBV, and for
most of 2024 provided executive consulting services for VSI, while at the same time, from
"January 2024 until the present . . . provided contract services to Stream" after the Trustee's
appointment. See Declaration of Charles M. Robinson, D.I #815-1 at pp. 1-2. It is unknown under
what "contract" Mr. Robinson was performing those services or who was paying him for those
services.

39.    What Mr. Robinson fails to disclose in his Declaration is that he is currently listed
as the Executive Vice President for Visual Technology Innovations, Inc. ("VTI") (see https://vti-
global.com/team/), which the Delaware Bankruptcy Court found explicitly existed for the purpose
of wrongfully usurping the resources of the Debtor for the benefit of Mr. Rajan.

40.    As a result, the Delaware Bankruptcy Court dismissed the Delaware Voluntary
Bankruptcy Case as having been filed in bad faith:

> Mr. Rajan established VTI of which he is the controlling
> shareholder, president, and until recently the sole director. Using
> VTI he began to fundraise using Stream's assets despite the
> injunction.
>
> It is clear, through documentary evidence, that Mr. Rajan intended
> to use a Stream bankruptcy as a mechanism by which he could, via
> Stream, regain the Ultra-D assets from the secured lenders and then
> through VTI obtain them at a fraction of what he believed was the
> assets' value.

Delaware Voluntary Bankruptcy Case at D.I. #200, 14:20-15:4; *id.* at D.I. #198 (order dismissing
bankruptcy).

41.    The level of control VSI had over the Debtors became explicitly clear when, on
April 3, 2023, the Debtors filed an Application Pursuant to 11 U.S.C. § 327(a) of the Bankruptcy

4889-9066-4446 v5    **TA-261**

Code for Authority to Employ their prior counsel, which was accompanied by a declaration from counsel in which it was represented that "Before filing these cases, Visual Semiconductor, Inc. ('VSI'), an investor in the Debtor, paid a flat non-refundable fee payment on behalf of the Debtors in the amount of $50,000.00 in preparation for filing the Chapter 11 bankruptcies. VSI has been advancing payments for Stream TV Networks, Inc's [sic] expenses in exchange for equity in Stream TV Networks, Inc." (D.I. #70).

42.     As it turns out, VSI continued funding the Debtors' post-petition operations in exchange for equity in Stream and, through VSI, solicited money from investors pursuant to an agreement for which the Debtors never obtained court approval.

43.     While taking the position that such transfers were not outside Stream's ordinary course of business (and thus did not require prior court approval), in support of the Stock Sale Motion (defined below), the Debtors represented to the Court that they were nonetheless seeking such approval out of an "abundance of caution," had not made any such transfers post-petition, and were awaiting Court permission to do so. Trustee Opinion at 39-40 (citing Stock Sale Motion ¶ 56) and 43 (citing April 24, 2023 Hrg. Tr. at 28:10-15, 31:22-32:1). "[T]he Court did not give that permission." *Id.* At trial, Mr. Rajan's testimony revealed to the Court that Stream – then under his control – had been issuing shares to VSI "every week or two since the Debtors' Petitions were filed." *Id.* at 44 (citing August 17, 2023 Hrg. Tr. at 205:21-206:1, 212:25-213:3).

ii.    **Rembrandt's Suspect Claims**

44.     The collusive and conspiratorial relationship between the Debtors and Rembrandt began well before the Debtors' bankruptcy cases were filed.

45.     On May 23, 2021, Stream, Rajan, Rajan's brother Raja, an attorney, and Rembrandt executed a collusive and self-serving settlement agreement (the "Settlement Agreement") that

granted Rembrandt creditor status in a ruse to circumvent the dismissal of the Delaware Voluntary Bankruptcy Case. A true and correct copy of the Settlement Agreement is attached as Exhibit "E" hereto.

46. The **same day** that Stream and Rembrandt entered into the Settlement Agreement, Rembrandt, as one of three (3) petitioning creditors, filed the Delaware Involuntary Bankruptcy Case against Stream.

47. While the filing was ultimately dismissed, the timing of the filing substantiated the concern that the Settlement Agreement was a sham concocted by Rajan and Rembrandt to manufacture a contrived claim for Rembrandt to end-run the Delaware Bankruptcy Court's dismissal of the Delaware Voluntary Bankruptcy Case.

48. On the Petition Date, Technovative filed its List of Creditors Who have the 20 Largest Unsecured Claims and are not Insiders (the "Top 20 List") and scheduled Rembrandt as its only creditor having a "breach of contract" claim in the amount of $10 million (+) and listed the claim as contingent, unliquidated and disputed and thus, not an allowed claim (Technovative Bankruptcy Docket, D.I. #1 and #3).

49. Then, mysteriously and without explanation, a mere two (2) weeks later, when Technovative filed its Schedules of Assets and Liabilities, Rembrandt's claim ballooned to $100 million dollars, more than ten (10) times the original amount, and listed by Rajan as underlined: undisputed, noncontingent, and liquidated and therefore, an "allowed" claim for "goods and services." (Technovative Bankruptcy Docket, D.I. #50).

50. To make matters worse, less than a month prior to the Petition Date, Rembrandt filed a complaint in the Delaware District Court against, *inter alia*, Technovative in which the only count asserted against Technovative was a request for injunctive relief and no monetary damages;

12

and yet Rajan listed Rembrandt as having an undisputed, non-contingent and liquidated claim of $100 million in its Schedules, ten times its original claim.

51.    How Technovative, a holding company, whose only assets were the interests in Media Holdings Co. LLC and Ultra D Ventures C.V. valued at $2,000.00 as of the petition date, incurred $100 million of undisputed, noncontingent, and unliquidated debt without explanation and with nothing to show for it reported on its Schedules defies comprehension, and blatantly signals collusion. *In re Technovative Media, Inc.* Case No. 23-10764 (AMC) (D.I. #47).

52.    Emails between counsel for Rembrandt and the Debtors concerning the "Plan for Rembrandt" all but confirm that the schedules were being manipulated:

> [Rembrandt Attorney:]  We have read Stream's latest motion papers and note that Stream was asking to have a number of employees and vendors paid to allow production to start but did not include any payment to Rembrandt. While I understand the list of vendors will not be paid, we expected to be included in the list of vendors that needed to be paid to restart production.  Coupled with Stream's failure to list Rembrandt as either a creditor or as having an executory contract with Stream, we are having a hard time reconciling your filings with your statements that Rembrandt will both be paid and treated as an administrative claim.  If VSI has $10,000,000 to invest in Stream, there are funds to pay Rembrandt, but we see no plan to do so. . . .
>
> [Debtors' Attorney]:   We have to update the schedules.
>
> Right now we are trying to deal with the secured lenders.
>
> Do your funding sources want to supply a DIP?
>
> Might be better optics.
>
> VSI isn't putting in $10 million - the purchase orders plus investors are the source of those funds.

True and correct copies of the emails are attached as Exhibit "F" hereto.

53.     Even more suspect is that Stream, who Rembrandt alleges is the counterparty to the Settlement Agreement, failed to even include a claim for Rembrandt in its Schedules and initially did not identify the collusive Rembrandt Agreement as an executory contract in its Schedules (the Stream Schedule G was ultimately amended to include the Settlement Agreement).

54.     Thereafter, on October 10, 2024, the Trustee filed an amendment to the Technovative Schedules to list the Rembrandt claim in the correct amount: $0.00. In response, Rembrandt falsely filed a nearly identical proof of claim against Technovative to the claim it filed against Stream for $1.2 billion based on the claimed Settlement Agreement, to which Technovative is not even a party.  A copy of Rembrandt's Claim No. 26-1 filed against Technovative in the Stream bankruptcy is attached as Exhibit "G" hereto.

55.     The Trustee is investigating Rembrandt's proofs of claim with the intention of objecting to the Rembrandt claims in the Debtors' bankruptcy cases and raising counterclaims in connection therewith.  The Trustee vehemently disputes the bona fides of this claimed debt.

### iii.     Transactions that Benefitted VSI and Rembrandt

56.     In addition to the transactions detailed above, there are a number of other problematic transactions between the Debtors, VSI, and Rembrandt – all of which have the taint of Rajan's involvement.

57.     Of particular concern were the proposed major transactions benefitting VSI, which this Court has also taken issue with:

> The Court has had concerns nearly from the inception of these cases about the relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles.  Certain transactions the Debtors have proposed have only reinforced that concern.  As discussed *supra*, the proposed funding transaction with VSI in April would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI.  It was, therefore, denied.  The unauthorized post-petition issuance of shares in Stream to VSI also

> raises serious questions about the administration of these cases for the benefit of VSI. These, however, were not the only instances where the Court's trust in the Debtor's management has deteriorated in light of transactions the Debtors have proposed either at the eleventh hour or under cover of more innocuous requests for relief that seem to benefit VSI without justification.

Trustee Opinion at 46.

58.    The proposed funding transactions with VSI that so concerned the Court first took the form of an expedited motion seeking court approval to sell $10 million of unissued Stream shares to VSI in exchange for funding of their post-petition operations. (D.I #135) ("Stock Sale Motion").

59.    The Stock Sale Motion stated that VSI and Stream had entered into an exclusive distribution agreement (the "Distribution Agreement") "as compensation for [VSI's] support" pursuant to which VSI would accept orders from and deliver products to third-party customers. Upon receiving an order, VSI would issue a purchase order to Stream for 90% of the order total and would keep 10% for itself. *Id.*

60.    While taking the position that such transfers were not outside Stream's ordinary course of business (and thus did not require prior court approval), in support of the Stock Sale Motion, the Debtors represented to the Court that they were nonetheless seeking such approval out of an "abundance of caution", had not made any such transfers post-petition, and were awaiting Court permission to do so. Trustee Opinion at 39-40 (citing Stock Sale Motion ¶ 56) and 43 (citing April 24, 2023 Hrg. Tr. at 28:10-15, 31:22-32:1).

61.    Even more troubling, Mr. Rajan's later testimony revealed to the Court that Stream – then under his control – had been issuing shares to VSI "every week or two since the Debtors' Petitions were filed." *Id.* at 44 (citing August 17, 2023 Hrg. Tr. at 205:21-206:1, 212:25-213:3).

62.    After the Court informed the Debtors that it would not approve the sale of Stream shares to VSI on an expedited basis, the Debtors sought approval of emergency debtor-in-possession financing the following day (D.I #155) ("DIP Financing Motion") in which the Debtors proposed two funding options: a) the Debtors could borrow roughly €872,000.00 from VSI on an unsecured basis to fund SCBV payroll, or b) Stream could enter into the Distribution Agreement with VSI and, in exchange, VSI would issue one or more unsecured SCBV promissory notes directly to SCBV.

63.    Approval of the DIP Financing Motion was also denied, as this Court specifically found that either the Stock Sale Motion or the DIP Financing Motion "would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI." Trustee Opinion at 46.

64.    Transactions, such as the Distribution Agreement with VSI and the Rembrandt License Covenant, appeared to benefit VSI primarily and raised additional concerns about conflicts of interest and Rajan's ability to act in the best interest of the Debtors' estates. Trustee Opinion at pp. 46-51.

65.    The Rembrandt License Covenant, like the Distribution Agreement, is especially of concern, as it was entered into by Rajan without court approval.

66.    The Rembrandt License Covenant clearly prioritized VSI's interests over the interests of the Debtors and their subsidiaries by expressly barring Rembrandt from issuing licenses to any of Stream's subsidiaries. Trustee Opinion at 49-50.

67.    Indeed, the Rembrandt License Covenant was "intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries. The Licensing

16

Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia*, Stream's subsidiaries." Trustee Opinion at 50.

68.    The concerns with the Rembrandt License Covenant also apply to the August 12, 2023, Settlement Amendment between Stream and Rembrandt, which was also entered into without the approval of the Court (the "Settlement Amendment").

69.    The Settlement Amendment served to amend the May 23, 2021, Settlement Agreement between Stream and Rembrandt.

70.    Like the Rembrandt License Covenant, the Settlement Amendment served to align Stream and VSI with respect to licensing the technology of Rembrandt, as it contained, *inter alia*, a clause stating that in the event there was a change of control in Stream, Rembrandt would transfer all licenses from Stream to VSI.

71.    This clause was essentially a "poison pill" that served to keep the Rembrandt licenses in Rajan's hands and to cause Stream to implode in the event Rajan was removed from control.

72.    There were also serious concerns with the Distribution Agreement. This Court stated: "In the end, the Court was left with the distinct impression that the Debtors sought to enter into the Distribution Agreement while attracting little attention to it, and once attention was drawn, failed to have a compelling reason for allowing VSI to benefit from the Debtors' product sales." Trustee Opinion at 46-48.

73.    With regard to these transactions, each "had the taint of benefit to VSI without clear benefit to the Debtors and their estates. Where Mr. Rajan stands on both sides of those transactions, they only add to the Court's conclusion that he has breached his fiduciary duties in proposing them

4889-9066-4446 v5

**TA-268**

without being able to articulate how they are a reasonable exercise of his business judgment." Trustee Opinion at 51.

### iv.    Rajan's History of Untrustworthiness

74.    Throughout the pendency of these bankruptcy cases, it has been made clear that Rajan and the parties he controls cannot and should not be trusted.

75.    This Court went to great lengths in the Trustee Opinion to stress that it was highly concerned with Rajan's "plans, trustworthiness, and motivations… in his role as, for all intents and purposes, the singular figure in the Debtors' management." Trustee Opinion at p. 31.

76.    There were numerous issues with Rajan's leadership, including, but not limited to (i) his lack of "ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court," (ii) "the relatively directionless nature of these cases to date," and (ii) "the entrenched acrimony between the Debtors, Hawk, SLS, and SeeCubic that has permeated the cases and driven nearly all activity to date." Trustee Opinion at p. 31.

77.    In the Trustee Opinion, the Court pointed directly to events that highlighted Rajan's lack of leadership and untrustworthiness, including:

a.    Rajan's purported deal with Zhongsheng Group Holdings Ltd. ("Zhongsheng"). The Court called its very existence into question and stated it did not believe the deal was real. Trustee Opinion at 35-38.

b.    The self-imposed funding crisis that nearly left SCBV's payroll unfunded. The Court took significant issue with the foreseeability of the funding crisis, and the Debtors', as managed by Rajan, attempt to solve the crisis by proposing the sale of shares of the Debtors to VSI on an expedited basis. Trustee Opinion at 42-43.

4889-9066-4446 v5

c.  Rajan's claims that there were "hundreds of millions of dollars" in purchase orders coming to Stream and numerous deals/partnerships in the works. The Court stated it had concerns with the veracity of the alleged purchase orders from VSI, stating there was nothing to substantiate them other than Rajan's meritless testimony. Trustee Opinion at 51-58.

d.  The Debtors' lack of transparency in post-petition operations and financing while under Rajan's leadership. The Court was alarmed by "the Debtors' failure to revise knowingly false monthly operating reports…" and the fact that the revised monthly operating reports filed by the Debtors revealed that there were payments VSI made on behalf of Stream, a fact that is directly contradicted by Rajan's testimony.

Trustee Opinion at 59-60.

78.  Ultimately, the net result of Rajan's administration of the Debtors was "confusion, mistrust, and unending acrimony that has led to the Court's assessment that, even if the Debtors have a reasonable likelihood of rehabilitation, they have made little progress to date in attaining it under Mr. Rajan's stewardship." Trustee Opinion at 61.

