| | |
|---|---|
| REMBRANDT 3D HOLDING, LTD, <br><br>　　　　Appellant, <br><br>v. <br><br>STREAM TV NETWORKS, INC. & TECHNOVATIVE MEDIA, INC., <br><br>　　　　Debtors-in-Possession, <br><br>and <br><br>WILLIAM HOMONY, *et al.,* <br><br>　　　　Trustees. | Bankruptcy Appeal <br><br>Civil No. 2:24-cv-02727-JMG <br><br>Appeal Related to Case No. 23-10763-AMC in the United States Bankruptcy Court for the Eastern District of Pennsylvania – 9019 Motion |
| VISUAL SEMICONDUCTOR, INC. & REMBRANDT 3D HOLDING, LTD, <br><br>　　　　Appellants, <br><br>v. <br><br>STREAM TV NETWORKS, INC. & TECHNOVATIVE MEDIA, INC., <br><br>　　　　Debtors-in-Possession, <br><br>and <br><br>WILLIAM HOMONY, *et al.,* <br><br>　　　　Trustees. | Bankruptcy Appeal <br><br>Civil No. 2:24-cv-06617-JMG <br><br>Appeal Related to Case No. 23-10763-AMC in the United States Bankruptcy Court for the Eastern District of Pennsylvania |

**APPELLANT REMBRANDT 3D HOLDING LTD.'S**
**<u>REPLY BRIEF ON APPEAL</u>**

DEVLIN LAW FIRM LLC
Andrew DeMarco (SBN 326294)

1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
ademarco@devlinlawfirm.com

BROWN & MICHAELS, PC
Christopher Michaels (*pro hac vice* admission to be applied for)

4th Floor, 118 North Tioga Street
Ithaca, NY 14850
(607) 236-2000
michaels@bpmlegal.com

*Attorneys for Rembrandt 3D Holding Ltd.*

i

# **TABLE OF CONTENTS**

| | | |
|---|---|---|
| A. | The Paper Tiger: A Façade of Protection | 2 |
| B. | The Bankruptcy Court's Decisions Were Unsupported and Contradictory | 5 |
| C. | Possession and Control Coupled with Equitable Title Equates to Ownership | 7 |
| D. | Appellee Cannot Dismiss the Criminal Implications Under 18 U.S.C. § 1832 | 11 |
| E. | Appellee's Flawed Argument that Section 365(n) Did Not Apply | 13 |
| F. | CONCLUSION | 15 |

Appearances can be deceiving. Appellee's claim that the Asset Purchase Agreement ("APA"[1]) and Sale Order fiercely protect third-party intellectual property (IP) rights, explicitly excluding Rembrandt's trade secrets from the 363 sale. Yet, the APA provides little more than a hollow assurance that falls apart under scrutiny. While they may seem imposing on paper, the claimed protections of Rembrandt's trade secrets lack any real substance.

The record reveals a troubling reality: the APA and its supposed "protections" for Rembrandt, as estate licensor, did nothing and SeeCubic was able to gain unrestricted access to, possession of, and continued use of Rembrandt's valuable trade secrets without a license. This converts the APA's exclusion clause from a safeguard into a Trojan horse, allowing SeeCubic as the Stalking Horse to acquire indirectly what it was expressly forbidden to purchase directly. The very existence of this paper tiger exposes the Bankruptcy Court's error in approving the 9019 Settlement Agreement and the Sale Order. By granting credence to the mere appearance of protection without examining its practical efficacy through proper proceedings, the Bankruptcy Court committed reversible error by letting the Stalking Horse sneak past what should have been the sturdy gates of intellectual property protections.

---

[1] Capitalized terms not expressly defined herein shall have the meaning ascribed to them in Appellant Rembrandt 3D Holding Ltd's Opening Brief on Appeal filed at 2:24-cv-02727-JMG, ECF No. 18.

1

The APA and Sale Order also did not adequately protect Rembrandt as an estate licensee. The Bankruptcy Court had an obligation to analyze the estate's licensing obligations to Rembrandt, even if Section 365(n) was not explicitly raised. Section 365(n) allows licensees to retain their rights even if the debtor-licensor rejects the license agreement. The bankruptcy court cannot simply exclude an estate obligation in licensing IP to Rembrandt, as happened here.

The integrity of the bankruptcy process and the protection of third-party IP rights hang in the balance here. Rembrandt urges this Court to look beyond the façade, acknowledge the Bankruptcy Court's errors in relying on impractical paper protection and a poorly developed evidentiary record, and take decisive action to safeguard Rembrandt's legitimate interests.