79.  VSI complains that the Trustee ignored better offers made by VSI. The Trustee could not establish that any of VSI's proposals were credible or likely to produce the promised results.

**C.    The Continued, Unapproved Use of the Debtors' Assets**

80.  After his appointment, the Trustee became aware that VSI was acting without his approval and was attempting to raise capital using and/or selling either Stream technology or products incorporating that technology in violation of the Trustee Order.

4889-9066-4446 v5

81.    VSI was acting like and holding itself out to be an affiliate of the Debtors, even though it is not.

82.    Indeed, despite the Court entering the Trustee Opinion and Order, Rajan, through VSI, continued to act on behalf of and exert control over the Debtors' assets by acting without the Court or the Trustee's approval, demonstrating Debtor technology and attempting to raise capital using and/or selling either Stream technology or products incorporating that technology. VSI has explicitly admitted this. *See* Case No. 23-00057-AMC, D.I. #135 at ¶ 10.

83.    VSI even admitted that it was finalizing the plans to take control of Stream's bonding equipment in order to deliver it to an unnamed strategic partner. *See id.* at ¶ 9.

84.    Further, the Trustee has recently been made aware that VSI and Rajan performed a "panel demonstration" on November 8, 2024 in Pennsylvania for a potential investor, Continental Advisory Services, LLC., in order to raise investment funds in an attempt to propose a Plan.

85.    Rajan's actions are part of his pattern to go to any lengths to regain control of the Debtors and is clearly willing to violate not only the Trustee Order and Opinion, but his duty of loyalty and fiduciary duties owed to the Debtors.

D.    **VSI and Rembrandt's Prior "Offers"**

86.    As set forth in detail in the Trustee's Declaration in Support of the Sale Motion, from the outset of the Trustee's appointment, in good faith, the Trustee solicited and entertained proposals from VSI and Rembrandt to fund SCBV's operations, fund a Plan, and/or acquire the Debtors' assets; however, the "offers" presented were illusory at best and without any verified or committed source of funding.

87.    The Trustee and his advisors have been given no reason to believe that VSI's proposals were feasible - VSI has repeatedly failed to show that it has the money or backing to

consummate any proposal, instead relying on purchase orders already dismissed by this Court as hyperbole at best, or fabrication at worst.

88.     Further, VSI's proposals have relied on the same purchase orders the Court previously held were unsubstantiated in the Trustee Opinion. Trustee Opinion at 55. Rajan continues to trot out the purchase orders to show claimed customer interest.

89.     At VSI's request, the Trustee personally met with VSI's alleged principal investor, Mr. Jacob Yahinian ("Yahinian") to discuss the Debtors' status and a potential path forward. Having engaged with Yahinian on numerous subsequent occasions, Yahinian is similarly more interested in renegotiating the terms of the Hawk Settlement than finding a viable path forward with VSI.

90.     Further, Yahinian has make it clear that he sees little value in the Debtors' assets and is troubled by the minimal progress the Debtors' have made despite having raised over $100 million during their history.

91.     Rembrandt's proposals have been even more ethereal than VSI's, as it has never made a true purchase offer.

92.     Indeed, Rembrandt repeatedly failed to present the Trustee with firm terms, commit to hard numbers, or present a valuation of the Debtors' Assets. While Christopher Michaels, Rembrandt's CFO and sometime lawyer ("Michaels"), initially claimed its investors had $70 million to invest in Stream, no offer was ever made by Rembrandt.

93.     Further, despite Rembrandt's allegedly continued interest, it has neither looked at the Assets nor gone into the Debtors' data room.

94.     The Trustee has continually urged VSI and Rembrandt to submit formal proposals and even to meet with Hawk, yet neither has and, to that extent, neither has submitted a bid for the

Debtors' Assets.

## III.  ARGUMENT

### A.    The Objections

95.    Despite the myriad of holdings by this Court to the contrary, including the Trustee Opinion, VSI and Rembrandt attempt to recast these cases and paint themselves as the aggrieved parties, and wrongfully portray the Trustee as the party acting in bad faith.

96.    As stated earlier, the Objections in large part boil down to attempts to either (i) re-litigate claims already resolved in the Hawk Settlement or reargue the objections to the 9019 Motion, both of which were made final with the entry of the 9019 Order; or (ii) reargue their objections to the Bid Procedures Motion, which have all been overruled by the Court.

97.    Those Objections can be categorized as complaints that (1) the sale process is unfair as it favors insiders and the Hawk Parties; (2) the Trustee has not provided a clear inventory of assets to be sold or resolved ownership issues; (3) insiders have misappropriated assets; (4) conflicts of interest exist among insiders; and (5) the sale is an improper sub rosa plan.

### i.  VSI's Objection

98.    VSI offers the same argument it has used to no avail throughout these Chapter 11 cases: that the sale process was unfair and not contemplated in good faith as the Stalking Horse Bidder, SeeCubic, is an insider, and thus, the sale was not negotiated at arm's length.

99.    The VSI Objection specifically alleges that sale and solicitation materials were incomplete as they omitted alleged purchased orders from VSI, agreements with Phillips and Rembrandt, and financial and operational data for Stream's research and development subsidiary.

100.     Further, VSI alleges that the Trustee failed to establish that all assets included in the sale are part of the Debtor's bankruptcy estates or ensure assets would be transferred free of encumbrances.

101.     All of the above, VSI argues, establishes *de facto* reorganization terms without complying with Chapter 11 requirements under the Bankruptcy Code.

### ii.    **Rembrandt's Objection**

102.     While the Trustee has filed numerous schedules detailing what exactly is being sold through the sale of the Debtors' Assets, Rembrandt's Objection chooses not to believe them and alleges that certain items are being sold when they are not.

103.     Further, the Rembrandt Objection argues on behalf of Phillips despite Rembrandt having no standing or authority to do so.

104.     Rembrandt's Objection requests the Court deny the approval of the sale of the Assets until the Trustee identifies assets belonging to the bankruptcy estate and removes third-party IP, including Philips' and allegedly Rembrandt's technology, from the Assets.

105.     The entirety of Rembrandt's Objection is centered around its allegation that the sale includes Rembrandt's and Phillip's intellectual property, which the Trustee has no authority to sell.  This allegation is untrue.

106.     Rembrandt's Objection alleges that there are numerous issues with the Sale Motion and the Debtors' cases in general that are harming the value of the Rembrandt and Phillips IP, including: (1) Hawk, SeeCubic, and SCBV violating the TRO; (2) the Trustee's lack of transparency with respect to information regarding estate assets and intellectual property; (3) discovery motions by Rembrandt and others having been quashed – raising questions about

23

accountability; (4) SeeCubic's alleged history of improper IP use; and (5) the perceived "late" employment of Panitch Schwarze Belisario & Nadel LLP ("Panitch").

107.    Rembrandt argues and threatens that if the sale of the Assets is approved as is, the sale of the Rembrandt and Phillips IP would violate existing licenses, exposing potential buyers to claims of patent infringement and trade secret misappropriation and, consequently, heavy fines and imprisonment.  It is hard to imagine how this threat stimulated interest.  More likely, the opposite is true.

108.    Through the Objection, Rembrandt once again proposes alternatives to the sale of the Assets. However, these alternatives are illusory at best and contain minimal terms.

109.    Indeed, the most the Rembrandt Objection says is that Rembrandt and other investors have a willingness to fund a reorganization rather than pursue a sale. The Trustee is not sure what they are waiting for.

**B.    Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code**

110.    The Trustee submits that the Sale requested by the Sale Motion is authorized under section 363(b) of the Bankruptcy Code governing sales outside of the ordinary course of a debtor's business.

111.    Section 363(b) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

112.    This Court's power under section 363 is augmented by section 105(a), which provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. As set forth below, the

Trustee submits he has satisfied the requirements of sections 105, 363, and 365 of the Bankruptcy Code.

113.    Courts typically require a sound business purpose to sell assets outside of a plan of reorganization. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

114.    Courts consider the following non-exhaustive list of factors in determining whether a sound business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in value. *See Lionel Corp.*, 722 F.2d at 1071; *Del. & Hudson Ry.*, 124 B.R. at 176; *In re Weatherly Frozen Food Grp., Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). A debtor is "simply required to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

115.    Consideration of the above factors here unequivocally establishes that the Sale should be approved.  As set forth in greater detail above and in the 9019 Motion, the Trustee has demonstrated sound business reasons for the sale in that after a lengthy investigation and consultation with his professionals, the Trustee concluded that a reorganization of the Debtors was not feasible and after soliciting proposals and negotiating with all of the salient parties in this case, the Hawk Settlement was the only viable option to produce a stalking horse bid.

116.    The Trustee, through his investment banker, SSG Capital Advisors ("SSG"), has marketed the Assets since early October and solicited more than 550 potential strategic and financial targets for the purchase of the Assets. Based on the Trustee's and SSG's marketing efforts, the Trustee has amply marketed the Assets.

117.    The approved Bidding Procedures were designed to maximize the purchase price for the Debtors' Assets and allowed for sale of all or part of the Debtors' Assets to various purchasers. The Bidding Procedures and Sale Notice were served in accordance with the Bidding Procedures Order and ensured that all interested parties received adequate notice of the Bid Deadline and Auction.

118.    Further, the Trustee is poised to file a Plan shortly after the closing on the Sale and based upon the Hawk Settlement or any successful bidder who makes a qualified bid in excess of the Stalking Horse Bid. A distribution to unsecured creditors is assured.

119.    For all these reasons, the Trustee respectfully submits that the Sale of the Assets is supported by sound business reasons and is in the best interests of the Debtors and their respective estates. Accordingly, the Trustee requests approval of the Sale pursuant to Section 363(b) of the Bankruptcy Code.

**C.    The Trustee can Sell the Stream Debtor's Assets and the Equity in Technovative's Downstream Entities Under the Bankruptcy Code**

120.    VSI and Rembrandt both devote considerable portions of the Objections incorrectly contending that the Sale Motion seeks to sell property, specifically intellectual property in which the Debtors do not have an interest.  VSI and Rembrandt argue that (i) the Trustee may not sell Debtors' property that is not property of the estate and (ii) before approving a sale, the Court must first determine whether such property constitutes property of the estate.

121.    The Trustee is only selling assets owned directly by the Debtors.  To be clear, the Assets being transferred by the Trustee are limited to the Stream assets identified in the asset purchase agreement filed in connection with the Sale Motion (the "APA") and the ownership interests of Technovative in the Non-Debtor Subsidiaries (D.I. #791-1).  The Trustee is NOT transferring title to any property owned by the Non-Debtor Subsidiaries.

122.    For the reasons set forth herein, the arguments of VSI and Rembrandt fail.

123.    It is axiomatic that the Bankruptcy Code, particularly Section 363, which provides for the sale of estate assets, does not expand the property rights of the estate beyond the parameters of nonbankruptcy law that creates the property right in the first place.

124.    Section 541(a)(1) of the Bankruptcy Code provides that the filing of a voluntary bankruptcy petition creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." *See* 11 U.S.C. § 541(a)(1).

125.    Without question, section 541(a)(1) of the Bankruptcy Code is given broad application and includes "all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property. . . ." *Westmoreland Human Opportunities, Inc. v. Walsh,* 246 F.3d 233, 241 (3d Cir. 2001) (citing *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n.9, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983)). See also *Burgess v. Sikes (In re Burgess),* 392 F.3d 782, 785 (5th Cir. 2004) (noting that the "'scope of property rights and interests included in a bankruptcy estate is very broad: the conditional, future, speculative or equitable nature of an interest does not prevent it from being property of the bankruptcy estate") (citations omitted); *In re Lock,* 329 B.R. 856, 858 (Bankr. S.D. Ill. 2005) ("The scope of estate property is very broad and includes every conceivable interest held by the debtor in property") (citation omitted).

126.    Section 363(b) of the Bankruptcy Code allows a trustee to sell property of the estate outside the debtor's ordinary course of business after notice and a hearing. 11 U.S.C. 363(b)(1). Implicit within the statutory grant of authority to sell property under section 363, however, is the requirement that the estate actually have an interest in the property to be sold. *Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3d Cir. 2001) (noting that, before the trustee could sell estate property under section 363(b)(1), the estate was required to have an interest in that property); *Gorka v. Joseph (In re Atl. Gulf Cmtys. Corp.)*, 326 B.R. 294, 299 (Bankr. D. Del. 2005) (under bankruptcy law, even speculative litigation claims are property of the estate) (citations omitted).

127.    Under section 363(f) of the Bankruptcy Code, a trustee can sell property of the estate free and clear of any interest in such property of an entity other than the estate, provided that one of five conditions is met: "(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) **such interest is in bona fide dispute**; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f) (emphasis added); *In re Scimeca Found., Inc.*, 497 B.R. 753, 772  (Bankr. E.D.Pa. 2013).

128.    Section 363(f) is drafted in the disjunctive; that is, the sale free of the claimed interest can occur if any one of the conditions specified in the subsection has been satisfied. *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 Bankr. LEXIS 4498, *37-38 (Bankr. D.N.J. June 29, 2006); *Scimeca Found.*, 497 B.R. at 772 ("[a]s section 363(f) is written in the disjunctive, a bankruptcy trustee can 'sell property free and clear of an interest in the property provided that one or more of the provisions under Section 363(f) is satisfied.'") *quoting In re Messina*, 687 F.3d 74, 77 n.4 (3d Cir. 2012). 3 Collier on Bankruptcy ¶ 363.06 (15th ed. rev. 2005).

28

129.    Furthermore, section 363(f) permits the bankruptcy court to authorize a sale free of "any interest" that an entity has in property of the estate. 3 Collier on Bankruptcy ¶ 363.06[1] (15th ed. rev. 2005).

130.    The phrase "bona fide dispute" is not defined in the Bankruptcy Code. Nonetheless, courts applying section 363(f)(4) of the Bankruptcy Code have developed a standard for determining whether a "bona fide dispute" exists; that is, courts will inquire "whether there is an objective basis for either a factual or legal dispute as to the validity of the asserted interest." *NJ Affordable Homes*, 2006 Bankr. LEXIS at *41 (citing, *In re Taylor*, 198 B.R. 142, 162 (Bankr. D.S.C. 1996)).

131.    The court in *NJ Affordable Homes Corp.* noted that the evidentiary record required to support a finding of a "bona fide dispute" for purposes of section 363(f)(4) of the Bankruptcy Code depends upon a case-by-case consideration of the following: (i) the procedural posture of the case; (ii) the need to expedite the sale; and (iii) the nature of the basis for determining that a dispute exists. *Id. at *41-42 (citing *In re Robotic Vision Sys., Inc.*, 322 B.R. 502, 506 (Bankr. D.N.H. 2005).

132.    The purpose behind §363(f)(4) "*is* to allow the sale of property of the estate free and clear of disputed interests so the liquidation of the assets is not unnecessarily delayed while the disputes are being litigated. See, *Robotic Vision*, 322 B.R. at 506 (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 171 (B.A.P. 9th Cir. 2001)). Succinctly, this is the concept behind § 363(f). *NJ Affordable Homes*, 2006 Bankr. LEXIS at *40.

133.    Like the standard for the assumption of executory contracts, the standard for sales of estate property is one of business judgment. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063 (2d Cir. 1983) (a sale under section 363 requires "some articulated business justification"). Thus, in connection with a Section 363 sale, the central issue

29

is the reasonableness of the trustee's business judgment to sell property whose ownership may be disputed, and this does not require a definitive determination of ownership rights.