### A.     The Paper Tiger: A Façade of Protection

The cornerstone of Appellee's response – the APA's exclusion of Rembrandt's trade secrets and IP license – is nothing more than a paper tiger. The APA utterly failed to prevent the improper transfer of assets containing Rembrandt's trade secrets, including critical prototypes and source code, to SeeCubic during the bankruptcy proceedings, which SeeCubic possesses and controls today. The "exclusion" of assets containing Rembrandt's trade secrets in the APA was not properly enforced. SeeCubic gained possession and control of these assets, rendering the 363 sale agreement ineffective. This unauthorized control through the debtors'

2

subsidiary, SeeCubic BV, which SeeCubic now owns by way of the sale, undermines the legitimacy of the bankruptcy proceedings. The Trustee and Bankruptcy Court made insufficient effort to segregate the prototypes and source code, resulting in the improper transfer of protected assets regardless of what the Sale Order indicates. The Disclosure Schedules identify source code for Depth Ranging Tuning (DRT), algorithms, Ultra-D software and firmware, and Screen Inventory that implement Rembrandt's trade secrets. ECF No. 810. The transfer of control of these assets among others to the Stalking Horse directly contradicts the purported exclusions in the APA.

Appellee's arguments focus on the legal structure of the transaction rather than disputing Rembrandt's factual claim concerning SeeCubic's access to and use of the trade secrets. Appellee does not directly address or counter Rembrandt's specific assertion that SeeCubic actually accessed, utilized, and now possesses Rembrandt's trade secrets. This noticeable omission makes obvious that Rembrandt's trade secrets were improperly included in the sale, even though they were excluded on paper. SeeCubic gained access to and now controls Rembrandt's trade secrets, undermining Appellee's claim that the sale only involved debtor-owned assets. Consequently, SeeCubic cannot be deemed a "good faith" purchaser under Section 363, as it knowingly took possession of excluded assets (Rembrandt's trade secrets). It also supports Rembrandt's argument that an adversary proceeding

3

was required to determine ownership of the assets (or portions thereof) and bifurcate such as needed prior to their transfer.[2] The absence of a rebuttal illustrates the uncertainty on the Trustee's part about what was actually being transferred. It also reinforces Rembrandt's claim that its IP rights were not adequately protected as mandated by the Bankruptcy Code.

SeeCubic's acquisition of the prototypes through an estate subsidiary it already controlled prior to its sale circumvents the explicit exclusions in the 363 agreement. This maneuver violates the approved 363 sale terms and indicates bad faith on the buyer's part. The Trustee and Bankruptcy Court failed to properly separate the prototypes and source code from the estate, resulting in the improper transfer of protected assets that should have been excluded from the sale. The Bankruptcy Court's approval of the sale, without thoroughly examining how SeeCubic acquired the prototypes, reveals a lack of adequate scrutiny of both the sale process and its practical consequences. This demonstrates that the legal form of the transaction took priority over its reality, and the Bankruptcy Court erred by not looking beyond the superficial nature of the APA's exclusion clause to address the substantive violation of Rembrandt's intellectual property rights.

Contrary to Appellee's assertion, Appellants have presented substantial

---

[2] Rembrandt commenced an adversary proceeding on December 4, 2024. Adversary Proceeding No. 24-00142-DJB. A hearing on the Trustee's motion to dismiss (ECF No. 3) is scheduled on April 2, 2025.

4

evidence of collusion between SeeCubic and the Trustee, as well as attempts to take unfair advantage. The record shows that SeeCubic, through its principal Shadron Stastney, maintained unauthorized possession and control of the estate prototypes containing Rembrandt's trade secrets throughout the bankruptcy proceedings, in violation of multiple court orders. A-265-269. The Trustee was aware of this improper possession yet failed to take any action to recover the assets or prevent their inclusion in the sale. *See id*. This constitutes clear evidence of collusion between SeeCubic and the Trustee to facilitate the transfer of non-estate property. To get around the paper tiger, the Trustee allowed the transfer to occur before the sale. SeeCubic did not have a license from Rembrandt to access its trade secrets nor did it want one despite its CEO, Shadron Stastney, testifying that SeeCubic was pursuing a sub-licensing business model. *See,* A-777 (discussing the testimony of Mr. Stastney). The Bankruptcy Court's failure to address these issues, despite Rembrandt's repeated objections, further supports the conclusion that SeeCubic cannot be deemed a good faith purchaser under Section 363(m).