134.    11 U.S.C.S. § 363(f)(4) permits a sale of property of the estate free and clear of a third party's interest therein if the interest is in bona fide dispute. Although § 363(f)(4) is most commonly applied when the entity's "interest" is a lien or security interest, the plain language of the provision would include an ownership "interest." See, *e.g.*, *In re Olympia Holding Corp.*, 129 B.R. 679, 681 (Bankr. M.D. Fla. 1991); *NJ Affordable Homes*, 2006 Bankr. LEXIS 4498. This result is also strongly supported by the wording of *§ 363(h)*, setting forth provisions for the sale of a co-owner's "interest" and using the word "interest" to mean an ownership rather than a lien or security interest. *See In re Spain,* 831 F.2d 236, 240 (11th Cir. 1987).

135.    Although implicit within the statutory grant of authority to sell property under 11 U.S.C.S. § 363 is the requirement that the estate have an interest in the property to be sold, "property of the estate" as defined by 11 U.S.C.S. § 541(a) includes contingent and disputed property interests of a debtor. Thus, an estate can normally convey its ownership interest in property, subject to the claims of a third party. *In re Kane,* 628 F.3d 631, 641 n.7 (3d Cir.  2010); *Gorka v. Joseph (In re Atlantic Gulf Communities, Corp.)*, 326 B.R. 294, 299 (Bankr. D. Del. 2005). Thus, an estate can normally convey its ownership interest in property, subject to the claims of a third party. *See, e.g., Atlantic Gulf Communities*, 326 B.R. 294 (regardless of whether the estate had ownership of the property at issue, the estate did have a claim to ownership, which the trustee could sell outside the ordinary course of business by executing quitclaim deed in sale agreement).

136.    Finally, both VSI and Rembrandt rely heavily in their Objections upon the case of *In re Whitehall Jewelers Holdings, Inc*., Case No. 08-11261 (KG), 2008 WL 2951974, at *9 (Bankr.

D. Del. July 28, 2008) for their central tenet that a debtor or trustee may not sell property through a 363 sale unless that property constitutes property of the debtor's bankruptcy estate and, before approving a sale, the bankruptcy court must determine whether the property the debtor proposes to sell constitutes property of the estate. The Objectors' reliance on *Whitehall* is misplaced based on the underlying facts of this case.

137.    In *Whitehall*, the debtors who were seeking to sell consigned goods did not even attempt to make a *prima facie* showing that the goods to be sold were property of the estate. Id. However, in contrast to facts of *Whitehall,* the Trustee here is not seeking to sell any assets that are not property of the estate. As has been made abundantly clear in the Trustee's Omnibus Response, the APA specifically excludes from the sale the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property. As such, *Whitehall* is distinguishable on its facts and is not an impediment to the approval of the Sale.

138.    First, it is important to note the Trustee is not proposing to sell the intellectual property, contracts or any other assets owned directly by the Non-Debtor Subsidiaries.  To be clear, the Trustee is transferring the Stream assets identified in the asset purchase agreement and the ownership interests of Technovative in the Non-Debtor Subsidiaries (D.I. #791-1).

139.    It is also important to note that the Schedules of Assets and Liabilities filed by both Stream and Technovative under penalty of perjury affirmatively state that neither of the Debtor entities own any intellectual property.  See Stream D.I. #52; Technovative D.I. #47.

140.    Therefore, Rembrandt does not have an "interest" in the Non-Debtor Subsidiaries' property; the only thing that Rembrandt has at this juncture is a "claim" that something owned or controlled by another foreign subsidiary that is indirectly owned by one of the Non-Debtor Subsidiaries contains Rembrandt "know how" or trade secrets (the "Rembrandt Claim").  No

31

evidence has been provided to show that the Debtors actually received "know how" from Rembrandt or that the Trustee is transferring any assets containing any Rembrandt, technology, "know how" or intellectual property.  In fact, the APA specifically excludes as an asset being transferred the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property.[7]

141.     The Rembrandt Claim is the subject of a bona fide dispute because of the following facts.

142.     The problematic incestuous relationship between Rajan, VSI, and Rembrandt is well documented.  *See* ¶¶ 44 through 55 above.

143.     The Rembrandt Claim is hotly disputed and is the subject of ongoing litigation, currently stayed against Technovative.  The Rembrandt Claim originally arose out of the Settlement Agreement and must be viewed critically, especially in light of the Rembrandt License Covenant and the Settlement Amendment, which Rembrandt and VSI attempted to enter into with Stream post-petition without Court authority and which this Court found so favored Rajan, VSI and Rembrandt. The Trustee believes the Settlement Agreement and any ancillary documents resulting therefrom are fraudulent transfers and will be challenged at the appropriate time by the Trustee.

---

[7] The specific language in section 2.2 (Excluded Assets) of the APA reads:

(j)   any grant of rights or license by Rembrandt 3D Holding Ltd. ("Rembrandt") or affiliates to Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, any amendment thereto, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction;

(k)   any physical assets that contain or include Rembrandt Intellectual Property, to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction

4889-9066-4446 v5

144.    In fact, less than a month prior to the Petition Date, Rembrandt filed a complaint in the Delaware District Court against Hawk, SeeCubic and Technovative, docketed as *Rembrandt 3D Holding Ltd v. Technovative Media, Inc. et al.*, C.A. No. 1:23-cv-00193-JLH (D. Del.), in which the only count asserted against Technovative was a request for injunctive relief (the "District Court Case").  The District Court Case is in its very early stages and is stayed as to Technovative, therefore, Rembrandt's "claims," while far from being proven, will ultimately be determined in the District Court Case.

145.    In addition, under the APA, SeeCubic or any Successful Purchaser "assumes any liability to the extent that there is any claim or cause of action alleging that any Intellectual Property of any third party, including but not limited to the Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer (or any Designated Buyer) as part of the Transferred Assets at Closing through the sale pursuant to this Agreement." (D.I. #795, Section 2.3).

146.    Upon information and belief, the Settlement Agreement is a contrivance that was "dead on arrival" and entered into to manufacture a claim so Rembrandt could serve as a petitioning creditor in Stream's second Delaware bankruptcy proceeding found to have been filed in bad faith.  Stream never paid the initial $1,528,000.00 **due on execution, the same date as the involuntary petition was filed,** Stream never provided Warrants, which is a condition to the effectiveness of the Settlement Agreement. **Stream never paid a single monthly fee** (originally at $28,000.00 per month), and more importantly at the time of execution, Stream had no ability to do so.  Stream never produced a single TV for Rembrandt under the Settlement Agreement, or provided a prototype for Rembrandt. Importantly, nowhere in the initial Settlement Agreement is there any admission that Stream violated Rembrandt's rights.

33

147.    Rajan conspired with Rembrandt to allow it to become a non-contingent creditor for $100,000,000.00 against the Technovative bankruptcy estate without any indication as to how Mr. Rajan arrived at that contrived and phony claim.

148.    Michaels has, however, continued to allege rights created under the Settlement Agreement and to threaten the Trustee, his professional, and potential purchasers with "imprisonment" for violation of patent laws when the Trustee is not conveying finished televisions or any property containing Rembrandt's alleged intellectual property.

149.    Even though there was no compliance by the Debtor with any of the monetary or production obligations under Rembrandt Settlement Agreement, there was no effort by Rembrandt for over two years to (a) enforce the Rembrandt Settlement; (b) collect on the monetary obligations under the Rembrandt Settlement; (c) cancel the alleged license issued under the Rembrandt Settlement; or (c) regain whatever technology it asserts it transferred under and pursuant to the Rembrandt Settlement.   How valuable were the obligations under the Rembrandt Settlement Agreement if Rembrandt did nothing to enforce them for over two (2) years?

150.    The Settlement Amendment fails to reflect the missed payments, and includes other additional terms to coincide with agreements between Rembrandt and Rajan contained in the Debtors' proposed plan of reorganization filed July 13, 2023.   The Settlement Amendment contains another "poison pill" providing that the alleged Rembrandt IP may be used solely for the benefit of Stream.

151.    The License Covenant entered in the same time period, also cut out the Stream subsidiaries from any use of any license purportedly granted to Stream.  How this freeze out served the Debtors' interest is impossible to understand.  Clearly the prohibition, which extends not only

to Hawk and SLS, but to all of the Stream Debtor's downstream subsidiaries provides no benefit to Stream.

152.    This court has already opined on the nature of the Licensing Covenant in the Trustee Opinion:

> The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt**, to the exclusion of,** *inter alia***, Stream's subsidiaries.**  While Mr. Rajan may assert that the purpose of the Licensing Covenant is "stopping the use of our technology of Rembrandt by companies who do not own our technology, specifically See Cubic of Delaware, to stop the use of our technology to compete against us," the Licensing Covenant goes beyond that, **precluding the issuance of a license to any Stream subsidiaries. . . . Each of these transactions have had the taint of benefit to VSI without clear benefit to the Debtors and their estates.**

Trustee Opinion at 50.

153.    Furthermore, a sale is clearly necessary considering that the outside closing date is December 10, 2024, under the APA and that the Trustee has only secured funding of SCBV (which holds substantial value) thru that date, not to mention that this case will have been pending for two years this coming March 2025 and the marketing campaign undertaken by the Trustee has, to date, not produced any other interested parties, let alone potential Purchasers.

154.    Similarly, the VSI and Rembrandt make seem to be under the impression that the Trustee is selling the Philips License, which is not accurate.  The Philips License is property of one the Debtors' downstream subsidiaries, whose assets are not being transferred.

155.    The Trustee has clearly demonstrated that he is only transferring property that belongs to the Debtors, including Technovative's interest in the Non-Debtor Subsidiaries, none of which include Rembrandt's alleged technology.

4889-9066-4446 v5

156.     Under the circumstances, for all of the reasons set forth above, of this case, the Trustee has met his burden of setting forth sufficient evidence demonstrating that a "bona fide dispute" for the purposes of section 363(f)(4) of the Bankruptcy Code, therefore to the extent that there is any question as to whether any Rembrandt property is in some way implicated in the sale, the Trustee can still transfer the assets free and clear to SeeCubic.

**D.     Rembrandt's Interests, if any, Are Adequately Protected**

157.     To be clear, through this sale process, the Trustee is transferring Technovative's equity interests in the Non-Debtor Subsidiaries that has its own intellectual property, namely the 3d technology and source code. Rembrandt has alleged a "claim" that some know how it provided was incorporated in part into the source code; a position that is subject to dispute in the Delaware Litigation, and if far from established fact.

158.     No court had ever determined that Rembrandt had an "interest" in the the Non-Debtor Subsidiaries' assets. In fact, Rembrandt has known since at least the time of the filing of the 9019 Motion that it was the intention of the Trustee to sell the Debtors' assets and until very recently, Rembrandt has chosen to do nothing to protect its alleged rights.

159.     Rembrandt could have filed an adversary proceeding or affirmatively moved before this Court to attempt to establish its "claim" or other rights, instead it chose to appeal the 9019 Order, failed to request any stay of these proceedings and allowed the appeal to languish by missing the date to file its appellate brief by over three (3) months.

160.     Moreover, even the collusive and contrived Settlement Agreement does not in any way concede that the Debtors in fact used or received any know how or other Rembrandt technology. In fact, the Settlement Agreement specifically provides for no admission of liability.

161.    In this case, the Trustee is transferring Technovative's equity ownership interests in the Non-Debtor Subsidiaries, in which Rembrandt has NO interest.  It has not established legal or equitable ownership or even an interest in any assets being sold by the Trustee pursuant to the Sale Motion.

162.    Rembrandt merely has an outstanding litigation claims against Technovative in which it claims it's "know how" or trade secrets were incorporated into SCBV's source Code; a position the Trustee vehemently disputes.

163.    As set forth above, section 363(f)(4) of the Bankruptcy Code specifically provides for the transfer of property free of any alleged "interest", include the alleged interest of Rembrandt which is subject to a bona fide dispute.

164.    Rembrandt attempts to confuse the Court by claiming that the Debtor is transferring Rembrandt's property.  The alleged property amounts to nothing more than a disputed "claim" in the downstream entities' source code which is not in the Debtor's possession to sell.

165.    However, the Trustee can sell the equity interests the Non-Debtor Subsidiaries over the disputed "claim" or interest of Rembrandt, if any, in the assets of the downstream subsidiary, provided that the "interests" are the subject of a bona fide dispute and are adequately protected. Rembrandt is entitled to adequate protection only to the extent its interest would be extinguished by virtue of the Sale Order.  That is not the case.

166.    Section 361 of the Bankruptcy Code provides for "adequate protection" to be provided to a party whose property is being used sold, used or leased.  Assuming an interest entitled to adequate protection exists in favor of Rembrandt, that interest is adequately protected.

167.    Section 361 provides in relevant part that: "[w]hen adequate protection is required under section [363] of this title . . . such adequate protection may be provided by . . . (2) providing

to *such entity* an additional or replacement lien to the extent that such [sale] results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." [Emphasis added].    Paragraph (3) of 361 allows this court to have flexibility in fashioning the provision of adequate protection.

168.    Here, Rembrandt's interest is not in the nature of a security interest, but in the nature of an unliquidated, disputed unsecured claim.

169.    It is respectfully submitted that Rembrandt's interests, whatever they may ultimately be determined to be, are adequately protected in a number of ways.

170.    First, any claim alleged by Rembrandt that its IP is in some way transferred as a part of the sale which the Trustee disputes, is an assumed liability by SeeCubic, who Rembrandt is already suing in the Delaware Action.  See Section 2.3 of the APA.

171.    Second, any rights of Rembrandt to pursue the nonbankrupt Debtor subsidiary SCBV is preserved.  Following the Closing, Rembrandt is free to pursue its state court litigation against both Hawk and See Cubic BV to attempt to have determined its interest in the source code of the downstream entity.

172.    Also, the APA specifically excludes as an asset being transferred the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property.

173.    In fact, Rembrandt's ability to protect its rights will not be altered in any way.

174.    It may in fact be determined in the District Court Case court that Rembrandt has no interest in the downstream Debtor's source code.  However, all of those rights are fully preserved as adequate protection of any claimed interest in the assets being transferred pursuant to the Sale Motion.

175.    The transfer of the equity interests in the Non-Debtor Subsidiaries will not alter in any way Rembrandt's litigation rights against SCBV or SeeCubic. Nothing in the Sale Motion attempts to deprive Rembrandt of its alleged "interests" which are limited to the ability to assert its claims that the source code in SCBV incorporates its claimed know how.

**D.    SeeCubic is an Appropriate Purchaser and has Acted in Good Faith During the Course of the Sale Proceeding**

176.    VSI goes to great lengths to detail its lengthy history with SeeCubic, which can only be characterized as complicated by persistent disputes over the Secured Creditors' efforts to exercise their rights to over their collateral, whether the secured debt had been converted and the Rajan's efforts to retain or regain control over the Debtors – efforts that continue to this day through is control over VSI.

177.    VSI's argument that SeeCubic is an inappropriate purchaser because of its bad acts ultimately fails because, under Third Circuit Law, the good faith of a purchaser is measured by the purchaser's conduct during the course of the sale proceedings.

178.    VSI also fails to cite to a single case in support of this argument because applicable case law supports SeeCubic as a good faith purchaser.