### B. The Bankruptcy Court's Decisions Were Unsupported and Contradictory

Appellee's argument that the Bankruptcy Court's decisions were well-supported by the factual record and that the Trustee acted in the best interests of the debtors and their creditors is undermined by the Trustee's failure to engage an intellectual property expert to properly assess Rembrandt's claims prior to the sale.

5

This oversight is particularly glaring given the complex nature of the trade secret issues involved in this case. The Trustee's own application to employ an IP attorney, filed on November 21, 2024, explicitly acknowledged the need for specialized expertise to evaluate these matters. Specifically, paragraph 12 of the application stated:

> A review of the pleadings filed in the Litigation Cases, and interviews conducted by the Trustee of the Debtors' principals, Debtors' counsel, and Debtors' litigation counsel and certain creditors of the Debtors have revealed that the Litigation Cases, particularly the District Court Case, and the potential sale of the Debtors' assets raise potentially complex issues relating to intellectual property, and trade secrets. In order to properly assess those issues the Trustee has determined that he requires the services of counsel who has expertise and experience in handling such matters.

ECF No. 813. This admission by the Trustee clearly demonstrates his awareness of the trade secret issues at stake and the potential implications for the sale. However, despite recognizing this need, the Trustee proceeded with the sale without the benefit of the expert's analysis. The Court did not approve the application to employ an IP attorney until December 16, 2024 – a full week after the sale order had been issued. The timing of these events demonstrates a lack of thoroughness in the Trustee's due diligence and the inadequacy of his assessment of Rembrandt's claims. By failing to engage an IP expert prior to the sale, the Trustee overlooked critical aspects of Rembrandt's trade secrets and their potential impact on the value and transferability of the Debtors' assets. A proper effort to protect these interests would have included

6

a thorough evaluation before proceeding with the sale. The failure to do so indicates that the factual record upon which the Bankruptcy Court based its decisions was incomplete.

Furthermore, the Bankruptcy Court's issuance and repeated extension of a Temporary Restraining Order (TRO) specifically enjoining the Stalking Horse and others from any action that would impact Rembrandt's license further underscores the critical nature of Rembrandt's trade secrets in this case. A2160-66. The TRO explicitly placed Rembrandt's license at the forefront of the court's concerns, demonstrating the court's recognition of its importance to the overall proceedings. Notably, the Bankruptcy Court continued to extend the TRO even after issuing the Sale Order, a clear indication that the court acknowledged the ongoing significance of protecting Rembrandt's license rights throughout the sale process and beyond. This repeated affirmation of the TRO's importance stands in stark contrast to the court's approval of a sale that potentially jeopardizes those very rights the TRO was designed to protect. The Court's contradictory actions – extending a TRO to protect Rembrandt's license while simultaneously approving a sale that may infringe upon it – raise serious questions about the propriety of the Sale Order.

    **C.**     **Possession and Control Coupled with Title Equates to Transfer without Authorization**

The Bankruptcy Court did not adequately consider that Rembrandt's trade secrets are so intertwined with the transferred assets that ownership of Rembrandt's

7

trade secrets effectively passed despite the APA's carve-outs. By emphasizing that only equity interests in subsidiaries were being sold, Appellee tacitly acknowledges that Rembrandt's trade secrets are indeed intertwined with the assets of debtor's estate. This inseparability means that transferring control of the Debtors' Ultra-D technology effectively transfers control of the embedded trade secrets.

The Rembrandt trade secrets were so intertwined with the transferred prototype and source code assets that ostensibly passed "free and clear" that ownership of Rembrandt's trade secrets effectively passed as well, despite broad APA § 2.2 carve-outs. The two are inseparable. Attempting to achieve a clean separation is impractical and unrealistic without court oversight. Appellee does not dispute that Stream's Ultra-D, technology that drove SeeCubic's interest in the 363 acquisition, is inextricably linked to Rembrandt's trade secrets. As evidenced by the Settlement Agreement, which allowed Stream to use Rembrandt's IP for the benefit of the parties, it is impossible to transfer Ultra-D without also transferring Rembrandt's trade secrets. A-478. Rembrandt provided list of documentary evidence supporting the proof of development of 175 trade secrets that were disclosed to the Eindhoven Team and Stream. A-1395-1416. Plaintiff notes that in the SDNY litigation and the current bankruptcy litigation, no one provided any evidence or testimony disputing Rembrandt's claims. Not a single word of testimony or a single document has been submitted contesting the mountains of evidence

8

provided by Rembrandt.