179.    The Bankruptcy Code does not define "good faith;" however, the Court of Appeals for the Third Circuit has held that the requirement that a purchaser act in good faith … speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders. *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986).

180.    Neither VSI nor Rembrandt point to a single instance where SeeCubic or the Trustee have engaged in fraud or collusion with other bidders during the sale process, again because no such conduct took place.

181.    Here, rather than attempt to take gross advantage of other bidders, the credit bid of SeeCubic was approved by this Court as the Stalking Horse Bid as part of the Hawk Settlement after notice and a hearing and over VSI and Rembrandt's objection.

182.    The objections over whether SeeCubic was an appropriate stalking horse bidder either were or should have been raised in the objections to the 9019 Motion, wherein the Trustee sought to have SeeCubic approved as the stalking horse bidder, which the 9019 Order ultimately accomplished.

183.    All of the bad conduct complained of in Mr. Robertson's declaration occurred pre-petition during the course of years long litigation between the Debtors, Rajan, and the Secured Creditors or are vague allegations that SeeCubic failed to return assets  - allegations that are unsupported except by Mr. Robertson, who freely admits in his declaration that he has a conflict of interest, even after the Trustee's appointment, when he worked for both VSI and the Debtors without the Trustee's knowledge or consent.

184.    As to the allegations that the Trustee did not secure the return of assets of the Debtors, it is important to consider the years prior to the Trustee's appointment, both pre and post-petition, that the Debtors and Rajan, who were in a far better position to know where those assets were kept, were unable to accomplish the very thing they complain the Trustee did not do.

185.    Upon his appointment, the Trustee inherited bankruptcy estates that Rajan left in complete disarray with no money, no operations, and in active and unstayed litigation with Hawk. To expect the Trustee, with almost no resources to secure the return of alleged assets such as the

Bonding Equipment, the Trustee would have had to first locate the assets in places as far away as China and the Netherlands, pay storage costs or landlord liens for the release of the assets, and safely package, ship and again store those assets – feats Rajan had been unable to achieve over a period of years, including with the protection of three separate bankruptcy proceedings.

186.    Rather than attempt to spend money he did not have in pursuing VSI and Rembrandt's proposed quixotic quest, the Trustee solicited proposals from VSI, Rembrandt and the Secured Creditors to purchase the Debtors' assets or fund a Plan, and in an exercise of his business judgment approved by this Court, entered into the Hawk Settlement which included exposing the Assets to the open market and permitting interested parties, including VSI and Rembrandt, to bid on those Assets.  Rather than do so, VSI and Rembrandt chose to use carefully coordinated efforts to block the sale by filing expedited motions and taking unsupportable, bad faith positions, filing multiple appeals that were either left to languish or filed in the eleventh hour, or attempting to relitigate issues already decided by this Court. These last-ditch efforts are solely to scuttle the Trustee's attempt to bring order to the chaos of these bankruptcy cases.

187.    The trustee has fulfilled his duties under the Bankruptcy Code and the mandates of the Trustee Order and Opinion.

188.    For the reasons set forth herein, in the 9019 Motion and the Procedures Motion, SeeCubic is an appropriate purchaser and it or such other qualified bidder that is selected as the Successful Bidder by the Trustee, should be approved by this Court along with the sale of the Assets to that Successful Bidder.

4889-9066-4446 v5

E.     **The Solicitation and Due Diligence Materials Offered by the Trustee and SSG are Not Misleading or Inadequate**

189.     In its objection, VSI attempts to reargue, as it did in its objection to the Procedures Motion, that the solicitation and due diligence materials offered by the Trustee and SSG are misleading and inadequate.

190.     VSI specifically complains that the Trustee was not transparent in his disclosure of the Assets being sold.

191.     Again, nothing could be farther from the truth.

192.     As is typical in a Chapter 11 sale process, SSG sent a one (1) page "Teaser" including a description of the Assets to more than 550 prospective strategic and financial targets, inviting interested parties to contact SSG to get access to its data room only after signing a nondisclosure agreement ("NDA"). The data room set up by SSG contains detailed information about the assets owned by Stream and Technovative and the assets, liabilities and financial condition of the Non-Debtor Subsidiaries and their foreign subsidiaries.

193.     Thus far, the only entity that contacted SSG to access the data room is VSI.

194.     This Court has already heard, considered, and dismissed VSI's arguments about the data room and Teaser and in so doing, directed the Trustee, in addition to the Assets being sold pursuant to the APA, to prepare and send to VSI and Rembrandt, a list of assets owned by the subsidiaries whose equity was being sold pursuant to the APA.

195.     The Trustee readily complied with the Court's direction and, on November 14, 2024, provided a list of the assets housed in downstream subsidiaries for VSI and Rembrandt to review and comment on. To be clear, the list forwarded to VSI and Rembrandt included assets not owned by the Debtors and not being transferred pursuant to the APA. By Rembrandt and VSI's

4889-9066-4446 v5

own arguments, the Trustee cannot transfer the assets in the downstream subsidiaries because the Debtors do not own those assets.

196.    Rembrandt and VSI annotated the list of assets prepared by the Trustee, including various admonitions and overt threats that any purchaser of the Assets would be subject to the continued wrath of VSI and Rembrandt, despite the fact that the APA specifically excludes as an asset being transferred the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property.

197.    Despite the fact that such language would clearly have the effect of chilling any interest in the acquisition of the Assets, the Trustee filed the list on the docket as directed by the Court as supplied by VSI and Rembrandt and without change (D.I #810).

198.    Ironically, even if the data room was in some way deficient, which the Trustee and SSG continue to dispute, it couldn't have any effect on the sale process because no one signed an NDA or accessed the data room to obtain more information except for VSI who has affirmatively stated that it does not intend to submit a qualified bid for the Assets.

199.    In many cases, interested parties that engage in any level of diligence have questions and inquiries, often asking for additional documents, support, and the ability to discuss issues with parties that have firsthand knowledge of the assets.  This was no different.  VSI requested, and Rembrandt, prior to the Hawk Settlement, requested and was provided direct access to SCBV personnel, including the Head of Technology and engineers involved in the development of the underlying 3D technology.

200.    Instead, VSI clearly visited the data room in an effort to gather information it could use in yet another attempt to manufacture reasons the sale should not be approved and not participate in the process in good faith.

**F.**    **The Proposed Sale Does Not Constitute an Improper Sub Rosa Plan of Reorganization and Should be Approved**

201.    VSI argues that the Sale Motion should be denied because the 9019 Agreement and proposed sale process constitute an impermissible sub rosa plan that strips the Debtors' creditors of the protections of the Bankruptcy Code and improperly attempts to extinguish their rights without their consent. (D.I. #815, ¶60).

202.    VSI alleges that the sale process, here, "short circuits" the requirements of Chapter 11 by dictating the terms of the plan sub rosa in connection with a sale of assets. VSI Objection to Sale Motion, D.I. #815, ¶61. VSI argues that the Trustee's sale process seeks to improperly channel consideration to specific creditor groups, is blatantly at the expense of the Debtors' other creditors, and will somehow "essentially ensure" that general unsecured creditors and perhaps administrative claimants will receive "only pennies on the dollar." (D.I. #815, ¶63).

203.    VSI erroneously asserts that the proposed sale is a sub rosa plan intended to bypass the confirmation requirements of the Bankruptcy Code. Courts have consistently acknowledged that assets of an estate can be sold prior to the confirmation or filing of a plan. *See In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995) (citing *In re Chateaugay Corp.*, 973 F.2d 141, 145 (2d Cir. 1992)); *In re Equity Mgt. Sys.*, 149 B.R. 120, 124 (Bankr. S.D. Iowa 1993); *In re Naron & Wagner Chartered*, 88 B.R. 85, 87-88 (Bankr. D. Md. 1988); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, *25 (D. Del. May 20, 2002).

204.    A bankruptcy trustee is authorized by statute to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). However, Section 363(b) does not authorize the trustee to enter a settlement or engage in a sale if the result amounts to a sub rosa plan of reorganization.

205.    A transaction amounts to a sub rosa plan of reorganization if it: 1) specifies the terms of any future reorganization plan; 2) restructures creditors' rights; and 3) requires that all parties release claims against the Debtor, its officers and directors, and its secured creditors. *Matter of Cajun Elec. Power CO-OP., Inc.*, 119 F.3d 349, 354 (5th Cir. 1997) (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)).

206.    When a transaction or settlement in bankruptcy has the effect of "dictating some of the terms of any future reorganization plan," a court deems the transaction impermissible because it "short circuits the requirements of Chapter 11 . . . by establishing the terms of the plan sub rosa in connection with a sale of assets." *In re Jevic Holding Corp.*, 787 F.3d 173, 187 (3d Cir. 2015) (Scirica, J., concurring in part and dissenting in part) (quoting *Braniff*, 700 F.2d at 940). The "hallmark of such a plan is that it dictates the terms of a reorganization plan." *Id.* at 188.

207.    To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote. *Cajun Elec.*, 119 F.3d at 354-55 (finding that the instant settlement is not a sub rosa reorganization of the type disapproved in *Braniff* in that it does not dispose of all claims against the debtor, does not restrict creditors' right to vote as they deem fit on a proposed reorganization plan and does not dispose of virtually all of the debtor's assets, leaving "little prospect or occasion for further reorganization"). See also, *In re Chrysler LLC*, 405 B.R. 84, 106 (Bankr. S.D.N.Y. 2009) (holding that the sale did not constitute a sub rosa plan of reorganization because, following the sale, the debtors would continue to administer their estates and seek to confirm a plan that would provide for the distribution of the value of remaining assets).

208.    A settlement agreement, which is a "necessary step toward, or building block of, a

plan of reorganization," does not constitute an improper sub rosa plan. *In re Nortel Networks, Inc.*,

522 B.R. 491, 508 (Bankr. D. Del. 2014); *see also Cajun Elec.*, 119 F.3d at 355; *In re Tower*

*Automotive Inc.*, 241 F.R.D. 162, 169-70 (S.D.N.Y. 2006).

209.    Courts have approved even large and important settlements prior to confirmation

of a plan, notwithstanding a "sub rosa plan" objection, where the settlements did not dispose of all

of the debtor's assets, restrict creditors' rights to vote as they deem fit on a plan of reorganization

or dictate the terms of a plan of reorganization. *Tower Automotive*, 241 F.R.D. at 169 (internal

citations omitted).

210.    A pre-confirmation approval of a settlement does not amount to a sub rosa plan

where it does not deprive any party of critical protections in a Chapter 11 confirmation process as

the settlement could have been proposed in the context of a Chapter 11 plan process, and the

confirmation hearing would have been conducted (and the settlement would have been considered)

in exactly the same manner as it was at the sale hearing. *In re Capmark Fin. Group Inc.*, 438 B.R.

471, 514 (Bankr. D. Del. 2012).

211.    Even releases contained in a settlement do not transform it into a sub rosa plan as

releases are a necessary and expected term in a settlement agreement. The point of settlement is to

finally and fully resolve outstanding disputes between the parties, and without such releases, a

settlement would be ineffective. This is especially true where the settlement neither releases direct

claims held by any third parties nor any claims held by the debtors against their officers and

directors. *Capmark*, 438 B.R. at 514.

212.    An objector arguing that a proposed sale constitutes a sub rosa plan must clearly

articulate the rights and benefits the unsecured creditor is being deprived of through the sale that

it would gain through a Chapter 11 plan. *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, *42 (Bankr. D.N.J. Mar. 26, 2008).

213.    Here, VSI's inability to establish its detriment through the sale and the Trustee's satisfaction of the sound business judgment and good faith requirements given the current demonstrated need to sell the Debtors' Assets mandate a finding that the proposed asset sale does not constitute a sub rosa plan.

214.    The factors that led the Fifth Circuit in *Braniff* to conclude that the transaction was a sub rosa plan simply do not exist here. The Court in *Braniff* reasoned that the proposed transaction encroached upon the plan confirmation process because it (a) "changed the composition of Braniff's assets," with the practical effect of dictating some of the terms of any future reorganization plan, (b) dictated that the secured creditors vote their deficiency claim in favor of any proposed plan approved by a majority of the unsecured creditors' committee, effectively placing restrictions on creditors' plan voting rights, and (c) would grant the debtor, its officers, its directors and the secured creditors a release of all claims by all parties, thereby altering creditors' rights. *Braniff*, 700 F.2d at 939-40.

215.    The settlement and sale process here do not constitute a sub rosa plan. There is no indication, and VSI has provided no evidence showing, that any other creditor's recovery is adversely impacted by the settlement, or that any requirement of Chapter 11 is subverted by the plan. Because the settlement neither subverts the bankruptcy process nor impermissibly dictates the outcome to other creditors, the Sale it is not a sub rosa plan.

### G.    <u>VSI Lacks Standing to Object to the Sale as its "Equity" is out of the Money.</u>

216.    VSI's only interest in the Debtors' cases is as an investor or equity holder.  VSI holds no monetary claims against either of the Debtor estates. *See Stream TV Networks, Inc.*, Case No. 23-10763-amc, Claims No. 1-26; *Technovative Media, Inc.*, Case No. 23-10764-amc, Claims

No. 1-4; *see also*, Stream TV Networks, Inc. Advanced Claims Search, https://www.bmcgroup.com/restructuring/Claims.aspx?ClientID=496 (last visited Nov. 26, 2024).

217.    Bankruptcy courts have historically used a "person aggrieved" standard in determining standing; however, in recent years, courts have been requiring constitutional or Article III standing.  *See Varma v. Quorum Health Corp. (In re Quorum Health Corp.)*, 2023 Bankr. LEXIS 62, at *11-15 (Bankr. D. Del. Jan. 12, 2023) (granting a reorganized debtor's motion to dismiss an amended complaint as it failed to establish cognizable harm to, or the personal stakes of, the plaintiff; and therefore, lacked constitutional standing under Article III).

218.    The issue of constitutional standing was also addressed in *In re Diocese of Camden*, Case No. 20-21257 (JNP), 2022 Bankr. LEXIS 814 at *26-27 (Bankr. D. N.J. Mar. 24, 2022).  In the *Diocese* case, the New Jersey Bankruptcy Court refined the requirements for constitutional standing.

219.    The *Diocese* court held that to have standing in bankruptcy court, a party must meet three requirements: (1) Article III's Constitutional requirements; (2) federal court prudential standing requirements; and (3) the "party in interest" requirements under Bankruptcy Code section 1109(b). *In re Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013) (citing *Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.*), 677 F.3d 869, 884 (9th Cir. 2012)); *In re Saratoga & N. Creek Ry., LLC*, 635 B.R. 581, 602-03 (Bankr. D. Colo. 2022). A party seeking constitutional standing must demonstrate an "injury in fact" that is "concrete," "distinct and palpable," and "actual or imminent," and that such injury "fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *In re Glob. Indus. Techs., Inc.,* 645 F.3d at 210 (citing Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L.

Ed. 2d 135 (1990)).  *In re Diocese of Camden*, Case No. 20-21257 (JNP), 2022 Bankr. LEXIS 814 at *9.

220.    Here, VSI's equity in Stream has no value.  With over $180 million in allowed secured debt and over $1.2 billion in alleged claims under the Bankruptcy Code's priority scheme, VSI's alleged equity value does not exist.  While section 1109(b) of the Bankruptcy Code has been construed broadly to encourage participation in Chapter 11 cases, the Plaintiff must still demonstrate sufficient constitutional standing. See *Varma,* 2023 Bankr. LEXIS at *12 (section 1109(b) construed broadly to encourage participation in Chapter 11 cases; however, plaintiff must demonstrate sufficient constitutional standing to bring the amended complaint).  Therefore, any harm claimed by VSI to its equity in the Debtors' bankruptcy cases is illusory.