The complexity of the technology and the Stalking Horse's unauthorized possession during the proceedings of estate assets embodying Rembrandt's trade secrets render the paper protections idealistic and impractical. The sale is far from a "clean" 363 sale.

SeeCubic's possession and control of Rembrandt's trade secrets during the bankruptcy proceedings, combined with it obtaining ownership of the subsidiary that transferred the assets containing the trade secrets, was an inappropriate and unauthorized transfer. By possessing the trade secrets throughout the proceedings, SeeCubic obtained a practical unauthorized transfer of these assets despite their purported exclusion from the sale on paper. By acquiring all equity in the subsidiary that transferred the assets and holds source code containing the trade secrets, SeeCubic gained inappropriate access to Rembrandt's trade secrets when they should have transferred back to the license holder, Stream.

Hence, the concept of "possession is 9/10 of the law" applies to SeeCubic's acquisition of Stream's subsidiary that had possession of the trade secrets licensed to Stream.  When equitable title was transferred from Stream to SeeCubic, the trade secrets should have been removed from the subsidiary and returned to Rembrandt. SeeCubic was under a temporary restraining order preventing them from interfering with Rembrandt's license to Stream.

By allowing SeeCubic to gain both possession of Rembrandt's trade secrets and ownership of the subsidiary holding those secrets, the court created a situation where it is extremely difficult for Rembrandt to enforce its rights or reclaim its intellectual property. Yet, even without possession, the Trustee agrees that purchasing equitable title to SCBV results in a transfer of SCBV's property. A275 at 20 ("Whether or not it's the Debtor's property or SeeCubic B.V.'s property, that bonding equipment is being transferred."). By allowing SeeCubic to gain both possession of the trade secrets and legal rights to the subsidiary holding them, the Court has effectively sanctioned a permanent transfer of Rembrandt's intellectual property without authorization or proper consideration. This has resulted in a *de facto* transfer without appropriate legal process constituting reversible error.

Contrary to the Appellee's assertion, the ownership of Rembrandt's trade secrets was never in bona fide dispute. Rembrandt's ownership of its trade secrets was clearly established and acknowledged throughout the proceedings and specifically acknowledged by Stream in the Disclosure Statement it filed. The Chief Executive Officers of Rembrandt, Stream and SeeCubic have all previously affirmed Rembrandt's IP rights by signing term sheets in from of Magistrate Judge Parker or signing the Settlement and License Agreement. The APA itself explicitly excluded "any grant of rights or license by Rembrandt [] or affiliates to Stream" from the assets being sold. A077. This exclusion inherently recognizes Rembrandt's

10

ownership of the intellectual property in question. The issue Appellee is alluding to is whether Rembrandt's trade secrets were improperly included in or commingled with estate assets, not whether Rembrandt owned them in the first place. The Trustee's failure to properly inventory and segregate Rembrandt's intellectual property does not create a bona fide dispute as to ownership. By mischaracterizing the nature of the dispute, Appellee attempts to justify the transfer of Rembrandt's trade secrets.

D.  **Appellee Cannot Dismiss the Criminal Implications Under 18 U.S.C. § 1832**

Appellee's attempt to dismiss the criminal implications under 18 U.S.C. § 1832 is misguided and fails to address the serious nature of the transfer of Rembrandt's trade secrets. While Appellee claims this argument was not properly raised before the bankruptcy court, the record shows that Rembrandt's counsel raised the issue of potential criminal violations under 18 U.S.C. § 1832 at the Sale hearing. A-327. Additionally, Rembrandt included a disclaimer in the APA exhibits warning about potential claims under this statute. A-1621. These references, though brief, were explicit and sufficient to preserve the issue for appeal. While the Bankruptcy Court may not have jurisdiction to adjudicate criminal matters, it is afforded latitude in examining if a buyer is purchasing in good faith. *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) ("Courts applying section 363(m) (and its predecessor, Fed.R.Bankr.P. 805) have, therefore, turned to traditional equitable

11

principles, holding that the phrase encompasses one who purchases in "good faith" and for "value."") (internal citations omitted). By approving the sale without adequately addressing the trade secret concerns, the bankruptcy court inadvertently authorized a transaction that violates federal law.