221.    Though clearly a party in interest for purposes of section 1109 of the Bankruptcy Code, the definition is not constitutional and requires the court to determine if constitutional or prudential standing exists.

222.    VSI cannot claim that it has suffered an injury in fact, because its equity was worthless on the Petition Date and with the secured claims and unsecured claims, there is no value for the VSI claimed equity interests.

223.    Moreover, VSI has no interest in the transfer of the Assets as contemplated in the Sale Motion, as the Sale does not in any way change the value of VSI's alleged equity in the Debtors.

224.    Further VSI fails to show how those equity interests will be impacted by the sale. The interests were valueless at the Petition Date, and they continue to be.

225.    More importantly, it is unknown whether the equity interests belong to VSI or investors in VSI.  Considering it was Rajan who filed the Schedules during a time when he held

competing dual roles with both VSI and Stream, this Court should be skeptical of his statements, even under oath, based upon his history of self-dealing and untruths. *See* Trustee Opinion at p. 31 (Court expressed concern with Rajan's "plans, trustworthiness, and motivations… in his role as, for all intents and purposes, the singular figure in the Debtors' management."); 56 ("the Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has been littered with questions about the role and involvement of VSI, the Debtors' ability to operate independently of VSI, and whether Mr. Rajan is able to differentiate his role with the Debtors from his role with VSI."); and 60-61("Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness.").

226.    Likewise, even if VSI's equity in Stream did have any value, the unauthorized transfer of equity in Stream to VSI or its investors is avoidable pursuant to Section 549 of the Bankruptcy Code.

## **RESERVATION OF RIGHTS**

227.    Nothing in this Response should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation of the Trustee's ability to contest same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim; or (d) granting third-party-beneficiary status or bestowing any additional rights on any third party.

## IV.    **CONCLUSION**

The Trustee respectfully requests that this Court: (i) order the Objections overruled; (ii) approve the sale of the Debtors' Assets free and clear of all liens, claims, encumbrances, and other interests; (iii) approve the assumption and assignment of certain executory contracts and unexpired

4889-9066-4446 v5

leases related thereto; and (iv) grant such other relief requested in the Sale Motion and such other

and further relief as may be just and proper.

Respectfully Submitted,

Dated: November 29, 2024        By: */s/ Michael D. Vagnoni*
                                     Edmond M. George, Esquire
                                     Michael D. Vagnoni, Esquire
                                     OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                     Centre Square West
                                     1500 Market Street, Suite 3400
                                     Philadelphia, PA 19102
                                     Telephone: (215) 665-3066
                                     Facsimile: (215) 665-3165
                                     E-mail:  edmond.george@obermayer.com
                                             michael.vagnoni@obermayer.com

                                     *Counsel to William A. Homony Chapter 11 Trustee*

4889-9066-4446 v5

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| In re: | Chapter 11 |
| --- | --- |
| Stream TV Networks, Inc., | Bky. No. 23-10763 (MDC) |
| Debtor. | |

| In re: | Chapter 11 |
| --- | --- |
| Technovative Media, Inc., | Bky. No. 23-10764 (MDC) |
| Debtor. | (Jointly Administered)[1] |

# MEMORANDUM

## I.    INTRODUCTION

Before the Court for disposition are two motions by Hawk Investment Holdings Ltd. ("Hawk"). The first motion (the "Hawk Stay Relief Motion")[2] seeks relief from the automatic stay in order to proceed with an action in the Delaware Court of Chancery (the "Delaware Chancery Court") seeking relief pursuant to §225 of Title 8 of the Delaware Code (the "Section 225 Action") against debtors Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", and together with Stream, the "Debtors"). The second motion (the "Section 1112/1104 Motion") seeks an order, pursuant to §1112(b) of the United States Bankruptcy Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), converting the Debtors' chapter 11 bankruptcy cases to cases under chapter 7 of the Bankruptcy Code or dismissing them, or

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases. Bankr. Docket No. 81.

[2] Bankr. Docket No. 16.

1

alternatively, appointing a trustee to administer the Debtors' bankruptcy cases pursuant to

§1104(a) of the Bankruptcy Code.

  For the reasons set forth herein, the Court will (i) grant the Section 1112/1104 Motion to

the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy

cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed, as

set forth below.

## II.  RELEVANT PROCEDURAL AND FACTUAL BACKGROUND[3]

  The history of the Debtors, their relationship with their creditors, and, in particular from

the Court's perspective, the events during these bankruptcy cases, are convoluted, and for the

most part, riddled with strife.  The docket in the Debtors' main case spans over 500 entries,

telling a story of near-endless conflict.[4]  The Court has spent an inordinate amount of time

dealing with expedited motion practice, emergency hearings, and drawn-out contested matters.

While the Court does not typically summarize the major activity in a case in order to explain a

decision, here it believes a lengthy summary is necessary in order to paint the picture of the

acrimony, relative lack of progress, and overlapping and simultaneous controversies these cases

have endured over the nearly ten months they have been pending.  Set forth below, therefore, is a

summary of the major events not only that led to the Debtors' bankruptcy cases, but also that

have transpired before this Court since the Debtors filed their bankruptcy petitions.

---

[3] The factual background recited herein is drawn from various pleadings filed on the docket as well as the
testimony and evidence adduced at Trial (as defined *infra*).  The Court notes, however, that to the extent
such facts as set forth in the parties' various pleadings are disputed, such disputes are irrelevant to the
Court's resolution of the pending motions, as the Court has drawn its conclusions from the record at Trial
and the procedural history of these cases.

[4] This does not even account for the approximately 120 docket entries in the adversary action the Debtors
filed in August 2023 against various parties, discussed *infra*.  *See* Adv. Pro. No. 23-00057.

### A.    Pre-Petition Events

#### 1.    Formation of the Debtors

Stream was founded in 2009 by Mathu Rajan ("Mr. Rajan") and Raja Rajan (together

with Mr. Rajan, "the Rajans").  The company was founded to develop and commercialize a

proprietary technology for viewing three-dimensional content without the need for 3D glasses or

goggles ("Ultra-D").  Stream created Technovative, a wholly owned subsidiary, which in turn

directly or indirectly owns various subsidiaries, including SeeCubic B.V. ("SCBV"), an entity

formed under the laws of the Netherlands and which functions as the primary research and

development engine for the business.[5]  Together, these subsidiaries own and hold rights in

technology including Ultra-D.  Stream's Ultra-D technology was developed, in part, based on

certain intellectual property, including a portfolio of glasses-free 3D patents licensed from

Koninklijke Philips Electronics ("Philips").  Stream also has a technology license from

Rembrandt 3d Holding Ltd. ("Rembrandt"), which allows it to use the Rembrandt technology

incorporated into Stream's Ultra-D products (the "Rembrandt Licensing Agreement").

#### 2.    Funding from SLS and Hawk

From 2011 to 2020, Stream's senior secured creditor, SLS Holdings VI, LCC ("SLS"),

loaned Stream $6 million through a series of secured promissory notes (the "SLS Notes").  In

return, Stream pledged all of its assets, and the assets of its wholly-owned subsidiaries, as

security for the SLS Notes. Stream and SLS executed a security agreement which authorized

SLS to take control of Stream's assets to satisfy the SLS Notes in the event Stream defaulted.

Between 2011 and 2014, Shadron Stastney ("Mr. Stastney"), the principal of SLS, served as an

outside director of Stream.  He rejoined the board as Vice Chairman in 2018 in a strategic role

---

[5] *See* Exhibit D-5.

until resigning in January 2020.

Between 2014 and 2020, Stream's junior secured creditor, Hawk Investment Holdings

Limited ("Hawk"), loaned Stream more than £50 million through a series of junior secured notes

(the "Hawk Notes", and together with the SLS Notes, the "Notes"). Subject to the senior

security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and

executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy

the Hawk Notes if Stream defaulted. On January 29, 2018, Stream entered into a conversion

agreement with Hawk, whereby the parties agreed to terms pursuant to which Stream would be

permitted to convert the outstanding portion of the Hawk Notes to Stream equity (the "Hawk

Conversion Agreement"). Stream and SLS contemporaneously entered into a parallel agreement

with respect to conversion of the SLS Notes to Stream equity (the "SLS Conversion Agreement"

and together with the Hawk Conversion Agreement, the "Conversion Agreements").

### 3.    Omnibus Agreement

In March 2020, Stream was notified it was in default under the SLS and Hawk Notes. In

May 2020, Stream, Hawk, SLS, and 52 of its stockholders entered into an Omnibus Agreement

whereby Stream would transfer all of its assets to a newly formed entity, SeeCubic Inc.

("SeeCubic"), and in exchange, SLS and Hawk would no longer pursue a foreclosure, and their

claims under the Notes would be entirely extinguished. Mr. Stastney, who by then had left

Stream, formed SeeCubic as a Delaware corporation to acquire Stream's assets pursuant to the

Omnibus Agreement.

### 4.    Litigation Over the Omnibus Agreement

In September 2020, Stream filed suit against SeeCubic in the Delaware Chancery Court

to invalidate the Omnibus Agreement. Both Stream and SeeCubic moved for preliminary

injunctions whereby Stream sought to prevent SeeCubic from taking any actions to enforce the
Omnibus Agreement, and SeeCubic sought to compel Stream's compliance therewith.  In
December 2020, the Delaware Chancery Court issued an opinion finding that SeeCubic was
entitled to injunctive relief and barring Stream from failing to comply with the Omnibus
Agreement.  In September 2021, the Delaware Chancery Court granted SeeCubic's motion for
summary judgment (the "Summary Judgment Order"), declaring the Omnibus Agreement to be
valid and entering a permanent injunction preventing Stream from interfering with the
agreement.

In November 2021 Stream appealed the Delaware Chancery Court's ruling,[6] alleging that
the Delaware Chancery Court erred because Stream's unambiguous certificate of incorporation
required the approval of Stream's Class B stockholders for Stream's entry into the Omnibus
Agreement.  In June 2022, the Delaware Supreme Court vacated the Summary Judgment Order
on the grounds that the Omnibus Agreement was invalid without the approval of Stream's Class
B Stockholders.  The Delaware Supreme Court also found that (1) Hawk was a secured creditor
of Stream, (2) Stream had pledged all of its assets as security for the more than $50 million
Hawk lent to Stream, and (3) the Hawk Notes were executed in conjunction with security
agreements authorizing Hawk to take control of Stream's assets to satisfy the Hawk Notes if
Stream defaulted.

On remand, in September 2022, the Delaware Chancery Court ordered the parties to
unwind the Omnibus Agreement but confirmed that Hawk's and SLS's rights remained intact.

---

[6] On November 10, 2021, the Delaware Chancery Court issued an Order Entering Partial Final Judgment
Under Rule 54(b) (the "Partial Final Judgment Order"), effectively making the rulings in the Summary
Judgment Order final in order to permit appeal, finding that even though SeeCubic's conversion claim
remained unresolved, there was "no risk that after addressing [whether the Omnibus Agreement was
valid] on appeal, the Delaware Supreme Court might have to revisit the same issue in an appeal from a
final trial-level adjudication." *See* First Day Declaration, at Exhibit X.

In its opinion, the Court held that because the Omnibus Agreement did not validly transfer legal title of Stream's assets to SeeCubic and that SeeCubic would be required to transfer back to Stream the equity placed in the operating subsidiary, Technovative.

### 5.  Stream's Prior Bankruptcies

While the Omnibus Agreement litigation was playing out, on February 24, 2021, Stream filed a voluntary chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court").  On May 17, 2021, the Delaware Bankruptcy Court dismissed the case as a bad faith filing.  After dismissal, on May 23, 2021, three of Stream's purported unsecured creditors, including Rembrandt, filed an involuntary Chapter 7 bankruptcy petition against Stream.  On June 10, 2021, the Delaware Bankruptcy Court again dismissed the involuntary bankruptcy action as a bad faith filing, and imposed a twelve-month bar on Stream re-filing for bankruptcy.

### 6.  Mr. Rajan's Formation of VSI

Mr. Rajan formed Visual Semiconductor, Inc. ("VSI") in 2022, purportedly as a vehicle to raise new capital and support Stream.  Upon formation, Mr. Rajan was the CEO of VSI.  Mr. Rajan and members of his family are minority economic shareholders in VSI but have the majority of voting stock.

### 7.  The Proxy Notice, Marshaling Directive and Section 225 Action

On October 17, 2022, after ownership of the Technovative shares was transferred to Stream, in furtherance of the unwinding of the Omnibus Agreement, Hawk issued a Proxy Notice, purportedly pursuant to its rights under the Hawk Notes, to remove Mr. Rajan as the sole director of Technovative and replace him with Mr. Stastney. Hawk further directed Stream to marshal its collateral to prepare for a sale under the Uniform Commercial Code in order to

satisfy the outstanding indebtedness (the "Marshaling Directive").  Stream refused to comply
with the Proxy Notice and Marshaling Directive, arguing that it had converted Hawk's secured
debt to Stream equity pursuant to the Hawk Conversion Agreement, and therefore Hawk no
longer possessed secured creditor rights pursuant to which it could issue the Proxy Notice or the
Marshaling Directive.

On the same date, Hawk responded by filing the Section 225 Action to resolve whether
Hawk validly appointed Mr. Stastney as the sole director of Technovative as of October 17,
2022.  On October 20, 2022, the Delaware Chancery Court entered an order providing that,
pending resolution of the Section 225 Action, Technovative was to operate according to the
status quo, and by separate order, appointing a receiver to operate Technovative on a day-to-day
basis (the "Receiver").

On November 13, 2022, Hawk moved for summary judgment in the Section 225 Action
on the issue of whether Stream defaulted under the Hawk Notes.  On November 29, 2022, the
Delaware Chancery Court issued a decision finding that, notwithstanding the Supreme Court
Opinion's reversal of the legal determination that the Omnibus Agreement was valid, the
underlying factual findings were undisturbed, such that Stream was collaterally estopped from
challenging whether (1) the Notes are valid and binding obligations of Stream; (2) Stream is in
default under the Notes; (3) Hawk may exercise the "Secured Creditor Rights" under the Notes,
including issuance of the Proxy Notice; (4) as of November 10, 2021, the Hawk Notes had not
been converted or satisfied; and (5) any conversion of the Hawk Notes must be supported by new
money, which had not occurred as of November 10, 2021 (the "Collateral Estoppel Opinion").

Trial in the Section 225 Action was scheduled to commence on March 23, 2023, but was
stayed by the filing of the Debtors' instant bankruptcy petitions.

B.    **Debtors' Pending Bankruptcy Cases**

1.    **The Filing of the Petitions**

The Debtors each filed voluntary bankruptcy petitions (each, a "Petition" and together, the "Petitions") under chapter 11 of the Bankruptcy Code on March 15, 2023.[7]  Notwithstanding the dispute to be litigated over who is the rightful director of Technovative, Mr. Rajan signed both Stream's Petition and Technovative's Petition as Director.[8]  The Corporate Resolutions attached to each of the Petitions identified Mr. Rajan as a Director, Secretary and Chief Executive Officer of Stream and Technovative, respectively, and he executed the Corporate Resolutions as Secretary of each entity.