Appellee argues there is no factual basis for the criminal accusations. However, this ignores the substantial evidence presented by Rembrandt that its trade secrets were inextricably intertwined with the assets being transferred. SCBV, as a wholly owned subsidiary of Stream and Technovative, currently employs Bart Barenbrug. Dr. Barenbrug had access to Rembrandt intellectual property that was eventually licensed to Stream. *See* A-1395-1416. Rembrandt has cited precise documents where the trade secrets were shared with Dr. Barenbrug. Stephen Blumenthal's declaration and Rembrandt various pleadings have provided overwhelming and incontrovertible evidence that the UltraD technology and all of Stream's products to date include Rembrandt's technology.

The fact that the APA purported to exclude Rembrandt's IP does not negate the practical reality that the trade secrets were embedded in the transferred technology. Moreover, the potential criminal implications are directly relevant to the determination of whether SeeCubic was a "good faith purchaser" under § 363(m). If SeeCubic knowingly acquired assets containing misappropriated trade secrets, any claim of good faith in the transaction is nonsense. At minimum, the serious nature

of these allegations warranted further investigation and discovery (as sought by VSI but quashed by the Trustee) before the bankruptcy court approved the sale. The court's failure to do so was an abuse of discretion.

### E.     Appellee's Flawed Argument that Section 365(n) Did Not Apply

Appellee argues that the Bankruptcy Court did not err in failing to address Rembrandt's licensee rights under section 365(n) of the Bankruptcy Code. However, this argument is flawed.

The Bankruptcy Court had an obligation to consider Rembrandt's rights to estate technology under section 365(n), even if not explicitly raised below. Section 365(n) provides critical protections for intellectual property licensees in bankruptcy cases. The Supreme Court has emphasized the importance of these protections in *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1657 (2019) ("A rejection breaches a contract but does not rescind it. And that means all the rights that would ordinarily survive a contract breach, including those conveyed here, remain in place."). Whatever "limitation[s] on the debtor's property [apply] outside of bankruptcy[ ] appl[y] inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either." D. Baird, Elements of Bankruptcy 97 (6th ed. 2014). Given the centrality of IP rights to this case, the bankruptcy court should have independently considered the applicability of section 365(n) to Rembrandt as a licensee.

13

While Rembrandt may not have used the specific words "section 365(n)" in its objections, it consistently argued that its IP rights, including inbound licensing rights, should be protected. The substance of Rembrandt's arguments implicated section 365(n), even if not cited by name. The Settlement Agreement granting Rembrandt rights to Stream's software was front and center during the proceedings. *See, e.g.*, A-217-18; A-403-04; 1045-46; 1057-58; 1077-78. The treatment of IP licenses is a pure question of law that this Court can address *de novo* on appeal.

Appellee's claim that Rembrandt's inbound licensing rights were adequately protected is unsupported. The APA and Sale Order's general language about preserving third-party rights is insufficient to address the specific protections afforded to Rembrandt by section 365(n). This provision gives licensees the option to retain their rights even if the debtor rejects the license agreement. Without explicit consideration of section 365(n), there is a risk that Rembrandt's rights could be inadvertently terminated.

The Bankruptcy Court's failure to address section 365(n) creates significant uncertainty about the status of Rembrandt's IP rights post-sale. This uncertainty undermines the entire sale process and could lead to further litigation. A proper analysis under section 365(n) was necessary to provide clarity to all parties about the treatment of Rembrandt's license in the sale. Even if Rembrandt did not explicitly invoke section 365(n) below, the issue is so central to the case that this

Court can and should consider it now.

### F. CONCLUSION

The reality of this transaction must take precedence over its legal form when determining its true nature and legal consequences. Rembrandt requests this Court to see through the illusion of the paper tiger, vacate the Sale Order, and remand for further proceedings to properly account for and protect Rembrandt's rights.

Dated: March 4, 2025

/s/ *Andrew DeMarco*
Andrew DeMarco, Esq.
PA Bar No. 326294
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

*Attorneys for Rembrandt 3D Holding Ltd.*

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies the following:

1.	The foregoing *Reply Brief of Appellant* (the "Brief") complies with: (i) the word limit of Federal Rule of Bankruptcy Procedure 8015(a)(7) because, excluding the parts of the document exempted by Federal Rules of Bankruptcy Procedure 8015(g), it contains 3,222 words; and (ii) the typeface and type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman with 14 point font.

2.	On March 4, 2025, I electronically filed the Brief with the Clerk of the Court for the United States District Court for the Eastern District of Pennsylvania by using the appellate CM/ECF system. The text of the electronic version of the Brief is identical to the text of the hard copies that will be provided.

Dated: March 4, 2025

>	*/s/Andrew DeMarco*
>	Andrew DeMarco