Attached to Stream's Petition was Official Form 204, setting forth a list of its 20 largest non-insider unsecured creditors.  Those creditors held purported claims totaling over $14 million.[9]  Attached to Technovative's petition was its Official Form 204, which listed only Rembrandt, with a claim purported claim of $10,000,000.00.

2.    **Hawk's Stay Relief Motion**

Less than one week after the Petitions were filed, on March 20, 2023, Hawk filed the Hawk Stay Relief Motion.  Hawk seeks relief from stay to proceed with the Section 225 Action against the Debtors in the Delaware Chancery Court.  Hawk argues the Section 225 Action was

---

[7] Bankr. Docket No. 1; Bankr. Case No. 23-17064, Docket No. 1.

[8] On May 4, 2023, Stream filed an amended bankruptcy Petition, executed by Mr. Rajan as CEO and Director.  Bankr. Docket No. 186.  The amended Petition made two changes to the initial Petition.  First, it responded in the affirmative to Question 12, asking whether the debtor owns or has possession of any real property or personal property that needs immediate attention, and by attachment references the Bonding Equipment (defined *infra*) located in China.  Second, in response to Question 15 regarding its estimated assets, it reduced the range of value from $500,000,001-$1 billion to $100,000,001-$500,000,000.

[9] On April 12, 2023, the Office of the United States Trustee (the "U.S. Trustee") filed a statement stating that an unsecured creditors' committee had not been appointed due to lack of response from unsecured creditors regarding serving on a committee.  Bankr. Docket No. 100.

days away from trial when the Petitions were filed, and the Delaware Chancery Court is already

intimately familiar with the dispute between Hawk and the Debtors and the governing Delaware

law.  Hawk asserts that the Section 225 Action will resolve issues of state law that, while

fundamental to the Debtors' bankruptcy cases, are most efficiently and appropriately resolved by

the Delaware Chancery Court, including (i) who was the rightful director of Technovative pre-

petition, and therefore whether Technovative's bankruptcy filing was authorized (the

"Technovative Director Issue"), and (ii) whether Stream's secured debt to Hawk was converted

to equity pre-petition (the "Debt Conversion Issue").[10]

On April 5, 2023, the Debtors objected to the Hawk Stay Relief Motion (the "Debtors'

Stay Relief Objection").[11]  The Debtors argue that Hawk's purpose in prosecuting the Section

225 Action is to obtain a declaration that it can exercise rights as a purported secured creditor of

Technovative, enabling it to conduct a sale of Technovative's assets under Article 9 of the

Uniform Commercial Code (and "Article 9 Sale").  The Debtors argue that even if Hawk were to

obtain such a declaration, it would be prohibited by the automatic stay from exercising any such

rights absent further stay relief, and that such a sale would eviscerate the Debtors' primary

assets, consisting of intellectual property held by their subsidiaries.  Rembrandt filed a joinder to

the Debtors' Stay Relief Objection.[12]

On April 14, 2023, the Court held an initial hearing on the Hawk Stay Relief Motion and

---

[10] Hawk argues that rulings by the Delaware Chancery Court will "result in a complete resolution of
issues surrounding (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS
Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any
current defense to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future
conversion of the Hawk Notes," which Hawk asserts are "all critical to the resolution of these Chapter 11
cases."  Hawk Stay Relief Motion, at 21.

[11] Bankr. Docket No. 78.

[12] Bankr. Docket No. 101.

determined that disputed facts would require an evidentiary trial.  That trial (the "Trial") was initially scheduled to commence on May 22, but was then rescheduled to June 26.

### 3.    Debtors' Stay Violation Motion

On March 28, 2023, the Debtors filed an emergency motion seeking enforcement of the automatic stay (the "Stay Violation Motion")[13] and imposition of related sanctions against SeeCubic and SCBV, as well as certain entities and individuals purportedly acting on their behalf (the "SeeCubic Parties").  In general, the Debtors asserted that SeeCubic and SCBV were exercising possession and/or control over certain bonding equipment (the "Bonding Equipment") of the Debtors located at a warehouse in China, which the Debtors asserted was essential to their ability to receive client orders and commence production of their Ultra-D products.  The Stay Violation Motion asserted that SeeCubic and SCBV, at the direction of Mr. Stastney, were interfering with the Debtors' repossession and relocation of the Bonding Equipment, in violation of the automatic stay and the Delaware Supreme Court's decision directing the unwinding of the Omnibus Agreement.  The Stay Violation Motion also asserted that SeeCubic and SCBV, at the direction of Mr. Stastney, were exercising possession and control over other Stream assets (the "Other Stream Assets"), including Ultra-D demonstrator samples, engineering assets, laptops, and intellectual property and software, in violation of the automatic stay.

On April 5, 2023, the Debtors filed an amended stay violation motion (the "Amended Stay Violation Motion").[14]  In addition to their assertions regarding SeeCubic and SCBV's interference with and control over the Bonding Equipment and Other Stream Assets, the Debtors asserted that Mr. Stastney, SLS, SeeCubic, and Hawk had initiated proceedings in Amsterdam

---

[13] Bankr. Docket No. 49.

[14] Bankr. Docket No. 76.

"to take certain measures preventing Debtors from managing its subsidiaries." The Debtors

sought a directive from the Court that the SeeCubic Parties' possession and control over the

Bonding Equipment and Other Stream Assets was to cease, and such estate property was to be

turned over to the Debtors.[15]

On April 7, 2023, Debtors filed a supplement to the Amended Stay Violation Motion (the

"Stay Violation Supplement"),[16] asserting that Mr. Stastney, SLS, SeeCubic, and Hawk had filed

a joint legal action (the "Amsterdam Action"), apparently different from the summary

proceeding described in the Amended Stay Violation Motion, seeking the removal of Mr. Rajan

as a director and CEO of Stream's Dutch subsidiaries, in further violation of the automatic stay.

On April 12, 2023, SeeCubic objected to the Stay Violation Motion and the Amended

Stay Violation Motion,[17] asserting that the Bonding Equipment and Other Stream Assets were

not property of Debtors' estates, and even if they are, mere possession did not constitute

violation of the automatic stay because it does not apply to the non-debtor Dutch subsidiaries.

Hawk filed a joinder in support of SeeCubic's objection.[18]

The Court held an initial hearing on the Stay Violation Motion on April 14, 2023. With

respect to the portions of that motion related to the Other Stream Assets and the Amsterdam

Action, the Court reserved ruling pending additional information and evidence.[19] With respect to

the Bonding Equipment, on July 13, 2023, the Court entered an order appointing my colleague,

---

[15] The Amended Stay Violation Motion did not seek specific relief with respect to the Amsterdam proceedings that were assumedly the reason for the amendment.

[16] Bankr. Docket No. 90.

[17] Bankr. Docket No. 105.

[18] Bankr. Docket No. 106.

[19] The Debtors followed with another emergency motion on April 18, 2023, seeking withdrawal of the Amsterdam Action in advance of a scheduled April 20 hearing in the Netherlands. Bankr. Docket No. 125. The Amsterdam court, however, thereafter postponed the scheduled hearing.

Case 2:24-cv-02727-JMG    Document 19-1    Filed 02/18/25    Page 320 of 341

Case 23-10763-amc    Doc 5-835-1    Filed 06/29/24    Entered 06/29/24 15:51:31    Desc Main
Document    Page 312 of 978
Exhibit    Page 312 of 978

Judge Mayer, to mediate that dispute.[20]  To the Court's knowledge, this dispute remains in
mediation.

### 4.    Hawk's Section 1112/1104 Motion

On April 6, 2023, Hawk filed the Section 1112/1104 Motion.  As noted *supra* and
discussed in greater detail *infra,* the motion seeks either conversion or dismissal of the Debtors'
bankruptcy cases pursuant to §1112(b) of the Bankruptcy Code, or alternatively, the appointment
of a chapter 11 trustee to administer the Debtors' bankruptcy cases pursuant to §1104(a) of the
Bankruptcy Code.

With respect to conversion or dismissal, Hawk argues that there are three statutorily-
grounded bases for converting or dismissing the cases under §1112(b) of the Bankruptcy Code.
First, Hawk argues there has been substantial and continuing loss to the Debtors' bankruptcy
estates without likelihood of rehabilitation, as contemplated by §1112(b)(4)(A).  Second, Hawk
argues there has been gross mismanagement of the estates, as contemplated by §1112(b)(4)(B).
Third, Hawk argues the Debtors have engaged in the unauthorized use of cash collateral, as
contemplated by §1112(b)(4)(D).[21]  In addition to these statutory grounds for finding cause to
convert or dismiss, Hawk argues the Debtors lacked good faith in filing their bankruptcy cases,
providing an alternate grounds for dismissal under §1112(b).  Finally, Hawk argues that
Technovative's bankruptcy filing was unauthorized because Mr. Rajan was replaced as a director
of Technovative prior to its Petition being filed, and therefore could not have authorized the
filing on behalf of the entity.  After asserting that multiple grounds exist for conversion or
dismissal, Hawk argues in the Section 1112/1104 Motion that the Court should dismiss the

---

[20] Bankr. Docket No. 294.

[21] As discussed *infra,* Hawk did not address the unauthorized use of cash collateral in its post-trial brief,
and therefore the Court understands Hawk to no longer be asserting this basis for conversion or dismissal.

Debtors' cases with prejudice, rather than convert them, because it would alleviate any fears of
the Debtors refiling, the Debtors are non-operational, and the both conversion and dismissal will
likely conclude with the sale of the Debtors' equity in their subsidiaries.[22]

With respect to the appointment of a chapter 11 trustee, Hawk asserts that even if the
Court is not inclined to convert or dismiss the Debtors' cases, cause exists to appoint a trustee
based on the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and
gross mismanagement of the Debtors' businesses.  Hawk further argues that Mr. Rajan has
engaged in self-dealing for the benefit of VSI that has led to irreconcilable acrimony between the
Debtors' management and several stakeholders.

On May 8, 2023, the Debtors filed an opposition to the Section 1112/1104 Motion (the
"Debtors' Section 1112/1104 Opposition").[23]  Rembrandt also filed an opposition to the Section
1112/1104 Motion (the "Rembrandt Section 1112/1104 Opposition").[24]

As was the case with the Hawk Stay Relief Motion, the Section 1112/1104 Motion was
scheduled to be heard at the Trial commencing on May 22, and subsequently rescheduled to June
26.

### 5.    Debtors' Expedited Motion to Approve Employee Obligations

On April 21, 2023, the Debtors filed an expedited motion (the "Employee Obligations

---

[22] As discussed *infra,* since filing the Section 1112/1104 Motion, Hawk's position has evolved, in that it
now seeks conversion of the Debtors' cases rather than dismissal.

[23] Bankr. Docket 196.  The Debtors filed an initial response to the Section 1112/1104 Motion on April 10,
2023, *see* Bankr. Docket No. 94, based on and contesting Hawk's request that the motion be heard on an
expedited basis.  The Court held an initial hearing on the motion on April 14, 2023, at which time it set a
briefing schedule and a trial date.  The Debtors' Section 1112/1104 Opposition was filed in accordance
with that briefing schedule.

[24] Bankr. Docket No. 193.

Motion")[25] seeking authority to make certain payments the Debtors characterized as employee

obligations.

First, the Debtors sought authority to pay various obligations in connection with the

employees of SCBV, including payroll, taxes, paid leave, benefits payments, etc.[26]  According to

the motion, there were 28 full-time, salaried employees of SCBV at the time of filing.  The

Debtors claimed that there were no pre-petition amounts owing to these employees, but that post-

petition payroll was about $180,000 per month.  The motion also sought to pay (a) six

independent contractors $193,000 for pre-petition services, as well ongoing post-petition fees of

$46,000 per month, (b) post-petition payroll taxes of $149,000 per month, (c) payroll processing

fees of $9,000 per month, and (d) pension contributions of $43,000 per month.  The Debtors also

sought to pay approximately $20,000 in pre-petition reimbursable business expenses to SCBV

employees.

The Employee Obligations Motion, however, sought additional relief unrelated to current

employee and independent contractor obligations.  It also sought authority to re-hire nine U.S.-

based Stream employees that purportedly left after the Delaware Chancery Court's Omnibus

Agreement decision in 2020, and who are now employed by VSI.  In connection with re-hiring

them, the Debtors sought to pay those employees approximately $30,000 in pre-petition wages

owed (subject to the $15,150 cap on pre-petition wages under §507(a)(4)).  The Debtors also

sought to pay certain independent service providers both pre-petition amounts owed, in the

amount of approximately $30,000 owed to one provider, and ongoing post-petition amounts of

approximately $10,000 per month.  The Debtors further sought to pay the re-hired employees'

---

[25] Bankr. Docket No. 134.

[26] The motion required expedited treatment because the post-petition compensation Debtors sought to pay
SCBV employees was coming due just four days later, on April 25.

post-petition payroll taxes of approximately $10,000 to $12,000 per month, as well as the pre-petition payroll taxes owing as necessary, up to $178,000. The Debtors also sought to reinstate their paid leave program and benefit plans at a cost of approximately $23,000 per month, as well as pay approximately $267,000 in unreimbursed pre-petition business expenses.

In addition to the U.S.-based former Stream employees, the Debtors also sought to re-hire three Taiwan-based Stream employees who purportedly left after the Delaware Chancery Court's 2020 Omnibus Agreement decision as well, and who are also now employed by VSI. In connection with these former employees, the Debtors sought authority to pay post-petition payroll costs of $7,000 and medical plan costs of about $3,000, but did not believe there were any pre-petition amounts owed. The Debtors also sought authority to pay approximately $3,000 in unreimbursed pre-petition business expenses.

Finally, the Debtors stated that they had been using 15 independent contractors in China for various services through an entity called ST4M, Inc. The Debtors sought authority to establish a Beijing-based subsidiary to employ these 15 individuals as full-time employees. The gross payroll would be approximately $22,000 monthly, and the Debtors would also be required to pay approximately $29,000 quarterly for a state-sponsored health-plan.

As discussed *infra,* the Court held an emergency hearing on the Employee Obligations Motion on April 24, but limited its consideration to whether and what payments to current SCBV employees were needed on an expedited basis.

### 6.    Debtors' Expedited Stock Sale Motion

On the same day that they filed the expedited Employee Obligations Motion, the Debtors filed an expedited motion for authority to sell up to $10 million in unissued shares of Stream's

Class A common stock to VSI to fund their post-petition operations (the "Stock Sale Motion").[27]
The Stock Sale Motion represented that VSI, formed by Mr. Rajan as a vehicle to raise new
capital for Stream and to support Stream while fighting the transfer of Stream's assets pursuant
to the Omnibus Agreement, had made pre-petition strategic investments in Stream, in addition to
having engaged key Stream employees.  Per the Stock Sale Motion, VSI was prepared to fund
the Debtors' post-petition product development and supply chain, but "as compensation for this
support" Stream had entered into an exclusive distribution agreement (the "Distribution
Agreement") whereby VSI would accept orders from and make delivery to third-party
customers, issue a purchase order to Stream for 90% of the value of the third-party order, and
retain the 10% difference as "margin for funding technical, business, and sales development."
The Debtors represented that VSI would also assist with "productization of electronics," and
asserted that the 10% fee was "industry standard for distribution agreements."

Together with the Debtor's expedited Employee Obligations Motion, the Court held an
emergency hearing on the Stock Sale Motion on April 24, as discussed *infra.*

### 7.  Debtors' Emergency Financing Motion and Seecubic's Proposed Alternative Funding

As will be discussed in further detail *infra,* on April 25, 2023, the Debtors filed an
emergency motion for the approval of debtor-in-possession financing from VSI as an alternative
to the proposed sale of stock to VSI, in order to fund the SCBV payroll obligations coming due
the following day.[28]  On the same day, SeeCubic filed an alternative funding motion that would
have compelled SCBV, or alternatively the Debtors, to borrow under an existing line of credit
from SeeCubic that had been put in place while the Receiver was managing Technovative and its

---

[27] Bankr. Docket No. 135.

[28] Bankr. Docket No. 156.

subsidiaries, including SCBV.[29]  Later that day, the Court held an eight-hour emergency hearing

on the alternative funding proposals that ended at approximately 11:00 p.m., after which it

determined that neither proposal would be approved.

### 8.    Debtors' Motion to Retain Thomas Park as Chief Financial Officer

On June 14, 2023, the Debtors filed a motion seeking authority to enter into an

employment agreement with Thomas Jung Ho Park ("Mr. Park") as Chief Financial Officer to

the Debtors (the "Park Retention Motion").[30]  The Debtors asserted in the Park Retention Motion

that, given their need to raise capital and the complexity of their businesses and structure of their

debt, it was necessary to have an experienced CFO to support the Debtors' financial operations

and successfully navigate the Debtors' businesses during their Chapter 11 cases and post-

emergence from bankruptcy.  Although the Debtors asserted that their entry into the employment

agreement with Mr. Park was within the ordinary course of their business, and therefore did not

require approval of the Court, after discussions with the United States Trustee the Debtors filed a

revised motion to employ Mr. Park on July 18, 2023.[31]

On July 25, 2023, Hawk filed an objection to the Park Retention Motion. In its objection,

Hawk argued that the Debtors neither provided a basis justifying the need for Mr. Park's

employment nor have the Debtors established that Mr. Park is not a disinterested person for the

purposes of §327 of the Bankruptcy Code. A hearing on the Park Retention Motion was

originally scheduled for August 16, 2023, but has been continued a number of times to allow for

Trial and other more pressing contested matters to go forward.

---

[29] Bankr. Docket No. 155.

[30] Bankr. Docket No. 234.

[31] Bankr. Docket No. 298.

9. **Debtors' Motion to Continue Trial Due to Mr. Rajan's Hospitalization**

On June 16, 2023, the Debtors filed an expedited motion to continue the Trial on the Hawk Stay Relief Motion and the Section 1112/1104 Motion, scheduled to commence on June 26.[32] The Debtors represented that Mr. Rajan was hospitalized after suffering a recent injury, and upon his medical provider's instruction, would be unable to participate in or attend Trial, whether remotely or in-person, nor would he be able to attend, remotely or in-person, his deposition. The Debtors therefore sought a continuation of the commencement of Trial for 45 days to allow Mr. Rajan to recuperate sufficiently to participate. Hawk objected to the continuation request, citing the prejudice a further delay would cause, and asserting that Mr. Rajan's absence would not affect the outcome to the extent the pending motions entailed strictly legal issues, as opposed to factual issues requiring testimony from Mr. Rajan. On June 21, 2023, the Court held an expedited hearing on the Debtors' continuance request, at which time it determined that Trial would proceed on June 26 to allow the parties to commence with the presentation of evidence, but that Trial would need to be continued to allow Mr. Rajan to recuperate sufficiently to be deposed and testify.

Trial then commenced from June 26 to June 29, and was subsequently continued on August 15 and 17, and again on September 22 and 25, to permit Mr. Rajan's recuperation and participation.

10. **Debtors' Amendment to Stock Sale Motion**

On June 23, 2023, the Debtors filed an amendment to their Stock Sale Motion (the "Stock Sale Motion Amendment").[33] The Debtors informed the Court that they had continued to

---

[32] Bankr. Docket No. 236.

[33] Bankr. Docket No. 258.

explore the sale of Class A common stock of Stream to third parties, one of which was a Chinese

company named Zhongsheng Group Holdings Ltd. ("Zhongsheng").  As a result, the Debtors had

entered into a non-binding term sheet with Zhongsheng on June 6, 2023 (the "Zhongsheng Term

Sheet"), pursuant to which Zhongsheng would invest $300 million in Stream through the

purchase of Stream Class A shares.

As discussed in further detail *infra*, a wave of motion practice followed the Stock Sale

Motion Amendment, and it later became one of the primary issues in the Trial.

### 11.    Debtors' Adversary Proceeding and TRO Motion

On August 12, 2023, with the resumption of Trial days away and in the midst of

contested hearings regarding discovery over the Zhongsheng Term Sheet, the Debtors filed an

adversary action ( the "Adversary Action") against a host of parties, including, among others,

Hawk, SLS, SeeCubic, and Mr. Stastney (collectively, the "Defendants").[34]  In their Complaint in

the Adversary Action, the Debtors allege that the Defendants have engaged in an effort to (a)

sabotage the Debtors' exercise of certain debt-to-equity conversion rights held against the

secured debtholders, (b) vitiate the Debtors' recapitalization, which would have rendered certain

Defendants' debt instruments obsolete; (c) restrict and/or interfere with the Debtors' ability to

raise funds and sell products, and (d) use their status as secured lenders to deny Stream the assets

and other business resources essential to its successful reorganization.

On September 1, 2023, the Debtors filed a motion in the United States District Court for

the Eastern District of Pennsylvania (the "District Court") to withdraw reference of the

Adversary Action from this Court.[35]  The Debtors followed that on September 28, 2023 with an

---

[34] Bankr. Docket No. 335; Adv. Pro. Docket No. 1.

[35] On November 16, 2023, the District Court denied the Debtors' request to withdraw the reference.  *See*
Case No. 23-mc-135, at Docket No. 18.

emergency motion in the District Court (the "TRO Motion") for a temporary restraining order, preliminary injunction, and permanent injunction.  The District Court denied the motion on the grounds that it was not properly filed in the District Court absent withdrawal of the reference of the Adversary Action.  Therefore on September 30, 2023, the Debtors refiled the TRO Motion in the Adversary Action before this Court.[36]

By the TRO Motion, the Debtors assert that Mr. Stastney testified in mid-September in the Amsterdam Action, during which he admitted that SeeCubic is in direct competition with Stream, and is currently working with twelve or thirteen customers using the Ultra-D technology developed by Stream.  Stream alleges that this action by SeeCubic puts its technology licenses with Philips and Rembrandt at risk because they strictly prohibit sub-licensing.  The Debtors further argue that SeeCubic's unauthorized use of the Philips and Rembrandt technology, as embedded in Stream's technology, violates the Philips and Rembrandt licenses and presents the potential of irreparable harm to Stream should Philips and Rembrandt decide to revoke their respective licenses.

The Court held a contested evidentiary hearing on the TRO Motion over the course of multiple days in October and November, after which the Court provided the parties certain dates in December that were available for the conclusion of the hearing, and directed that they confer regarding their mutual availability.  The parties thereafter advised the Court that they had agreed to postpone continuation of the TRO hearing, as well as multiple other matters that were scheduled for hearing in December, until late January or early February to pursue settlement discussions.  On December 14, the Court held a status hearing with the parties to discuss the impact of the proposed continuation on the status of the TRO hearing.  The Court determined

---

[36] Adv. Pro. Docket No. 27.

that the entry of a limited temporary restraining order was warranted, based strictly on the

evidence presented at the TRO hearing to that point and in light of the lengthy delay that

continuation of the hearing would cause to the Court's final resolution of the matter.  The Court

directed Debtors' counsel to prepare an agreed form of order reflecting the Court's ruling at the

status hearing.  Indicative of the acrimony that has stalled progress in this case at nearly every

turn, the parties subsequently advised the Court that they were unable to reach agreement

regarding the terms of a proposed order.  The Court therefore prepared an Order consistent with

its ruling at the December 14 status hearing, which was entered on January 4, 2024.[37]

### 12.   Trial on the Pending Motions

Commencing on June 26, the Court held Trial over eight days, concluding on September

25.  During the Trial, the Court heard testimony from Mr. Stastney, Mr. Park, Mr. Rajan, and

Christopher Michaels of Rembrandt.  Approximately 130 exhibits were admitted into evidence.[38]

### 13.   The Parties' Positions After Trial

At the Court's direction, Hawk, the Debtors, and Rembrandt submitted post-trial briefs

(each a "Post-Trial Brief") setting forth their positions in light of the evidence presented at

Trial.[39]

### a.   The Section 1112/1104 Motion

---

[37] Adv. Pro. Docket No. 119.

[38] The transcripts of the Trial span nearly 2,000 pages, which is merely a fraction of the pages of transcripts that have accumulated from all of the contested hearings the Court has had to hold in these cases.

[39] Although Rembrandt submitted post-trial briefing in opposition to the two pending motions, the arguments therein relate largely to Rembrandt's history with the Debtors and its position with respect to the Rembrandt license.  Although the Rembrandt license is a central feature of these cases, it does not factor into the Court's analysis below regarding whether conversion, dismissal, or appointment of a trustee is warranted and whether cause exists to grant Hawk stay relief for resolution of the Technovative Director Issue and the Debt Conversion Issue.  The Court therefore will not summarize Rembrandt's arguments here.

Hawk argues that the Court should order conversion of the Debtors' cases to chapter 7 for
any of three independent reasons.[40]

First, Hawk argues that the evidence established that conversion is warranted under
§1112(b)(4)(A), based on the substantial or continuing losses to the Debtors' estates and no
reasonable prospect at rehabilitation.[41]  According to Hawk, the record evidence established that
the Debtors are incurring substantial losses during the pendency of these cases in the form of
accruing administrative expenses and post-petition payment obligations to Rembrandt, without
any offsetting revenue, and have no reasonable likelihood of rehabilitation because they have
never had any operations, as all of the value lies in their non-debtor operating subsidiaries (and
to the extent Mr. Rajan testified regarding the Debtors' operations, these are actually taking place
at the VSI level).

Next, Hawk argues that the evidence established conversion is warranted under
§1112(b)(4)(B), based on the Debtors' gross mismanagement of the estates.[42]  Hawk argues that
the evidence at Trial established the Debtors' gross mismanagement in a number of ways: (a)
Mr. Rajan's breach of his fiduciary duties and conflicts of interest; (b) the Debtors' lack of

---

[40] In its Post-Trial Brief, Bankr. Docket No. 431, Hawk does not address its argument in the Section
1112/1104 Motion that conversion or dismissal is warranted under §1112(b)(4)(D), based on the Debtors'
unauthorized use of cash collateral.  *See* Hawk Post-Trial Brief, at 42 (arguing that there are three bases
under §1112(b) under which the Court can order conversion here: (i) substantial or continuing loss or
diminution of the estate and absence of reasonable likelihood of rehabilitation under §1112(b)(4)(A); (b)
gross mismanagement of the estate under §1112(b)(4)(B); and (c) lack of good faith in filing the
Petitions).  In its Post-Trial Reply Brief, Bankr. Docket No. 436, Hawk acknowledges that it has not
identified any cash collateral the Debtors used without permission, but attributes that to the Debtors'
failure to adhere to their financial reporting and disclosure obligations.  *Id.* at 14. While the Court is not
clear that Hawk is even advancing this basis for conversion or dismissal given its omission from the
Hawk Post-Trial Brief, Hawk's concession in its reply brief seems to end the inquiry, and the Court
therefore does not address it further herein.

[41] Hawk Post-Trial Brief, at 44-47.

[42] *Id.* at 48-57.

candor to the Court and interested parties; (c) the Debtors' "blatant gamesmanship" in their requests for relief in this Court and the litigation that has ensued; and (d) likely fraud in the fabrication of a purported funding transaction.

Finally, Hawk argues that the evidence established conversion is warranted based on the Debtors' bad faith in commencing these cases.[43] Hawk argues that the timing of the Debtors' Petitions alone establishes *per se* bad faith because they were filed on the eve of trial in the Section 225 Action as a bad faith litigation tactic. Hawk further argues that under the totality of the circumstances test used in the Third Circuit, twelve of the fourteen factors used support a finding of bad faith.

Hawk argues that conversion of the Debtors' cases, rather than dismissal, is warranted so that the Court may continue to oversee them but curtail Mr. Rajan's influence in administering them.[44] Barring conversion, Hawk argues that dismissal is appropriate because the existence of cause has been established under §1112. If, however, the Court is not inclined to either convert or dismiss, Hawk argues the evidence establishes that appointment of a trustee is proper based on Mr. Rajan's pattern of fraud and dishonesty in managing the Debtors, his gross mismanagement not only of the estates, but also of the pre-petition Debtors, and the conflicts of interest between Mr. Rajan and his roles with and interests in the Debtors and VSI that have revealed themselves through the administration of these cases.[45] Hawk argues that the costs of appointing a trustee "are effectively nil" because Mr. Rajan's administration of the estates to date has been so

---

[43] *Id.* at 57-61.

[44] *Id.* at 62. The Court notes Hawk's request for conversion rather than dismissal represents a change from its preference for dismissal with prejudice as stated in the Section 1112/1104 Motion, but is consistent with the evolved position Hawk took in its pre-trial brief filed in May. *See* Bankr. Docket No. 195, at ¶¶23 to 42.

[45] *Id.* at 64-67.

harmful to creditors' prospects for recovery.

The Debtors argue that Hawk has failed to establish by a preponderance of the evidence that cause exists for conversion, dismissal, or the appointment of a trustee.[46]

First, the Debtors argue the evidence does not establish the absence of a reasonable likelihood of rehabilitation.  The Debtors assert that their proposed plan of reorganization,[47] the post-petition purchase orders they have procured, and Mr. Rajan's testimony at Trial regarding expected revenues to be generated from new and existing Stream customers belie Hawk's narrative of a non-operating entity that has no ability to rehabilitate.[48]  Moreover, the Debtors argue, the evidence does not establish substantial or continuing loss to the estates because operating expenses are being funded by VSI in exchange for Stream shares.[49]

The Debtors also argue that the evidence does not establish gross mismanagement of the estates supporting conversion or dismissal.  The Debtors assert that their efforts to obtain financing from VSI to fund operations pursuant to the Debtor DIP Motion were the subject of "extreme resistance" that ultimately resulted in the Court declining to approve the financing, and that they have retained Mr. Park to provide independent oversight of the Debtors' post-petition finances and internal systems, thereby buffering management of the estates with "another layer of independence to the Debtors' management team."[50]

With respect to Hawk's argument that the Petitions were filed in bad faith, thereby providing another basis for conversion or dismissal, the Debtors argue that the cases were filed to

---

[46] Debtors Post-Trial Brief, Bankr. Docket No. 432, at 2-3.

[47] *See* Bankr. Docket No. 293.

[48] Debtors Post-Trial Brief, at 11-16.

[49] *Id.* at 17-19.

[50] *Id.* at 19-21.

provide breathing room and to develop a plan of reorganization, not as a litigation tactic solely
for purposes of staying the Section 225 Action.[51]

Just as they argue there is no basis for conversion or dismissal, the Debtors argue there is
no basis for the appointment of a trustee.  The Debtors cite Mr. Rajan's experience as a
businessman, his intimate familiarity with the Debtors' business and related technology, and the
post-petition retention of Mr. Park as reasons for finding that the Debtors' estates are better
administered by current management.[52]

### b.    The Hawk Stay Relief Motion

Hawk argues that cause exists to grant relief from stay to allow the Section 225 Action to
proceed because its resolution "will determine: (1) the amount and priority of the claims in
respect of the Hawk Notes and the SLS Notes, (2) the validity of the liens securing the Hawk
Notes and the SLS Notes, (3) the resolution of any available defense(s) to the Hawk Notes and
the SLS Notes, and (4) the requirements for any potential future conversion of the Hawk Notes –
all critical to the resolution of these Chapter 11 cases."[53]  Relying on Mr. Stastney's Trial
testimony regarding the late stage at which the Section 225 Action was when the Petitions were
filed, the expenses that had been incurred getting to that point, and the extensive discovery that
had been undertaken, Hawk argues that a quick resolution by the Delaware Chancery Court
would be efficient and conserve judicial and estate resources.

The Debtors, in response, argue that relief from stay is not warranted.  The Debtors first
argue that Hawk has failed to articulate the exact relief and specific matters that it seeks to

---

[51] *Id.* at 22-26 (arguing that "virtually none" of the factors set forth in *Primestone Inv. Partners v.
Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.),* 272 B.R. 554, 557 (D.De. 2002) for analyzing
whether a filing was in bad faith are present here).

[52] *Id.* at 27.

[53] Hawk Post-Trial Brief, at 62-63.

pursue in the Section 225 Action.[54]  Furthermore, they argue, the ultimate relief sought in that

action is to authorize Hawk to exercise rights under the Hawk Notes and the SLS Notes,

including pursuit of an Article 9 Sale of their purported collateral.[55]  Hawk cannot do so, the

Debtors argue, without resolution of the dispute regarding Stream's rights in connection with

ownership of 100% of Technovative shares, which are undisputedly estate property and therefore

subject to resolution by this Court rather than the Delaware Chancery Court.[56]  The Debtors

further argue that allowing the Section 225 Action to proceed would greatly prejudice the

Debtors by allowing Hawk to move forward with its plans to effectuate a sale of downstream

assets, thereby inflicting irreparable harm on the Debtors' ability to effectuate an orderly

reorganization process.  The Debtors also argue that they have strong defenses in the Section 225

Action, militating against relief.

## III.    DISCUSSION

### A.    Cause Exists and It Is In the Best Interest of Creditors and the Estates at This Stage to Appoint a Chapter 11 Trustee

#### 1.    Legal Standard for Dismissal or Conversion Under §1112(b)

Section 1112(b)(1) of the Bankruptcy Code sets forth the Court's power to convert or

dismiss a chapter 11 bankruptcy case:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest,
> and after notice and a hearing, the court shall convert a case under this chapter to a case
> under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of
> creditors and the estate, for cause unless the court determines that the appointment under
> section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

11 U.S.C. §1112(b).  The movant bears the initial burden to demonstrate cause by a

---

[54] Debtors Post-Trial Brief, at 28.

[55] *Id.*

[56] *Id.* at 29.

preponderance of the evidence, and once shown, the burden shifts to the debtor to establish an

exception under §1112(b)(2).[57]  *In re Dr. R.C. Samanta Roy Institute of Science Technology,* 465

Fed. Appx. 93, 96-97 (3d Cir. 2011) ("[O]nce cause is found, the burden shifts to the opposing

party to show why dismissal or conversion would not be in the best interests of the estate and the

creditors."); *In re Mann Realty Assocs.,* 2019 WL 4780937, at *6 (M.D. Pa. Sept. 30, 2019)

("After cause is established, the burden shifts to the opposing party to identify unusual

circumstances that suggest conversion would not be in the best interests of the estate and its

creditors, and that there is a reasonable likelihood that a reorganization plan will be confirmed in

a reasonable time.");  *In re Vascular Access Centers, L.P.,* 611 B.R. 742, 761 (Bankr. E.D. Pa.

2020) (citing cases).

The Bankruptcy Code sets forth a non-exclusive list of circumstances that constitute

"cause" for conversion or dismissal.  11 U.S.C. §1112(b)(4).  As discussed *supra,* Hawk's Post-

Trial Brief focuses on two of these circumstances: (A) substantial or continuing loss to or

diminution of the estate and the absence of a reasonable likelihood of rehabilitation; and (B)

gross mismanagement of the estate.

A motion filed under §1112(b) necessitates a two-step analysis: (1) to determine if cause

exists to either dismiss the case or convert it to chapter 7, and (2) if so, which option is in the

best interests of creditors and the estate (unless appointment of a trustee under §1104 is in the

best interests).  *Camden Ordnance*, 245 B.R. at 798.  In considering whether to convert or

---

[57] Section 1112(b)(2) provides that the court may not convert or dismiss a case if the court finds and
identifies unusual circumstances establishing that converting or dismissing the case is not in the best
interests of creditors and the estate and the debtor or a party in interest establishes (1) there is a reasonable
likelihood a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or,
if not applicable, within a reasonable period and (2) the grounds for converting or dismissing the case
include an act or omission of the debtor other than under paragraph (4)(A) for which there exists a
reasonable justification for the act or omission; and that will be cured within a reasonable period of time
fixed by the court.

dismiss, a bankruptcy court may consider a variety of factors, including:

(1)    whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

(2)    whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

(3)    whether the debtor would simply file a further case upon dismissal;

(4)    the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors;

(5)    in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

(6)    whether any remaining issues would be better resolved outside the bankruptcy forum;

(7)    whether the estate consists of a "single asset";

(8)    whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

(9)    whether a plan has been confirmed and whether any property remains in the estate to be administered;

(10)    whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns; and

(11)    consideration of the effect of dismissal under §349 of the Bankruptcy Code.

*In re Ramreddy, Inc.,* 440 B.R. 103, 115 (Bankr. E.D. Pa. 2009) (citing 7 COLLIER ON

BANKRUPTCY ¶1112.04[6]).

Although §1112(b)(4)'s enumerated circumstances constituting cause are wide-ranging, a

court may consider other factors as they arise and may use its equitable powers to reach an

appropriate result in individual cases.  *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.,* 245

B.R. 794, 798 (E.D. Pa. 2000) (quoting *Mechanical Maintenance, Inc.,* 128 B.R. 382, 386 (E.D.

Pa. 1991)).  For example, it is well-settled that a debtor's inability to achieve confirmation of a

plan, by itself, provides sufficient cause for dismissal or conversion of a chapter 11 case. *See,
e.g., 1121 Pier Village LLC,* 635 B.R. at 137 n.14; *In re 3 Ram, Inc.,* 343 B.R. 113, 117 n.14
(Bankr. E.D. Pa. 2006).

 Importantly, good faith is an implicit requirement in the filing of a chapter 11 bankruptcy
case, and a case not filed in good faith is subject to dismissal under §1112(b). *See, e.g., In re
SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir. 1999) (chapter 11 petitions are subject to
dismissal unless filed in good faith); *In re DCNC North Carolina I, LLC,* 407 B.R. 651, 661
(Bankr. E.D. Pa. 2009) (citing *SGL Carbon*).  The debtor bears the burden of proving good faith.
*Id.* (citing *In re PPI Enterprises (U.S.), Inc.,* 324 F.3d 197, 211 (3d Cir. 2003)).  In the business
bankruptcy context, the preservation and rehabilitation of a going concern or the maximizing of
the value of a debtor's estate for the benefit of creditors through an orderly liquidation are valid
bankruptcy purposes supporting a finding of good faith.  *Id.* (citing *In re Integrated Telecom
Express, Inc.,* 384 F.3d 108 (3d Cir. 2004)); *In re Team Systems International LLC,* 640 B.R.
296, 311 (Bankr. D. Del. 2022) ("The ultimate touchstone is whether the case is being used to
accomplish one of the basic purposes of chapter 11 – to preserve a going concern and/or to
maximize the property available to satisfy creditor claims.").  Whether a case should be
dismissed for lack of good faith is committed to the discretion of the bankruptcy court, and the
determination is a fact-intensive inquiry based on the totality of the circumstances.  *Id.* at 662
(citing *Integrated Telecom*).  The inquiry is facilitated, however, by factors courts use, the
presence of which suggests a case was not filed in good faith:

 (1) the debtor has few or no unsecured creditors;

 (2) there has been a previous bankruptcy petition by the debtor or a related entity;

 (3) the prepetition conduct of the debtor has been improper;

(4)     the petition effectively allows the debtor to evade court orders;

(5)     there are few debts to non-moving creditors;

(6)     the petition was filed on the eve of foreclosure;

(7)     the foreclosed property is the sole or major asset of the debtor;

(8)     the debtor has no ongoing business or employees;

(9)     there is no possibility of reorganization;

(10)    the debtor's income is not sufficient to operate;

(11)    there was no pressure from non-moving creditors;

(12)    reorganization essentially involves the resolution of a two-party dispute;

(13)    a corporate debtor was formed and received title to its major assets immediately before the petition; and

(14)    the debtor filed solely to create the automatic stay.

*Id.* (citing *In re SB Properties, Inc.,* 185 B.R. 198, 204 (E.D. Pa. 1995)).

As discussed *supra,* the preservation and rehabilitation of a going concern is a valid bankruptcy purpose supporting a finding of good faith, and the determination of whether a case should be dismissed for lack of good faith is a fact-intensive inquiry based on the totality of circumstances.

### 2.     It Has Been Established by a Preponderance of the Evidence and the History of These Cases that Current Management's Actions and Inactions Constitute Gross Mismanagement of the Estates

Section 1112(b)(4)(B) provides that cause for conversion or dismissal exists where there has been gross mismanagement of the estate. 11 U.S.C. §1112(b)(4)(B). A debtor-in-possession owes a fiduciary duty to its creditors, and gross mismanagement is a breach of that duty. *In re Ozcelebi,* 639 B.R. 365, 388 (Bankr. S.D. Tex. 2022). Section 1112(b)(4)(B) focuses on the conduct of the *estate's* affairs, not the pre-petition debtor's, and requires that the mismanagement

be gross in character, meaning that it is "'glaringly noticeable usually because of inexcusable badness or objectionableness.'" *In re 210 West Liberty Holdings, LLC,* 2009 WL 1522047, at *5 (Bankr. N.D. W.Va. May 29, 2009) (citing *Webster's Ninth New Collegiate Dictionary* 538 (1991)); see also *Ozcelebi,* 639 B.R. at 388 ("[W]hile 'gross mismanagement' is not defined by the Bankruptcy Code, Black's Law Dictionary defines 'gross' as 'beyond all reasonable measure; flagrant.' Given the plain language, a debtor's mismanagement must be beyond all reasonable measure.").

The above summary outlining the major activity in these cases, which have been pending for months, evidences the acrimony and overall lack of progress that has plagued these cases from their inception. Rather than moving expeditiously toward confirmation of a reorganizational plan that addresses creditor claims and formulates the Debtors' operations moving forward, these cases have stalled at virtually every turn. The Court has expressed its concern with the cases' lack of progress and direction on multiple occasions. Furthermore, the evidence at Trial on the pending motions crystalized the Court's primary and urgent concern with the administration of the Debtors' cases to date, *i.e.,* the plans, trustworthiness, and motivations of Mr. Rajan in his role as, for all intents and purposes, the singular figure in the Debtors' management. There are many examples, large and small, that highlight (a) the Court's lack of faith in Mr. Rajan's ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court, (b) the relatively directionless nature of these cases to date, and (c) the entrenched acrimony between the Debtors, Hawk, SLS, and SeeCubic that has permeated the cases and driven nearly all activity to date. The Court discusses the most glaring examples below.

### a.    All Indications Are That the Purported $300 Million Transaction with Zhongsheng Was Not Real

From the early days of these cases, the Court repeatedly raised concerns about how the Debtors were being funded. Although the Debtors attempted to answer that question in part with an ill-conceived emergency financing through the sale of stock to VSI, they later proposed a $300 million transaction for the sale of Stream Class A stock to Zhongsheng. That transaction was suspect from the start given its timing on the eve of Trial, lack of detail, and non-binding nature, but the dearth and opacity of information the Debtors provided about it at Trial when pressed, together with their abandonment of the proposed transaction, leads this Court to believe it never truly existed, and either embellished or fabricated to portray the Debtors' cases and operations as sufficiently progressing.

The Debtors filed the purported Zhongsheng Term Sheet on the evening of June 23, i.e., the Friday prior to the start of the Trial on the pending Hawk Motions.[58] That term sheet, which states that it is non-binding, provides that Zhongsheng will invest $300 million in exchange for Class A Common Stock in Stream, resulting in Zhongsheng holding a 35% equity stake in Stream.[59] Attached to the Term Sheet was a draft Subscription Agreement providing for Zhongsheng's purchase of the Stream shares, with an initial $15 million tranche to be sold by an unspecified date in July 2023, and the balance of the sale to occur by December 31, 2023. According to the Debtors, they intended to use the first $30 million received from the sale of

---

[58] The Term Sheet was filed as an attachment to a two-page pleading styled as an amendment to the Stock Sale Motion. Incredibly to the Court, the Debtors stated their position therein that they believed the relief sought by the Stock Sale Motion was broad enough to cover the sale of $300 million in Stream shares to Zhongsheng, but were filing the amendment out of an abundance of caution. The Court questions whether the post-petition sale of $300 million in equity in a debtor could ever be covered under an ordinary course of business concept, but it is enough to say that it certainly is not here.

[59] See Bankr. Docket No. 258-1.

Stream's Class A shares to fund their operations through confirmation. As such, the Zhongsheng

transaction was to fund the Debtors through the issuance of Stream securities rather than the

incurrence of debt.

The authenticity of this transaction, however, quickly began to grow murky, particularly

in light of the amount of the purported investment and its importance to the Debtors' cases. Mr.

Park testified at Trial less than a week later, on June 29, that he understood Zhongsheng to be a

publicly traded entity on Hong Kong's Hang Seng Index, involved in the high-end auto

dealership business but with a finance arm as well.[60] Mr. Park wanted to make clear, however,

that he was not involved in any negotiations with Zhongsheng related to the Term Sheet, despite

serving as CFO and being tasked with raising capital for the Debtors. Instead, the negotiations

were handled by Mr. Rajan, and Mr. Park had not discussed the proposed deal with Mr. Rajan

notwithstanding its enormous size and implications for the Debtors' finances.[61]

Following Mr. Park's testimony, Hawk sought more information about the Zhongsheng

Term Sheet through discovery, and ultimately filed a motion to compel the Debtors to produce

information sufficient to permit Hawk to depose a Zhongsheng representative about the

purported transaction (the "Motion to Compel").[62] By the Motion to Compel, Hawk made clear

that it sought the information in order to, among other things, "evaluate the veracity of the Term

Sheet."[63] Although the Court denied the Motion to Compel, it entered an order (the "Discovery

---

[60] June 29, 2020 Hearing Transcript, 55:5 to 55:15.

[61] *Id.* at 55:21 to 56:9. The idea that Mr. Park, as CFO, would not even discuss the proposed deal with
Mr. Rajan, let alone be involved in the negotiations, is indicative of its specious nature, or otherwise
speaks to the marginal role Mr. Park plays with the Debtors despite Mr. Rajan being their only other
employee.

[62] CR-242.

[63] *See* Motion to Compel, at ¶17.